# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WILMINGTON TRUST, NATIONAL ASSOCIATION, as Trustee for the benefit of the Registered Holders of BBCMS Mortgage Trust 2022-C15 Commercial Mortgage Pass-Through Certificates, Series 2022-C15, acting by and through its special servicer, Rialto Capital Advisors, LLC,<br><br>       Plaintiff,<br><br>       v.<br><br>AEVRI SALINA MEADOWS LLC; HAWTHORNE PROPERTY SERVICES, LLC; and MOSHE ROTHMAN,<br><br>       Defendants. | Case No.: 1:23-cv-08824-(JPC-JLC)<br><br>Hon. John P. Cronan<br><br>**SECOND AMENDED COMPLAINT** |

Plaintiff, Wilmington Trust, National Association, as Trustee for the benefit of the Registered Holders of BBCMS Mortgage Trust 2022-C15 Commercial Mortgage Pass-Through Certificates, Series 2022-C15 ("Plaintiff" or "Lender"), acting by and through its special servicer, Rialto Capital Advisors LLC (the "Special Servicer"), for its Second Amended Complaint (the "Complaint") against defendants, alleges as follows:

## PARTIES

1.     Plaintiff Wilmington Trust, National Association, acting solely in its capacity as trustee, is a national banking association that serves as the trustee of a New York common law trust formed by a publicly available Pooling and Servicing Agreement dated as of April 1, 2022 (the "PSA").

2.     The PSA vests Plaintiff with "all right title and interest" title to the "Trust Fund," which includes scheduled mortgage loans and all related income, proceeds, rights, and remedies.

3.      The transfer of the mortgage loans and related rights to the Plaintiff is "without recourse, for the benefit of the Certificateholders" and "absolute".

4.      The Plaintiff, in turn, "by the execution and delivery of the [PSA]… declares that it holds and will hold such other assets included in the Trust Fund, in trust, for the exclusive use and benefit of all present and future Certificateholders….".

5.      Pursuant to the PSA, the Plaintiff is charged with administering the loans through servicers "authorized and empowered by the Trustee". If the Plaintiff terminates a servicer, it is obligated to assume its duties and administer the loans directly.

6.      In contrast, the beneficiary "certificateholders," do not have "any right to vote (except as expressly provided for herein) *or in any manner otherwise control the operation and management of the Trust*" nor shall anything in the PSA "*be construed so as to constitute the [beneficiaries] as partners or members of an association*…".

7.      More broadly, the Plaintiff has authority to file suit in its own name to enforce any aspect of the PSA and/or contractual rights of the trustee.

8.      Rialto Capital Advisors LLC is the special servicer for the Plaintiff and filed this action solely as a representative of the Trustee and does not have any direct stake in the litigation apart from its duties under the PSA.

9.      The Plaintiff trustee's main office as specified in its Articles of Association is located in Wilmington, Delaware. Plaintiff is therefore a citizen of Delaware.

10.     Defendant Aevri Salina Meadows LLC ("Borrower") is a limited liability company organized under the laws of the State of Delaware. Upon information and belief, Borrower maintains an address in New York at 2604 Elmwood Avenue, Suite 210, Rochester, New York 14618. Borrower is named as a defendant to extinguish all estate, right, title, fee and interest it

holds in and to certain real property located Onondaga County and commonly known as 200, 220, and 231 Salina Meadows Parkway, and 301 Plainfield Road, Syracuse, New York 13212, and designated as Section 50, Block 1, Lots 1.3, 1.6, 1.7, and 2.0 on the Tax Map for Onondaga County (the "Real Property"), together with the premises, improvements, fixtures, machinery, equipment, personalty and other rights or interests of any kind or nature located thereon (the "Personal Property," and together with the Real Property, as more particularly described in the Mortgage (as defined herein), the "Property"), and to determine its liabilities and obligations under the Loan Documents (as defined herein).

11.     The sole member of the Borrower is Aevri Salina Meadows SPE LLC ("Aevri SPE").  The sole members of Aevri SPE are Aevri Salina Manager LLC ("Aevri Manager") and Aevri Salina Investors LLC ("Aevri Investors").

12.     The sole member of Aevri Manager is Moshe Rothman.  Defendant Moshe Rothman ("Rothman") is a natural person and citizen of the State of New York, having an address at 1600 Monroe Avenue, Rochester, New York 14618.  In addition to being the sole member of Aevri Manager, Rothman is named as a defendant to obtain a judgment for amounts owed to Plaintiff in his personal capacity as a guarantor under the Guaranty (as defined herein), and to preserve Plaintiff's right to seek a deficiency judgment or other amounts for which Rothman may be liable on account of his liability and obligations under the Guaranty (as defined herein).

13.     The sole members of Aevri Investors are Kalman Rubinstein, Allen Azoulay, Hannah Gottesman, David Helfgott, Gavriel Herzig and Shenuel Friedman (collectively, the "Members").

14.     Kalman Rubinstein is natural person and a citizen of the State of the New York having an address at 1162 57th Street, Brooklyn New York 11219.

- 3 -

15.     Allen Azoulay is natural person and a citizen of the State of the New Jersey having an address at 1628 Jacks Way, Toms River, New Jersey 08701.

16.     Hannah Gottesman is natural person and a citizen of the State of the New York having an address at 650 West End Avenue, New York, New York, 10025.

17.     David Helfgott is natural person and a citizen of the State of the New Jersey having an address at 139 Ocean Avenue, Lakewood, New Jersey 08701.

18.     Gavriel Herzig is natural person and a citizen of the State of the New York having an address at 133 Edison Court., Monsey, New York 10952.

19.     Shenuel Friedman is natural person and a citizen of the State of the New Jersey having an address at 1942 White Knoll Drive, Toms River, New Jersey 08755.

20.     Accordingly, Borrower is a citizen of New York and New Jersey.

21.     Hawthorne Property Services, LLC ("Hawthorne") is a limited liability company organized under the laws of the State of New York.  Upon information and belief, Borrower maintains an address at 645 State Route 31, Bridgeport, New York 14618.  Borrower is named as a defendant to extinguish a mechanic's lien filed against the Real Property.

22.     The sole members of Hawthorne are Raymond Carney and Arthur Diamond.  Upon information and belief Raymond Carey is a natural person and a citizen of New York having an address at 645 State Route 31, Bridgeport, New York 13030.  Upon information and belief Arthur Diamond is a natural person and a citizen of New York having an address at 6659 Colton Road, La Fayette, New York 13084.  Accordingly, Hawthorne is a citizen of New York.

## JURISDICTION AND VENUE

23.     Jurisdiction over this matter properly rests within this Court pursuant to Fed. R. Civ. Pro. §1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

24.     Venue is proper in this Court pursuant to the consent of the parties and because origination of the Loan and related misrepresentations took place in this district.  28 U.S.C. 1391(b)(2); N.Y. Gen. Ob. Law 1402.

## FACTS

### A.     The Loan

25.     On or about February 16, 2022, Bank of Montreal ("Original Lender") made a loan to Borrower in the original principal amount of $25,000,000 (the "Loan").

26.     To evidence its indebtedness under the Loan, Borrower, as obligor, duly executed, acknowledged and delivered to Original Lender, as obligee, a Promissory Note dated as of February 16, 2022, in the original principal amount of $25,000,000 (the "Note").  The Note obligated Borrower to pay Original Lender, its successors or assigns, the principal sum of $25,000,000, plus interest and other amounts owing under the Loan.

27.     A true and correct copy of the Note is attached hereto as **Exhibit 1**.

28.     To secure its payment and performance obligations under the Loan, Borrower, as obligor and mortgagor, executed and delivered to Original Lender, as obligee and mortgagee, a Mortgage and Security Agreement, dated as of February 16, 2022 (the "Mortgage").  The Mortgage granted a security interest in the Property to Original Lender, its successors or assigns, to secure Borrower's obligations under the Loan.

29.     A true and correct copy of the Mortgage is attached hereto as **Exhibit 2**.

60906122

30.     The Mortgage was duly filed and recorded in the Recorder's Office of Onondaga County, New York on December 7, 2022, as Instrument No. 2022-00009536.

31.      Upon information and belief, the applicable recording taxes due, if any, were duly paid at the time of recording of the Mortgage.

32.     To further secure its payment and performance of obligations under the Loan, Borrower, as obligor and assignor, executed and delivered to Original Lender, as oblige and assignee, an Assignment of Leases and Rents dated as of February 16, 2023 (the "ALR").  The ALR granted a security interest in the Rents (as defined in the ALR) to secure Borrower's obligations under the Loan.

33.     The ALR was duly filed and recorded in the Recorder's Office for Onondaga County, New York on March 7, 2022, as Instrument No. 2022-00009537.

34.     A true and complete copy of the ALR is attached as **Exhibit 3**.

35.     As an inducement for Original Lender to make the Loan and to secure repayment of the Loan, Rothman executed and agreed to be bound by a Limited Recourse Guaranty dated as of February 16, 2022 (the "Guaranty") in favor of Original Lender, its successors or assigns.

36.     A true and correct copy of the Guaranty is attached hereto as **Exhibit 4**.

37.     Pursuant to the Guaranty, Rothman unconditionally and irrevocably guaranteed, in his personal capacity, the "punctual payment when due" of the "Guaranteed Recourse Obligations of Borrower," as defined by Article 13 of the Loan Agreement.

38.     Additional obligations concerning the collection and control of rental income from the Property are set forth in a Cash Management Agreement executed by the Borrower dated February 16, 2022 (the "CMA").

39.     A true and complete copy of the CMA is attached hereto as **Exhibit 5.**

- 6 -

40. As additional protection for the Lender, the Borrower executed and delivered a Conditional Assignment of Management Agreement dated February 16, 2022 (the "<u>Management Assignment</u>").

41. A true and complete copy of the Management Assignment is attached as **Exhibit 6**.

42. Borrower also executed and delivered to Original Lender a certain Loan Agreement dated as of February 16, 2022 (as amended, restated, or otherwise modified, the "<u>Loan Agreement</u>," and together with all other documents and agreements referred to, created, or contemplated thereunder, including but not limited to the Note, Mortgage, CMA, and Guaranty, the "<u>Loan Documents</u>"), pursuant to which the Borrower agreed to comply with additional terms, provisions, and obligations with respect to the Loan for the benefit of the Original Lender, its successors and assigns.

43. A true and correct copy of the Loan Agreement is attached hereto as **Exhibit 7**.

44. The Loan Documents are all governed by New York law and contain a choice of venue of any state or federal court located in the county of New York.

**B.      <u>Transfer of the Loan to Plaintiff</u>**

45. Plaintiff physically delivered the Note to Lender and executed an Allonge to the Note in Lender's favor on or about April 13, 2022 (the "<u>Allonge</u>").  A true and correct copy of the Allonge is affixed to the Note, which is attached hereto as **Exhibit 1**.

46. Original Lender assigned its interest in the Mortgage to the Lender by Assignment of Mortgage effective as of April 13, 2022 (the "<u>Assignment of Mortgage</u>") and recorded in the Recorder's Office of Onondaga County, New York on August 18, 2022 as Instrument No. 2022-00033776.

47.    A true and correct copy of the Assignment of Mortgage is attached hereto as **Exhibit 8**.

48.    Original Lender assigned its interest in the ALR to Lender pursuant to an Assignment of ALR effective as of April 13, 2022 (the "Assignment of ALR") and recorded in the Recorder's Office for Onondaga County, New York on August 18, 2022 as Instrument No. 2022-00033777.

49.    A true and correct copy of the Assignment of ALR is attached hereto as **Exhibit 9**.

**C.    The Borrower's Defaults**

50.    Multiple Events of Default have occurred under the terms of the Loan Documents, all as more particularly described below.

**1.    The Payment Default.**

51.    Pursuant to Section 10.1(a) of the Loan Agreement, an Event of Default exists if:

> If (A) any monthly Debt Service payment or the payment due on the Maturity Date is not paid when due, (B) any deposit to any of the Accounts required hereunder or under the other Loan Documents is not paid when due and such non-payment continues for five (5) days following notice to Borrower (it being acknowledged that no notice shall be required from Lender if such deposit was included in the monthly invoice provided to Borrower)…

52.    Borrower failed to make the regular monthly payment of interest and escrows due under the Loan Documents on April 6, May 6, and June 6, 2023.

53.    Through at least June 2023 the Borrower received monthly invoices of amounts due.

54.    By letter dated June 29, 2023 (the "Notice of Default"), Plaintiff notified Borrower that an Event of Default had occurred due to its failure to make payments as and when due under the Loan Documents.  A true and complete copy of the Notice of Default is attached as **Exhibit 10**.

60906122

55.     Borrower made a lump sum payment of $320,000 on July 3, 2023, however, the payment was insufficient pay past due interest and did not make any contribution to the past due escrow payments required under the Loan Agreement.

56.     Borrower failed to make any payment on account of the installment due on July 6, 2023.

57.     By letter dated August 2, 2023 (the "Notice of Acceleration"), the Lender exercised its right to accelerate the Loan and declare the entire debt immediately due and payable.  A true and complete copy of the Notice of Acceleration is attached as **Exhibit 11**.

58.     As of the date of this pleading, the Borrower has not made any payment since July 3, 2023.

## 2.     <u>The Cash Management Defaults</u>

59.     Section 9.1 (a) of the Loan Agreement, titled "Establishment of Certain Accounts" states that "Borrower shall, simultaneously herewith, establish an Eligible Account (the "Restricted Account") pursuant to the Restricted Account Agreement in the name of Borrower for the sole and exclusive benefit of Lender ***into which Borrower shall cause tenants to deposit all revenue generated by the Property***." (Emphasis supplied).

60.     Section 9.2 (a) of the Loan Agreement, titled "Deposits into Restricted Account, Maintenance of Restricted Account" states:

> Borrower represents, warrants and covenants that, so long as the Debt remains outstanding, (i) Borrower shall, or shall cause Manager to, deposit all revenue derived from the Property and received by Borrower or Manager, as the case may be, into the Restricted Account within two (2) Business Days of Borrower's or Manager's, as applicable, receipt thereof….
>
> Until deposited into the Restricted Account, any Rents and other revenues from the Property held by Borrower shall be deemed to be collateral and shall be held in trust by it for the benefit, and as the

property, of Lender pursuant to the Security Instrument and shall not be commingled with any other funds or property of Borrower. Borrower warrants and covenants that it shall not rescind, withdraw or change any notices or instructions required to be sent by it pursuant to this Section 9.2 without Lender's prior written consent

61.     Pursuant to Section 10.1(q) of the Loan Agreement, an Event of Default exists:

With respect to any default or breach of any term, covenant or condition of this Agreement not specified in subsections (a) through (p) above or not otherwise specifically specified as an Event of Default in this Agreement, if the same is not cured (i) within ten (10) days after notice from Lender (in the case of any default which can be cured by the payment of a sum of money) or (ii) for thirty (30) days after notice from Lender (in the case of any other default or breach)…

62.     Contemporaneous with the closing of the Loan, Lender and Borrower opened the Restricted Account required under the Loan Agreement.

63.     The Borrower initially instructed the tenants of the Property to deposit and/or deposited upon receipt all or a substantial portion of the rents.

64.     However, the Borrower almost immediately began diverting rents from the Restricted Account and has not made a single deposit to the Restricted Account since October 24, 2022.  True and complete copies of the monthly statements for the Restricted Account are attached as **Exhibit 12**.

65.     Although funds in the Restricted Account would typically be transferred to the Borrower daily, upon the occurrence of a "Trigger Period", all excess cash would be held by the Lender in an Excess Cash Flow Account as additional collateral for the Loan.

66.     Multiple Trigger Period exist and have existed since at least June 2022 based on the existence of Events of Default, a Debt Yield Trigger and Specified Tenant Trigger Period, all as defined in the Loan Agreement.

67. The most rent roll submitted by the Borrower shows annual rental income of approximately $3.3 million.

68. The 2023 budget included in the Loan Agreement projects annual operating expenses of $1,650,584.

69. Accordingly, there should be substantial net cash flow every month.

70. By letters dated August 2 and August 8, 2023, the Plaintiff demanded that the Borrower immediately resume compliance with the cash management obligations of the Loan Documents and provide and account of all amounts diverted from the Restricted Account since the origination of the Loan. True and complete copies of these letter as attached as **Exhibits 11** and **13**.

71. To date, the Borrower continues to openly disregard the Cash Management Provisions (as defined in the Loan Agreement).

**3.**     **The Financial Disclosure Defaults.**

72. Pursuant to Section 4.12(a), the Borrower is obligated to provided Lender with a certified rent roll and updated operating statement within thirty (30) days of the end of each quarter and an annual balance sheet, operating statement and statement of cash flow within eighty-five (85) days of the end of each fiscal year.

73. Further, Borrower is obligated to provide copies of the Borrower's and Guarantor's state and federal tax returns to the Lender within ten (10) days of a written request.

74. By letter dated August 8, 2023, the Plaintiff provided notice of the Borrower's failure to comply with its disclosure requirements and demanded production of the Borrower's and Guarantor's state and federal tax returns. A true and complete copy of the August 8, 2023 Financial Disclosure demand letter is attached as **Exhibit 14.**

- 11 -

75. Section 4.12(e) provides in pertinent part:

In the event Borrower fails to deliver to Lender any of the Required Financial Items within five (5) Business Days of the giving of notice by Lender or Borrower of Borrower's failure to deliver the same within the time frame specified herein (each such event a "Reporting Failure"), the same shall, at Lender's option, constitute an immediate Event of Default hereunder…

76. To date, the Borrower has failed to comply with the Plaintiff's August 8, 2023, demand.

**D. Rothman is Liable for the Full Amount Due on the Loan**

77. Paragraph 1 of the Guaranty states:

Guaranteed Recourse Obligations of Borrower. Guarantor hereby unconditionally and irrevocably guarantees to Lender the punctual payment when due, and not merely the collectability, whether by lapse of time, by acceleration of maturity, or otherwise, and at all times thereafter the payment of the Guaranteed Recourse Obligations of Borrower (hereinafter defined). As used herein, the term "Guaranteed Recourse Obligations of Borrower" shall mean all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Article 13 of the Loan Agreement.

78. Pursuant to Article 13 of the Loan Agreement, the "Guaranteed Recourse Obligations of Borrower" include the entire amount owed on the Loan if "(ii) Borrower fails to comply with any Cash Management Provisions or fails to appoint a new property manager upon the request of Lender…".

79. The Borrower has failed to comply with the Cash Management Provisions of the Loan agreement by, without limitation, (i) failing to instruct tenants to pay rent into the Restricted Account and/or rescinding such instructions without Plaintiff's consent; (ii) failing to deposit all rent received directly from tenants into the Restricted Account with two (2) business days; and (iii) failing to hold all rents collected in trust for the Lender.

- 12 -

80.     Further, paragraph 5 of the Management Assignment, titled "Lenders Right to Replace Manager" states:

> At Lender's option, Lender shall have the right to terminate the Management Agreement and replace [Manager] or require that Borrower terminate the Management Agreement and replace [Manager], without penalty or fee, if at any time during the Loan there exists:… a Trigger Period…

81.     By letter dated September 26, 2023 the Lender demanded that the Borrower replace the existing Manager, Smartcore Consulting, LLC d/b/a Mike Barney Management, with William C. Colucci of Cushman & Wakefield/Pyramid Brokerage.  A true and complete copy of the September 26, 2023 letter is attached as **Exhibit 15**.

82.     As of the date of this pleading the Borrower has not complied with Lender's demand.

**E.      The Hawthorne Mechanic's Lien**

83.     From on our about June 7, 2022, though August 15, 2022, Hawthorn provided certain materials and services to the Borrower and performed labor on the Real Property amounting to $27,748.08.

84.     The Borrower failed to pay Hawthorn.

85.     On September 15, 2022, Hawthorn filed a mechanic's lien encumbering the Real Property in the Onondaga County Clerk's Office as Instrument No. 2022-00012505 (the "Mechanic's Lien").  A true and complete copy of the Mechanic's Lien is attached as **Exhibit 16**.

**FIRST CAUSE OF ACTION**
**(Foreclosure of the Mortgage)**

86.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

- 13 -

87.     Each of the Payment Default, Cash Management Default, Financial Disclosure Defaults, among other defaults, constitutes an Event of Default under the Loan Agreement, Mortgage and other Loan Documents, which entitles Plaintiff to exercise its rights under the Loan Documents to foreclose upon the Mortgage.

88.     Pursuant to Section 8.1 of the Mortgage, upon the occurrence of an Event of Default, Plaintiff may:

> (a) declare the entire unpaid Debt to be immediately due and payable;
>
> (b) institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner…
>
> (g) seek and obtain the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any guarantor or indemnitor under the Loan or any other Person liable for the payment of the Debt…

89.     The full amount of the Debt is currently due and payable.

90.     Pursuant to Section 16.9 of the Loan Agreement, Borrower expressly waived the right to assert any counterclaims, other than compulsory counterclaims, in any action to enforce the Loan.

91.     Borrower has failed to pay the Debt.

92.     Pursuant to the Loan Documents and applicable law, the unpaid balance of Borrower's obligations under the Loan Documents, estimated as of October 1, 2023 totals at least $34,098,597.38, and includes (i) the unpaid principal amount of $25,000,000, (ii) interest at the non-default rate of 5.02% per annum ("Note Rate") in the amount of $320,722.22, (iii) separate and additional default interest at the rate of 5.00% per annum (the "Default Rate") in the amount

- 14 -

of $625,775.94, (iv) late fees in the amount of $75,727.98, (v) Property protection advances totaling $12,839.52, (vi) interest on advances in the amount of $7,172.17, (vii) payoff fee in the amount of $1,500, (viii) special servicer fees in the amount of $21,006.93, (ix) a liquidation fee in the amount of $356,591.29, and (x) estimated yield maintenance premium in the amount of $9,594,384.24, less $1,917,122.91 in funds held in suspense, reserve, or escrow accounts to be credited against any of the outstanding amounts due under the Loan.  Attorneys' fees and costs, due diligence report costs, title charges, and other amounts due and owing pursuant to the Loan Documents and applicable law continue to accrue. Interest accrues at the Note Rate of 5.02% per annum, and default interest accrues at the additional Default Rate of 5.00% per annum for a cumulative rate of 10.02% per annum.  The above amounts are estimates only and the full amount of the Debt shall be calculated at the appropriate stage of this case to reflect the total amount then due and owing under the Loan.

93.     In order to protect its security, Plaintiff may be compelled during the pendency of this action to pay charges affecting the Property.  Such sums paid by Plaintiff, together with interest thereon and any other amounts due under the Loan Documents as a result thereof, constitute part of the Debt due to Plaintiff under the Loan and Loan Documents, and, accordingly, Plaintiff requests that any such sums be added to the sums otherwise due under the Loan Documents.

94.     Each of the defendants herein have or claim to have some interest in, or lien upon the Property or some part thereof, which interest or lien, if any, is subject and subordinate to the lien of Plaintiff's Mortgage sought to be foreclosed in this action.

95.     The Mechanic's Lien is a junior encumbrance on the Real Property, subject and subordinate to the lien of the Mortgage.

96. No other action or proceeding has been commenced or maintained or is now pending at law or otherwise for the foreclosure of the Mortgage, or for recovery of the sum evidenced by the Note and secured by Mortgage or any part thereof.

97. Section 9-x of New York's Banking Law is not applicable to the parties or Loan at issue in this action.

98. All conditions precedent necessary to bring forth the claims set forth herein have been satisfied.

99. Plaintiff requests that in the event that this action proceeds to a judgment of foreclosure and sale, the Property be sold subject to the following:

(a)     Any state of facts that an inspection of the Property would disclose;

(b)     Any state of facts that an accurate survey of the Property would show;

(c)     Covenants, restrictions, easements, and public utility agreements of record, if any;

(d)     Building and zoning ordinances or codes of the municipality, or any of its agencies or instrumentalities, in which the mortgaged Property are located and possible violations of such ordinances or codes;

(e)     Any rights of lawful tenants or persons lawfully in possession of the Property;

(f)     Any equity of redemption of the United States of America to redeem the premises within 120 days from date of sale; and

(g)     Prior or superior lien(s) of record, if any.

100. Plaintiff's election to accelerate and declare immediately due and payable all unpaid amounts owing under the Loan and Loan Documents shall not be, or deemed to have been, waived, altered, released or changed by reason of any payment after the commencement of this action, and such election shall continue and remain effective.

- 16 -

## SECOND CAUSE OF ACTION
### (Judgment on the Guaranty Against Rothman)

101.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

102.     The Guaranty is a valid guaranty agreement executed by and enforceable against Rothman in his personal capacity.

103.     Rothman is a principal owner of the Borrower and materially benefitted from Lender's making of the Loan.

104.     Plaintiff is the owner and holder of the Guaranty and is entitled to all of the rights and remedies set forth therein.

105.     Pursuant to paragraph 1 of the Guaranty Rothman is personally obligated for "the punctual payment when due, and not merely the collectability, whether by lapse of time, by acceleration of maturity, or otherwise, and at all times thereafter the payment of the Guaranteed Recourse Obligations of Borrower" which includes the full amount owed on the Loan upon the occurrence of certain events specified in Section 13 of the Loan Agreement.

106.     Such events occurred in connection with the Loan as a result of Borrower's failure to comply with the Cash Management Provisions of the Loan Agreement and failure to replace the Manager upon demand by the Lender.

107.     Pursuant to, *inter alia*, Section 24 of the Guaranty, Rothman waived a broad array of defenses, counterclaims and/or offsets.

108.     Accordingly, Rothman is personally liable for the full amount of the Debt.

109.     The Guaranty also states that Rothman "shall pay on demand all attorneys' fees and all other costs and expenses incurred by Lender in the enforcement of or preservation of Lender's rights under this Guaranty…".

- 17 -

110.     Rothman, however, has failed to satisfy his obligations under the Guaranty and the amounts owing thereunder remain unpaid.

### THIRD CAUSE OF ACTION
**(Equitable Accounting and Restitution)**

111.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

112.     Pursuant to section 9.2(a) the Loan Agreement:

> Until deposited into the Restricted Account, any Rents and other revenues from the Property held by Borrower shall be deemed to be collateral and ***shall be held in trust*** by it for the benefit, and as the property, of Lender...

113.     Based on the Loan Documents, the Borrower owes a fiduciary duty to the Lender when collecting Rents.

114.     Since the inception of the Loan, the Borrower has failed to deposit Rents into the Restricted Account and/or account for the Rents.

115.     The Borrower has ignored repeated demands by the Plaintiff for it to provide an accounting of all Rents diverted from the Restricted Account and turnover of all such Rents.  *See* **Exhibit 11 and 13**.

116.     Documentary evidence exists showing that the Borrower and/or its agents knowingly and purposefully instructed tenants of the Real Property to pay Rents directly to a new account, controlled by the Borrower, rather than the Restricted Account.  Attached as **Exhibit 17** is an email filed in a pending action before the Supreme Court of Monroe County acknowledging that from at least October 2022 forward, tenants diverted Rent from the Restricted Account at the specific instruction of the Borrower's agent and that the Borrower was aware such instruction violated the Loan Documents.

**WHEREFORE**, Plaintiff respectfully requests:

- 18 -

(a)    that the defendants and all persons claiming under them, subsequent to the commencement of this action, be barred and foreclosed of and from all estate, right, title, interest, claim, lien, and equity of redemption of, in and to (A) the Property, as more particularly described in this Complaint, and each and every part and parcel thereof, including any personal property appurtenant thereto, (B) any and all leases, licenses, and/or occupancy agreements of any kind or nature in or to the Property or any portion thereof; that the Property may be decreed to be sold, according to law, in "as is" physical order and condition, subject to the items set forth in paragraph 99 of this Complaint; that the monies arising from the sale thereof may be brought into Court; that Plaintiff may be paid the amount due on the Note, Mortgage, and other Loan Documents, with interest, default interest, late charges, exit fees, and the expenses of such sale, including attorneys' fees, together with the costs, allowances, and disbursements of this action, and together with any sums incurred by Plaintiff pursuant to any term or provision of the Note, Mortgage, and other Loan Documents set forth in this Complaint or to protect the lien of the Mortgage, together with interest and default interest upon those sums accruing from the dates of the respective payments and advances, so far as the amount of such monies properly applicable thereto will pay the same; that the Borrower may be adjudged to pay the whole residue, or so much thereof as permitted under the Loan Documents or the Court determines to be just and equitable, of the debt remaining unsatisfied after the sale and the application of the proceeds pursuant to the directions contained in such judgment; that in the event Plaintiff possesses any other lien(s) against the Property either by way of judgment, junior mortgage or

otherwise, Plaintiff requests that such other lien(s) shall not be merged in Plaintiff's cause(s) of action set forth in this Complaint but that Plaintiff shall be permitted to enforce the other lien(s) and/or seek determination of priority thereof in any independent action(s) or proceeding(s), including, without limitation, any surplus money proceedings; and that Plaintiff may have such other and further relief as may be just and equitable;

(b)     that, upon application therefor, this Court forthwith appoint a receiver in accordance with the provisions of the Mortgage;

(c)     in accordance with Real Property Actions and Proceedings Law § 1371, Rothman be adjudged to pay the whole residue or so much thereof as permitted under the Guaranty and other Loan Documents, if any, or the Court determines to be just and equitable, of the debt remaining unsatisfied and deficient after a foreclosure sale of the Property and the application of the proceeds pursuant to the directions contained in such judgment;

(d)     judgment be entered in Plaintiff's favor and against Rothman, in an amount to be determined at trial, plus attorneys' fees, costs, and expenses incurred by Plaintiff in enforcing its rights under the Guaranty, and pre- and post-judgment interest at the applicable rate(s) until paid in full;

(e)     that judgment be entered directing the Borrower to provide a full accounting of all Rents collected since the inception of the Loan and to turn over all such Rents to the Plaintiff for application to the Debt; and

(f)     such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      March 4, 2024                  Respectfully submitted,

**VENABLE LLP**

By: */s/ Brent W. Procida*
    Gregory A. Cross
    Brent W. Procida
    750 E. Pratt Street, Suite 900
    Baltimore, Maryland 21202
    Tel.: (410) 244-7400
    Fax: (410) 244-7742
    bwprocida@venable.com

    Adam G. Possidente
    151 W. 42nd Street
    New York, New York 10036
    Tel.: (212) 307-5500
    Fax: (212) 307-5598
    apossidente@venable.com

    *Counsel for Plaintiff*

- 21 -

# EXHIBIT 1

Loan No.: 99020222091

## PROMISSORY NOTE

$25,000,000                                                        New York, New York

February 16, 2022

FOR VALUE RECEIVED **AEVRI SALINA MEADOWS LLC**, a Delaware limited liability company, as maker, having its principal place of business at 2604 Elmwood Avenue, Suite 210 Rochester, New York 14618 ("**Borrower**"), hereby unconditionally promises to pay to the order of **BANK OF MONTREAL**, a Canadian chartered bank operating out of its Chicago branch, having an address at c/o BMO Capital Markets Corp., 3 Times Square, New York New York 10036 (together with its successors and/or assigns, "**Lender**"), or at such other place as the holder hereof may from time to time designate in writing, the principal sum of TWENTY-FIVE MILLION AND NO/100 DOLLARS ($25,000,000), or so much thereof as is advanced, in lawful money of the United States of America, with interest thereon to be computed from the date of this Note at the Interest Rate, and to be paid in accordance with the terms of this Note and that certain Loan Agreement dated the date hereof between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**").  All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

### ARTICLE 1:  PAYMENT TERMS

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note from time to time outstanding at the rates and at the times specified in Article 2 of the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date.

### ARTICLE 2:  DEFAULT AND ACCELERATION

The Debt shall without notice become immediately due and payable at the option of Lender if any payment required in this Note is not paid on or prior to the date when due or if not paid on the Maturity Date or on the happening of any other Event of Default.

### ARTICLE 3:  LOAN DOCUMENTS

This Note is secured by the Security Instrument and the other Loan Documents.  All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein.  In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE 4:  SAVINGS CLAUSE

Notwithstanding anything to the contrary, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the Maximum Legal Rate, (b) in calculating whether any interest exceeds the Maximum Legal Rate, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender, and (c) if through any contingency or event, Lender receives or is deemed to receive interest in excess of the lawful maximum, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lender, or if there is no such indebtedness, shall immediately be returned to Borrower.

## ARTICLE 5:  NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6:  WAIVERS

Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind.  No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower or any other Person who may become liable for the payment of all or any part of the Debt under this Note, the Loan Agreement or the other Loan Documents.  No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents.  If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals comprising the partnership or limited liability company, and the term "Borrower," as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability.  If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower," as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder.  (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, limited liability company or corporation, which may be set forth in the Loan Agreement, the Security Instrument or any other Loan Document.)

2

## ARTICLE 7:  TRANSFER

Upon the transfer of this Note, Borrower hereby waiving notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE 8:  EXCULPATION

The provisions of Article 13 of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

## ARTICLE 9:  GOVERNING LAW

The governing law and related provisions contained in Section 17.2 of the Loan Agreement are hereby incorporated by reference as if fully set forth herein.

## ARTICLE 10:  NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Article 14 of the Loan Agreement.

## ARTICLE 11:  LIABILITY

If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several.

## [NO FURTHER TEXT ON THIS PAGE]

151404689v3



**IN WITNESS WHEREOF,** Borrower has duly executed this Note as of the day and year first above written.

BORROWER:

**AEVRI SALINA MEADOWS LLC**
a Delaware limited liability company

By: _____
Name: Moshe Rothman
Title:  President

## ALLONGE

ALLONGE to that certain Promissory Note dated as of February 16, 2022 in the original principal amount of $25,000,000.00, executed by AEVRI SALINA MEADOWS LLC, a Delaware limited liability company, payable to the order of BANK OF MONTREAL.

Pay to the order of WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE REGISTERED HOLDERS OF BBCMS MORTGAGE TRUST 2022-C15, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2022-C15, AND THE RR INTEREST OWNER, without recourse, representation or warranty.

Effective as of the 13th day of April, 2022.

BANK OF MONTREAL

By: _____

Name: _M,CHAEL S.B.RATICLAND_

Title: _AUTHORIZED S.ENATORY_

Reference No.: 5206.004
Matter Name Salina Meadows Office Park
Pool BBCMS 2022-C15
Allonge

# EXHIBIT 2

Loan No. 99020222091

**AEVRI SALINA MEADOWS LLC**, as mortgagor

to

**BANK OF MONTREAL**, as mortgagee

_____

**MORTGAGE AND SECURITY AGREEMENT**
_____

Dated:  As of February 16, 2022

| | |
|---|---|
| Location: | 301 Plainfield Road, Syracuse, NY |
| | 200 Salina Meadows Parkway, Syracuse, NY |
| | 220 Salina Meadows Parkway, Syracuse, NY |
| | 231 Salina Meadows Parkway, Syracuse, NY |

County:    Onondaga

PREPARED BY AND UPON
RECORDATION RETURN TO:

Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022
Attention:  Peter Doyle, Esq.

151404691v4

**THIS MORTGAGE AND SECURITY AGREEMENT** (this "**Security Instrument**") is made as of this 16th day of February, 2022, by **AEVRI SALINA MEADOWS LLC**, a Delaware limited liability company, having its principal place of business at 2604 Elmwood Avenue, Suite 210 Rochester, New York 14618, as mortgagor (together with its permitted successors and assigns, "**Borrower**") for the benefit of **BANK OF MONTREAL**, a Canadian chartered bank operating out of its Chicago branch, having an address at c/o BMO Capital Markets Corp., 3 Times Square, New York New York 10036 (together with its successors and assigns, "**Lender**"), as mortgagee. All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement (defined below).

## RECITALS:

This Security Instrument is given to Lender to secure a certain loan in the original principal amount of $25,000,000 (the "**Loan**") advanced pursuant to a certain loan agreement between Borrower and Lender (as the same may have been or may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), which such Loan is evidenced by, among other things, a certain Promissory Note executed in connection with the Loan Agreement (together with all extensions, renewals, replacements, restatements or other modifications thereof, whether one or more being hereinafter collectively referred to as the "**Note**"). The stated maturity date of the Note (exclusive of any acceleration thereof as provided in the Loan Documents) is March 6, 2022;

Borrower desires to secure the payment of the outstanding principal amount set forth in, and evidenced by, the Loan Agreement and the Note together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, the Loan Agreement, this Security Instrument or any of the other Loan Documents (defined below) (collectively, the "**Debt**") and the performance of all of the obligations due under the Note, the Loan Agreement and all other documents, agreements and certificates executed and/or delivered in connection with the Loan (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, collectively, the "**Loan Documents**"); and

This Security Instrument is given pursuant to the Loan Agreement, and payment, fulfillment, and performance of the obligations due thereunder and under the other Loan Documents are secured hereby in accordance with the terms hereof.

## Article 1 - GRANTS OF SECURITY

**Section 1.1** <u>PROPERTY MORTGAGED</u>. Borrower does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer, convey and grant a security interest to Lender and its successors and assigns in and to the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "**Property**"):

(a) <u>Land</u>. The real property described in <u>Exhibit A</u> attached hereto and made a part hereof (collectively, the "**Land**");

(b) <u>Additional Land</u>. All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by

supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument;

(c)　　Improvements. The buildings, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (collectively, the "**Improvements**");

(d)　　Easements and Other Rights. All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, excess or unused zoning floor area development rights, abatements, zoning floor area bonuses, zoning incentives or awards (including, without limitation, designation or availability of additional zoning floor area pursuant to the NYC Zoning Resolution), and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, appurtenant to, relating or pertaining to the Land and the Improvements and/or otherwise owned by or available to Borrower and the reversions and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, rights of dower, rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements, and every part and parcel thereof, with the appurtenances thereto;

(e)　　Fixtures and Personal Property. All machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures), furniture, software used in or to operate any of the foregoing and other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Land and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Land and the Improvements (collectively, the "**Personal Property**"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "**Uniform Commercial Code**"), and all proceeds and products of the above;

(f)　　Leases and Rents. All leases, subleases, subsubleases, lettings, licenses, concessions or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Land and the Improvements, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be

2

performed and observed by the other party thereto, heretofore or hereafter entered into, whether before or after the filing by or against Borrower of any petition for relief under any Creditors Rights Laws (collectively, the "**Leases**") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Property, including, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower or Manager and proceeds, if any, from business interruption or other loss of income insurance whether paid or accruing before or after the filing by or against Borrower of any petition for relief under any Creditors Rights Laws (collectively, the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(g)     Insurance Proceeds.  All insurance proceeds in respect of the Property under any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property (collectively, the "**Insurance Proceeds**");

(h)     Condemnation Awards.  All condemnation awards, including interest thereon, which may heretofore and hereafter be made with respect to the Property by reason of any taking or condemnation, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property (collectively, the "**Awards**");

(i)     Tax Certiorari.  All refunds, rebates or credits in connection with reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(j)     Rights.  The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(k)     Agreements.  All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or any business or activity conducted on the Land and any part thereof

3

and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Borrower thereunder;

(l)  Intangibles.  All tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property;

(m)  Accounts.  All reserves, escrows and deposit accounts maintained by Borrower with respect to the Property, including without limitation, the Accounts and all cash, checks, drafts, certificates, securities, investment property, financial assets, instruments and other property held therein from time to time and all proceeds, products, distributions or dividends or substitutions thereon and thereof (collectively, the "**Secured Accounts**"**);**

(n)  Proceeds.  All proceeds of any of the foregoing items set forth in subsections (a) through (m) including, without limitation, Insurance Proceeds and Awards, whether cash, liquidation claims (or other claims) or otherwise; and

(o)  Other Rights.  Any and all other rights of Borrower in and to the items set forth in subsections (a) through (n) above.

This Section 1.1 is intended to grant in favor of Lender a first priority continuing lien and security interest in all of the Property.  Borrower authorizes Lender and its counsel to file UCC financing statements in form and substance satisfactory to Lender, describing the collateral as all assets of Borrower, all Property of Borrower or using words with similar effect.

**Section 1.2**  ASSIGNMENT OF RENTS.  Borrower hereby absolutely and unconditionally assigns to Lender all of Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.  Nevertheless, subject to the terms of the Loan Agreement and Section 8.1(h) of this Security Instrument, Lender grants to Borrower a revocable license to (i) collect, receive, use and enjoy the Rents and Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums, and (ii) enforce the terms of the Leases.

**Section 1.3**  SECURITY AGREEMENT.  This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code.  The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property.  By executing and delivering this Security Instrument, Borrower hereby grants to Lender, as security for the Obligations (hereinafter defined), a security interest in the Personal Property to the full extent that the Personal Property may be subject to the Uniform Commercial Code.

**Section 1.4**  FIXTURE FILING.  Certain of the Property is or will become "fixtures" (as that term is defined in the Uniform Commercial Code) on the Land, and this Security Instrument, upon being filed for record in the real estate records of the city or county wherein such fixtures are situated, shall operate also as a financing statement filed as a fixture filing in accordance with

4

the applicable provisions of said Uniform Commercial Code upon such of the Property that is or may become fixtures.

**Section 1.5** CONDITIONS TO GRANT. TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Lender and its successors and assigns, forever; PROVIDED, HOWEVER, these presents are upon the express condition that, if Lender shall be well and truly paid the Debt at the time and in the manner provided in the Note, the Loan Agreement and this Security Instrument, if Borrower shall well and truly perform the Other Obligations as set forth in this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein and in the Note, the Loan Agreement and the other Loan Documents, these presents and the estate hereby granted shall cease, terminate and be void.

## Article 2 - DEBT AND OBLIGATIONS SECURED

**Section 2.1** DEBT. This Security Instrument and the grants, assignments and transfers made in Article 1 are given for the purpose of securing the Debt.

**Section 2.2** OTHER OBLIGATIONS. This Security Instrument and the grants, assignments and transfers made in Article 1 are also given for the purpose of securing the performance of the following (the "**Other Obligations**"): (a) all other obligations of Borrower contained herein; (b) each obligation of Borrower contained in the Loan Agreement and any other Loan Document; and (c) each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, the Loan Agreement or any other Loan Document.

**Section 2.3** DEBT AND OTHER OBLIGATIONS. Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively herein as the "**Obligations**."

**Section 2.4** PAYMENT OF DEBT. Borrower will pay the Debt at the time and in the manner provided in the Loan Agreement, the Note and this Security Instrument.

**Section 2.5** INCORPORATION BY REFERENCE. All the covenants, conditions and agreements contained in (a) the Loan Agreement, (b) the Note and (c) all and any of the other Loan Documents, are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

## Article 3 - PROPERTY COVENANTS

Borrower covenants and agrees that:

**Section 3.1** INSURANCE. Borrower shall obtain and maintain, or cause to be obtained and maintained, in full force and effect at all times insurance with respect to Borrower and the Property as required pursuant to the Loan Agreement.

**Section 3.2** TAXES AND OTHER CHARGES. Borrower shall pay all real estate and personal property taxes, assessments, water rates or sewer rents (collectively "**Taxes**"), ground

151404691v4

rents, maintenance charges, impositions (other than Taxes), and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property (collectively, "**Other Charges**"), now or hereafter levied or assessed or imposed against the Property or any part thereof in accordance with the Loan Agreement.

        **Section 3.3**    LEASES.  Borrower shall not (and shall not permit any other applicable Person to) enter in any Leases for all or any portion of the Property unless in accordance with the provisions of the Loan Agreement.

        **Section 3.4**    WARRANTY OF TITLE.  Borrower has good, indefeasible, marketable and insurable title to the Property and has the right to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the same.  Borrower possesses an unencumbered fee simple absolute estate in the Land and the Improvements except for the Permitted Encumbrances, such other liens as are permitted pursuant to the Loan Documents and the liens created by the Loan Documents.  This Security Instrument, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (a) a valid, perfected first priority lien on the Property, subject only to Permitted Encumbrances and the liens created by the Loan Documents and (b) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances, such other liens as are permitted pursuant to the Loan Documents and the liens created by the Loan Documents.  Borrower shall forever warrant, defend and preserve the title and the validity and priority of the lien of this Security Instrument and shall forever warrant and defend the same to Lender against the claims of all Persons whomsoever.

**Article 4 - FURTHER ASSURANCES**

        **Section 4.1**    COMPLIANCE WITH LOAN AGREEMENT.  Borrower shall comply with all covenants set forth in the Loan Agreement relating to acts or other further assurances to be made on the part of Borrower in order to protect and perfect the lien or security interest hereof upon, and in the interest of Lender in, the Property.

        **Section 4.2**    AUTHORIZATION TO FILE FINANCING STATEMENTS; POWER OF ATTORNEY. Borrower hereby authorizes Lender at any time and from time to time to file any initial financing statements, amendments thereto and continuation statements as authorized by applicable law, as applicable to all or part of the Personal Property and as necessary or required in connection herewith.  For purposes of such filings, Borrower agrees to furnish any information requested by Lender promptly upon request by Lender.  Borrower also ratifies its authorization for Lender to have filed any like initial financing statements, amendments thereto or continuation statements, if filed prior to the date of this Security Instrument.  Borrower hereby irrevocably constitutes and appoints Lender and any officer or agent of Lender, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Borrower or in Borrower's own name to execute in Borrower's name any such documents and otherwise to carry out the purposes of this Section 4.2, to the extent that Borrower's authorization above is not sufficient and Borrower fails or refuses to promptly execute such documents.  To the extent permitted by law, Borrower hereby ratifies all acts said attorneys-in-fact have lawfully done in the past or shall lawfully do or cause to be done in the

6

future by virtue hereof.  This power of attorney is a power coupled with an interest and shall be irrevocable.

## Article 5 - DUE ON SALE/ENCUMBRANCE

**Section 5.1**    NO SALE/ENCUMBRANCE.  Except in accordance with the express terms and conditions contained in the Loan Agreement, Borrower shall not cause or permit a sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or grant of any options with respect to, or any other transfer or disposition (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of a direct or indirect legal or beneficial interest in the Property or any part thereof, Borrower, any constituent owner or other holder of a direct or indirect equity interest in Borrower, any indemnitor or other guarantor of the Loan, any constituent owner or other holder of a direct or indirect equity interest in such indemnitor or guarantor, any manager or operating lessee of the Property that is affiliated with Borrower or any constituent owner or other holder of a direct or indirect equity interest in such manager or such operating lessee.

## Article 6 - PREPAYMENT; RELEASE OF PROPERTY

**Section 6.1**    PREPAYMENT.  The Debt may not be prepaid in whole or in part except in strict accordance with the express terms and conditions of the Note and the Loan Agreement.

**Section 6.2**    RELEASE OF PROPERTY.  Borrower shall not be entitled to a release of any portion of the Property from the lien of this Security Instrument except in accordance with terms and conditions of the Loan Agreement.

## Article 7 - DEFAULT

**Section 7.1**    EVENT OF DEFAULT.  The term "**Event of Default**" as used in this Security Instrument shall have the meaning assigned to such term in the Loan Agreement.

## Article 8 - RIGHTS AND REMEDIES UPON DEFAULT

**Section 8.1**    REMEDIES.  Upon the occurrence and during the continuance of any Event of Default, Borrower agrees that Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(a)    declare the entire unpaid Debt to be immediately due and payable;

(b)    institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

7

(c)     with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority;

(d)     sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(e)     institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note, the Loan Agreement or in the other Loan Documents;

(f)     recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents;

(g)     seek and obtain the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any guarantor or indemnitor under the Loan or any other Person liable for the payment of the Debt;

(h)     the license granted to Borrower under Section 1.2 hereof shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower; (vi) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property to the payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting

8

therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, insurance and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i)      apply any sums then deposited or held in escrow or otherwise by or on behalf of Lender in accordance with the terms of the Loan Agreement, this Security Instrument or any other Loan Document and/or the Secured Accounts to the payment of the following items in any order in its sole discretion: (i) Taxes and Other Charges; (ii) insurance premiums; (iii) interest on the unpaid principal balance of the Debt; (iv) amortization of the unpaid principal balance of the Debt; (v) all other sums payable pursuant to the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, including without limitation advances made by Lender pursuant to the terms of this Security Instrument;

(j)      surrender the insurance policies maintained pursuant to the Loan Agreement, collect the unearned insurance premiums for such insurance policies and apply such sums as a credit on the Debt in such priority and proportion as Lender in its discretion shall deem proper, and in connection therewith, Borrower hereby appoints Lender as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Borrower to collect such insurance premiums;

(k)      apply the undisbursed balance of any deposit made by Borrower with Lender in connection with the restoration of the Property after a casualty thereto or condemnation thereof, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its discretion; and/or

(l)      pursue such other remedies as Lender may have under applicable law.

In the event of a sale, by foreclosure, power of sale or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority. Notwithstanding the provisions of this Section to the contrary, if any Event of Default as described in Section 10.1(f) of the Loan Agreement shall occur with respect to Borrower or any SPE Component Entity, the entire unpaid Debt shall be automatically due and payable, without any further notice, demand or other action by Lender.

**Section 8.2**   APPLICATION OF PROCEEDS. Upon the occurrence and during the continuance of any Event of Default, the purchase money, proceeds and avails of any disposition of the Property (or any part thereof) and any other sums collected by Lender pursuant to the Note, this Security Instrument or the other Loan Documents may, in each case, be applied by Lender to the payment of the Debt in such order, priority and proportions as Lender in its sole discretion shall determine.

**Section 8.3**   RIGHT TO CURE DEFAULTS. Upon the occurrence and during the continuance of any Event of Default, Lender may, but without any obligation to do so and

9

without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make any payment or do any act required of Borrower hereunder in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 8.3, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at any default rate specified in the Loan Agreement, if any (the "**Default Rate**"), for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by this Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

Section 8.4    ACTIONS AND PROCEEDINGS.  Lender has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

Section 8.5    RECOVERY OF SUMS REQUIRED TO BE PAID.  Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

Section 8.6    OTHER RIGHTS, ETC.

(a)    The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument. Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender to comply with any request of Borrower or any guarantor or indemnitor with respect to the Loan to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any Person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the other Loan Documents.

(b)    It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in the value of the Property, for failure to maintain the insurance policies required to be maintained pursuant to the Loan Agreement, or for failure to determine whether insurance in force is adequate as to the amount of risks insured. Possession by Lender shall not be deemed an election of judicial

151404691v4

relief if any such possession is requested or obtained with respect to any Property or collateral not in Lender's possession.

(c)　　Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect.  Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose this Security Instrument.  The rights of Lender under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others.  No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.  Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

**Section 8.7**　　RIGHT TO RELEASE ANY PORTION OF THE PROPERTY.  Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder.  This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

**Section 8.8**　　RIGHT OF ENTRY.  Upon reasonable notice to Borrower, Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

**Section 8.9**　　BANKRUPTCY.  (a) Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right to proceed in its own name or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Borrower, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the lessee under such Lease under the Bankruptcy Code.

(b)　　If there shall be filed by or against Borrower a petition under the Bankruptcy Code and Borrower, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than ten (10) days' prior notice of the date on which Borrower shall apply to the bankruptcy court for authority to reject the Lease.  Lender shall have the right, but not the obligation, to serve upon Borrower within such ten-day period a notice stating that (i) Lender demands that Borrower assume and assign the Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender covenants to cure or provide adequate assurance of future performance under the Lease.  If Lender serves upon Borrower the notice described in the preceding sentence, Borrower shall not seek to reject the Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the

11

performance by Lender of the covenant provided for in clause (ii) of the preceding sentence.

**Section 8.10** SUBROGATION. If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of the Other Obligations.

### Article 9 - ENVIRONMENTAL HAZARDS

**Section 9.1** ENVIRONMENTAL COVENANTS. Borrower has provided representations, warranties and covenants regarding environmental matters set forth in the Environmental Indemnity and Borrower shall comply with the aforesaid covenants regarding environmental matters.

### Article 10 - WAIVERS

**Section 10.1** MARSHALLING AND OTHER MATTERS. Borrower hereby waives, to the extent permitted by law, the benefit of all Legal Requirements now or hereafter in force regarding appraisement, valuation, stay, extension, reinstatement and redemption and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each and every Person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all Persons to the extent permitted by Legal Requirements.

**Section 10.2** WAIVER OF NOTICE. Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Security Instrument or the Loan Agreement specifically and expressly provides for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not permitted by Legal Requirements to waive its right to receive notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender to Borrower.

**Section 10.3** INTENTIONALLY OMITTED.

**Section 10.4** SOLE DISCRETION OF LENDER. Whenever pursuant to this Security Instrument, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole (but reasonable) discretion of Lender and shall be final and conclusive.

12

**Section 10.5** <span style="font-variant: small-caps">Waiver of Trial by Jury</span>. **BORROWER AND LENDER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF LENDER AND BORROWER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER AND LENDER.**

**Section 10.6** <span style="font-variant: small-caps">Waiver of Foreclosure Defense</span>. Borrower hereby waives any defense Borrower might assert or have by reason of Lender's failure to make any tenant or lessee of the Property a party defendant in any foreclosure proceeding or action instituted by Lender.

### Article 11 - <span style="font-variant: small-caps">Intentionally Omitted</span>

### Article 12 - <span style="font-variant: small-caps">Notices</span>

**Section 12.1** <span style="font-variant: small-caps">Notices</span>. All notices or other written communications hereunder shall be delivered in accordance with the applicable terms and conditions of the Loan Agreement.

### Article 13 - <span style="font-variant: small-caps">Applicable Law</span>

**Section 13.1** <span style="font-variant: small-caps">Governing Law</span>. The governing law and related provisions contained in Section 17.2 of the Loan Agreement are hereby incorporated by reference as if fully set forth herein.

**Section 13.2** <span style="font-variant: small-caps">Provisions Subject to Applicable Law</span>. All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law. If any term of this Security Instrument or any application thereof shall be invalid or unenforceable, the remainder of this Security Instrument and any other application of the term shall not be affected thereby.

### Article 14 - <span style="font-variant: small-caps">Definitions</span>

**Section 14.1** <span style="font-variant: small-caps">General Definitions</span>. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender and any of Lender's successors and assigns," the word "Note" shall mean "the Note and any other evidence of indebtedness secured

13

by this Security Instrument," the word "Property" shall include any portion of the Property and any interest therein, and the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder.

### Article 15 - MISCELLANEOUS PROVISIONS

**Section 15.1** NO ORAL CHANGE. This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

**Section 15.2** SUCCESSORS AND ASSIGNS. This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

**Section 15.3** INAPPLICABLE PROVISIONS. If any term, covenant or condition of the Loan Agreement, the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Loan Agreement, the Note and this Security Instrument shall be construed without such provision.

**Section 15.4** HEADINGS, ETC. The headings and captions of various Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

**Section 15.5** NUMBER AND GENDER. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

**Section 15.6** ENTIRE AGREEMENT. This Security Instrument and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, are superseded by the terms of this Security Instrument and the other Loan Documents.

**Section 15.7** LIMITATION ON LENDER'S RESPONSIBILITY. No provision of this Security Instrument shall operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender, nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the tenants or any other Person, or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger. Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession."

**Section 15.8** JOINT AND SEVERAL LIABILITY. If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several.

## Article 16 - STATE-SPECIFIC PROVISIONS

**Section 16.1** PRINCIPLES OF CONSTRUCTION. In the event of any inconsistencies between the terms and conditions of this Article 16 and the terms and conditions of this Security Instrument, the terms and conditions of this Article 16 shall control and be binding.

**Section 16.2** SECTION 254 OF THE RPL. In the event of any conflict, inconsistency or ambiguity between the provisions of the Loan Documents and the provisions of subsection 4 of Section 254 of the Real Property Law of New York, the provisions of the Loan Documents shall control.

**Section 16.3** MODIFICATION OF LEASES AND SECTION 291-F OF THE RPL. Borrower shall not enter into, modify or amend in any material respect, consent to the cancellation of or terminate any Lease, or guaranty of any Lease, whether now existing or hereafter entered into, without the prior written consent of Lender which consent may be granted or withheld in Lender's sole discretion (except as otherwise expressly set forth in the Loan Documents). In addition to any other right or remedy contained herein or in any other Loan Document, Lender shall have all of the rights against lessees of the Property or any part thereof as are set forth in Section 291f of the Real Property Law of New York.

**Section 16.4** TRUST FUND. Pursuant to Section 13 of the Lien Law of New York, Borrower shall receive the advances secured hereby and shall hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of any improvement and shall apply such advances first to the payment of the cost of any improvement before using any part thereof for any other purpose. Borrower shall comply strictly with Section 13 of the Lien Law of New York.

**Section 16.5** COMMERCIAL PROPERTY. Borrower represents and warrants that this Security Instrument does not encumber real property principally improved or to be improved by one or more structures containing in the aggregate not more than six (6) residential dwelling units having their own separate cooking facilities.

**Section 16.6** TRANSFER TAX PROVISIONS.

(a) Borrower covenants and agree that, in the event of a sale of the Property or other transfer of the Property ("**Transfer**"), it will duly complete, execute and deliver to Lender contemporaneously with the submission to the applicable taxing authority or recording officer, all forms and supporting documentation required by such taxing authority or recording officer to estimate and fix any and all applicable state and local real estate transfer taxes (collectively, "**Transfer Taxes**") by reason of such sale or other Transfer or recording of the deed evidencing such sale or other Transfer.

(b) Borrower shall pay all Transfer Taxes that may hereafter become due and payable with respect to any Transfer (other than those due by reason of a Transfer after any Transfer by Borrower to Lender or its nominee by way of a deed-in-lieu of foreclosure or after a Transfer of

15

the Property in a foreclosure action or pursuant to a non-judicial foreclosure), and in default thereof Lender may pay the same and the amount of such payment shall be added to the Debt and, unless incurred in connection with a foreclosure of this Security Instrument, be secured by this Security Instrument.  The provisions of this Section shall survive any Transfer and the delivery of the deed in connection with any Transfer.

Section 16.7  MAXIMUM PRINCIPAL AMOUNT.  NOTWITHSTANDING ANY PROVISION SET FORTH HEREIN TO THE CONTRARY, THE MAXIMUM AMOUNT OF PRINCIPAL INDEBTEDNESS SECURED BY THIS SECURITY INSTRUMENT AT EXECUTION, OR WHICH UNDER ANY CONTINGENCY MAY BECOME SECURED HEREBY AT ANY TIME HEREAFTER, IS U.S. $25,000,000.00 PLUS ALL INTEREST PAYABLE UNDER THE NOTE AND ALL AMOUNTS EXPENDED BY LENDER AFTER DEFAULT BY BORROWER: (A) FOR THE PAYMENT OF TAXES, CHARGES OR ASSESSMENTS WHICH MAY BE IMPOSED BY LEGAL REQUIREMENTS UPON THE PROPERTY; (B) TO MAINTAIN THE INSURANCE REQUIRED UNDER THIS SECURITY INSTRUMENT; (C) FOR ANY EXPENSES INCURRED IN MAINTAINING THE PROPERTY AND UPHOLDING THE LIEN OF THIS SECURITY INSTRUMENT, INCLUDING, BUT NOT LIMITED TO, THE EXPENSE OF ANY LITIGATION TO PROSECUTE OR DEFEND THE RIGHTS AND LIEN CREATED BY THIS MORTGAGED, AND (D) FOR ANY AMOUNT, COST OR CHARGE TO WHICH LENDER BECOMES SUBROGATED, UPON PAYMENT, WHETHER UNDER RECOGNIZED PRINCIPLES OF LAW OR EQUITY, OR UNDER EXPRESS STATUTORY AUTHORITY, TOGETHER WITH INTEREST ON ALL OF THE FOREGOING AMOUNTS AT THE DEFAULT RATE (AS DEFINED IN THE NOTE).

Section 16.8  COVENANTS IN ADDITION TO RPL.  All covenants hereof shall be construed as affording to Lender rights in addition to and not exclusive of the rights conferred under the provisions of Sections 254, 271, 272 and 291-f of the Real Property Law of the State of New York or any other applicable laws.

Section 16.9  ASSIGNMENT OF MORTGAGE.  Notwithstanding anything herein to the contrary, upon any permitted prepayment or payment to Lender of the Obligations as provided for in the Note and the Loan Agreement and the performance by Borrower of all of the obligations imposed on Borrower in the Loan Documents, then Borrower shall be entitled to receive, at the option and request of Borrower, an assignment of this Security Instrument by Lender to a lender, in recordable form without recourse to, or any representation or warranty by, Lender, express or implied, without payment of any further sums to Lender (other than Lender's reasonable attorneys' fees relating thereto), but only if, in the case of any such assignment, such assignment can be accomplished without violating the provisions of any applicable law or administrative regulation including, without limitation, the Uniform Commercial Code.

Section 16.10  BORROWER HEREBY DECLARES AND ACKNOWLEDGES THAT IT HAS RECEIVED, WITHOUT CHARGE A TRUE COPY OF THIS SECURITY INSTRUMENT.

**[NO FURTHER TEXT ON THIS PAGE]**

151404691v4

**IN WITNESS WHEREOF**, this Security Instrument has been executed by the undersigned as of the day and year first above written.

BORROWER:

**AEVRI SALINA MEADOWS LLC**
a Delaware limited liability company

By: 
Name:  Moshe Rothman
Title:    President

**ACKNOWLEDGEMENT**

STATE OF ~~NEW YORK~~ *NJ*                              )
                                                                              )        ss:
COUNTY OF ~~ONONDAGA~~ *Monmouth*          )

        On this *10th* day of February in the year 2022 before me, *Patricia J. DiGiovanni*, a Notary Public in and for said state, personally appeared Moshe Rothman as President of **AEVRI SALINA MEADOWS LLC**, a Delaware limited liability company, known to me to be the person who executed the within instrument on behalf of said limited liability company and acknowledged to me that he executed the same for the purposes therein stated.

        IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

(SEAL)

_____
Notary Public

My commission expires: _____

PATRICIA J. DIGIOVANNI
Notary Public, State of New Jersey
My Commission Expires
August 11, 2026

## EXHIBIT A

## LEGAL DESCRIPTION

ALL that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Town of Salina, in the County of Onondaga, State of NY:

TRACT 1:

LOT 6

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, BELONGING, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK, AND BEING DESIGNATED AS LOT 6 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK, AMENDMENT NO. 3, PART OF MILITARY LOTS 2, 3, 17 AND 18, TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED ON THE CLERK'S OFFICE AS MAP 7196.

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY, THE NORTHEAST CORNER OF LOT 6 AND THE NORTHWEST CORNER OF LOT 10, SAID POINT BEING THE POINT OF BEGINNING.

RUNNING THENCE LEAVING SAID SOUTHERLY RIGHT-OF-WAY SOUTH 06° 54' 25" WEST ALONG THE EASTERLY BOUNDARY LINE OF LOT 6 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE 481.53 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 83° 05' 35" WEST ALONG THE SOUTHERLY BOUNDARY LINE OF LOT 6 AND THE NORTHERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 282.00 FEET TO A MAG NAIL;

THENCE NORTH 38° 05' 35" WEST ALONG THE WESTERLY BOUNDARY LINE OF LOT 6 AND THE EASTERLY BOUNDARY LINE OF LOT 7 A DISTANCE 281.48 FEET TO A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY;

THENCE NORTH 45° 24' 54" EAST ALONG SAID SOUTHERLY RIGHT-OF-WAY A DISTANCE 202.21 FEET TO A MAG NAIL AT A POINT OF CURVATURE.

THENCE ALONG A CURVE TO THE RIGHT SAID CURVE HAVING A RADIUS OF 352.96 FEET AND AN ARC LENGTH OF 396.82 FEET TO THE POINT OF BEGINNING.

LOT 10

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, BELONGING, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK AND BEING DESIGNATED AS LOT 10 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK, AMENDMENT NO. 3, PART OF MILITARY LOT 2, 3, 17 AND 18, TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196.

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY, THE NORTHEAST CORNER OF LOT 6 AND THE NORTHWEST CORNER OF LOT 10, SAID POINT BEING THE POINT OF BEGINNING.

RUNNING THENCE ALONG A CURVE TO THE RIGHT TO A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 352.96 FEET AND AN ARC LENGTH OF 36.63 FEET TO A CAPPED IRON ROD SET;

THENCE SOUTH 64° 13' 24" EAST CONTINUING ALONG THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS A DISTANCE OF 170.00 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE LEFT TO A CAPPED IRON ROD SET AT A POINT OF REVERSE CURVE, SAID CURVE HAVING A RADIUS OF 600.00 FEET AND AN ARC LENGTH OF 151.63 FEET;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY ON THE WESTERLY RIGHT-OF-WAY LINE OF PLAINFIELD ROAD, SAID CURVE HAVING A RADIUS OF 25.00 FEET AND AN ARC LENGTH OF 37.07 FEET TO A CAPPED IRON ROD SET;

THENCE SOUTH 06° 14' 53" WEST ALONG SAID WESTERLY RIGHT-OF-WAY LINE A DISTANCE OF 211.20 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 540.37 FEET AND AN ARC LENGTH OF 415.87 FEET;

THENCE SOUTH 50° 20' 35" WEST A DISTANCE OF 173.84 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 320.00 FEET AND AN ARC LENGTH OF 260.06 FEET;

THENCE NORTH NORTH 83° 05' 35" WEST A DISTANCE OF 164.88 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 06° 54' 25" EAST ALONG THE EASTERLY BOUNDARY LINE OF LOT 7 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 453.76 FEET TO A DRILL HOLE SET;

THENCE SOUTH 83° 05' 35" EAST ALONG THE NORTHERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 295.00 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 06° 54' 25" EAST ALONG THE EASTERLY BOUNDARY LINE OF LOT 6 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 481.53 FEET TO A CAPPED IRON ROD SET AT THE POINT OF BEGINNING.

Being the same premises conveyed to Salina Park, LLC by deed made by SCCP SALINA I, LIMITED PARTNERSHIP, a Delaware limited partnership dated 06/06/2016, recorded 06/14/2016 in the Office of the County Clerk, Onondaga County in Book 5376 page 591.

TRACT 2:

LOT 3:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK CONTAINING 4.620 ACRES AND BEING DESIGNATED AS LOT 3 AS SHOWN ON THAT CERTAIN PLAT ENTITLED" FINAL PLAN SALINA MEADOWS OFFICE PARK AMENDMENT NO. 3 PART OF MILITARY LOTS 2,3, 17 AND 18 TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196 BOUNDED AND DESCRIBED AS FOLLOWS;

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY, WHICH POINT IS THE DIVIDING LINE BETWEEN LOTS 3 AND 13 AS SHOWN ON SAID MAP;

RUNNING THENCE ALONG SAID DIVIDING LINE, NORTH 42° 02' 10" WEST, 338.15 FEET TO LOT 8 AS SHOWN ON SAID MAP;

THENCE ALONG SAID LAST MENTIONED LOT, NORTH 45° 24' 54" EAST, 407.00 FEET TO LAND NOW OR FORMERLY OF DONALD W. KNIGHT;

THENCE ALONG SAID LAST MENTIONED LAND, SOUTH 82° 25' 16" EAST, 285.00 FEET TO LOT 1 ON SAID MAP;

THENCE ALONG SAID LAST MENTIONED LOT, SOUTH 7° 34' 44" WEST, 439.29 FEET TO THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 412.96 FEET, A DISTANCE OF 301.66 FEET TO THE POINT OR PLACE OF BEGINNING.

BEING THE SAME PREMISES CONVEYED TO ROWE PROPERTIES-SALINA MEADOWS IV LIMITED PARTNERSHIP BY DEED FROM ROWE DEVELOPMENT COMPANY, A VIRGINIA CORPORATION, TO ROWE PROPERTIES-SALINA MEADOWS IV LIMITED PARTNERSHIP, A VIRGINIA LIMITED PARTNERSHIP, DATED JULY 2, 1987 AND RECORDED IN ONONDAGA COUNTY CLERK'S OFFICE JULY 27, 1987 ON BOOK 3371 OF DEEDS AT PAGE 165.

LOT 7:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK CONTAINING 4.161 ACRES AND BEING DESIGNATED AS LOT 7 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK AMENDMENT NO. 3 PART OF MILITARY LOTS 2, 3, 17 AND 18 TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196, BOUNDED AND DESCRIBED AS FOLLOWS;

BEGINNING AT A POINT ON THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, WHICH POINT IS THE DIVIDING LINE BETWEEN LOTS 7 AND 6 AS SHOWN ON SAID MAP;

RUNNING THENCE ALONG SAID DIVIDING LINE SOUTH 38° 05' 35" EAST, 281.48 FEET TO LOT 10 AS SHOWN ON SAID FILED MAP;

THENCE ALONG THE DIVIDING LINE BETWEEN LOTS 7 AND 10, NORTH 83° 05' 35" WEST, 13.00 FEET TO A POINT;

THENCE STILL ALONG THE DIVIDING LINE BETWEEN LOTS 7 AND 10, SOUTH 6° 54' 25" WEST, 453.76 FEET TO THE NORTHERLY SIDE OF PLAINFIELD ROAD;

THENCE ALONG THE NORTHERLY AND NORTHEASTERLY SIDES OF PLAINFIELD ROAD THE FOLLOWING 4 COURSES AND DISTANCES:

1. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 203.77 FEET, A DISTANCE OF 153.83 FEET;

2. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 801.50 FEET, A DISTANCE OF 208.36 FEET;

3. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 271.60 FEET, A DISTANCE OF 221.81 FEET;

4. NORTH 5° 58' 33" WEST, 79.40 FEET TO THE EXTREME SOUTHERLY END OF THE ARC OF A CURVE CONNECTING THE EASTERLY SIDE OF PLAINFIELD ROAD WITH THE SOUTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE NORTHEASTERLY, ALONG THE ARC OF SAID CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 25.00 FEET, A DISTANCE OF 36.60 FEET TO THE SOUTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE NORTHEASTERLY ALONG THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 489.54 FEET, A DISTANCE OF 277.45 feet.

THENCE NORTHEASTERLY ALONG THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, NORTH 45 DEGREES 24 MINUTES 54 SECONDS EAST, 34.36 FEET TO THE POINT OR PLACE OF BEGINNING.

Address Reference: 220 Salina Meadows Parkway and 301 Plainfield Road (as to Tract 1) and 231 Salina Meadows Parkway and 200 Salina (as to Tract 2), Syracuse, NY 13212 (For Information Only)

Being the same premises conveyed to Salina Park, LLC by deed made by SCCP SALINA II, LIMITED PARTNERSHIP, a Delaware limited partnership dated 06/06/2016 recorded 06/14/2016 in the Office of the County Clerk, Onondaga County in Book 5376 page 604.

For Information Only:

Said Premises being known as 200 Salina Meadows Pkwy, Syracuse, NY.

Section: 50 Block: 1 Lot: 1.7

# EXHIBIT 3

401 Montgomery Street
Room 200
Syracuse, NY 13202
(315) 435-2229

## Onondaga County Clerk Recording Cover Sheet

**Received From :**
SIMPLIFILE

**Return To :**
SIMPLIFILE

**Method Returned :** ERECORDING

**First PARTY 1**

AEVRI SALINA MEADOWS LLC

**First PARTY 2**

BANK OF MONTREAL

**Index Type :** Land Records

**Instr Number :** 2022-00009537

**Book :**               **Page :**

**Type of Instrument :** Assignment Of Rent
**Type of Transaction :** Assignment Of Rents And Leases
**Recording Fee:**               $126.00

**Recording Pages :**               16

### Recorded Information

State of New York

County of Onondaga

I hereby certify that the within and foregoing was
recorded in the Clerk's office for Onondaga
County, New York

On (Recorded Date) : 03/07/2022

At (Recorded Time) : 12:46:15 PM

Lisa Dell, County Clerk

Loan No: 99020222091

**AEVRI SALINA MEADOWS LLC**, as Borrower
(Borrower)

to

**BANK OF MONTREAL**, as Lender
(Lender)

**ASSIGNMENT OF LEASES AND RENTS**

Dated: As of February 16, 2022

PREPARED BY AND UPON
RECORDATION RETURN TO:

Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022
Attention: Peter Doyle, Esq.

## ASSIGNMENT OF LEASES AND RENTS

**THIS ASSIGNMENT OF LEASES AND RENTS** (this "**Assignment**") made as of the 16th day of February, 2022, by **AEVRI SALINA MEADOWS LLC**, a Delaware limited liability company, as assignor, having its principal place of business at 2604 Elmwood Avenue, Suite 210 Rochester, New York 14618 ("**Borrower**") to **BANK OF MONTREAL**, a Canadian chartered bank operating out of its Chicago branch, having an address at c/o BMO Capital Markets Corp., 3 Times Square, New York New York 10036 (together with its successors and assigns, "**Lender**").

## W I T N E S S E T H:

**WHEREAS**, this Assignment is given in connection with a loan (the "**Loan**") made by Lender to Borrower pursuant to that certain Loan Agreement, dated as of the date hereof (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and evidenced by that certain Promissory Note, dated the date hereof, given by Borrower to Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Note**");

**WHEREAS**, Borrower desires to secure the payment of the Debt and the performance of all of its obligations under the Note, the Loan Agreement and the other Loan Documents; and

**WHEREAS**, this Assignment is given pursuant to the Loan Agreement, and payment, fulfillment, and performance by Borrower of its obligations thereunder and under the other Loan Documents is secured hereby, and each and every term and provision of the Loan Agreement and the Note, including the rights, remedies, obligations, covenants, conditions, agreements, indemnities, representations and warranties therein, are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Assignment.

**NOW THEREFORE**, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Assignment:

## ARTICLE I - ASSIGNMENT

**Section 1.1** **Property Assigned**. Borrower hereby absolutely and unconditionally assigns and grants to Lender the following property, rights, interests and estates, now owned, or hereafter acquired by Borrower:

(a) Leases. All leases, subleases or subsubleases, lettings, licenses, concessions or other agreements made a part hereof (whether written or oral and whether now or hereafter in effect), pursuant to which any Person is granted a possessory interest in, or a right to use or occupy, all or any portion of any space in that certain lot or piece of land, more particularly described in Exhibit A annexed hereto and made a part hereof, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located thereon (collectively, the "**Property**") and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the

covenants, conditions and agreements to be performed and observed by the other party thereto, and the right, title and interest of Borrower, its successors and assigns, therein and thereunder.

(b)     Other Leases and Agreements.   All other leases and other agreements, whether or not in writing, affecting the use, enjoyment or occupancy of the Property or any portion thereof now or hereafter made, whether made before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the "**Bankruptcy Code**") together with any extension, renewal or replacement of the same. This Assignment of other present and future leases and present and future agreements being effective without further or supplemental assignment. The "leases" described in Subsection 1.1(a) and the leases and other agreements described in this Subsection 1.1(b) are collectively referred to as the "**Leases**".

(c)     Rents.   All rents, rent equivalents, income, receivables, revenues, receipts, insurance proceeds, deposits and profits arising from the Leases and renewals thereof together with all rents, rent equivalents, income, fees, receivables, accounts, profits (including, but not limited to, all oil and gas or other mineral royalties and bonuses), charges for services rendered and any and all payment and consideration of whatever form or nature received by Borrower or its agents or employees from any and all sources relating to the use, enjoyment and occupancy of the Property whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code (collectively, the "**Rents**").

(d)     Bankruptcy Claims.   All of Borrower's claims and rights (the "**Bankruptcy Claims**") to the payment of damages arising from any rejection by a lessee of any Lease under the Bankruptcy Code.

(e)     Lease Guaranties.   All of Borrower's right, title and interest in and claims under any and all lease guaranties, letters of credit and any other credit support (individually, a "**Lease Guaranty**", collectively, the "**Lease Guaranties**") given by any guarantor in connection with any of the Leases or leasing commissions (individually, a "**Lease Guarantor**", collectively, the "**Lease Guarantors**") to Borrower.

(f)     Proceeds.   All proceeds from the sale or other disposition of the Leases, the Rents, the Lease Guaranties and the Bankruptcy Claims.

(g)     Other.   All rights, powers, privileges, options and other benefits of Borrower as lessor under the Leases and beneficiary under the Lease Guaranties, including without limitation the immediate and continuing right to make claim for, receive and collect all Rents payable or receivable under the Leases and all sums payable under the Lease Guaranties or pursuant thereto (and to apply the same to the payment of the Debt), and to do all other things which Borrower or any lessor is or may become entitled to do under the Leases or the Lease Guaranties.

(h)     Entry.   The right, at Lender's option, upon revocation of the license granted herein, to enter upon the Property in person, by agent or by court-appointed receiver, to collect the Rents.

-2-

(i)  Power of Attorney.  Borrower's irrevocable power of attorney, coupled with an interest, to take any and all of the actions set forth in Section 3.1 of this Assignment and any or all other actions designated by Lender for the proper management and preservation of the Property.

(j)  Other Rights and Agreements.  Any and all other rights of Borrower in and to the items set forth in subsections (a) through (i) above, and all amendments, modifications, replacements, renewals and substitutions thereof.

## ARTICLE 2 - TERMS OF ASSIGNMENT

**Section 2.1  Present Assignment And License Back.**  It is intended by Borrower that this Assignment constitute a present, absolute assignment of the Leases, Rents, Lease Guaranties and Bankruptcy Claims, and not an assignment for additional security only. Nevertheless, subject to the terms of this Section 2.1, the Restricted Account Agreement and the Loan Agreement, Lender grants to Borrower a revocable license to collect, receive, use and enjoy the Rents and other sums due under the Lease Guaranties and Borrower shall hold such Rents and all sums received pursuant to any Lease Guaranty, or a portion thereof sufficient to discharge all current sums due on the Debt, in trust for the benefit of Lender for use in the payment of such sums.

**Section 2.2  Notice To Lessees.**  Borrower hereby authorizes and directs the lessees named in the Leases or any other future lessees or occupants of the Property and all Lease Guarantors to pay over to Lender or to such other party as Lender directs all Rents and all sums due under any Lease Guaranties upon receipt from Lender of written notice to the effect that Lender is then the holder of this Assignment and that an Event of Default (as defined in the Loan Agreement) exists, and to continue so to do until otherwise notified by Lender.

**Section 2.3  Incorporation By Reference.**  All representations, warranties, covenants, conditions and agreements contained in the Loan Agreement and the other Loan Documents as same may be modified, renewed, substituted or extended are hereby made a part of this Assignment to the same extent and with the same force as if fully set forth herein.

## ARTICLE 3 - REMEDIES

**Section 3.1  Remedies of Lender.**  Upon or at any time after the occurrence of an Event of Default, the license granted to Borrower in Section 2.1 of this Assignment shall automatically be revoked, and Lender shall immediately be entitled to possession of all Rents and sums due under any Lease Guaranties, whether or not Lender enters upon or takes control of the Property. In addition, Lender may, at its option, without waiving such Event of Default, without regard to the adequacy of the security for the Debt, either in person or by agent, nominee or attorney, with or without bringing any action or proceeding, or by a receiver appointed by a court, dispossess Borrower and its agents and servants from the Property, without liability for trespass, damages or otherwise (other than arising as a direct result of Lender's gross negligence or willful misconduct) and exclude Borrower and its agents or servants wholly therefrom, and take possession of the Property and all books, records and accounts relating thereto and have, hold, manage, lease and operate the Property on such terms and for such period of time as

-3-

Lender may deem proper and either with or without taking possession of the Property in its own name, demand, sue for or otherwise collect and receive all Rents and sums due under all Lease Guaranties, including those past due and unpaid with full power to make from time to time all alterations, renovations, repairs or replacements thereto or thereof as Lender may deem proper and may apply the Rents and sums received pursuant to any Lease Guaranties to the payment of the following in such order and proportion as Lender in its sole discretion may determine, any law, custom or use to the contrary notwithstanding:  (a) all expenses of managing and securing the Property, including, without being limited thereto, the salaries, fees and wages of a managing agent and such other employees or agents as Lender may deem necessary or desirable and all expenses of operating and maintaining the Property, including, without being limited thereto, all taxes, charges, claims, assessments, water charges, sewer rents and any other liens, and premiums for all insurance which Lender may deem necessary or desirable, and the cost of all alterations, renovations, repairs or replacements, and all expenses incident to taking and retaining possession of the Property; and (b) the Debt, together with all costs and reasonable attorneys' fees.  In addition, upon the occurrence of an Event of Default, Lender, at its option, may (i) complete any construction on the Property in such manner and form as Lender deems advisable, (ii) exercise all rights and powers of Borrower, including, without limitation, the right to negotiate, execute, cancel, enforce or modify any Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents from the Property and all sums due under any Lease Guaranties, (iii) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupancy of such part of the Property as may be in possession of Borrower or (iv) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise.

      **Section 3.2**   **Other Remedies**.  Nothing contained in this Assignment and no act done or omitted by Lender pursuant to the power and rights granted to Lender hereunder shall be deemed to be a waiver by Lender of its rights and remedies under the Loan Agreement, the Note, or the other Loan Documents and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Lender under the terms thereof.  The right of Lender to collect the Debt and to enforce any other security therefor held by it may be exercised by Lender either prior to, simultaneously with, or subsequent to any action taken by it hereunder.  Borrower hereby absolutely, unconditionally and irrevocably waives any and all rights to assert any setoff, counterclaim or crossclaim of any nature whatsoever with respect to the obligations of Borrower under this Assignment, the Loan Agreement, the Note, the other Loan Documents or otherwise with respect to the Loan in any action or proceeding brought by Lender to collect same, or any portion thereof, or to enforce and realize upon the lien and security interest created by this Assignment, the Loan Agreement, the Note, or any of the other Loan Documents (provided, however, that the foregoing shall not be deemed a waiver of Borrower's right to assert any compulsory counterclaim if such counterclaim is compelled under local law or rule of procedure, nor shall the foregoing be deemed a waiver of Borrower's right to assert any claim which would constitute a defense, setoff, counterclaim or crossclaim of any nature whatsoever against Lender in any separate action or proceeding).

      **Section 3.3**   **Other Security**.  Lender may take or release other security for the payment of the Debt, may release any party primarily or secondarily liable therefor and may

-4-

apply any other security held by it to the reduction or satisfaction of the Debt without prejudice to any of its rights under this Assignment.

**Section 3.4**    <u>**Non-Waiver**</u>. The exercise by Lender of the option granted it in <u>Section 3.1</u> of this Assignment and the collection of the Rents and sums due under the Lease Guaranties and the application thereof as herein provided shall not be considered a waiver of any default by Borrower under the Note, the Loan Agreement, the Leases, this Assignment or the other Loan Documents. The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Assignment. Borrower shall not be relieved of Borrower's obligations hereunder by reason of (a) the failure of Lender to comply with any request of Borrower or any other party to take any action to enforce any of the provisions hereof or of the Loan Agreement, the Note or the other Loan Documents, (b) the release regardless of consideration, of the whole or any part of the Property, or (c) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of this Assignment, the Loan Agreement, the Note, or the other Loan Documents. Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect. Lender may take any action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to enforce its rights under this Assignment. The rights of Lender under this Assignment shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.

**Section 3.5**    <u>**Bankruptcy**</u>

    (a)      Upon or at any time after the occurrence of an Event of Default, Lender shall have the right to proceed in its own name or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Borrower, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the lessee under such Lease under the Bankruptcy Code.

    (b)      If there shall be filed by or against Borrower a petition under the Bankruptcy Code, and Borrower, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than ten (10) days' prior notice of the date on which Borrower shall apply to the bankruptcy court for authority to reject the Lease. Lender shall have the right, but not the obligation, to serve upon Borrower within such ten-day period a notice stating that (i) Lender demands that Borrower assume and assign the Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender covenants to cure or provide adequate assurance of future performance under the Lease. If Lender serves upon Borrower the notice described in the preceding sentence, Borrower shall not seek to reject the Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Lender of the covenant provided for in clause (ii) of the preceding sentence.

## ARTICLE 4 - NO LIABILITY, FURTHER ASSURANCES

15140468 l v 4

**Section 4.1** **No Liability of Lender**. This Assignment shall not be construed to bind Lender to the performance of any of the covenants, conditions or provisions contained in any Lease or Lease Guaranty or otherwise impose any obligation upon Lender. Lender shall not be liable for any loss sustained by Borrower resulting from Lender's failure to let the Property after an Event of Default or from any other act or omission of Lender in managing the Property after an Event of Default unless such loss is caused by the willful misconduct and bad faith of Lender. Lender shall not be obligated to perform or discharge any obligation, duty or liability under the Leases or any Lease Guaranties or under or by reason of this Assignment and Borrower shall, and hereby agrees to, indemnify Lender for, and to hold Lender harmless from, any and all liability, loss or damage which may or might be incurred under the Leases, any Lease Guaranties or under or by reason of this Assignment and from any and all claims and demands whatsoever, including the defense of any such claims or demands which may be asserted against Lender by reason of any alleged obligations and undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in the Leases or any Lease Guaranties. Should Lender incur any such liability, the amount thereof, including costs, expenses and reasonable attorneys' fees, shall be secured by this Assignment and the other Loan Documents and Borrower shall reimburse Lender therefor immediately upon demand and upon the failure of Borrower so to do Lender may, at its option, declare all sums secured by this Assignment and the other Loan Documents immediately due and payable. This Assignment shall not operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender, nor for the carrying out of any of the terms and conditions of the Leases or any Lease Guaranties; nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the tenants or any other parties, or for any dangerous or defective condition of the Property including, without limitation, the presence of any Hazardous Substances (as defined in the Environmental Indemnity), or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger.

**Section 4.2** **No Mortgagee in Possession**. Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession" in the absence of the taking of actual possession of the Property by Lender. In the exercise of the powers herein granted Lender, no liability shall be asserted or enforced against Lender, all such liability being expressly waived and released by Borrower.

**Section 4.3** **Further Assurances**. Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all further acts, conveyances, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, require for the better assuring, conveying, assigning, transferring and confirming unto Lender the property and rights hereby assigned or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Assignment or for filing, registering or recording this Assignment and, on demand, will execute and deliver and hereby authorizes Lender to execute in the name of Borrower to the extent Lender may lawfully do so, one or more financing statements, chattel mortgages or comparable security instruments, to evidence more effectively the lien and security interest hereof in and upon the Leases.

## ARTICLE 5 - MISCELLANEOUS PROVISIONS

151404681v4

Section 5.1 **Conflict of Terms**. In case of any conflict between the terms of this Assignment and the terms of the Loan Agreement, the terms of the Loan Agreement shall prevail.

Section 5.2 **No Oral Change**. This Assignment and any provisions hereof may not be modified, amended, waived, extended, changed, discharged or terminated orally, or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom the enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 5.3 **General Definitions**. All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Assignment may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or interest therein," the word "Lender" shall mean "Lender and any subsequent holder of the Note", the word "Note" shall mean "the Note and any other evidence of indebtedness secured by the Loan Agreement", the word "Property" shall include any portion of the Property and any interest therein, the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all attorney's, paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder; whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 5.4 **Inapplicable Provisions**. If any term, covenant or condition of this Assignment is held to be invalid, illegal or unenforceable in any respect, this Assignment shall be construed without such provision.

Section 5.5 **Governing Law**. The governing law and related provisions contained in Section 17.2 of the Loan Agreement are hereby incorporated by reference as if fully set forth herein.

Section 5.6 **Termination of Assignment**. Upon payment or defeasance in full of the Debt (in each case, in accordance with the applicable terms and conditions of the Loan Documents), this Assignment shall become and be void and of no effect.

Section 5.7 **Notices**. All notices or other written communications hereunder shall be delivered in accordance with Article 14 of the Loan Agreement.

Section 5.8 **WAIVER OF TRIAL BY JURY**. **BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THIS ASSIGNMENT, THE NOTE, OR THE OTHER LOAN**

-7-

**DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.**

Section 5.9 <u>Exculpation</u>. The provisions of Article 13 of the Loan Agreement are hereby incorporated by reference into this Assignment to the same extent and with the same force as if fully set forth herein.

Section 5.10 <u>Successors and Assigns</u>. This Assignment shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

Section 5.11 <u>Headings, Etc.</u> The headings and captions of various paragraphs of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 5.12 <u>Joint and Several Liability</u>. If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several.

**[NO FURTHER TEXT ON THIS PAGE]**

**IN WITNESS WHEREOF,** Borrower has executed this instrument the day and year first above written.

                                                    BORROWER:

                                                    **AEVRI SALINA MEADOWS LLC**
                                                    a Delaware limited liability company

                                                    By: _____

**ACKNOWLEDGEMENT**                                 Name:  Moshe Rothman
                                                    Title:    President

STATE OF ~~NEW YORK~~ Jersey                )
                                            )    ss:
COUNTY OF ~~ONONDAGA~~ Ocean                )


On this *16* day of February in the year 2022 before me, _Naftalie Berg_, a Notary Public in and for said state, personally appeared Moshe Rothman as President of AEVRI SALINA MEADOWS LLC, a Delaware limited liability company, known to me to be the person who executed the within instrument on behalf of said limited liability company and acknowledged to me that he executed the same for the purposes therein stated.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

(SEAL)                          _____
                                Notary Public
                                My term expires: _____

                    NAFTALIE BERGER
                NOTARY PUBLIC OF NEW JERSEY
                    Commission # 50127242
                My Commission Expires 5/11/2025

## EXHIBIT A
## LEGAL DESCRIPTION

ALL that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Town of Salina, in the County of Onondaga, State of NY:

TRACT 1:

LOT 6

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, BELONGING, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK, AND BEING DESIGNATED AS LOT 6 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK, AMENDMENT NO. 3, PART OF MILITARY LOTS 2, 3, 17 AND 18, TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED ON THE CLERK'S OFFICE AS MAP 7196.

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY, THE NORTHEAST CORNER OF LOT 6 AND THE NORTHWEST CORNER OF LOT 10, SAID POINT BEING THE POINT OF BEGINNING.

RUNNING THENCE LEAVING SAID SOUTHERLY RIGHT-OF-WAY SOUTH 06° 54' 25" WEST ALONG THE EASTERLY BOUNDARY LINE OF LOT 6 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE 481.53 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 83° 05' 35" WEST ALONG THE SOUTHERLY BOUNDARY LINE OF LOT 6 AND THE NORTHERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 282.00 FEET TO A MAG NAIL;

THENCE NORTH 38° 05' 35" WEST ALONG THE WESTERLY BOUNDARY LINE OF LOT 6 AND THE EASTERLY BOUNDARY LINE OF LOT 7 A DISTANCE 281.48 FEET TO A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY;

THENCE NORTH 45° 24' 54" EAST ALONG SAID SOUTHERLY RIGHT-OF-WAY A DISTANCE 202.21 FEET TO A MAG NAIL AT A POINT OF CURVATURE.

THENCE ALONG A CURVE TO THE RIGHT SAID CURVE HAVING A RADIUS OF 352.96 FEET AND AN ARC LENGTH OF 396.82 FEET TO THE POINT OF BEGINNING.

LOT 10

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, BELONGING, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK AND BEING DESIGNATED AS LOT 10 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK, AMENDMENT NO. 3, PART OF MILITARY LOT 2, 3, 17 AND 18, TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196.

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY, THE NORTHEAST CORNER OF LOT 6 AND THE NORTHWEST CORNER OF LOT 10, SAID POINT BEING THE POINT OF BEGINNING.

RUNNING THENCE ALONG A CURVE TO THE RIGHT TO A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 352.96 FEET AND AN ARC LENGTH OF 36.63 FEET TO A CAPPED IRON ROD SET;

THENCE SOUTH 64° 13' 24" EAST CONTINUING ALONG THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS A DISTANCE OF 170.00 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE LEFT TO A CAPPED IRON ROD SET AT A POINT OF REVERSE CURVE, SAID CURVE HAVING A RADIUS OF 600.00 FEET AND AN ARC LENGTH OF 151.63 FEET;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY ON THE WESTERLY RIGHT-OF-WAY LINE OF PLAINFIELD ROAD, SAID CURVE HAVING A RADIUS OF 25.00 FEET AND AN ARC LENGTH OF 37.07 FEET TO A CAPPED IRON ROD SET;

THENCE SOUTH 06° 14' 53" WEST ALONG SAID WESTERLY RIGHT-OF-WAY LINE A DISTANCE OF 211.20 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY. SAID CURVE HAVING A RADIUS OF 540.37 FEET AND AN ARC LENGTH OF 415.87 FEET:

THENCE SOUTH 50° 20' 35" WEST A DISTANCE OF 173.84 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 320.00 FEET AND AN ARC LENGTH OF 260.06 FEET;

THENCE NORTH NORTH 83° 05' 35" WEST A DISTANCE OF 164.88 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 06° 54' 25" EAST ALONG THE EASTERLY BOUNDARY LINE OF LOT 7 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 453.76 FEET TO A DRILL HOLE SET;

THENCE SOUTH 83° 05' 35" EAST ALONG THE NORTHERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 295.00 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 06° 54' 25" EAST ALONG THE EASTERLY BOUNDARY LINE OF LOT 6 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 481.53 FEET TO A CAPPED IRON ROD SET AT THE POINT OF BEGINNING.

Being the same premises conveyed to Salina Park, LLC by deed made by SCCP SALINA I, LIMITED PARTNERSHIP, a Delaware limited partnership dated 06/06/2016, recorded 06/14/2016 in the Office of the County Clerk, Onondaga County in Book 5376 page 591.

TRACT 2:

LOT 3:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK CONTAINING 4.620 ACRES AND BEING DESIGNATED AS LOT 3 AS SHOWN ON THAT CERTAIN PLAT ENTITLED" FINAL PLAN SALINA MEADOWS OFFICE PARK AMENDMENT NO. 3 PART OF MILITARY LOTS 2,3, 17 AND 18 TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196 BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY, WHICH POINT IS THE DIVIDING LINE BETWEEN LOTS 3 AND 13 AS SHOWN ON SAID MAP;

RUNNING THENCE ALONG SAID DIVIDING LINE, NORTH 42° 02' 10" WEST, 338.15 FEET TO LOT 8 AS SHOWN ON SAID MAP;

THENCE ALONG SAID LAST MENTIONED LOT, NORTH 45° 24' 54" EAST, 407.00 FEET TO LAND NOW OR FORMERLY OF DONALD W. KNIGHT;

THENCE ALONG SAID LAST MENTIONED LAND, SOUTH 82° 25' 16" EAST, 285.00 FEET TO LOT 1 ON SAID MAP;

THENCE ALONG SAID LAST MENTIONED LOT, SOUTH 7° 34' 44" WEST, 439.29 FEET TO THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 412.96 FEET, A DISTANCE OF 301.66 FEET TO THE POINT OR PLACE OF BEGINNING.

BEING THE SAME PREMISES CONVEYED TO ROWE PROPERTIES-SALINA MEADOWS IV LIMITED PARTNERSHIP BY DEED FROM ROWE DEVELOPMENT COMPANY, A VIRGINIA CORPORATION, TO ROWE PROPERTIES-SALINA MEADOWS IV LIMITED PARTNERSHIP, A VIRGINIA LIMITED PARTNERSHIP, DATED JULY 2, 1987 AND RECORDED IN ONONDAGA COUNTY CLERK'S OFFICE JULY 27, 1987 ON BOOK 3371 OF DEEDS AT PAGE 165.

LOT 7:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK CONTAINING 4.161 ACRES AND BEING DESIGNATED AS LOT 7 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK AMENDMENT NO. 3 PART OF MILITARY LOTS 2, 3, 17 AND 18 TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196, BOUNDED AND DESCRIBED AS FOLLOWS;

BEGINNING AT A POINT ON THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, WHICH POINT IS THE DIVIDING LINE BETWEEN LOTS 7 AND 6 AS SHOWN ON SAID MAP;

RUNNING THENCE ALONG SAID DIVIDING LINE SOUTH 38° 05' 35" EAST, 281.48 FEET TO LOT 10 AS SHOWN ON SAID FILED MAP;

THENCE ALONG THE DIVIDING LINE BETWEEN LOTS 7 AND 10, NORTH 83° 05' 35" WEST, 13.00 FEET TO A POINT;

THENCE STILL ALONG THE DIVIDING LINE BETWEEN LOTS 7 AND 10, SOUTH 6° 54' 25" WEST, 453.76 FEET TO THE NORTHERLY SIDE OF PLAINFIELD ROAD;

THENCE ALONG THE NORTHERLY AND NORTHEASTERLY SIDES OF PLAINFIELD ROAD THE FOLLOWING 4 COURSES AND DISTANCES:

1. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 203.77 FEET, A DISTANCE OF 153.83 FEET;

2. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 801.50 FEET, A DISTANCE OF 208.36 FEET;

3. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 271.60 FEET, A DISTANCE OF 221.81 FEET;

4. NORTH 5° 58' 33" WEST, 79.40 FEET TO THE EXTREME SOUTHERLY END OF THE ARC OF A CURVE CONNECTING THE EASTERLY SIDE OF PLAINFIELD ROAD WITH THE SOUTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE NORTHEASTERLY, ALONG THE ARC OF SAID CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 25.00 FEET, A DISTANCE OF 36.60 FEET TO THE SOUTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE NORTHEASTERLY ALONG THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 489.54 FEET, A DISTANCE OF 277.45 feet.

THENCE NORTHEASTERLY ALONG THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, NORTH 45 DEGREES 24 MINUTES 54 SECONDS EAST, 34.36 FEET TO THE POINT OR PLACE OF BEGINNING.

Address Reference: 220 Salina Meadows Parkway and 301 Plainfield Road (as to Tract 1) and 231 Salina Meadows Parkway and 200 Salina (as to Tract 2), Syracuse, NY 13212 (For Information Only)

Being the same premises conveyed to Salina Park, LLC by deed made by SCCP SALINA II, LIMITED PARTNERSHIP, a Delaware limited partnership dated 06/06/2016 recorded 06/14/2016 in the Office of the County Clerk, Onondaga County in Book 5376 page 604.

For Information Only:

Said Premises being known as 200 Salina Meadows Pkwy, Syracuse, NY.

Section: 50 Block: 1 Lot: 1.7

Premises: **200 Salina Meadows Pkwy, Town of Salina**
County: **Onondaga** State: **NY**  Sec.: **50** Block: **1** Lot: **1.7**

Premises: **220 Salina Meadows Pkwy, Town of Salina**
County: **Onondaga** State: **NY**  Sec.: **50** Block: **1** Lot: **1.6**

Premises: **231 Salina Meadows Pkwy, Town of Salina**
County: **Onondaga** State: **NY**  Sec.: **50** Block: **1** Lot: **1.3**

Premises: **301 Plainfield Rd, Town of Salina**
County: **Onondaga** State: **NY**  Sec.: **50** Block: **1** Lot: **2.0**

# EXHIBIT 4

Loan No.: 99020222091

**LIMITED RECOURSE GUARANTY**

      **THIS LIMITED RECOURSE GUARANTY** ("**Guaranty**") is made this 16th day of February, 2022, by **MOSHE ROTHMAN**, having an address at 1600 Monroe Avenue, Rochester, NY 14618 (the "**Guarantor**"), in favor of **BANK OF MONTREAL**, a Canadian chartered bank operating out of its Chicago branch (including its successors, transferees and assigns, the "**Lender**").

RECITALS:

      A.    Lender and **AEVRI SALINA MEADOWS LLC**, a Delaware limited liability company ("**Borrower**") have entered into a certain Loan Agreement (as it may hereafter be modified, supplemented, extended, or renewed and in effect from time to time, the "**Loan Agreement**"), which Loan Agreement sets forth the terms and conditions of a loan (said loan, together with all advances which may hereafter be made pursuant to the Loan Agreement, being referred to herein as the "**Loan**") to Borrower secured by certain Property as defined and more particularly described in the Loan Agreement.

      B.    Guarantor is an Affiliate of Borrower and will receive direct or indirect benefit from Lender's making of the Loan to Borrower.

      C.    The Loan is evidenced by a certain Promissory Note executed by Borrower and payable to the order of Lender (such Promissory Note, as it may hereafter be renewed, extended, supplemented, increased or modified and in effect from time to time, and all other notes given in substitution therefor, or in modification, renewal, or extension thereof, in whole or in part, is herein called the "**Note**").

      D.    Any capitalized term used and not defined in this Guaranty shall have the meaning given to such term in the Loan Agreement. This Guaranty is one of the Loan Documents described in the Loan Agreement.

      NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and as a material inducement to Lender to extend credit to Borrower, Guarantor hereby guarantees to Lender the prompt and full payment and performance of the Guaranteed Recourse Obligations of Borrower (defined below), this Guaranty being upon the following terms and conditions:

      1.    <u>Guaranteed Recourse Obligations of Borrower</u>. Guarantor hereby unconditionally and irrevocably guarantees to Lender the punctual payment when due, and not merely the collectability, whether by lapse of time, by acceleration of maturity, or otherwise, and at all times thereafter the payment of the Guaranteed Recourse Obligations of Borrower (hereinafter defined). As used herein, the term "**Guaranteed Recourse Obligations of Borrower**" shall mean all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Article 13 of the Loan Agreement.

151404690v3

2.      Certain Agreements and Waivers by Guarantor.

(a)      Guarantor hereby agrees that each of the following shall constitute Events of Default hereunder: (i) the occurrence of a default by Guarantor in payment of the Guaranteed Recourse Obligations of Borrower, or any part thereof, when such indebtedness becomes due and (ii) the dissolution, bankruptcy and/or insolvency of any Guarantor.

(b)      Upon the occurrence of any Event of Default hereunder, the Guaranteed Recourse Obligations of Borrower, for purposes of this Guaranty, shall be deemed immediately due and payable at the election of Lender.  Guarantor shall, on demand, pay the Guaranteed Recourse Obligations of Borrower to Lender.  It shall not be necessary for Lender, in order to enforce such payment, first to (i) institute suit or pursue or exhaust any rights or remedies against Borrower or others liable for the Debt, (ii) enforce any rights against any security that shall ever have been given to secure the Debt, (iii) join Borrower or any others liable for the payment or performance of the Guaranteed Recourse Obligations of Borrower or any part thereof in any action to enforce this Guaranty and/or (iv) resort to any other means of obtaining payment or performance of the Guaranteed Recourse Obligations of Borrower.

(c)      Suit may be brought or demand may be made against all parties who have signed this Guaranty or any other guaranty covering all or any part of the Guaranteed Recourse Obligations of Borrower, or against any one or more of them, separately or together, without impairing the rights of Lender against any party hereto.

(d)      In the event any payment by Borrower or any other Person to Lender is held to constitute a preference, fraudulent transfer or other voidable payment under any bankruptcy, insolvency or similar law, or if for any other reason Lender is required to refund such payment or pay the amount thereof to any other party, such payment by Borrower or any other party to Lender shall not constitute a release of Guarantor from any liability hereunder and this Guaranty shall continue to be effective or shall be reinstated (notwithstanding any prior release, surrender or discharge by Lender of this Guaranty or of Guarantor), as the case may be, with respect to, and this Guaranty shall apply to, any and all amounts so refunded by Lender or paid by Lender to another Person (which amounts shall constitute part of the Guaranteed Recourse Obligations of Borrower), and any interest paid by Lender and any attorneys' fees, costs and expenses paid or incurred by Lender in connection with any such event.  If acceleration of the time for payment of any amount payable by Borrower under any Loan Document is stayed or delayed by any law or tribunal, any amounts due and payable hereunder shall nonetheless be payable by Guarantor on demand by Lender.

3.      Subordination.  If, for any reason whatsoever, Borrower is now or hereafter becomes indebted to Guarantor:

(a)      such indebtedness and all interest thereon and all liens, security interests and rights now or hereafter existing with respect to property of Borrower securing same shall, at all times, be subordinate in all respects to the Guaranteed Recourse Obligations of Borrower and to all liens, security interests and rights now or hereafter existing to secure the Guaranteed Recourse Obligations of Borrower;

2

(b)     Guarantor shall not be entitled to enforce or receive payment, directly or indirectly, of any such indebtedness of Borrower to Guarantor until the Guaranteed Recourse Obligations of Borrower have been fully and finally paid and performed;

(c)     Guarantor hereby assigns and grants to Lender a security interest in all such indebtedness and security therefor, if any, of Borrower to Guarantor now existing or hereafter arising, including any dividends and payments pursuant to debtor relief or insolvency proceedings referred to below.  In the event of receivership, bankruptcy, reorganization, arrangement or other debtor relief or insolvency proceedings involving Borrower as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and shall have the right to receive directly from the receiver, trustee or other custodian (whether or not an Event of Default shall have occurred or be continuing under any of the Loan Documents), dividends and payments that are payable upon any obligation of Borrower to Guarantor now existing or hereafter arising, and to have all benefits of any security therefor, until the Guaranteed Recourse Obligations of Borrower have been fully and finally paid and performed. If, notwithstanding the foregoing provisions, Guarantor should receive any payment, claim or distribution that is prohibited as provided above in this Section, Guarantor shall pay the same to Lender immediately, Guarantor hereby agreeing that it shall receive the payment, claim or distribution in trust for Lender and shall have absolutely no dominion over the same except to pay it immediately to Lender; and

(d)     Guarantor shall promptly upon request of Lender from time to time execute such documents and perform such acts as Lender may require to evidence and perfect its interest and to permit or facilitate exercise of its rights under this Section.

4.     <u>Other Liability of Guarantor or Borrower</u>.  If Guarantor is or becomes liable, by endorsement or otherwise, for any indebtedness owing by Borrower to Lender other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may have against Guarantor.

5.     <u>Assignment by Lender</u>.  This Guaranty is for the benefit of Lender and Lender's successors and assigns, and in the event of an assignment of the Guaranteed Recourse Obligations of Borrower, or any part thereof, the rights and benefits hereunder, to the extent applicable to the Guaranteed Recourse Obligations of Borrower so assigned, may be transferred with such Guaranteed Recourse Obligations of Borrower.  Guarantor waives notice of any transfer or assignment of the Guaranteed Recourse Obligations of Borrower, or any part thereof, and agrees that failure to give notice will not affect the liabilities of Guarantor hereunder.

6.     <u>Binding Effect</u>.  This Guaranty is binding not only on Guarantor, but also on Guarantor's heirs, personal representatives, successors and assigns.  Upon the death of Guarantor, if Guarantor is a natural person, this Guaranty shall continue against Guarantor's estate as to all of the Guaranteed Recourse Obligations of Borrower, including that portion incurred or arising after the death of Guarantor and shall be provable in full against Guarantor's estate, whether or not the Guaranteed Recourse Obligations of Borrower are then due and payable.  If this Guaranty is signed by more than one Person, then all of the obligations of Guarantor arising hereunder shall be jointly and severally binding on each of the undersigned,

and their respective heirs, personal representatives, successors and assigns, and the term "Guarantor" shall mean all of such Persons and each of them individually. Without limitation of any other term, provision or waiver contained herein, Guarantor hereby acknowledges and agrees that it has been furnished true, complete and correct copies of the Loan Documents and has reviewed the terms and provisions thereof (including, without limitation, the Guaranteed Recourse Obligations of Borrower).

7.    <u>Nature of Guaranty</u>.    Guarantor hereby acknowledges and agrees that this Guaranty (a) is a guaranty of payment and not only of collection and that Guarantor is liable hereunder as a primary obligor, (b) shall only be deemed discharged after the indefeasible satisfaction in full of the Guaranteed Recourse Obligations of Borrower and the Debt, (c) shall not be reduced, released, discharged, satisfied or otherwise impacted in connection with (i) any act or occurrence that might, but for the provisions hereof, be deemed a legal or equitable reduction, satisfaction, discharge or release and/or (ii) Lender's enforcement of remedies under the Loan Documents and (d) shall survive the foregoing and shall not merge with any resulting foreclosure deed, deed in lieu or similar instrument (if any) and (e) is an "instrument for the payment of money only" within the meaning of New York Civil Practice Law and Rules Section 3213.

8.    <u>Governing Law</u>.    The governing law and related provisions set forth in Section 17.2 of the Loan Agreement (including, without limitation, any authorized agent provisions thereof) are hereby incorporated by reference as if fully set forth herein (with Guarantor substituted in all places where Borrower appears thereunder) and shall be deemed fully applicable to Guarantor hereunder.  Guarantor hereby certifies that it has received and reviewed the Loan Agreement (including, without limitation, Section 17.2 thereof).  In the event of any conflict or inconsistency between the terms and conditions hereof and this Section 8, this Section 8 shall control.

9.    <u>Invalidity of Certain Provisions</u>.    If any provision of this Guaranty or the application thereof to any Person or circumstance shall, for any reason and to any extent, be declared to be invalid or unenforceable, neither the remaining provisions of this Guaranty nor the application of such provision to any other Person or circumstance shall be affected thereby, and the remaining provisions of this Guaranty, or the applicability of such provision to other Persons or circumstances, as applicable, shall remain in effect and be enforceable to the maximum extent permitted by applicable Legal Requirements.

10.    <u>Attorneys' Fees, Costs and Expenses of Collection</u>.    Guarantor shall pay on demand all attorneys' fees and all other costs and expenses incurred by Lender in the enforcement of or preservation of Lender's rights under this Guaranty including, without limitation, all attorneys' fees, costs and expenses, investigation costs, and all court costs, whether or not suit is filed herein, or whether at maturity or by acceleration, or whether before or after maturity, or whether in connection with bankruptcy, insolvency or appeal, or whether in connection with the collection and enforcement of this Guaranty against any other Guarantor, if there be more than one.  Guarantor agrees to pay interest on any expenses or other sums due to Lender under this Section 10 that are not paid when due, at a rate per annum equal to the interest rate provided for in the Note.  Guarantor's obligations and liabilities under this Section 10 shall survive any payment or discharge in full of the Guaranteed Recourse Obligations of Borrower.

151404690v3

11.    Payments.  All sums payable under this Guaranty shall be paid in lawful money of the United States of America that at the time of payment is legal tender for the payment of public and private debts.

12.    Controlling Agreement.  It is not the intention of Lender or Guarantor to obligate Guarantor to pay interest in excess of that lawfully permitted to be paid by Guarantor under applicable Legal Requirements.  Should it be determined that any portion of the Guaranteed Recourse Obligations of Borrower or any other amount payable by Guarantor under this Guaranty constitutes interest in excess of the maximum amount of interest that Guarantor, in Guarantor's capacity as guarantor, may lawfully be required to pay under applicable Legal Requirements, the obligation of Guarantor to pay such interest shall automatically be limited to the payment thereof in the maximum amount so permitted under applicable Legal Requirements. The provisions of this Section shall override and control all other provisions of this Guaranty and of any other agreement between Guarantor and Lender.

13.    Notices.  Any and all notices, elections, demands, requests and responses thereto permitted or required to be given under this Guaranty shall be given in accordance with the applicable terms and conditions of the Loan Agreement.  Notices to Guarantor shall be addressed to the address set forth in the opening paragraph.

14.    Cumulative Rights.  The exercise by Lender of any right or remedy hereunder or under any other Loan Document, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.  Lender shall have all rights, remedies and recourses afforded to Lender by reason of this Guaranty or any other Loan Document or by law or equity or otherwise, and the same (a) shall be cumulative and concurrent, (b) may be pursued separately, successively or concurrently against Guarantor or others obligated for the Guaranteed Recourse Obligations of Borrower, or any part thereof, or against any one or more of them, or against any security or otherwise, at the sole discretion of Lender, (c) may be exercised as often as occasion therefor shall arise, it being agreed by Guarantor that the exercise of, discontinuance of the exercise of or failure to exercise any of such rights, remedies, or recourses shall in no event be construed as a waiver or release thereof or of any other right, remedy, or recourse, and (d) are intended to be, and shall be, nonexclusive.  No waiver of any default on the part of Guarantor or of any breach of any of the provisions of this Guaranty or of any other document shall be considered a waiver of any other or subsequent default or breach, and no delay or omission in exercising or enforcing the rights and powers granted herein or in any other document shall be construed as a waiver of such rights and powers, and no exercise or enforcement of any rights or powers hereunder or under any other document shall be held to exhaust such rights and powers, and every such right and power may be exercised from time to time.  The granting of any consent, approval or waiver by Lender shall be limited to the specific instance and purpose therefor and shall not constitute consent or approval in any other instance or for any other purpose.  No notice to or demand on Guarantor in any case shall of itself entitle Guarantor to any other or further notice or demand in similar or other circumstances.  No provision of this Guaranty or any right, remedy or recourse of Lender with respect hereto, or any default or breach, can be waived, nor can this Guaranty or Guarantor be released or discharged in any way or to any extent, except specifically in each case by a writing intended for that purpose (and which refers specifically to this Guaranty) executed, and delivered to Guarantor, by Lender.

5

15. <u>Subrogation</u>. Notwithstanding anything to the contrary contained herein, (a) Guarantor shall not have any right of subrogation in or under any of the Loan Documents or to participate in any way therein, or in any right, title or interest in and to any security or right of recourse for the Guaranteed Recourse Obligations of Borrower, until the Guaranteed Recourse Obligations of Borrower have been fully and finally paid, and (b) if Guarantor is or becomes an "insider" (as defined in Section 101 of the Bankruptcy Code) with respect to Borrower, then Guarantor hereby irrevocably and absolutely waives any and all rights of contribution, indemnification, reimbursement or any similar rights against Borrower with respect to this Guaranty (including any right of subrogation, except to the extent of collateral held by Lender), whether such rights arise under an express or implied contract or by operation of law. It is the intention of the parties that Guarantor shall not be deemed to be a "creditor" (as defined in Section 101 of the Bankruptcy Code) of Borrower by reason of the existence of this Guaranty in the event that Borrower or Guarantor becomes a debtor in any proceeding under the Bankruptcy Code. This waiver is given to induce Lender to make the Loan as evidenced by the Note to Borrower.

16. <u>Further Assurances</u>. Guarantor at Guarantor's expense will promptly execute and deliver to Lender upon Lender's request all such other and further documents, agreements, and instruments in compliance with or accomplishment of the agreements of Guarantor under this Guaranty.

17. <u>No Fiduciary Relationship</u>. The relationship between Lender and Guarantor is solely that of lender and guarantor. Lender has no fiduciary or other special relationship with or duty to Guarantor and none is created hereby or may be inferred from any course of dealing or act or omission of Lender.

18. <u>Interpretation</u>. If this Guaranty is signed by more than one Person as "Guarantor", then the term "Guarantor" as used in this Guaranty shall refer to all such Persons jointly and severally, and all promises, agreements, covenants, waivers, consents, representations, warranties and other provisions in this Guaranty are made by and shall be binding upon each and every such undersigned Person, jointly and severally and Lender may pursue any Guarantor hereunder without being required (i) to pursue any other Guarantor hereunder or (ii) pursue rights and remedies under the Security Instrument and/or applicable Legal Requirements with respect to the Property or any other Loan Documents.

19. <u>Time of Essence</u>. Time shall be of the essence in this Guaranty with respect to all of Guarantor's obligations hereunder.

20. <u>Execution</u>. This Guaranty may be executed in multiple counterparts, each of which, for all purposes, shall be deemed an original, and all of which together shall constitute one and the same agreement.

21. <u>Entire Agreement</u>. This Guaranty embodies the entire agreement between Lender and Guarantor with respect to the guaranty by Guarantor of the Guaranteed Recourse Obligations of Borrower. This Guaranty supersedes all prior agreements and understandings, if any, with respect to guaranty by Guarantor of the Guaranteed Recourse Obligations of Borrower. No condition or conditions precedent to the effectiveness of this Guaranty exist. This Guaranty shall

151404690v3

be effective upon execution by Guarantor and delivery to Lender. This Guaranty may not be modified, amended or superseded except in a writing signed by Lender and Guarantor referencing this Guaranty by its date and specifically identifying the portions hereof that are to be modified, amended or superseded. The Loan Documents represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties.

22. <u>WAIVER OF JURY TRIAL</u>. GUARANTOR HEREBY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH GUARANTOR AND LENDER MAY BE PARTIES ARISING OUT OF, IN CONNECTION WITH, OR IN ANY WAY PERTAINING TO, THIS GUARANTY AND ANY OTHER LOAN DOCUMENT. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS GUARANTY. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY GUARANTOR, AND GUARANTOR HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. GUARANTOR FURTHER REPRESENTS AND WARRANTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS GUARANTY AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED BY INDEPENDENT LEGAL COUNSEL SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

23. <u>Consent to Jurisdiction</u>. Guarantor irrevocably submits generally and unconditionally for itself and in respect of its property to the nonexclusive jurisdiction of any state or federal court sitting in the State of New York over any suit, action or proceeding arising out of, or relating to, this Guaranty, and irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such state or federal court. Guarantor irrevocably waives, to the fullest extent permitted by law, any objection that Guarantor may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in any such court, and any claims that any such suit, action or proceeding is brought in an inconvenient forum. Final judgment in any such suit, action or proceeding brought in any such court shall be conclusive and binding upon Guarantor and may be enforced in any court in which Guarantor is subject to jurisdiction, by a suit upon such judgment provided that service of process is effected upon Guarantor as provided in the Loan Documents or as otherwise permitted by applicable Legal Requirements. Guarantor hereby releases, to the extent permitted by applicable Legal Requirements, all errors and all rights of exemption, appeal, stay of execution, inquisition, and other rights to which Guarantor may otherwise be entitled under the laws of the United States of America or of any state or possession of the United States of America now in force and which may hereinafter be enacted. The authority and power to appear for and enter judgment against Guarantor shall not be exhausted by one or more exercises thereof or by any imperfect exercise thereof and shall not be extinguished by any judgment entered pursuant thereto. Such authority may be exercised on one or more occasions or from time to time in the same or different jurisdiction as often as Lender shall deem necessary and desirable, for all of which this Guaranty shall be sufficient warrant.

151404690v3

24. <u>Waivers</u>.

(a) Guarantor hereby agrees that neither Lender's rights or remedies nor Guarantor's obligations under the terms of this Guaranty shall be released, diminished, impaired, reduced or affected by any one or more of the following events, actions, facts, or circumstances, and the liability of Guarantor under this Guaranty shall be absolute and unconditional irrespective of (and Guarantor hereby waives any rights or protections related to): (i) any limitation of liability or recourse in any other Loan Document or arising under any law; (ii) any claim or defense that this Guaranty was made without consideration or is not supported by adequate consideration; (iii) the taking or accepting of any other security or guaranty for, or right of recourse with respect to, any or all of the Guaranteed Recourse Obligations of Borrower; (iv) any homestead exemption or any other similar exemption under applicable Legal Requirements and Guarantor hereby waives the benefit of any such exemption as to the Guaranteed Recourse Obligations of Borrower; (v) any release, surrender, abandonment, exchange, alteration, sale or other disposition, subordination, deterioration, waste, failure to protect or preserve, impairment, or loss of, or any failure to create or perfect any lien or security interest with respect to, or any other dealings with, any collateral or security at any time existing or purported, believed or expected to exist in connection with any or all of the Guaranteed Recourse Obligations of Borrower, including any impairment of Guarantor's recourse against any Person or collateral; (vi) whether express or by operation of law, any partial release of the liability of Guarantor hereunder, or if one or more other guaranties are now or hereafter obtained by Lender covering all or any part of the Guaranteed Recourse Obligations of Borrower, any complete or partial release of any one or more of such guarantors under any such other guaranty, or any complete or partial release or settlement of Borrower or any other party liable, directly or indirectly, for the payment or performance of any or all of the Guaranteed Recourse Obligations of Borrower; (vii) the death, insolvency, bankruptcy, disability, dissolution, liquidation, termination, receivership, reorganization, merger, consolidation, change of form, structure or ownership, sale of all assets, or lack of corporate, partnership or other power of Borrower or any other party at any time liable for the payment or performance of any or all of the Guaranteed Recourse Obligations of Borrower; (viii) either with or without notice to or consent of Guarantor: any renewal, extension, modification or rearrangement of the terms of any or all of the Guaranteed Recourse Obligations of Borrower and/or any of the Loan Documents; (ix) any neglect, lack of diligence, delay, omission, failure, or refusal of Lender to take or prosecute (or in taking or prosecuting) any action for the collection or enforcement of any of the Guaranteed Recourse Obligations of Borrower, or to foreclose or take or prosecute any action to foreclose (or in foreclosing or taking or prosecuting any action to foreclose) upon any security therefor, or to exercise (or in exercising) any other right or power with respect to any security therefor, or to take or prosecute (or in taking or prosecuting) any action in connection with any Loan Document, or any failure to sell or otherwise dispose of in a commercially reasonable manner any collateral securing any or all of the Guaranteed Recourse Obligations of Borrower; (x) any failure of Lender to notify Guarantor of any creation, renewal, extension, rearrangement, modification, supplement, subordination, or assignment of the Guaranteed Recourse Obligations of Borrower or any part thereof, or of any Loan Document, or of any release of or change in any security, or of any other action taken or refrained from being taken by Lender against Borrower or any security or other recourse, or of any new agreement between Lender and Borrower, it being understood that Lender shall not be required to give Guarantor any notice of any kind under any circumstances with respect to or in connection with the Guaranteed Recourse Obligations of Borrower, any and

8

all rights to notice Guarantor may have otherwise had being hereby waived by Guarantor, and Guarantor shall be responsible for obtaining for itself information regarding Borrower, including, but not limited to, any changes in the business or financial condition of Borrower, and Guarantor acknowledges and agrees that Lender shall have no duty to notify Guarantor of any information which Lender may have concerning Borrower; (xi) if for any reason Lender is required to refund any payment by Borrower to any other party liable for the payment or performance of any or all of the Guaranteed Recourse Obligations of Borrower or pay the amount thereof to someone else; (xii) the making of advances by Lender to protect its interest in the Property, preserve the value of the Property or for the purpose of performing any term or covenant contained in any of the Loan Documents; (xiii) the existence of any claim, counterclaim, set off, recoupment, reduction or defense based upon any claim or other right that Guarantor may at any time have against Borrower, Lender, or any other Person, whether or not arising in connection with this Guaranty, the Note, the Loan Agreement, or any other Loan Document; (xiv) the unenforceability of all or any part of the Guaranteed Recourse Obligations of Borrower against Borrower, whether because the Guaranteed Recourse Obligations of Borrower exceed the amount permitted by law or violate any usury law, or because the act of creating the Guaranteed Recourse Obligations of Borrower, or any part thereof, is ultra vires, or because the officers or Persons creating same acted in excess of their authority, or because of a lack of validity or enforceability of or defect or deficiency in any of the Loan Documents, or because Borrower has any valid defense, claim or offset with respect thereto, or because Borrower's obligation ceases to exist by operation of law, or because of any other reason or circumstance, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other Person be found not liable on the Guaranteed Recourse Obligations of Borrower, or any part thereof, for any reason (and regardless of any joinder of Borrower or any other party in any action to obtain payment or performance of any or all of the Guaranteed Recourse Obligations of Borrower); (xv) any order, ruling or plan of reorganization emanating from proceedings under any bankruptcy or similar insolvency laws with respect to Borrower or any other Person, including any extension, reduction, composition, or other alteration of the Guaranteed Recourse Obligations of Borrower, whether or not consented to by Lender; and/or (xvi) any partial or total transfer, pledge and/or reconstitution of Borrower and/or any direct or indirect owner of Borrower (regardless of whether the same is permitted under the Loan Documents).

(b)     This Guaranty shall be effective as a waiver of, and Guarantor hereby expressly waives:

(i)     any and all rights to which Guarantor may otherwise have been entitled under any suretyship laws in effect from time to time, including any right or privilege, whether existing under statute, at law or in equity, to require Lender to take prior recourse or proceedings against any collateral, security or Person whatsoever;

(ii)     any rights of sovereign immunity and any other similar and/or related rights;

(iii)     any other circumstance that may constitute a defense of Borrower or Guarantor hereunder and/or under the other Loan Documents; and

151404690v3

(iv)    any right and/or requirement of or related to notice, presentment, protest, notice of protest, further notice of nonpayment, notice of dishonor, default, nonperformance, intent to accelerate, acceleration, existence of the Debt and/or any amendment or modification of the Debt.

25.    <u>Representations, Warranties and Covenants of Guarantor</u>.  Guarantor hereby makes the following representations, warranties and covenants (each of which shall remain materially true and correct during the term hereof):  (a) intentionally omitted; (b) the execution, delivery and performance of this Guaranty and the incurrence of the Guaranteed Recourse Obligations of Borrower, now or hereafter owing, and the creation of liens on Guarantor's assets (i) intentionally omitted and (ii) do not require any approval or consent of, or filing with, any governmental authority or other Person (or such approvals and consents have been obtained and delivered to the Lender) and are not in contravention of any provision of law applicable to Guarantor; (c) this Guaranty and the other Loan Documents to which Guarantor is a party constitutes when delivered, valid and binding obligations of Guarantor, enforceable in accordance with their respective terms; (d) Guarantor is not a party to any indenture, loan or credit agreement, or any lease or other agreement or instrument, or subject to any restriction, which is likely to have a Material Adverse Effect; (e) Guarantor has filed all tax returns which are required to be filed (or obtained proper extensions of time for the filing thereof) and has paid, or made adequate provision for the payment of, all taxes which have or may become due pursuant to said returns or to assessments received; (f) the financial statements and other information pertaining to Guarantor submitted to Lender are true, complete and correct in all material respects and do not contain any material misstatement of fact or omit to state a material fact or any fact necessary to make the statements contained therein not misleading; (g) there is no litigation, at law or in equity, or any proceeding before any federal, state, provincial or municipal board or other governmental or administrative agency pending or, to the knowledge of Guarantor, threatened, or any basis therefor, which involves a risk of any material judgment or liability not fully covered by insurance (other than any deductible) which is likely to be adversely determined and if so, would have a Material Adverse Effect, and no judgment, decree, or order of any federal, state, provincial or municipal court, board or other governmental or administrative agency has been issued against Guarantor which has a Material Adverse Effect; (h) the making of the Loan to Borrower will result in material benefits to Guarantor; (i) Guarantor (1) has not entered into this Guaranty or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (2) has received reasonably equivalent value in exchange for the Guaranteed Recourse Obligations of Borrower hereunder and under the Loan Documents; and (j) Guarantor is not a "foreign person" within the meaning of Section 1445(1)(3) of the Internal Revenue Code.  Each of the representations and covenants of and/or relating to Guarantor set forth in the other Loan Documents are hereby re-made by Guarantor and incorporated herein by reference as if fully set forth herein.

26.    <u>Financial Covenants of Guarantor</u>

(a)    Guarantor (i) shall keep and maintain complete and accurate books and records and (ii) shall permit Lender and any authorized representatives of Lender to have access to and to inspect, examine and make copies of the books and records, any and all accounts, data and other documents of Guarantor, at all reasonable times, during normal business hours, at Guarantor's address for notices as set forth herein upon the giving of reasonable notice of such intent.

Guarantor shall also provide to Lender, upon Lender's reasonable request, such proofs of payments, costs, expenses, revenues and earnings, and other documentation as Lender may reasonably request, from time to time, and with such other information, in such detail as may reasonably be required by Lender.

(b)     Lender shall have the right, at any time and from time to time upon the occurrence and continuance of an "Event of Default" hereunder or under the other Loan Documents, to audit the books and records of Guarantor.

(c)     During the term hereunder, Guarantor will furnish or cause to be furnished to Lender, as soon as available, and in any event within ninety (90) days after the end of each calendar year, the annual financial statements of Guarantor, which financial statements shall be prepared on an unaudited basis, in form substantially similar to those previously delivered by Guarantor to Lender and which shall include Guarantor's balance sheet, tax returns and statements of net worth and contingent liabilities. All such financial statements shall (A) be prepared by Guarantor's independent certified public accountants (which accountants shall be reasonably acceptable to Lender) and (B) be certified by Guarantor to Lender as true and correct in all material respects and (C) contain such backup and/or supporting information as may be reasonably requested by Lender. In addition, Guarantor shall promptly furnish to Lender any other financial information reasonably requested by Lender from time to time in respect of Guarantor.

(d)     Guarantor shall, at all times while the Debt remains unsatisfied, maintain a net worth of not less than $25,000,000.00 and a liquidity of not less than $2,500,000.00. For the purposes hereof, Guarantor's net worth and liquidity shall be determined by Lender in its reasonable discretion, at any time and from time to time, and Guarantor's net worth shall exclude any equity attributable to the Property

27.     <u>Replacement Guarantor</u>.  To the extent that any Guarantor is a natural person, the death or incompetency of such Guarantor shall be an Event of Default hereunder (a "**Specified EOD**") unless such Guarantor is replaced in accordance with this Section. In connection with the occurrence of a Specified EOD, Borrower shall be permitted to substitute a replacement guarantor and no "Event of Default" shall be deemed to have occurred hereunder as a result thereof, provided, that (a) no other Event of Default hereunder or under and as defined in the Loan Agreement has occurred and is then continuing, (b) such substitution is permitted by then applicable REMIC Requirements and (c) each of the following terms and conditions are satisfied: (i) within thirty (30) days after the occurrence of such death or incompetency, Borrower delivers to Lender written notice of its intent to substitute the guarantor; (ii) the replacement guarantor is a Satisfactory Replacement Guarantor (as defined below); (iii) within fifteen (15) days after delivery of the written notice described in the preceding subclause (i), such Satisfactory Replacement Guarantor assumes the obligations of Guarantor hereunder and under the other Loan Documents in a manner satisfying the Prudent Lender Standard; (iv) concurrently with such assumption, (A) such Satisfactory Replacement Guarantor delivers to Lender a Spousal Consent (as defined below), as and to the extent applicable and (B) each of Borrower and such Satisfactory Replacement Guarantor affirms each of their respective obligations under the Loan Documents in a manner satisfying the Prudent Lender Standard; and (v) prior to or concurrently with such assumption, as applicable, Lender receives such information,

documentation and opinions as may be required by Lender in connection with such assumption and the foregoing in order to satisfy the Prudent Lender Standard (including, without limitation, opinions relating to REMIC). As used herein, the term "**Satisfactory Replacement Guarantor**" shall mean a replacement guarantor that (1) satisfies the net worth and liquidity requirements set forth herein, (2) is acceptable to the Rating Agencies, (3) satisfies the Prudent Lender Standard and (4) is an Affiliate of Sponsor.

28.     Change in Residency. Guarantor hereby represents and warrants that Guarantor is a resident of the State of New York and that Guarantor's primary domicile is in the State of New York. Guarantor shall not change Guarantor's State of residence and/or primary domicile to a State that is a community property jurisdiction unless (i) Guarantor first (A) provides Lender at least ten (10) Business Days prior written notice thereof and (B) if Guarantor is married at the time, causes Guarantor's spouse to execute and deliver to Lender a spousal consent with respect to this Guaranty (which spousal consent shall be in form and substance satisfactory to Lender) (a "**Spousal Consent**") and (ii) if Guarantor is not married at the time and subsequently marries, or if Guarantor enters into a new marriage, at any time when Guarantor is a resident (and/or has a primary domicile) in a community property jurisdiction, Guarantor causes his spouse to execute and deliver to Lender a Spousal Consent within ten (10) days after the occurrence of any such marriage. Guarantor's failure to comply with any of the foregoing shall, at Lender's option, constitute an "Event of Default" hereunder and under the Loan Agreement.

**[NO FURTHER TEXT ON THIS PAGE]**

151404690v3



 

**IN WITNESS WHEREOF**, Guarantor has duly executed this Guaranty as of the date first written above.

GUARANTOR:

**MOSHE ROTHMAN**, an individual

# EXHIBIT 5

Loan No. 99020222091

**CASH MANAGEMENT AGREEMENT**

Dated:  as of February 16, 2022

between

**AEVRI SALINA MEADOWS LLC,**
as Borrower

and

**BANK OF MONTREAL**,
as Lender

## CASH MANAGEMENT AGREEMENT

**THIS CASH MANAGEMENT AGREEMENT**, dated as of February 16, 2022 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), between **BANK OF MONTREAL**, a Canadian chartered bank operating out of its Chicago branch, having an address at c/o BMO Capital Markets Corp., 3 Times Square, New York New York 10036 (together with its successors and/or assigns, "**Lender**") and **AEVRI SALINA MEADOWS LLC**, a Delaware limited liability company, having its principal place of business at 2604 Elmwood Avenue, Suite 210 Rochester, New York 14618 (together with its successors and/or assigns, "**Borrower**").

### WITNESSETH:

WHEREAS, pursuant to that certain Loan Agreement (as the same may hereafter be amended, restated, replaced, supplemented, renewed, extended or otherwise modified from time to time, the "**Loan Agreement**"), dated as of the date hereof, between Borrower and Lender, Lender has made the Loan (as defined in the Loan Agreement) to Borrower;

WHEREAS, pursuant to the Loan Documents (as defined in the Loan Agreement), Borrower has granted to Lender a security interest in all of Borrower's right, title and interest in, to and under the Rents ((as defined in the Loan Agreement)) and has assigned and conveyed to Lender all of Borrower's right, title and interest in, to and under the Rents due and to become due to Borrower; and

WHEREAS, in order to fulfill all of its obligations under the Loan Documents, Borrower has agreed that, as and to the extent required under the Loan Agreement, all Rents and other revenues from the Property will be deposited directly into the Restricted Account (as defined in the Loan Agreement) established by Borrower with Bank (as defined in the Loan Agreement) and which Rents and other revenues from the Property shall be transferred from the Restricted Account by Bank as and to the extent set forth in the Loan Agreement;

NOW, THEREFORE, in consideration of the covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS

**Section 1.1     General**. As used herein, the following terms shall have the following definitions:

"**Cash Management Bank**" shall mean a Person designated from time to time by Lender in accordance with Section 2.1 hereof.

**Section 1.2     Other Capitalized Terms**. All other capitalized terms set forth in this Agreement not defined herein shall have the meaning set forth in the Loan Agreement.

# ARTICLE II

# THE ACCOUNTS

**Section 2.1** **Designation of Cash Management Bank; Establishment of Accounts**.

(a)        In connection with each of the initial establishment of the Cash Management Account and the succession of one Person for another as Cash Management Bank hereunder, Lender shall, by written notice to the newly designated Cash Management Bank and Borrower (in the form attached hereto as Schedule 1 (the "**Designation Notice**"), designate a Person as Cash Management Bank, which such Person (i) shall meet the applicable requirements set forth in the Loan Agreement and (ii) without limitation of the foregoing, may be Lender or Servicer. From and after such designation and the counter-signature of the Designation Notice by the applicable newly designated Cash Management Bank, said Cash Management Bank shall have all of the right, duties and obligations hereunder as if a direct party hereto, which such rights shall include, without limitation, the rights to directly enforce the rights and duties of Cash Management Bank hereunder.

(b)        Borrower shall establish and maintain the Accounts as and to the extent required and pursuant to the applicable terms and conditions, in each case, of the Loan Agreement. Borrower agrees to cooperate with Cash Management Bank and to execute from time to time any documents and take all actions which may be reasonably necessary or proper to establish and maintain the Cash Management Account (including, without limitation, in connection with any succession of one Person for another as Cash Management Bank hereunder as provided herein). Borrower hereby acknowledges and agrees that some or all of the Accounts may be maintained as subaccounts of the Cash Management Account on a ledger-entry basis. To the extent that any such Accounts are so maintained (such Accounts, the **"Applicable Accounts"**), references herein to the Cash Management Account shall be deemed to also refer to the Applicable Accounts. Notwithstanding the foregoing or anything to the contrary contained herein or in the other Loan Documents, references in (i) the Loan Agreement to the Cash Management Account and the Applicable Accounts being established with Lender or Servicer shall be deemed to refer to the Cash Management Account and the Applicable Accounts being established with Cash Management Bank in accordance with the applicable terms and conditions hereof and (ii) Section 9.3 of the Loan Agreement to "amounts due and owing to Lender and/or Servicer pursuant to the terms hereof and/or of the other Loan Documents" shall be deemed to include amounts due and owing to Cash Management Bank hereunder.

**Section 2.2** **Account Name**. The Cash Management Account shall be in the name of Borrower for the benefit of Lender (or in such other name as Lender shall direct in writing). The Cash Management Account shall be assigned the federal tax identification number of Borrower, which number is 87-3753260.

**Section 2.3** **Eligible Account**. The Cash Management Account shall be treated as a "deposit account" as such term is defined in Section 9-102(a) of the UCC. For so long as this Agreement remains in effect, the Cash Management Account shall be maintained as an Eligible Account. Unless required by applicable Legal Requirements or as otherwise expressly provided

2

for in the Loan Agreement, the Cash Management Account shall be held as a non-interest bearing account.

**Section 2.4    Minimum Balance**. The Borrower agrees that the Cash Management Account shall at all times have a minimum balance of $5,000.00 (the "**Minimum Balance**").   If at any time during the term of the Loan, the balance in the Cash Management Account is less than the Minimum Balance, Borrower shall immediately deposit into the Cash Management Account sufficient funds to meet the Minimum Balance requirement.  Cash Management Bank may change the Minimum Balance at any time upon one (1) Business Day's advance notice to Borrower.

**ARTICLE III**

**DEPOSITS AND DISBURSEMENTS**

**Section 3.1    Deposits into Restricted Account; Maintenance of Restricted Account**. Borrower shall cause the deposits to be made to the Restricted Account and maintain the Restricted Account, in each case, as and to the extent required by Section 9.2 of the Loan Agreement and shall otherwise comply with Section 9.2 of the Loan Agreement.

**Section 3.2    Additional Deposits**.  Borrower shall make such additional deposits into the Cash Management Account and the other Accounts as may be required by the Loan Agreement and any other Loan Document.

**Section 3.3    Transfers from the Restricted Account**.  Borrower shall cause Bank to transfer all funds on deposit in the Restricted Account as and to the extent required under the Loan Agreement.

**Section 3.4    Application of Cash Management Account Funds**.  Subject to the terms and conditions hereof and of the Loan Agreement (including, without limitation, Section 8.7 thereof), Cash Management Bank shall apply and disburse sums on deposit in the Cash Management Account and the Applicable Accounts, in each case, as provided in the Loan Agreement (including, without limitation, Sections 9.3 and 9.4 thereof).   Notwithstanding anything to the contrary contained herein or in the Loan Agreement, the amounts available for application and disbursement from the Cash Management Account on each Monthly Payment Date pursuant to Section 9.3 of the Loan Agreement shall only be deemed to include amounts on deposit therein as of the end of the Interest Accrual Period immediately preceding such Monthly Payment Date.

**Section 3.5    Deficiencies.**  Notwithstanding anything herein to the contrary, Borrower acknowledges that Borrower is responsible for monitoring the sufficiency of funds deposited in the Accounts and that Borrower is liable for any deficiency in available funds, irrespective of whether Borrower has received any account statement, notice or demand from Lender.  If, on any Monthly Payment Date, the amount of the available funds in the Cash Management Account is insufficient to make all of the disbursements provided for in Section 3.4, Borrower shall deposit into the Cash Management Account on or prior to such Monthly Payment Date, without the need

for any notice or demand from Lender, the amount of such deficiency in immediately available funds.

**Section 3.6     Sole Dominion and Control**.

(a)     Borrower and Cash Management Bank acknowledge and agree that the Restricted Account, Cash Management Account and any and all other Accounts are subject to the sole dominion, control and discretion of Lender subject to the terms hereof and of the Loan Agreement.   Cash Management Bank shall comply with all instructions given by Lender with respect to the Cash Management Account without further consent by Borrower or any other Person.   Borrower acknowledges and agrees that, except as specifically provided in this Agreement, neither Borrower nor any other Person claiming on behalf of, or through, Borrower shall have any right to access, withdraw or make use of any amounts from the Accounts.

(b)     The parties acknowledge and agree that Lender may from time to time grant to Servicer the revocable right and power to act, as Lender's representative for the purpose of managing and administrating the Cash Management Account in all respects, including, without limitation, the disposition of funds on deposit in the Cash Management Account, making deposits thereto and withdrawals therefrom, initiating electronic funds transfers therefrom, obtaining in the ordinary course of business any other bank services then provided by Cash Management Bank relating thereto, and deleting, adding, or changing authorized signatories therefor, in each case, in accordance with this Agreement, the Account Documentation (as defined below) and the standard policies and procedures of Cash Management Bank.   Lender will provide written notice to Cash Management Bank of the appointment of a Servicer.   Until Cash Management Bank receives, and has had a reasonable opportunity to act upon, written notice from the Lender to the contrary, Servicer is authorized to act as stated herein, and Cash Management Bank is entitled to rely upon such authority.   If Servicer resigns as servicer for the Loan, Servicer may, with ten (10) days prior written notice to all other parties to this Agreement, withdraw from its obligations hereunder.   In the event of such withdrawal or in the event Cash Management Bank receives, and has had a reasonable opportunity to act upon, written notice from Lender that the Servicer is no longer authorized hereunder, Cash Management Bank shall comply only with instructions provided by Lender, unless and until Lender appoints a replacement Servicer hereunder.

**Section 3.7     Borrower's Operating Account Information**.   Unless otherwise instructed by Lender (or Servicer) in writing, Cash Management Bank will transfer any funds payable to Borrower as set forth in this Article III by wire transfer (or other means in Cash Management Bank's sole discretion) of immediately available funds to the account of Borrower or such other account of Borrower later specified by Lender (or Servicer) in writing.

# ARTICLE IV

# PLEDGE OF ACCOUNTS

**Section 4.1     Security for Obligations**.   (a)   To secure the full and punctual payment and performance of all obligations of Borrower now or hereafter existing with respect to the

Loan, whether for principal, interest, fees, expenses or otherwise, and all obligations of Borrower now or hereafter existing under the Note, the Security Instrument, this Agreement and all other Loan Documents (all such obligations, collectively, the "**Obligations**"), Borrower hereby grants to Lender a first priority continuing security interest in and to the following property of Borrower, whether now owned or existing or hereafter acquired or arising and regardless of where located (all of the same, collectively, the "**Collateral**"):

> (i)      the Accounts and all cash, checks, drafts, certificates, and instruments, if any, from time to time deposited or held in the Accounts from time to time including, without limitation, all deposits or wire transfers made to the Accounts and all Account Collateral (as defined in the Loan Agreement);

> (ii)      any and all amounts invested in Permitted Investments;

> (iii)      all interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and

> (iv)      to the extent not covered by clauses (i), (ii) or (iii) above, all "proceeds" (as defined under the Uniform Commercial Code as in effect in the state in which the Cash Management Account is located (the "**UCC**")) of any or all of the foregoing.

(b)      Lender, and its authorized designees, shall have with respect to the Collateral, in addition to the rights and remedies herein set forth and under the Loan Documents, all of the rights and remedies available to a secured party under the UCC, as if such rights and remedies were fully set forth herein. Notwithstanding anything to the contrary herein, Cash Management Bank shall not be liable or responsible for the validity or enforceability of the security interest (except to the extent the applicable security interest is deemed invalid or unenforceable in a court of competent jurisdiction due to the gross negligence, willful misconduct, or fraud of Cash Management Bank).

**Section 4.2      Rights Upon Event of Default**.  Upon the occurrence and during the continuance of an Event of Default, Lender shall promptly notify Cash Management Bank in writing of such Event of Default and, without notice from Cash Management Bank or Lender to Borrower, (a) Borrower shall have no further right in respect of (including, without limitation, the right to instruct Lender or Cash Management Bank to transfer from) the Accounts, (b) Lender may direct Cash Management Bank to liquidate and transfer any amounts then invested in Permitted Investments to the Cash Management Account or reinvest such amounts in such other Permitted Investments as Lender may reasonably determine is necessary to perfect or protect any security interest granted or purported to be granted hereby or to enable Cash Management Bank, as Cash Management Bank for Lender, or Lender, to exercise and enforce Lender's rights and remedies hereunder with respect to any collateral and (c) Lender may apply any funds in the Cash Management Account to any Obligations in such order of priority as Lender may determine in its sole discretion.  If any Event of Default no longer exists, Lender agrees to promptly notify Cash Management Bank that such Event of Default no longer exists and that the Borrower's rights to disbursements from the Accounts (if any, as set forth in this Agreement) shall be

5

151404685v4

reinstated.  Notwithstanding anything to the contrary herein, Cash Management Bank shall have a reasonable opportunity to act after receipt of notice of an Event of Default, which shall be defined as reasonably promptly, but not less than one (1) Business Day following receipt of such notice.

**Section 4.3  Financing Statement; Further Assurances**.  Simultaneously herewith, Borrower shall execute (if required under Legal Requirements) and deliver to Lender for filing a financing statement or statements in connection with the Collateral in the form required by Lender to properly perfect Lender's security interest therein.  Borrower agrees that at any time and from time to time, at the expense of Borrower, Borrower will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that Cash Management Bank or Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby (including, without limitation, any security interest in and to any Permitted Investments) or to enable Cash Management Bank or Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral.

**Section 4.4  Termination of Agreement**.  This Agreement shall create a continuing security interest in the Collateral and shall remain in full force and effect until indefeasible payment and performance in full of the Obligations.  Upon the indefeasible payment and performance in full of the Obligations, this Agreement shall terminate and Borrower shall be entitled to the prompt return, at its expense, of such of the Collateral as shall not have been sold or otherwise applied pursuant to the terms hereof or pursuant to the terms of the Loan Documents, and Lender shall authorize the release to Borrower of all funds remaining on deposit under this Agreement including, without any limitation, any amounts invested in the Permitted Investments.

**Section 4.5  Acknowledgment of Lien/Offset Rights**.  Cash Management Bank may charge or set off against any Account for (i) any of Cash Management Bank's charges, fees and expenses as provided herein, (ii) all items deposited in and credited to an Account and subsequently returned unpaid or with respect to which Cash Management Bank fails to receive final settlement, (iii) all customary charges and obligations and liabilities arising out of any cash management services provided by Cash Management Bank under and in accordance with this Agreement, including, but not limited to, ACH system transactions that have not been paid or satisfied after written demand from Cash Management Bank to Borrower with a copy to Lender, and (iv) any amounts deposited in an Account in error or as necessary to correct processing errors. If there are insufficient collected funds in the Accounts to cover the amount of any returned check or other adjustment or correction to be debited thereto, Borrower shall repay Cash Management Bank the amount of such debit immediately upon demand.

# ARTICLE V

# CERTAIN MATTERS AFFECTING CASH MANAGEMENT BANK

**Section 5.1**    Cash Management Bank may rely, and shall be protected in and shall not be liable for, acting or refraining from acting, upon any instruction, direction, notice, request,

consent, order, certificate, report, opinion or document (including, but not limited to, electronically confirmed facsimiles thereof) believed by it to be genuine and to have been signed or presented by the proper party or parties, including, without limitation, Lender (or its designee). Cash Management Bank shall have no obligation to review or confirm that actions taken pursuant to the foregoing in accordance with this Agreement comply with any other agreement or document to which it is not a party.

**Section 5.2**    The duties and obligations of Cash Management Bank set forth in this Agreement shall be determined solely by the express provisions of this Agreement. Cash Management Bank shall not be responsible for any actions except for the performance of its duties and obligations as are specifically set forth herein. No implied covenants or obligations shall be read into this Agreement against Cash Management Bank. Cash Management Bank makes no express or implied representations or warranties with respect to its obligations under this Agreement, except for those expressly set forth herein.

**Section 5.3**    Cash Management Bank will not be liable to Borrower, Lender or any other Person for any losses and liabilities caused by (i) circumstances beyond Cash Management Bank's reasonable control (including, without limitation, computer malfunctions, interruptions of communication facilities, labor difficulties, acts of God, wars, or terrorist attacks) or (ii) any other circumstances, except, in each case, to the extent that such losses and liabilities are directly caused by Cash Management Bank's gross negligence or willful misconduct as determined by a final non-appealable judgment by a court of competent jurisdiction. Cash Management Bank shall not be deemed to have knowledge (imputed or otherwise) of any of the terms or conditions of the Loan Agreement (other than: (x) Article 8 and Article 9 of the Loan Agreement (the "**CM Provisions**"), (y) other provisions of the Loan Agreement expressly referenced herein and/or in the CM Provisions, and (z) definitions associated with capitalized terms utilized in the CM Provisions or this Agreement).

**Section 5.4**    IN NO EVENT WILL CASH MANAGEMENT BANK BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, WHETHER OR NOT THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN TO CASH MANAGEMENT BANK, AND REGARDLESS OF THE FORM OF THE CLAIM OR ACTION, OR THE LEGAL THEORY ON WHICH SUCH CLAIM OR ACTION IS BASED.

**Section 5.5**    Borrower will indemnify, defend and hold harmless Cash Management Bank, its officers, directors, employees, and agents (collectively, the "**Indemnified Parties**") from and against any and all claims, demands, losses, liabilities, damages, costs and expenses (including reasonable attorneys' fees) (collectively "**Losses and Liabilities**") Cash Management Bank may suffer or incur as a result of or in connection with (a) Cash Management Bank's complying with any binding legal process, legal notice or court order, (b) Cash Management Bank's following any instruction or request of Lender, (c) Cash Management Bank's complying with its obligations under this Agreement, or (d) this Agreement or the services provided hereunder, except to the extent such Losses and Liabilities are caused by Cash Management Bank's gross negligence or willful misconduct as determined by a final non-appealable judgment by a court of competent jurisdiction.

7

# ARTICLE VI

# RESIGNATION AND TERMINATION

**Section 6.1** **Resignation or Termination of Cash Management Bank**. (a)  Cash Management Bank shall have the right to resign as Cash Management Bank hereunder upon thirty (30) days' prior written notice to Borrower and Lender, and in the event of such resignation, Lender shall appoint a successor Cash Management Bank hereunder satisfying the applicable terms hereof and of the Loan Agreement.  No such resignation by Cash Management Bank shall become effective until a successor Cash Management Bank shall have accepted such appointment and executed an agreement by which it shall have assumed all of the rights and obligations of Cash Management Bank hereunder (an "**Assignment Agreement**").  If no such successor Cash Management Bank is appointed within sixty (60) days after receipt of the resigning Cash Management Bank's notice of resignation, the resigning Cash Management Bank shall disburse the funds in the Cash Management Account and the Applicable Accounts pursuant to the written instructions of Lender.  Notwithstanding anything to the contrary contained in the foregoing, Cash Management Bank may resign from this Agreement immediately upon written notice to Borrower and Lender in the event that Cash Management Bank suspects fraud or other illegal activity has occurred in connection with any Account or this Agreement.

(b)  In connection with any resignation by Cash Management Bank or any termination of Cash Management Bank hereunder, (i) the resigning or terminated (as applicable) Cash Management Bank shall, at the sole cost of Borrower, (A) duly assign, transfer and deliver to the successor Cash Management Bank this Agreement and all cash and Permitted Investments held by it hereunder, (B) execute such financing statements and other instruments as may be necessary to assign the security interest in the Collateral existing in favor of the resigning or terminated Cash Management Bank hereunder to the successor Cash Management Bank and to otherwise give effect to such succession and (C) take such other actions as may be reasonably required by Lender, Borrower or the successor Cash Management Bank in connection with the foregoing and (ii) the successor Cash Management Bank shall establish (in accordance with the applicable terms and conditions hereof and of the Loan Agreement) cash collateral account(s), which shall become the Cash Management Account for purposes of this Agreement upon the succession of such Cash Management Bank in accordance with written instructions from Lender.

(c)  Lender at its sole discretion shall have the right, upon thirty (30) days' notice to Borrower and Cash Management Bank, to (i) terminate this Agreement and Cash Management Bank or (ii) replace Cash Management Bank with a successor Cash Management Bank satisfying the applicable terms hereof and of the Loan Agreement, provided that such successor Cash Management Bank shall execute an Assignment Agreement in connection therewith.

(d)  Upon satisfaction in full or, if applicable, defeasance in full of the Obligations, this Agreement shall be terminated on notice from Lender that its security interest in the Cash Management Account has been released.  Upon any such termination of this Agreement, Cash Management Bank will transfer all collected and available balances (less any deductions permitted hereof) in the Cash Management Account on the date of such termination in accordance with Lender's written instructions.

8

(e)     In connection with any termination and disposition of funds in the Cash Management Account, Cash Management Bank shall have the right to deduct from the final disbursement of funds from the Cash Management Account any amounts that are then due and owing to Cash Management Bank under this Agreement or that are reasonably anticipated to become due to Cash Management Bank under this Agreement, including, but not limited to, any amount due or expected to become due under Section 9.3 hereof, and any other reasonable and customary costs and expenses anticipated in connection with the termination of this Agreement. Cash Management Bank agrees that any amount withheld in excess of Cash Management Bank's actual costs and expenses incurred in connection with the termination of this Agreement shall be forwarded within thirty (30) calendar days to Lender if any Obligations are outstanding, and otherwise to Borrower.

(f)     Borrower's payment obligations hereunder, as well as the indemnifications made by Borrower, and the limitations on the liability of Cash Management Bank accepted by Borrower and Lender under this Agreement will continue after the termination of this Agreement or resignation by Cash Management Bank, as applicable, with respect to all the circumstances to which they are applicable, existing or occurring before such termination, and any liability of any party to this Agreement, as determined under the provisions of this Agreement, with respect to acts or omissions of such party prior to such termination will also survive such termination.

**Section 6.2     Lender Appointed Attorney-In-Fact**.  Borrower hereby irrevocably constitutes and appoints Lender as Borrower's true and lawful attorney-in-fact, with full power of substitution, to execute, acknowledge and deliver any instruments and to exercise and enforce every right, power, remedy, option and privilege of Borrower with respect to the Collateral, and do in the name, place and stead of Borrower, all such acts, things and deeds for and on behalf of and in the name of Borrower, which Borrower could or might do or which Lender may deem necessary or desirable to more fully vest in Lender the rights and remedies provided for herein. The foregoing powers of attorney are irrevocable and coupled with an interest; provided however, the same shall not be exercised by Lender unless Borrower fails to perform any agreement herein and such failure shall continue for five (5) Business Days after notice of such failure is given to Borrower.  Any reasonable expenses of Lender in connection therewith shall be paid by Borrower.

## ARTICLE VII

## REMEDIES

**Section 7.1     Remedies**.  Upon the occurrence and during the continuance of an Event of Default, Lender may:

(a)     without notice to Borrower, except as required by law, and at any time or from time to time, charge, set-off and otherwise apply all or any part of the Collateral against the Obligations or any part thereof;

(b)     in its sole discretion, at any time and from time to time, exercise any and all rights and remedies available to it under this Agreement, the Loan Agreement and the other Loan Documents, and as a secured party under the UCC and under any Legal Requirements; and

9

(c)     demand, collect, take possession of, receipt for, settle, compromise, adjust, sue for, foreclose or realize upon the Collateral (or any portion thereof) as Lender may determine in its sole discretion.

This Section 7.1 is not intended to limit in any way the rights and remedies available to Lender under the Loan Agreement or any other Loan Documents.

**Section 7.2     Waiver.**     Borrower hereby expressly waives, to the fullest extent permitted by law, presentment, demand, protest or any notice of any kind in connection with this Agreement or the Collateral.   Borrower acknowledges and agrees that ten (10) days' prior written notice of the time and place of any public sale of the Collateral or any other intended disposition thereof shall be reasonable and sufficient notice to Borrower within the meaning of the applicable UCC.

## ARTICLE VIII

## LIMITATION ON LENDER'S LIABILITY

**Section 8.1     Limitation on Liability.**     Lender shall not be liable for any acts, omissions, errors in judgment or mistakes of fact or law, including, without limitation, acts, omissions, errors or mistakes with respect to the Collateral, except for those arising as a result of Lender's active gross negligence or willful misconduct.   Without limiting the generality of the foregoing, except as otherwise expressly provided for herein or as required by Legal Requirements, Lender shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not Lender has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other right pertaining to any Collateral.   Lender is hereby authorized by Borrower to act on any written instruction believed by Lender in good faith to have been given or sent by Borrower.

**Section 8.2     Indemnity.**   Borrower shall indemnify and hold Lender, its employees and officers harmless from and against any loss, cost or damage (including, without limitation, reasonable attorneys' fees and disbursements) incurred by Lender in connection with the transactions contemplated hereby, except to the extent that such loss or damage results from Lender's gross negligence or willful misconduct.

## ARTICLE IX

## MISCELLANEOUS

**Section 9.1     No Waiver.**   The rights and remedies provided in this Agreement and the other Loan Documents are cumulative and may be exercised independently or concurrently, and are not exclusive of any other right or remedy provided at law or in equity.   No failure to exercise or delay by Lender in exercising any right or remedy hereunder or under the Loan Documents shall impair or prohibit the exercise of any such rights or remedies in the future or be deemed to constitute a waiver or limitation of any such right or remedy or acquiescence therein. Every right and remedy granted to Lender hereunder or by law may be exercised by Lender at any time and from time to time, and as often as Lender may deem it reasonably expedient.   Any

and all of Lender's rights with respect to the lien and security interest granted hereunder shall continue unimpaired, and Borrower shall be and remain obligated in accordance with the terms hereof, notwithstanding (a) any proceeding of Borrower under any Creditors Rights Laws, (b) the release or substitution of Collateral at any time, or of any rights or interests therein or (c) any delay, extension of time, renewal, compromise or other indulgence granted by Lender in the event of any default, with respect to the Collateral or otherwise hereunder. No delay or extension of time by Lender in exercising any power of sale, option or other right or remedy hereunder, and no notice or demand which may be given to or made upon Borrower by Lender, shall constitute a waiver thereof, or limit, impair or prejudice Lender's right, without notice or demand, to take any action against Borrower or to exercise any other power of sale, option or any other right or remedy. No waiver of any term or condition of this Agreement, whether by delay, omission or otherwise, shall be effective unless in writing and signed by the party sought to be charged, and then such waiver shall be effective only in the specific instance and for the purpose for which given.

**Section 9.2**   **Costs and Expenses**.  The Collateral shall secure, and Borrower shall pay to Lender on demand, from time to time, all reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees and disbursements, and transfer, recording and filing fees, taxes and other charges) of, or incidental to, the creation or perfection of any lien or security interest granted or intended to be granted hereby, the custody, care, sale, transfer, administration, collection of or realization on the Collateral, or in any way relating to the enforcement, protection or preservation of the rights or remedies of Lender under this Agreement, the Loan Agreement, the Note, the Security Instrument, and any other Loan Document.

**Section 9.3**   **Bank Fees**.  Borrower agrees to pay all Cash Management Bank's usual and customary fees and charges for the maintenance and administration of the Cash Management Account (including the Applicable Accounts) and for the treasury management and other account services provided with respect to the Cash Management Account (including the Applicable Accounts) and transfer fees and fees for items deposited therein and the funds withdrawn therefrom (collectively "**Bank Fees**").  The Bank Fees will be paid to Cash Management Bank as set forth herein, without notice to Lender or Borrower.  Borrower and Lender hereby agree that Cash Management Bank shall be authorized to charge the Cash Management Account for all Bank Fees.  If there are not sufficient funds in the Cash Management Account to cover fully the Bank Fees on the Business Day Cash Management Bank attempts to debit them from the Cash Management Account, such shortfall or the amount of such Bank Fees will be paid by Borrower to Cash Management Bank, without setoff or counterclaim, within five (5) calendar days after demand from Cash Management Bank.

**Section 9.4**   **Account Documentation**.  Lender and Borrower agree that, except as specifically provided in this Agreement, the Cash Management Account (including the Applicable Accounts) will be subject to, and Cash Management Bank's operation of the Cash Management Account and the Applicable Accounts shall be in accordance with, the terms and provisions of Cash Management Bank's deposit account opening documentation and other related account documentation governing the Cash Management Account (including the Applicable Accounts) (the "**Account Documentation**").  Borrower agrees, upon Cash Management Bank's request and from time to time (including, without limitation, in connection with any succession of one Person for another as Cash Management Bank hereunder as provided

11

herein), to promptly execute and deliver the Account Documentation to Cash Management Bank. For the avoidance of doubt, the parties hereto acknowledge and agree that pursuant to the Account Documentation, the Cash Management Account may be subject to Cash Management Bank's sweep product services or other services as may be applicable. Notwithstanding anything to the contrary contained herein, the foregoing provisions of this Section 9.4 shall not operate to void, amend or otherwise modify the rights and obligations of Lender, Borrower and/or Cash Management Bank, in each case, as specifically and expressly set forth herein.

**Section 9.5** **Balance Reports and Bank Statements**. Borrower agrees that it shall, at its sole cost and expense, make available to Lender information directly related to the Cash Management Account, including granting Lender online access to Borrower's treasury reporting with Cash Management Bank (if any). Cash Management Bank will, at the telephone or written request of Lender, provide Lender such information by a transmission method determined by Cash Management Bank, in its sole discretion, which may include granting Lender online access to Borrower's treasury reporting (if any), and Borrower consents to the provision of such information to Lender.

**Section 9.6** **Successors and Assigns; Joint and Several Obligations**.

(a) This Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective successors and permitted assigns. The foregoing shall not be construed, however, to permit assignments or transfers otherwise prohibited under the Loan Agreement or the other Loan Documents.

(b) Lender shall have the right to assign or transfer rights and obligations under this Agreement without limitation. Any assignee or transferee shall be entitled to all the benefits afforded Lender under this Agreement; provided, that such assignee or transferee shall upon written request deliver to the other parties hereto written confirmation that such assignee or transferee agrees to be bound by the terms of this Agreement and is also the assignee or transferee of the Note and the other Loan Documents.

(c) Borrower shall not have the right to assign and transfer its rights and obligations hereunder, except with Lender's consent and as expressly permitted under the terms of the Loan Agreement.

(d) Any duties or actions of Lender hereunder may be performed by Lender or its agent(s), including without limitation, any Servicer or any trustee in a Securitization.

(e) If Borrower consists of more than one person or entity, each shall be jointly and severally liable to perform Borrower's obligations under this Agreement.

**Section 9.7** **Notices**. All notices required or permitted hereunder shall be given and shall become effective as provided in the Loan Agreement. Cash Management Bank shall, promptly after its designation hereunder, provide written notice to Borrower and Lender of the address(es) to which notices are to be provided to it in accordance with the foregoing.

151404685v4

Section 9.8    **Captions**.    Captions in this Agreement are included herein for convenience of reference only and shall not constitute part of this Agreement for any other purpose.

Section 9.9    **Governing Law**.  This Agreement shall be governed by the laws of the State of New York (without giving effect to its conflicts of law rules), except with regard to payment of checks and other items and other issues relating to the operations of the Cash Management Account or any other account to which funds from the Cash Management Account are transferred, which issues shall be governed by the laws of the state where the Cash Management Account or such other account are located.

Section 9.10    **Severability**.    To the extent that the terms of this agreement are inconsistent with, or prohibited or unenforceable under, any Legal Requirements, they will be deemed ineffective only to the extent of such prohibition or unenforceability, and will be deemed modified and applied in a manner consistent with such law or regulation.  Any provision of this agreement which is deemed unenforceable or invalid in any jurisdiction will not affect the enforceability or validity of the remaining provisions of this agreement or the same provision in any other jurisdiction.

Section 9.11    **Duplicate Originals; Counterparts**.  This Agreement may be executed in any number of duplicate originals, and each duplicate original shall be deemed to be an original. This Agreement (and each duplicate original) also may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute a fully executed agreement even though all signatures do not appear on the same document.  Any counterpart delivered by facsimile, pdf or other electronic means shall have the same import and effect as original counterparts and shall be valid, enforceable and binding for the purposes of this Agreement.

Section 9.12    **Entire Agreement**.    This Agreement and the Account Documentation constitutes the entire and final agreement between the parties with respect to the subject matter hereof and may not be changed, terminated or otherwise varied, except by a writing duly executed by the parties.

Section 9.13    **Modifications, Amendments, and Waivers**.  This Agreement may not be modified or amended, or any provision thereof waived, except in a writing signed by all parties to this agreement. At any time when the Cash Management Bank is not also the Servicer (or an affiliate of the Servicer), without the prior written consent of Cash Management Bank, Borrower and Lender shall not amend the definition of Eligible Account, Eligible Institution or Permitted Investment set forth in the Loan Agreement. Additionally, at any time when the Cash Management Bank is not also the Servicer (or an affiliate of the Servicer), Borrower and Lender acknowledge that Cash Management Bank will not be bound by any amendment to Section 8.7, Section 9.3 or Section 9.4 of the Loan Agreement until notice of said amendment is delivered to Cash Management Bank.

Section 9.14    **Trial by Jury**.  THE PARTIES HERETO HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT

151404685v4

SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE CASH MANAGEMENT ACCOUNT OR THIS AGREEMENT.

**Section 9.15** **Borrower Information**.  Borrower shall provide information as may reasonably be requested by Cash Management Bank from time to time for purposes of compliance by Cash Management Bank with applicable laws (including without limitation the USA Patriot Act and other "know your customer" and anti-money laundering rules and regulations), and any policy or procedure implemented by Cash Management Bank to comply therewith.

**Section 9.16** **Interpleader**.  If at any time: (a) Cash Management Bank, in good faith, is in doubt as to the action it should take under this Agreement, (b) the Borrower  becomes subject to a voluntary or involuntary bankruptcy, reorganization, receivership or similar proceeding, or (c) Cash Management Bank is served with legal process which it in good faith believes prohibits the disbursement of the funds deposited in any Account, then Cash Management Bank shall have the right (i) to place a hold on the funds in the Accounts until such time as it receives an appropriate court order or other assurance satisfactory to it as to the disposition of the funds in the Accounts, or (ii) to commence, at Borrower's expense, an interpleader action in any competent Federal or State Court located in the State of New York, and otherwise to take no further action except in accordance with written instructions from Lender and Borrower or in accordance with the final order of a competent court, served on Cash Management Bank.

**[NO FURTHER TEXT ON THIS PAGE]**

151404685v4



**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the day and year first above written.

BORROWER:

**AEVRI SALINA MEADOWS LLC**
a Delaware limited liability company

By: _____
Name: Moshe Rothman
Title: President

**SCHEDULE 1**

**FORM OF DESIGNATION NOTICE**

**DESIGNATION NOTICE**

Aevri Salina Meadows LLC

[NEW CASH MANAGEMENT BANK]

>    Re: Cash Management Agreement by and among [_____], a [_____] and [Bank of Montreal], dated as of [_____] (the "**Cash Management Agreement**").

To Whom it May Concern:

    Please be informed that (i) pursuant to Section 2.1(a) of the Cash Management Agreement, [_____] has been designated by Lender as Cash Management Bank thereunder and (ii) this notice constitutes a Designation Notice (as defined in the Cash Management Agreement).

>                   Very truly yours,

>              **[BANK OF MONTREAL]**

>              By: _____
>              Name:
>              Title:

151404685v4

**ACKNKOWLEDGED AND AGREED TO BY:**

**[CASH MANAGEMENT BANK]**


By: _____
       Name:
       Title:

# EXHIBIT 6

## CONDITIONAL ASSIGNMENT OF MANAGEMENT AGREEMENT

THIS CONDITIONAL ASSIGNMENT OF MANAGEMENT AGREEMENT (this "**Assignment**") is made as of the 16th day of February, 2022, by **AEVRI SALINA MEADOWS LLC**, a Delaware limited liability company, having an address at 2604 Elmwood Avenue, Suite 210 Rochester, New York 14618 ("**Borrower**") to **BANK OF MONTREAL**, a Canadian chartered bank operating out of its Chicago branch, having an address at c/o BMO Capital Markets Corp., 3 Times Square, New York New York 10036 (together with its successors and/or assigns, "**Lender**"), and is acknowledged and consented to by **MIKE BARNEY MANAGEMENT** having an address at 5015 Campuswood Drive, Suite 101, East Syracuse, NY 13057 (together with its successors and assigns, "**Agent**").

### RECITALS:

A.      Borrower, pursuant to the Note (as defined in the Loan Agreement (defined below)) is indebted to Lender in the principal sum of $25,000,000.00 in lawful money of the United States of America, with interest from the date thereof at the rates set forth in the Note (the indebtedness evidenced by the Note, together with such interest accrued thereon, shall collectively be referred to as the "**Loan**"), principal and interest to be payable in accordance with the terms and conditions provided in the Note and the Loan Agreement (defined below).

B.      The Loan is secured by, among other things, the Security Instrument (as defined in the Loan Agreement), which grants Lender a first lien on the property encumbered thereby (the "**Property**") and a Loan Agreement dated as of the date hereof and executed by Borrower and Lender (together with any and all extensions, renewals, substitutions, replacements, amendments, modifications and/or restatements thereof, the "**Loan Agreement**"). All capitalized terms not otherwise defined herein have the meanings set forth in the Loan Agreement.

C.      Pursuant to a certain Agreement of Management dated as of the date herein between Borrower and Agent (the "**Management Agreement**") (a true and correct copy of which Management Agreement is attached hereto as <u>Exhibit A</u>), Borrower employed Agent exclusively to rent, lease, operate and manage the Property.

D.      Lender requires as a condition to the making of the Loan that Borrower assign the Management Agreement as set forth below.

### AGREEMENT:

For good and valuable consideration the parties hereto agree as follows:

1.      <u>Assignment of Management Agreement</u>. As additional collateral security for the Loan, Borrower hereby conditionally transfers, sets over and assigns to Lender all of Borrower's right, title and interest in and to the Management Agreement, said transfer and assignment to automatically become a present, unconditional assignment, at Lender's option exercised by written notice to Borrower and Agent, upon the occurrence and during the continuance of an

Event of Default. After exercise of Lender's rights under this Paragraph 1, (i) Agent shall, subject to the terms and conditions contained herein, continue to provide management services in accordance with, and to the extent provided for in, the Management Agreement and shall take no further instruction from Borrower or any Person (other than Lender) in connection therewith and (ii) neither Lender nor Successor Owner shall be responsible or liable for any representation or warranty made by Borrower under the Management Agreement or for any act, omission or default by Borrower under the Management Agreement which occurred prior to exercise of Lender's rights under this Paragraph 1, and each such act, omission or default shall be deemed to have been waived by Agent and shall not constitute grounds for the termination of the Management Agreement by Agent or for any other claim or liability against Lender, provided, however, such waiver by Agent in favor of Lender shall not preclude Agent from pursuing a claim against Borrower with respect thereto.

2.     Termination. At such time as the Loan is paid in full and the Security Instrument is released or assigned of record, this Assignment and all of Lender's right, title and interest hereunder with respect to the Management Agreement shall terminate.

3.     Borrower's Covenants. Without limiting the terms and conditions set forth in the Loan Agreement and the other Loan Documents, Borrower hereby covenants with Lender that during the term of this Assignment: (a) Borrower shall not assign or transfer (directly or indirectly) the responsibility for the management of the Property from Agent to any other Person other than in compliance with the terms and conditions of the Loan Agreement applicable thereto; (b) Borrower shall not terminate or amend any of the terms or provisions of the Management Agreement other than in compliance with the terms and conditions of the Loan Agreement applicable thereto; and (c) Borrower shall, in the manner provided for in this Assignment, give notice to Lender of any notice or information that Borrower receives which indicates that Agent is terminating the Management Agreement or that Agent is otherwise discontinuing its management of the Property.

4.     Notice and Cure. Agent hereby agrees that prior to Agent's commencement of any action in exercise of its remedies under the Management Agreement, Agent agrees (a) to notify Lender in writing of any default by Borrower under the Management Agreement and (b) that Lender shall have the right (but not the obligation) to cure such default within thirty (30) days from the date of Lender's receipt of such notice, or if such default is not reasonably susceptible of being cured within said thirty (30) day period. Lender shall have such additional time as is reasonably required to cure such default, provided Lender (i) gives written notice to Agent of its intent to cure the default, (ii) commences to cure such default within said initial thirty (30) day period, and (iii) thereafter diligently proceeds to cure such default. Agent hereby agrees that no termination of the Management Agreement, or any other action at law in exercise of Agent's remedies under the Management Agreement, shall commence unless the Agent has complied with the above notice procedure and Lender has been given the opportunity to cure the default as set forth herein.

5.     Lender's Right to Replace Agent. At Lender's option, Lender shall have the right to terminate the Management Agreement and replace Agent or require that Borrower terminate the Management Agreement and replace Agent, without penalty or fee, if at any time during the Loan: (a) Agent shall become insolvent or a debtor in (i) any involuntary bankruptcy or

2

insolvency proceeding that is not dismissed within ninety (90) days of the filing thereof; or (ii) any voluntary bankruptcy or insolvency proceeding; (b) there exists a Trigger Period; (c) intentionally omitted; (d) Agent has engaged in gross negligence, fraud, willful misconduct or misappropriation of funds; or (e) there exists a default by Agent beyond all applicable notice and cure periods under the Management Agreement. Unless Agent is notified to the contrary in writing by Lender or any Successor Owner (as defined herein), the Management Agreement and Agent's rights thereunder shall automatically terminate upon Lender's or any Successor Owner's acquisition of title to the Property following Lender's exercise of its remedies under the Loan Documents and the expiration of the notice period described below. Additionally, any Successor Owner shall have the right to terminate without cause the Management Agreement and Agent's rights thereunder. Agent and Borrower acknowledge and agree that the exercise of the aforesaid termination rights shall (I) in the case of the exercise of the termination rights only, require ten (10) days' notice to Agent (which notice may be given prior to, concurrently with or following Lender's or Successor Owner's acquisition of the Property), (II) not require the payment of any penalty or similar fee by Lender or any Successor Owner and (III) shall be in addition to any other termination or similar rights set forth in the Management Agreement. At such time as Agent may be removed pursuant to this Paragraph 5, a Qualified Manager shall assume management of the Property pursuant to a Qualified Management Agreement. The term "**Successor Owner**" as used herein shall mean any Person acquiring title to the Property in connection with or subsequent to Lender exercising its remedies under the Loan Documents.

6.    Subordination of Management Fees. Borrower and Agent hereby agree that at all times prior to the termination of this Assignment, the Management Agreement shall be subordinate, inferior and subject to the Security Instrument and the other Loan Documents. Borrower and Agent further agree that Agent shall not be entitled to receive any fee, commission or other amount payable to Agent under the Management Agreement (including, without limitation, incentive management fees and/or termination fees, if any) (collectively, the "**Management Fees**") for and during any period of time that any amount due and owing under the Note and the other Loan Documents is not paid when due; provided, however, that Agent shall not be obligated to return or refund to Lender any fee, commission or other amount already received by Agent, and to which Agent was entitled under this Assignment. Any incentives or other scheduled compensation (including, without limitation, any termination fees) beyond the base management fee set forth in the Management Agreement will be deferred and will be paid annually in arrears, provided that all debts and other obligations or expenses have been paid in full for the prior year and there has been no material adverse change in the Property since the time of the last annual payment. Borrower and Agent hereby agree that, notwithstanding anything in the Management Agreement to the contrary, any Management Fees payable to Agent under the Management Agreement in excess of three percent (3%) of Gross Rents per annum from the Property shall only be due and payable to the extent sufficient net excess cash flow exists from the Property following payment of all amounts then due under the Loan Documents and all Property expenses.

7.    Consent and Agreement by Agent. Agent hereby acknowledges and consents to this Assignment and agrees that Agent will act in conformity with the provisions of this Assignment and Lender's rights hereunder or otherwise related to the Management Agreement. Agent hereby further agrees that it shall faithfully observe and perform each and every one of the obligations and agreements imposed upon it under the Management Agreement. In the event

3

151404683v4

that the responsibility for the management of the Property is transferred from Agent in accordance with the provisions hereof, Agent shall, and hereby agrees to, fully cooperate in transferring its responsibility to a new management company and effectuate such transfer no later than thirty (30) days from the date the Management Agreement is terminated. Further, without limiting the other provisions hereof, Agent hereby agrees (a) not to contest or impede the exercise by Lender of any right it has under or in connection with this Assignment; (b) that it shall, in the manner provided for in this Assignment, give Lender at least sixty (60) days' prior written notice of its intention to assign or transfer any interest, right or obligation under the Management Agreement or to terminate the Management Agreement or otherwise discontinue its management of the Property; (c) Agent may not terminate or cancel the Management Agreement or otherwise discontinue its management of the Property, provided, however, Agent shall have the right to terminate the Management Agreement (i) as a result of a default by Borrower under the Management Agreement and in accordance with the terms thereof, subject to Lender's rights under Paragraph 4 of this Agreement or (ii) to the extent that (x) no Event of Default has occurred and is continuing, (y) Lender receives from Agent (in the manner provided for in this Assignment) written notice at least sixty (60) days' prior to the effective date thereof and (z) prior to or contemporaneously with such termination or discontinuance, a Qualified Manager has assumed management of the Property pursuant to a Qualified Management Agreement and the other applicable conditions set forth herein and in the other Loan Documents have been satisfied; (d) notwithstanding anything in the Loan Agreement to the contrary, to the extent Agent is an affiliate of Borrower as of the date hereof, Agent shall be deemed an "Affiliated Manager" at all times during the term of the Loan; and (e) Agent shall not assign or transfer (directly or indirectly) any interest, right or obligation under the Management Agreement, provided, however, that Agent shall have the right to assign the Management Agreement to the extent that (i) no Event of Default has occurred and is continuing, (ii) Lender receives (in the manner provided for in this Assignment) at least sixty (60) days' prior written notice of the same and (iii) the applicable assignee is a Qualified Manager engaged pursuant to a Qualified Management Agreement and the other applicable conditions set forth herein and in the other Loan Documents have been satisfied.

8.     Agreement by Borrower and Agent. Borrower and Agent hereby acknowledge and agree that all revenues generated from the Property and/or payable by Agent to Borrower shall be held and disbursed in accordance with the terms and conditions contained in Article 9 of the Loan Agreement. Borrower and Agent also agree that Agent shall manage the Property and interact with Borrower and other Persons, in each case, in a manner which would not cause a breach or violation of Article 5 of the Loan Agreement.

9.     Governing Law.     The governing law and related provisions set forth in Section 17.2 of the Loan Agreement (including, without limitation, any authorized agent provisions thereof) are hereby incorporated by reference as if fully set forth herein (with each of Borrower and Agent substituted in all places where Borrower appears thereunder) and shall be deemed fully applicable to each of Borrower and Agent hereunder. Agent hereby certifies that it has received and reviewed the Loan Agreement (including, without limitation, Section 17.2 thereof).

4

151404683v4

10.  Notices.  All notices required or permitted hereunder shall be given and shall become effective as provided in the Loan Agreement. All notices to Agent shall be addressed to the address set forth in the opening paragraph.

11.  No Oral Change.  This Assignment, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

12.  Liability.  If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Assignment shall be binding upon and inure to the benefit of Borrower, Agent and Lender and their respective successors and assigns forever.

13.  Inapplicable Provisions.  If any term, covenant or condition of this Assignment is held to be invalid, illegal or unenforceable in any respect, this Assignment shall be construed without such provision.

14.  Headings, etc.  The headings and captions of various paragraphs of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

15.  Duplicate Originals; Counterparts.  This Assignment may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Assignment may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Assignment. The failure of any party hereto to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

16.  Number and Gender.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

17.  Secondary Market:  The provisions of Article 11 of the Loan Agreement are incorporated herein by reference with the same force as if fully set forth herein.

18.  Miscellaneous.  Wherever pursuant to this Assignment it is provided that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, reasonable legal fees and disbursements of Lender, whether with respect to retained firms, the reimbursement for the expenses of in-house staff or otherwise. In the event of any conflict or inconsistency between (a) the terms and conditions this Assignment or the Loan Agreement and (b) the terms and conditions of the Management Agreement, the terms and conditions of this Assignment and the Loan Agreement shall control and be binding and the Management Agreement shall be deemed amended thereby.

19.  Exculpation.  The provisions of Article 13 of the Loan Agreement are incorporated herein by reference with the same force as if fully set forth herein.

5

151404683v4

[NO FURTHER TEXT ON THIS PAGE]

6



**BORROWER:**

**AEVRI SALINA MEADOWS
LLC**
a Delaware limited liability company

By: _____
Name:  Moshe Rothman
Title:    President

**IN WITNESS WHEREOF,** each of the parties has signed this Agreement by its duly authorized representative as of the date first written above.

**LENDER:**

**BANK OF MONTREAL**

By: _____

Name: Michael S. Birajiclian
Title: Authorized Signatory

**AGENT:**

**SMARTCORE CONSULTING, LLC,**
a New York limited liability company

By:

Name:   Michael Barney

Title:  Member

# EXHIBIT A

## MANAGEMENT AGREEMENT

### (attached hereto)

151404683v1

## AGREEMENT OF MANAGEMENT

**AGREEMENT OF MANAGEMENT,** ("Agreement") made this __ day of February 2022 between Smartcore Consulting, LLC, a New York limited liability company doing business as: Mike Barney Management ("Manager"), and Aevri Salina Meadows LLC ("Owner").

1.  RETENTION OF AGENT. The Owner hereby retains the Manager as sole and exclusive agent to manage the following New York State properties (hereinafter, collectively referred to as the "Property"):

    - 301 Plainfield Road. Syracuse, New York
    - 200 Salina Meadows Parkway, Syracuse, New York
    - 220 Salina Meadows Parkway, Syracuse, New York
    - 231 Salina Meadows Parkway, Syracuse, New York

2.  TERM OF AGENCY. This agreement is effective for (24) twenty-four months starting on February __, 2022: To ensure continuous service, this agreement will be automatically renewed for successive (12) twelve-month periods, unless either party serves written notice on the other party of its intention to cancel the renewal at least sixty (60) days prior to the expiration of the initial Term of Agency.

3.  ACCEPTANCE OF AGENCY. The Manager hereby accepts such agency and agrees to perform all services necessary for the care, protection, maintenance, and management of the property, including but not limited to, the following:

    a.  Collect all rentals and other income for the Property, provided that nothing herein contained shall constitute a guarantee by the Manager of the payment of rent by tenants. Manager shall collect all rents, deposits, fees and other sums payable with respect to the Property when due and all sums so collected shall be promptly deposited by Manager in the Owner's property operating account. Manager shall collect from tenants any charges for special services or for above standard use of services by any tenant, as provided for in such tenant's Lease.

    b.  Negotiate on behalf of Owner contracts with all vendors, service providers and contractors for the maintenance and operation of the Property. Manager shall not enter any contract without the prior written approval of Owner; provided that Manager may enter a contract with a term of less than twelve (12) months and that requires no more than thirty (30) days' notice to terminate. The Manager shall discharge any contractor whose discharge is demanded by the Owner, unless Manager reasonably believes that such demand would be in violation of any written agreement or contract existing with respect to any such contractor and that Manager would suffer potential liability as a result of the discharge of the contractor. If Manager obtains any volume discounts or other benefits, Manager shall pass the benefit of such discounts to Owner. Any proposed contracts with officers, employees, shareholders or affiliates of Manager or anyone related to such employees, officers or affiliates shall be disclosed to Owner and shall be at prevailing market rates.

c. Enforce all leases and provide Owner with immediate notice of any consequential tenant complaints, problems, or continuous property issues.

d. In accordance with the approved Property Budget, purchase on behalf of the Owner, all equipment, and materials necessary for the maintenance and operation of the Property, provided that outside of the Property Budget, the purchase of any one single item in excess of $1,000.00, or in the aggregate, during a one (1) month period, in excess of $2,000.00, shall not be made without Owner's prior approval.

e. Contract on behalf of the Owner for and supervise the making of all repairs and common area alterations at the Property. The Manager shall not contract for any repair, alteration, or decoration exceeding in cost of $2,000.00 per property without the prior written approval of the Owner except as set forth in the Property Budget.

f. Negotiate on behalf of the Owner natural gas, electricity, and other services and commodities necessary for the operation and maintenance of the Property, provided, however, Manager shall first obtain Owner's prior written approval before entering into any binding contracts on behalf of Owner relating to the foregoing.

g. Organize, review, and recommend payment for all property vendors and contractors. Twice a month invoices will be batched and submitted to Owner for review and approval for payment

h. Provide notice to every tenant with contact information and emergency contact information. Notification shall be in accordance with individual tenant leases and include the current onsite tenant contacts.

i. Monthly status of all construction projects and capital expenditure projects.

j. Obtain lien waivers and/or necessary receipts for all contractor, subcontractors, and vendors simultaneous with payment.

k. Forward tenant work orders, construction requests and other tenant payables to the Owner for proper billing.

l. Maintain Emergency contact list for all tenants.

m. Review and approve for accuracy the monthly tenant rent statements and mail statements for delivery prior to the 25th of each month.

n. Distribute, track and collect necessary tenant estoppels and SNDA documents as required by the Owner.

o. Ensure that the physical facilities on the Property, including the buildings, parking areas, personal property and grounds are at all times well maintained and kept in good order and repair, and in a proper state of cleanliness.

p. Provide the additional services listed on Exhibit A of this Agreement.

4. BOOKKEEPING, FINANCIAL REPORTING AND BUDGET PREPARATION.

a. Manager shall submit to Owner the following monthly statements and reports with respect to the Property and such other reports reasonably requested by Owner:

- A balance sheet;
- A current year twelve (12) month cash flow projection containing year to date monthly income and expenses and projected monthly income and expenses for the balance of the fiscal year;
- A current Rent Roll;
- A tenant receivable report;
- A reconciliation of all bank accounts; and
- A detailed general ledger

b. Manager shall from time to time, and at least annually, prepare and submit to the Owner a budget of income and expenses. The Manager shall also from time to time, and as requested by Owner, prepare and submit to the Owner the following schedules:

- Forecast of rental and occupancy changes;
- Review of lease negotiations for budget forecasting;
- Abstracts of leases;
- Variance reports with comparisons to the approved annual budget;
- Profit and Loss Statement / Income and Expense Statement;

c. The budget for expenses submitted by the Manager, and approved by the Owner, shall in general form be the basis on which the Manager shall incur expense items for the operation of the Property and the procuring of tenants for the Property.

d. Bookkeeping scope of work shall include tracking, documenting, and reporting income and expenses on a monthly basis.

e. Owner shall have online access to all management software that pertains to the Property records at all times and shall maintain sole ownership of all data generated therefrom; if kept in non-electronic form, Manager shall provide copies to Owner at Owner's reasonable expense within a reasonable period of time.

5. Annual Budgets.

    a. On or before November 1 of each calendar year, Manager shall prepare and submit to Owner for approval:

        (1) A proposed annual operating budget and projection of monthly receipts and disbursements for the Property for the forthcoming fiscal year in such format as is approved by Owner.

        (2) A proposed annual budget and projection of capital or extraordinary expenditures for the forthcoming fiscal year in such format as is approved by Owner. Owner will consider the proposed budgets and will consult with Manager in the ensuing period prior to the commencement of the forthcoming fiscal year in order to mutually agree on an operating budget (the "Property Operating Budget") and on a capital budget (the "Property Capital Budget," and together with the Property Operating Budget, the "Property Budget"). In the event that as of the commencement of any fiscal year Owner has failed to approve a Property Operating Budget for such fiscal year, Manager is authorized to maintain and operate the Property under the parameters set forth in the Property Operating Budget for the previous fiscal year.

    b. Manager agrees to use diligence and to employ all reasonable efforts to ensure that the actual costs of maintaining and operating the Property shall not exceed the Property Operating Budget or the Property Capital Budget.

    c. In the event sufficient funds are not available in the Operating Account, Manager shall apply all funds available in the Operating Account each month in the following priority: (a) all taxes, mortgage and insurance payments, and requirements of any governmental authority; (b) Utilities; (c) Management Fee and other commissions or fees due to Manager, and (d) third parties (e). Under no circumstances shall Manager be required to advance its own funds for the benefit of Owner or of the Property.

6 EMPLOYEES.

    a. All Property employees will be employed solely and directly by the Manager. Manager shall manage, maintain and operate the Property as an independent contractor of Owner (not as an employee, partner or joint venturer of Owner). The management company responsibilities include:

        (1) Maintaining a full-time Property specific, quality, trained and knowledgeable building engineer with training specific to the properties.

        (2) Provide and maintain professional attire including management company uniforms;

        (3) Weekly time sheet signoffs and hourly oversight;

        (4) Evaluations and salary rate adjustments;

        (5) Disciplinary actions and all related documentation;

(6) Bi-annual employee evaluations and all related documentation;

(7) Terminations and all related documentation;

(8) Worker's Compensation related matters.

b. Manager shall replace any full-time, on-site employees who are at any time disapproved by Owner.

c. Manager is an equal opportunity, nondiscriminatory employer.

d. Manager shall make all necessary payroll deductions for unemployment insurance, social security, withholding taxes and other applicable taxes or employee fringe benefits and shall prepare, maintain and file all necessary reports with respect to such taxes or deductions and all other necessary statements and reports pertaining to Manager's employees.

e. This base contract compensation package includes one full-time building engineer in the fee structure. Overtime, emergencies, or extraordinary circumstances that require more than one full-time engineer will be billed at the defined rates below. All overtime that exceeds two (2) hours per week or emergency work that requires added manpower must be approved by the Owner.

f. Overtime, emergency, or extraordinary circumstances hourly billing rate at $50.00 per manhour. Billing rate remains consistent for the initial term of the agreement but will be subject to annual increases after the initial term.

7. MEETING ATTENDANCE. The Manager shall have representation to participate in weekly or bi-weekly management meetings. Topics to include all, but not limited to, tenant issues, accounts receivables, accounts payables, operational issues, construction projects, tenant improvement projects and capital improvement projects.

8. INDEMNIFICATION & INSURANCE.

a. The Owner agrees to carry, at its own expense, necessary public liability insurance adequate to protect the interests of the parties hereto. The policies shall be written to include the Manager as an additional insured.

b. Owner hereby agrees to defend, indemnify, and hold Manager, harmless from and against all actions, claims, allegations, liabilities, demands, damages, losses, attorney's fees, costs, or expenses of any nature whatsoever (collectively "Losses"), in any way arising out of, based upon, or related to the management of this Property by the Manager, or the performance of any of the duties, obligations, or authorities by Manager hereunder. Provided, however, the foregoing indemnification obligation of Owner shall not apply to the extent such losses arise or are related to any act of Manager, its officers, agents, or employees that is the beyond the scope of the powers and authorities granted herein, or any act of gross negligence or willful misconduct or violation of law by Manager, its officers, agents, or employees.

c. Manager shall at all times during the term of this Agreement, carry and maintain the following insurance coverage with companies qualified and authorized to do business within the State of the Property, with an A.M. Best rating of A8 or higher. Unless otherwise provided for in this Agreement, the cost of this insurance will be at Manager's sole cost and expense. Manager shall furnish Owner with certificates of said insurance policy or policies.

    (1) <u>Employee Dishonesty Insurance</u>. An insurance policy which includes employee dishonesty coverage in the amount of not less than $1,000,000, for all employees of Manager who handle funds of Owner. Said policy may be a blanket policy covering all employees of Manager.

    (2) <u>Workers' Compensation Insurance</u>. Workers' compensation insurance in full compliance with all applicable state and federal laws and regulations covering all employees of Manager. Coverage shall include employer's liability insurance in the amount of not less than $500,000.

d. Manager hereby agrees to defend, indemnify and hold Owner harmless from and against all actions, claims, allegations, liabilities, demands, loss, attorney's fees, cost or expense of any nature whatsoever arising out of or based upon any act of Manager, its officers, agents or employees that is beyond the scope of the powers and authorities granted herein, or any act of negligence (gross or ordinary) or willful misconduct or violation of law by Manager, its officers, agents or employees

9. <u>COMPENSATION FOR MANAGEMENT SERVICES</u>. The Owner shall pay the Manager as Manager's compensation:

    a Property management and bookkeeping: A flat monthly fee of $9,550.00 Compensation includes property managers full participation.

    b. Full Time Building Engineer coverage: $5,500.00 per month. Overtime and added coverage is approved by the Owner and billed at the rate of $50.00 per hour and invoiced monthly on an as required basis. Building engineer pay rate is fixed for the initial term, but subject to annual escalations after the initial term of the agreement.

    c. Monthly compensation fees shall be paid monthly by the 10th day of the month Example: March 2022 management fees will be paid on or before March 10, 2022.

10. <u>ANNUAL COST ADJUSTMENTS.</u> Management fees in the initial term of the agreement shall not be subject to cost adjustment. After the initial (24) twenty-four-month term, annual cost adjustments shall not exceed (3%) three percent in any given annual adjustment period.

11. CONSTRUCTION OVERSIGHT SERVICES. Intentionally Omitted. Covered under a separate agreement.

10. COMPLIANCE WITH LAWS.

    a.  Manager shall notify Owner, as soon as practicable after Manager's receipt of notice, of any known violation of any federal, state, municipal or other governmental law, ordinance, rule or regulation due to the structure or condition of the Property or the use made thereof by any tenant or occupant.

    b.  Manager shall not, in the performance of its services hereunder, knowingly violate, and shall comply in all material respects with, the terms of any ground lease, space lease, mortgage, deed of trust or other security instrument binding on or affecting any of the Property, provided that true and complete copies of such documents have been delivered to Manager or Owner has otherwise disclosed such terms to Manager in writing. In the event of a conflict between the terms of any such document and the terms of this Agreement, Manager shall not take any action except to notify Owner and await Owner's written instructions. Manager shall not be required to make any payment or incur any liability in order to comply with any such terms or conditions of any such instruments.

12. NOTIFICATION OF LITIGATION. If Manager shall be apprised of any claim, demand, suit or other legal proceeding made or instituted against Owner on account of any matter connected with the Property, Manager shall notify Owner as soon as practicable following Manager's receipt of notice thereof. Manager shall assist and cooperate with Owner in all reasonable respects in the defense of any such suit or other legal proceeding.

13. CHANGE OF OWNERSHIP. If the Property changes ownership during the Term of this Agreement, this Agreement will terminate on the day of the closing and Manager will cease to manage the Property unless arrangements have been made by the new owner prior to closing. Manager further agrees to do all other things reasonably necessary to cause an orderly transition of the management of the Property (upon sale of the Property or otherwise) to a replacement property manager.

14. LEASE COMMISSION OVER-RIDE. Lease Override on new leases: One-half percent (1/2%) of the base rent income lease value. Leasing override Manager participation is specifically excluded for existing tenant renewals.

15. CONFIDENTIALITY. Manager shall use all reasonable efforts to keep confidential the results of the operation of the Property and all other information with respect to the properties (being managed by Manager) that are customarily kept confidential by managing agents of similar class properties in the area. Manager shall not provide any third party, including tenants within the Property, with any confidential information provided or obtained from Owner, without Owner's written authorization to do so. No publication, announcement or other public advertisement of Owner's name in connection with the Property shall be made by Manager without Owner's written

approval, except in connection with Leases or other agreements negotiated and/or entered into by Manager in Owner's name as expressly provided for herein, or as may be required by applicable law. Specifically, Manager may not disclose to any third parties the purchase price of the Property, or the identity of any of Owner's members or officers, and in the event, Manager is approached by press inquiries shall only respond "no comment."

16. TERMINATION.

    a. Cause. This Agreement may be immediately terminated by Owner without notice and with no further financial responsibilities in the event of any of the following:

        (1) Manager ceases doing business as a going concern, (ii) the termination or suspension of Manager's real estate brokerage license, (iii) Manager makes an assignment for the benefit of creditors, (iv) Manager admits in writing its inability to pay its debts as they become due, (v) Manager is the subject of a voluntary or involuntary petition in bankruptcy, (vi) Manager is adjudicated as bankrupt or insolvent, (vii) Manager files or has filed against it any petition seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or dissolution under any present or future state or federal bankruptcy or insolvency law, or a receiver or liquidator is appointed for all or a substantial part of Manager's assets or properties;

        (2) Upon the failure by Manager to perform any of the Manager's covenants, obligations or duties contained in this Agreement, and the continuation of any such failure to perform after thirty (30) days' written notice thereof from Owner; provided, however, that if any such failure to perform is cured by Manager within said thirty (30) day period, such failure to perform shall no longer constitute cause for termination by Owner

        (3) In the event Manager demonstrates negligence as it relates to managing the Property.

    b. This Agreement may be terminated by Owner without cause at any time by giving at least thirty (30) days' prior written notice to Manager. In the event of such termination by Owner without cause, Owner shall pay Manager a cancellation fee equal to the following: (i) until the first anniversary of this Agreement, a sum reflecting the total number of months' Management Fee; and (ii) after the first anniversary of this Agreement, the sum of one month's Management Fee. In the event this Agreement is not renewed and the required notice is given, no such reimbursement from Owner will be due to Manager.

    c. This Agreement may be terminated by Manager without cause by giving at least sixty (60) days' prior written notice to Owner.

d. In the event Michael Barney is unable, or it is reasonably foreseeable that he will be unable to participate in the fulfillment of this Agreement for greater than (45) forty-five days (such as death or a physical or mental disability) then the Manager or Owner may terminate this Agreement with ten (10) days written notice and no further financial responsibilities.

e. Upon the expiration of or the effective date of termination of this Agreement, Manager shall deliver to Owner the originals of all books and records (including invoices) in Manager's possession with respect to the Property relating to the period this Agreement is in effect, together with all permits, plans, Leases, licenses, contracts, other documents pertaining to the Property or to any items paid for by the Owner for its operation of the Property, any insurance policies, bills of sale or other documents evidencing title or rights of Owner, and any and all other records or documents pertaining to the Property, whether or not enumerated herein, which are necessary or desirable for the ownership and operation of the Property. Manager further agrees to do all other things reasonably necessary to cause an orderly transition of the management of the Property without detriment to the rights of Owner or to the continued management of the Property.

f. Within ten (10) days after the expiration or effective date of termination of this Agreement, Manager shall render a full accounting to Owner which shall include all accrued expenses

17. NOTICES.

To Owner:
Aevri Salina Meadows LLC
2604 Elmwood Avenue
Suite 210
Rochester, New York 14618
Attn: Moshe Rothman

To Manager:
Mike Barney Management
5015 Campuswood Drive – Suite 101
East Syracuse, NY 13057
315.634.5033

18. Sale of Property. Owner shall be free to sell, transfer or lease the Property to any third party. Upon direction from Owner, Manager shall cooperate fully and completely with the prospective purchasers or lessees of the Property in their review of the Property and the files related thereto, and in the event of sale, with any transition to any replacement property manager and/or leasing agent. Manager hereby covenants that within a reasonable time, it will provide all information regarding the Property, its operations and this Agreement so as to assist Owner in the sale of the Property.

19. Except as expressly provided in this Agreement, Manager shall have no right to incur any liability on behalf of Owner or to bind Owner by any contract or obligation without Owner's prior written approval.

20. Headings. The headings used herein are for purposes of convenience only and should not be used in construing the provisions hereof.

21. Covenant of Further Assurances. The parties hereby agree to execute such other documents and perform such other acts as may be necessary or desirable to carry out the purposes of this Agreement.

22. Entire Agreement. This document, including any exhibits attached hereto, represents the entire agreement between the parties with respect to the subject matter hereof, and to the extent inconsistent therewith, supersedes all other prior agreements, representations, and covenants, oral or written.

23. Assignment. Owner shall have the right at any time in its sole discretion, to assign its rights and obligations hereunder to any successor in interest to the Property. Manager shall not assign its rights hereunder without the prior written consent of Owner, and any such assignment without Owner's prior consent shall be null and void.

24. Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties, their heirs, legal representatives, successors and assigns

25. Attorneys' Fees. In the event of any controversy, claim or action being filed between the parties respecting this Agreement or in connection with the Property, the prevailing party shall be entitled, in addition to all expenses, costs or damages, to reasonable attorneys' fees, only if such controversy was litigated or prosecuted to judgment.

26. Time of the Essence. Time is of the essence of this Agreement with respect to this Agreement.

27. Governing Law. This Agreement is entered into and shall be governed by and construed in accordance with the laws of the State of Michigan.

28. No Advertising. No publication, announcement or other public advertisement of Owner's name in connection with the Property shall be made by Manager without Owner's written approval, except in connection with Leases or other agreements negotiated and/or entered into by Manager in Owner's name as expressly provided for herein, or as may be required by applicable law. Specifically, Manager may not disclose to any third parties the purchase price of the Property, or the identity of any of Owner's members or officers, and in the event Manager is approached by press inquiries shall only respond "no comment."

29. Amendment. This Agreement may not be modified except by an express writing signed by the parties hereto.

30. <u>OFAC Representations, Warranties, and Indemnification.</u> Representations and Warranties. Owner represents and warrants that (i) it is not, and none of its partners, members, managers, employees, officers, directors, representatives or agents is, a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or under any other law, rule, order, or regulation that is enforced or administered by OFAC (such persons and entities each being a "**Prohibited Person**"); (ii) it is not acting directly or indirectly, for or on behalf of any Prohibited Person; (iii) it is not engaged in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of any Prohibited Person; and (iv) it will not contract with or otherwise engage in any dealings or transactions or be otherwise associated with any Prohibited Person.

31. <u>Indemnification.</u> Owner hereby agrees to defend, indemnify, and hold harmless Manager from and against any and all claims, damages, losses, risks, liabilities, and expenses (including attorney's fees and costs) arising from or related to any breach of the foregoing representations and warranties.

32. <u>Electronic Scanned Signatures.</u> The parties agree that an electronically scanned signed copy of this Agreement transmitted by one party to the other party by electronic transmission shall be binding upon the sending party to the same extent as if it had delivered a signed original of this Agreement.

33. <u>Counterparts.</u> This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one Agreement.

34. <u>Third Parties.</u> Nothing in this Agreement shall be deemed to create any right in any person or entity not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third person or entity. Notwithstanding the foregoing, an institutional lender having a first mortgage lien on the property is an intended third-party beneficiary of the Agreement.

*(Signature Page Follows)*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

Manager:

Owner:

SMARTCORE CONSULTING, LLC

AEVRI SALINA MEADOWS LLC

By: _____

By: _____

Name: Michael Barney – Member

Name: __Moshe Rothman__

Exhibit A

Additional Management Functions, Responsibilities, Etc.

### Tenant Service Requests
Manager shall create and maintain the tenant protocol for service requests. The service request process shall include:
- Written acknowledgement of the request to the tenant.
- Written assignment of responsibility..
- Written tenant follow-up confirming completion.

### Tenant Relationships
- Resolve billing issues with the tenants.
- Meet with tenants in default and undertake measures to collect past due rents.
- Coordinate and oversee legal action involving tenants with Owner's counsel.
- Maintain a 24-hour emergency answering service with a person on call for each property.
- Meet or contact all tenants on a regular basis.

### Contracts, Vendors, Construction
- Competitively bid contracts annually including snow and ice removal, lawn maintenance, landscaping, pest control, janitorial services, mechanical maintenance, sprinkler maintenance, testing etc.
- Oversee and negotiate all tenant and property repairs. All invoices will be routed to the management company for vouchering and approval. Upon approval, the management company will forward payables to Owner..

### Emergencies and Losses
- In the event of an emergency or loss Manager will act as Owner's Agent.
- In the event of a water, fire, smoke, or structural event, Manager will coordinate the completion of the clean-up, and hiring the contractors on behalf of the Owner.
- Assist in insurance claims documentation and settlements, but in any event consult with Owner at all times, and Owner shall have the right to select the Public Adjuster.

### Leasing Support
- Assist leasing agent in showing space. Provide construction support and expertise, operating costs and accompanied access for leasing tours.

### Security
- Maintain proper Fire/Life Safety program for the Property.
- Schedule meetings with local Fire Inspectors to ensure property program is satisfactory with regards to codes, evacuation, and life safety.
- Educate and disseminate information to Tenants regarding the Fire, Emergency and Life Safety programs, and all other governmental or health agency requirements (e.g. COVID-related information/regulations).

# EXHIBIT 7

Loan No.: 99020222091

---

**LOAN AGREEMENT**

---

Dated as of February 16, 2022

Between

**AEVRI SALINA MEADOWS LLC**,
as Borrower

and

**BANK OF MONTREAL**, as Lender

151395847v8

## Table of Contents

ARTICLE 1 DEFINITIONS; PRINCIPLES OF CONSTRUCTION ..........................................1
    Section 1.1    Definitions ....................................................................................1
    Section 1.2    Principles of Construction ...........................................................25

ARTICLE 2 GENERAL TERMS..............................................................................................26
    Section 2.1    Loan Commitment; Disbursement to Borrower .................................26
    Section 2.2    The Loan.......................................................................................26
    Section 2.3    Disbursement to Borrower ...........................................................26
    Section 2.4    The Note and the other Loan Documents.....................................26
    Section 2.5    Interest Rate .................................................................................26
    Section 2.6    Loan Payments.............................................................................28
    Section 2.7    Prepayments.................................................................................29
    Section 2.8    Defeasance...................................................................................30

ARTICLE 3 REPRESENTATIONS AND WARRANTIES ........................................................32
    Section 3.1    Legal Status and Authority ...........................................................32
    Section 3.2    Validity of Documents ..................................................................32
    Section 3.3    Litigation .....................................................................................32
    Section 3.4    Agreements ..................................................................................33
    Section 3.5    Financial Condition .....................................................................33
    Section 3.6    Disclosure ....................................................................................33
    Section 3.7    No Plan Assets; FIRRMA ..............................................................33
    Section 3.8    Not a Foreign Person....................................................................34
    Section 3.9    Intentionally Omitted ...................................................................34
    Section 3.10    Business Purposes .......................................................................34
    Section 3.11    Borrower's Principal Place of Business ........................................34
    Section 3.12    Status of Property.........................................................................34
    Section 3.13    Financial Information....................................................................36
    Section 3.14    Condemnation..............................................................................36
    Section 3.15    Separate Lots ...............................................................................36
    Section 3.16    Insurance.....................................................................................36
    Section 3.17    Use of Property............................................................................37
    Section 3.18    Leases and Rent Roll....................................................................37
    Section 3.19    Filing and Recording Taxes..........................................................38
    Section 3.20    Management Agreement ...............................................................38
    Section 3.21    Illegal Activity/Forfeiture.............................................................38
    Section 3.22    Taxes ...........................................................................................38
    Section 3.23    Permitted Encumbrances ............................................................38
    Section 3.24    Third Party Representations .........................................................39
    Section 3.25    Non-Consolidation Opinion Assumptions ...................................39
    Section 3.26    Federal Reserve Regulations .......................................................39
    Section 3.27    Investment Company Act ..............................................................39
    Section 3.28    Fraudulent Conveyance ...............................................................39
    Section 3.29    Intentionally Omitted ...................................................................39
    Section 3.30    Anti-Money Laundering and Economic Sanctions........................39

i

Section 3.31 Organizational Chart ....................................................................41
Section 3.32 Bank Holding Company ...............................................................41
Section 3.33 Intentionally Omitted ...................................................................41
Section 3.34 Property Document Representations.............................................41
Section 3.35 No Change in Facts or Circumstances; Disclosure......................41

ARTICLE 4 BORROWER COVENANTS ....................................................................42
Section 4.1 Existence.......................................................................................42
Section 4.2 Legal Requirements .....................................................................42
Section 4.3 Maintenance and Use of Property ................................................43
Section 4.4 Waste.............................................................................................43
Section 4.5 Taxes and Other Charges..............................................................44
Section 4.6 Litigation ......................................................................................44
Section 4.7 Access to Property ........................................................................44
Section 4.8 Notice of Default...........................................................................45
Section 4.9 Cooperate in Legal Proceedings ..................................................45
Section 4.10 Performance by Borrower .............................................................45
Section 4.11 HVCRE and Federal Reserve Regulations...................................45
Section 4.12 Books and Records.......................................................................45
Section 4.13 Estoppel Certificates ....................................................................48
Section 4.14 Leases and Rents ..........................................................................49
Section 4.15 Management Agreement ...............................................................51
Section 4.16 Payment for Labor and Materials ................................................53
Section 4.17 Performance of Other Agreements ...............................................54
Section 4.18 Debt Cancellation.........................................................................54
Section 4.19 ERISA; FIRRMA .........................................................................54
Section 4.20 No Joint Assessment ....................................................................55
Section 4.21 Alterations ....................................................................................56
Section 4.22 Property Document Covenants .....................................................56
Section 4.23 Upfront CapEx Work. Borrower shall complete the UpFront CapEx Work in a good and workmanlike manner and in accordance with all applicable Legal Requirements within a commercially reasonable and prudent time. .................57

ARTICLE 5 ENTITY COVENANTS ...........................................................................57
Section 5.1 Single Purpose Entity/Separateness ............................................57
Section 5.2 Independent Director.....................................................................61
Section 5.3 Change of Name, Identity or Structure ........................................63
Section 5.4 Business and Operations ..............................................................63

ARTICLE 6 NO SALE OR ENCUMBRANCE.............................................................63
Section 6.1 Transfer Definitions ......................................................................63
Section 6.2 No Sale/Encumbrance ...................................................................63
Section 6.3 Permitted Equity Transfers ...........................................................64
Section 6.4 Permitted Property Transfer (Assumption) ..................................66
Section 6.5 Lender's Rights .............................................................................68
Section 6.6 Economic Sanctions, Anti-Money Laundering and Transfers ..........................69
Section 6.7 Immaterial Easements, Etc ...........................................................69

ARTICLE 7 INSURANCE; CASUALTY; CONDEMNATION; RESTORATION .................70
    Section 7.1    Insurance ..................................................................................................70
    Section 7.2    Casualty ....................................................................................................76
    Section 7.3    Condemnation ...........................................................................................76
    Section 7.4    Restoration ................................................................................................77

ARTICLE 8 RESERVE FUNDS ...................................................................................82
    Section 8.1    Immediate Repair Funds ..........................................................................82
    Section 8.2    Replacement Reserve Funds ....................................................................83
    Section 8.3    Leasing Reserve Funds ............................................................................84
    Section 8.4    Operating Expense Funds .........................................................................85
    Section 8.5    Excess Cash Flow Funds .........................................................................85
    Section 8.6    Tax and Insurance Funds .........................................................................86
    Section 8.7    The Accounts Generally ...........................................................................87
    Section 8.8    Alion Reserve Funds ...............................................................................88
    Section 8.9    Free Rent Reserve Funds .........................................................................89

ARTICLE 9 CASH MANAGEMENT ............................................................................89
    Section 9.1    Establishment of Certain Accounts ..........................................................89
    Section 9.2    Deposits into the Restricted Account; Maintenance of Restricted Account ......90
    Section 9.3    Disbursements from the Cash Management Account ....................................91
    Section 9.4    Withdrawals from the Debt Service Account ..................................................92
    Section 9.5    Payments Received Under this Agreement .................................................92

ARTICLE 10 EVENTS OF DEFAULT; REMEDIES ....................................................92
    Section 10.1   Event of Default ........................................................................................92
    Section 10.2   Remedies ..................................................................................................96

ARTICLE 11 SECONDARY MARKET .........................................................................98
    Section 11.1   Securitization ............................................................................................98
    Section 11.2   Disclosure ...............................................................................................100
    Section 11.3   Reserves/Escrows ...................................................................................101
    Section 11.4   Servicer ...................................................................................................101
    Section 11.5   Rating Agency Costs and REMIC Savings Clause ...................................101
    Section 11.6   Mezzanine Option ...................................................................................101
    Section 11.7   Conversion to Registered Form ...............................................................102
    Section 11.8   Uncross of Properties ..............................................................................102

ARTICLE 12 INDEMNIFICATIONS ...........................................................................103
    Section 12.1   General Indemnification ..........................................................................103
    Section 12.2   Mortgage and Intangible Tax Indemnification .........................................104
    Section 12.3   ERISA and FIRRMA Indemnification .....................................................104
    Section 12.4   Duty to Defend, Legal Fees and Other Fees and Expenses ......................104
    Section 12.5   Survival ...................................................................................................104
    Section 12.6   Environmental Indemnity ........................................................................104

ARTICLE 13 EXCULPATION .................................................................................105
    Section 13.1  Exculpation .......................................................................105

ARTICLE 14 NOTICES ..........................................................................................107
    Section 14.1  Notices ..............................................................................107

ARTICLE 15 FURTHER ASSURANCES ................................................................109
    Section 15.1  Replacement Documents ...................................................109
    Section 15.2  Recording of Security Instrument, etc ..............................109
    Section 15.3  Further Acts, etc ................................................................110
    Section 15.4  Changes in Tax, Debt, Credit and Documentary Stamp Laws .......................110

ARTICLE 16 WAIVERS ..........................................................................................111
    Section 16.1  Remedies Cumulative; Waivers .......................................111
    Section 16.2  Modification, Waiver in Writing ......................................111
    Section 16.3  Delay Not a Waiver..........................................................111
    Section 16.4  Waiver of Trial by Jury ....................................................112
    Section 16.5  Waiver of Notice ..............................................................112
    Section 16.6  Remedies of Borrower ......................................................112
    Section 16.7  Marshalling and Other Matters........................................112
    Section 16.8  Waiver of Statute of Limitations .....................................112
    Section 16.9  Waiver of Counterclaim ...................................................113
    Section 16.10 Sole Discretion of Lender.................................................113

ARTICLE 17 MISCELLANEOUS ...........................................................................113
    Section 17.1  Survival ............................................................................113
    Section 17.2  Governing Law .................................................................113
    Section 17.3  Headings ...........................................................................115
    Section 17.4  Severability ......................................................................115
    Section 17.5  Preferences .......................................................................115
    Section 17.6  Expenses ...........................................................................115
    Section 17.7  Cost of Enforcement ........................................................116
    Section 17.8  Schedules Incorporated ....................................................117
    Section 17.9  Offsets, Counterclaims and Defenses ..............................117
    Section 17.10 No Joint Venture or Partnership; No Third Party Beneficiaries.....................117
    Section 17.11 Publicity...........................................................................118
    Section 17.12 Limitation of Liability .....................................................118
    Section 17.13 Conflict; Construction of Documents; Reliance ...............118
    Section 17.14 Entire Agreement .............................................................119
    Section 17.15 Liability ...........................................................................119
    Section 17.16 Duplicate Originals; Counterparts ...................................119
    Section 17.17 Brokers .............................................................................119
    Section 17.18 Set-Off .............................................................................120
    Section 17.19 Cross-Default; Cross-Collateralization ...........................120

# LOAN AGREEMENT

**THIS LOAN AGREEMENT**, dated as of February 16, 2022 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), between **BANK OF MONTREAL**, a Canadian chartered bank operating out of its Chicago branch, having an address at 388 Greenwich Street, 8th Floor, New York, New York 10013 (together with its successors and/or assigns, "Lender"), and **AEVRI SALINA MEADOWS LLC**, a Delaware limited liability company, having its principal place of business at 2604 Elmwood Avenue, Suite 210 Rochester, New York 14618 (together with its successors and/or assigns, "**Borrower**".

## RECITALS:

Borrower desires to obtain the Loan (defined below) from Lender.

Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (defined below).

In consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## ARTICLE 1

## DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1     Definitions**.

For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Acceptable LLC**" shall mean a limited liability company formed under Delaware law which (i) has at least one springing member, which, upon the dissolution of all of the members or the withdrawal or the disassociation of all of the members from such limited liability company, shall immediately become the sole member of such limited liability company, and (ii) otherwise meets the Rating Agency criteria then applicable to such entities.

"**Account Collateral**" shall mean (i) the Accounts, and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the Accounts from time to time; (ii) any and all amounts invested in Permitted Investments; (iii) all interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and (iv) to the extent not covered by clauses (i) - (iii) above, all "proceeds" (as defined under the UCC as in effect in the State in which the Accounts are located) of any or all of the foregoing.

"**Accounts**" shall mean the Cash Management Account, the Debt Service Account, the Restricted Account, the Tax Account, the Insurance Account, the Alion Reserve Account, the Free Rent Reserve Account, the Replacement Reserve Account, the Immediate Repair Account,

the Leasing Reserve Account, the Excess Cash Flow Account, the Operating Expense Account and any other account established by this Agreement or the other Loan Documents.

"**AC Laws**" shall have the meaning set forth in Section 3.30 hereof.

"**Act**" is defined in Section 5.1 hereof.

"**Affected Property"** shall have the meaning set forth in Section 11.8 hereof.

"**Affiliate**" shall mean, as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or, with respect to any natural Person, is a member of the Family Group of such Person.

"**Affiliated Manager**" shall mean any managing agent of any Individual Property in which Borrower, Guarantor, Sponsor, any SPE Component Entity (if any) or any Affiliate of such entities has, directly or indirectly, any legal, beneficial or economic interest.

"**Alion**" shall mean Alion Science and Technology Corporation, as Tenant under the Alion Lease.

"**Alion Lease**" shall mean that certain Lease dated September 11, 2017, by and between Salina Park LLC, a New York limited liability company, as predecessor-in-interest to Borrower, as landlord, and Alion, as Tenant, as same may be further amended, supplemented, renewed, assigned, extended, replaced or otherwise modified from time to time.

"**Alion Reserve Account**" shall have the meaning set forth in Section 8.8 hereof.

"**Alion Reserve Funds**" shall have the meaning set forth in Section 8.8 hereof.

"**Alion Reserve Release Event**" shall mean that (i) no Trigger Period has occurred and is continuing, and (ii) either (A) Alion has expressly waived it's termination right pursuant to Section 22.30 of the Alion Lease (such waiver to be in form and substance acceptable to Lender in its reasonably discretion), or (B) Alion's termination option pursuant to Section 22.30 of the Alion Lease has expired pursuant to the terms of the Alion Lease and, on or prior to such expiration date, Borrower has not received notice of any kind whatsoever that Alion was exercising such termination option.

"**Allocated Loan Amount**" shall mean the portion of the principal amount of the Loan allocated to any applicable Individual Property as set forth on Schedule V hereof, as such amounts may be adjusted from time to time as hereinafter set forth. Notwithstanding the foregoing, with respect to a Condemnation or Casualty affecting one hundred percent (100%) of an Individual Property, the Allocated Loan Amount for such Individual Property shall, at Lender's sole discretion, be reduced to zero (such Allocated Loan Amount prior to reduction being referred to as the "**Withdrawn Allocated Amount**") and each other Allocated Loan Amount shall, if the Withdrawn Allocated Amount exceeds the Applied Net Proceeds realized with respect to such Individual Property (such excess being referred to as the "**Proceeds Deficiency**"), be increased by an amount equal to the product of (1) the Proceeds Deficiency and (2) a fraction, the numerator of which is the applicable Allocated Loan Amount (prior to the

adjustment in question) and the denominator of which is the aggregate of all of the Allocated Loan Amounts (prior to the adjustment in question) other than the Withdrawn Allocated Amount.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Alteration Threshold**" shall mean, with respect to each Individual Property, an amount equal to 5% of the outstanding principal amount of the Allocated Loan Amount attributable to such Individual Property.

"**AML Laws**" shall have the meaning set forth in Section 3.30 hereof.

"**Approved Accounting Method**" shall mean GAAP, federal tax basis accounting (consistently applied) or such other method of accounting, consistently applied, as may be reasonably acceptable to Lender.

"**Approved Annual Budget**" shall have the meaning set forth in Section 4.12 hereof.

"**Approved Extraordinary Expense**" shall mean an operating expense of the applicable Individual Property not set forth on the Approved Annual Budget but approved by Lender in writing (which such approval shall not be unreasonably withheld or delayed).

"**Approved ID Provider**" shall mean each of CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company and Lord Securities Corporation; provided, that, (A) the foregoing shall be deemed Approved ID Providers unless and until disapproved by any Rating Agency and (B) additional national providers of Independent Directors may be deemed added to the foregoing hereunder to the extent approved in writing by Lender and the Rating Agencies.

"**Approved Operating Expense**" shall mean an operating expense of the applicable Individual Property set forth on the Approved Annual Budget.

"**Assignment of Management Agreement**" shall mean that certain Conditional Assignment of Management Agreement dated as of the date hereof among Lender, Borrower and Manager, as the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bank**" shall be deemed to refer to the bank or other institution maintaining the Restricted Account pursuant to the Restricted Account Agreement.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"**Bankruptcy Event**" shall mean the occurrence of any one or more of the following: (i) Borrower or any SPE Component Entity shall commence any case, proceeding or other action (A) under the Bankruptcy Code and/or any Creditors Rights Laws seeking to have an order for relief entered with respect to it, or seeking to adjudicate it as bankrupt or insolvent, or seeking reorganization, liquidation or dissolution or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets; (ii) Borrower or any SPE Component Entity shall make a general assignment for the benefit of its creditors; (iii) any Restricted Party (or Affiliate thereof) files, or joins or colludes in the filing of, (A) an involuntary petition against Borrower or any SPE Component Entity under the Bankruptcy Code or any other Creditors Rights Laws, or solicits or causes to be solicited or colludes with petitioning creditors for any involuntary petition under the Bankruptcy Code or any other Creditors Rights Laws against Borrower or any SPE Component Entity or (B) any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of Borrower's or any SPE Component Entity's assets; (iv) Borrower or any SPE Component Entity files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Creditors Rights Laws, or solicits or causes to be solicited or colludes with petitioning creditors for any involuntary petition from any Person; (v) any Restricted Party (or Affiliate thereof) consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower, any SPE Component Entity or any portion of the Property; (vi) Borrower or any SPE Component Entity makes an assignment for the benefit of creditors, or admits, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; (vii) any Restricted Party (or Affiliate thereof) contesting or opposing any motion made by Lender to obtain relief from the automatic stay or seeking to reinstate the automatic stay in the event of any proceeding under the Bankruptcy Code or any other Creditors Rights Laws involving Sponsor or its subsidiaries; (viii) any Restricted Party (or Affiliate thereof) taking any action in furtherance of, in collusion with respect to or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in items (i) through (vii) above; and (ix) in the event Lender receives less than the full value of its claim in any proceeding under the Bankruptcy Code or any other Creditors Rights Laws, Sponsor or any of its Affiliates receiving an equity interest or other financial benefit of any kind as a result of a "new value" plan or equity contribution.

"**Borrower Party**" and "**Borrower Parties**" shall mean each of Borrower, any SPE Component Entity, Sponsor, any Affiliated Manager and Guarantor.

"**Business Day**" shall mean a day on which commercial banks are not authorized or required by applicable law to close in New York, New York.

4

"**Cash Flow Adjustments**" shall mean adjustments made by Lender in its calculation of Underwritable Cash Flow and the components thereof, in each case, based upon Lender and Rating Agency underwriting criteria, which such adjustments shall include, without limitation, adjustments (A) for (i) items of a non-recurring nature, (ii) a credit loss/vacancy allowance equal to the greater of actual vacancy and 5% and (iii) imminent liabilities and/or other expense increases (including, without limitation, imminent increases to Taxes and Insurance Premiums); and (B) to exclude rental income attributable to any Tenant (1) in bankruptcy that has not affirmed its Lease in the applicable bankruptcy proceeding pursuant to a final, non-appealable order of a court of competent jurisdiction, (2) not paying rent under its Lease (unless (x) such non-payment of rent is solely the result of a market free rent period or similar market rent concession and (y) in connection with the foregoing free rent period or similar rent concession, Borrower has deposited cash into a Reserve Account with Lender an amount equal to the total unabated rent that would otherwise be due and payable during all remaining unexpired free rent (or similar rent concession) periods if no such free rent period and/or rent concession were in place) or otherwise in default under its Lease beyond any applicable notice and cure periods, (3) that has expressed its intention (directly, constructively or otherwise) to not renew, terminate, cancel and/or reject its applicable Lease, (4) whose tenancy at the Property is month-to-month and/or (5) under a Lease which expires within or less of the applicable date of calculation hereunder.

"**Cash Management Account**" shall have the meaning set forth in Section 9.1 hereof.

"**Cash Management Provisions**" shall mean the representations, covenants and other terms and conditions of this Agreement and the other Loan Documents (including, without limitation, the Restricted Account Agreement) related to, in each case, cash management and/or other related matters (including, without limitation, Article 9 hereof).

"**Cash Management Violation**" shall mean any violation of or failure to comply with, in each case, the Cash Management Provisions (including without limitation, the Cash Management Provisions related to the timing of required deposits into the Restricted Account).

"**Casualty**" shall have the meaning set forth in Section 7.2.

"**Casualty Consultant**" shall have the meaning set forth in Section 7.4 hereof.

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result, in lieu or in anticipation, of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Constituent Owner**" shall mean, as to any Person, any Person that owns a direct or indirect interest in such Person.

"**Control**" shall mean the power to direct the management and policies of an entity, directly or indirectly, whether through the ownership of voting securities or other beneficial

interests, by contract or otherwise. The terms **"Controlled"** and **"Controlling"** shall have correlative meanings.

"**Covered Rating Agency Information**" shall mean any Provided Information furnished to the Rating Agencies in connection with issuing, monitoring and/or maintaining the Securities.

"**Creditors Rights Laws**" shall mean any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"**Crowdfunded Person**" means a Person capitalized primarily by monetary contributions (A) of less than $35,000 each from more than 35 investors who are individuals and (B) which are funded primarily (I) in reliance upon Regulation Crowdfunding promulgated by the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended and/or (II) through internet-mediated registries, platforms or similar portals, mail-order subscriptions, benefit events and/or other similar methods.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement or the other Loan Documents (including, without limitation, all costs and expenses payable to Lender thereunder).

"**Debt Service**" shall mean, with respect to any particular period of time, scheduled principal (if applicable) and interest payments hereunder (including, as and to the extent applicable, interest accruing at the Default Rate).

"**Debt Service Account**" shall have the meaning set forth in Section 9.1 hereof.

"**Debt Yield**" shall mean, as of any date of calculation, a ratio conveyed as a percentage in which: (i) the numerator is the Underwritable Cash Flow; and (ii) the denominator is the then outstanding principal balance of the Loan.

"**Deemed Approval Requirements**" shall mean, with respect to any matter, that (i) no Event of Default shall have occurred and be continuing (either at the date of any notices specified below or as of the effective date of any deemed approval), (ii) Borrower shall have sent Lender a written request for approval with respect to such matter in accordance with the applicable terms and conditions hereof (the "Initial Notice"), which such Initial Notice shall have been (A) accompanied by any and all required information and documentation relating thereto as may be reasonably required in order to approve or disapprove such matter (the "Approval Information") and (B) marked in bold lettering with the following language: "LENDER'S RESPONSE IS REQUIRED WITHIN TEN (10) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER" and the envelope containing the Initial Notice shall have been marked "PRIORITY-DEEMED APPROVAL MAY APPLY"; (iii) Lender shall have failed to respond to the Initial Notice within the aforesaid time-frame; (iv) Borrower shall have submitted a second request for approval with respect to such matter in accordance with the applicable terms and conditions hereof (the "Second Notice"), which such Second Notice shall

151395847v8

have been (A) accompanied by the Approval Information and (B) marked in bold lettering with the following language: "LENDER'S RESPONSE IS REQUIRED WITHIN FIVE (5) BUSINESS DAYS OF RECEIPT OF THIS NOTICE PURSUANT TO THE TERMS OF A LOAN AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER" and the envelope containing the Second Notice shall have been marked "PRIORITY-DEEMED APPROVAL MAY APPLY"; and (v) Lender shall have failed to respond to the Second Notice within the aforesaid time-frame. For purposes of clarification, Lender requesting additional and/or clarified information, in addition to approving or denying any request (in whole or in part), shall be deemed a response by Lender for purposes of the foregoing.

"**Default**" shall mean the occurrence of any event hereunder or under the Note or the other Loan Documents which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (i) the Maximum Legal Rate, or (ii) five percent (5%) above the Interest Rate.

"**Default Yield Maintenance Premium**" shall mean an amount equal to the greater of (i) 5% of the amount of Debt prepaid or (ii) the Yield Maintenance Premium.

"**Defeasance Approval Item**" shall have the meaning set forth in Section 2.8 hereof.

"**Defeasance Collateral Account**" shall have the meaning set forth in Section 2.8 hereof.

"**Disclosure Documents**" shall mean, collectively and as applicable, any offering circular, prospectus, prospectus supplement, private placement memorandum or other offering document, in each case, in connection with a Securitization.

"**Division**" shall have the meaning set forth in Section 5.1 hereof.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, the United Kingdom, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is an account or accounts maintained with a federal or state-chartered depository institution or trust company which (a) complies with the definition of Eligible Institution, (b) has a combined capital and surplus of at least $50,000,000, and (c) has

7

corporate trust powers and is acting in its fiduciary capacity. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean (a) a depository institution or trust company insured by the Federal Deposit Insurance Corporation (i) in the case of accounts in which funds are held for thirty (30) days or less, the short term unsecured debt obligations or commercial paper of which are rated at least "A-1" (or its equivalent) from each of the Rating Agencies and (ii) in the case of accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "A" (or its equivalent) from each of the Rating Agencies or (b) such other depository institution otherwise approved by the Rating Agencies from time-to-time.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Laws**" shall have the meaning set forth in the Environmental Indemnity.

"**Equity Collateral**" shall have the meaning set forth in Section 11.6 hereof.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may heretofore have been or shall be amended, restated, replaced or otherwise modified.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" shall have the meaning set forth in Section 10.1 hereof.

"**Excess Cash Flow**" shall have the meaning set forth in Section 9.3 hereof.

"**Excess Cash Flow Account**" shall have the meaning set forth in Section 8.5 hereof.

"**Excess Cash Flow Funds**" shall have the meaning set forth in Section 8.5 hereof.

"**Exchange Act**" shall mean the Securities and Exchange Act of 1934, as amended.

"**Exculpated Parties**" shall have the meaning set forth in Section 13.1 hereof.

"**Family Group**" shall mean, as to any natural Person, the spouse, children and grandchildren (in each case, by birth or adoption) and other lineal descendants, in each case, of such natural Person and, in each case, family trusts and/or conservatorships for the benefit of any of the foregoing Persons.

"**FIRRMA**" shall mean, collectively, (i) the Defense Production Act of 1950, as amended (50 U.S.C. § 4565), all laws and regulations related thereto and all mandates,

requirements, powers and similar requirements imposed or exercised thereunder (including, without limitation, the Foreign Investment Risk Review Modernization Act and any of the foregoing implemented by and/or otherwise relating to the Committee on Foreign Investment in the United States) and (ii) as the foregoing may be amended from time to time, any successor statute or statutes and all rules and regulations from time to time promulgated in connection with the foregoing.

"**FIRRMA Documents**" means any notice, correspondence, document, agreement, declaration, or other communication relating to or arising in connection with FIRRMA; provided, however, that if the communication is oral, "FIRRMA Document" shall mean a written summary thereof prepared by Borrower.

"**FIRRMA Prohibited Filing Event**" shall mean an event which shall be deemed to have occurred if (i) any mandatory filing or declaration relating to FIRRMA is required and/or (ii) any Governmental Authority requires (or recommends to the President of the United States) forfeiture, divestiture or abandonment of all or any portion of the Property and/or imposes any material mitigation measures on Borrower, the Constituent Owners of Borrower and/or the Property, in each case, related to FIRRMA.

"**FIRRMA Prohibited Transfer**" shall mean any Sale or Pledge of the Property or any part thereof or any legal or beneficial interest therein (including, without limitation, the Loan and/or Loan Documents) or any Sale or Pledge of an interest in any Restricted Party, in each case, which (i) triggers a mandatory filing or declaration requirement with respect to FIRRMA, (ii) makes advisable a voluntary filing or declaration with respect to FIRRMA or (iii) increases the likelihood of (A) forfeiture, divestiture or abandonment of all or any portion of the Property relating to FIRRMA or (B) any mitigation measures being imposed by any Governmental Authority on Borrower, the Constituent Owners of Borrower and/or the Property, in each case, related to FIRRMA.

"**Free Rent Reserve Account**" shall have the meaning set forth in Section 8.9 hereof.

"**Free Rent Reserve Funds**" shall have the meaning set forth in Section 8.9 hereof.

"**First Monthly Payment Date**" shall mean April 6, 2022.

"**Fitch**" shall mean Fitch, Inc.

"**Flood Insurance Acts**" shall have the meaning set forth in Section 7.1 hereof.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**Government Securities**" shall mean "government securities" as defined in Section 2(a)(16) of the Investment Company Act of 1940 and within the meaning of Treasury Regulation Section 1.860G-2(a)(8); provided, that, (i) such "government securities" are not subject to prepayment, call or early redemption, (ii) to the extent that any REMIC Requirements require a revised and/or alternate definition of "government securities" in connection with any defeasance hereunder, the foregoing shall be deemed amended in a manner commensurate

therewith and (iii) the aforesaid laws and regulations shall be deemed to refer to the same as may be and/or may hereafter be amended, restated, replaced or otherwise modified.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Gross Rents**" shall mean an amount equal to annual rental income reflected in a current rent roll for all Tenants paying rent, open for business and in actual physical occupancy of their respective space demised pursuant to Leases which are in full force and effect.

"**Guarantor**" shall mean MOSHE ROTHMAN, an individual, and any successor to and/or replacement of any of the foregoing Person, in each case, pursuant to and in accordance with the applicable terms and conditions of the Loan Documents.

"**Guarantor Control Condition**" shall mean a condition which shall be deemed satisfied to the extent that each Person that Controls (directly or indirectly) Borrower and, if applicable, each SPE Component Entity is, in each case, itself a current Guarantor (as distinguished from any prior Guarantor that has been replaced in accordance with the applicable terms and conditions of the Loan Documents) or Controlled (directly or indirectly) by one or more current Guarantors (as distinguished from any prior Guarantor that has been replaced in accordance with the applicable terms and conditions of the Loan Documents).

"**Guaranty**" shall mean that certain Limited Recourse Guaranty executed by Guarantor and dated as of the date hereof.

"**HVCRE Loan**" shall mean a loan that, under laws and regulations governing federally chartered banks, could reasonably be classified as a "High Volatility Commercial Real Estate Loan" (as such term is defined in such laws and regulations).

"**Immediate Repair Account**" shall have the meaning set forth in Section 8.1 hereof.

"**Immediate Repair Funds**" shall have the meaning set forth in Section 8.1 hereof.

"**Immediate Repairs**" shall have the meaning set forth in Section 8.1 hereof.

"**Improvements**" shall mean, individually and/or collectively (as the context requires), the "Improvements" as defined in the Security Instrument.

"**Indebtedness**" shall mean, for any Person, any indebtedness or other similar obligation for which such Person is obligated (directly or indirectly, by contract, operation of law or otherwise), including, without limitation, (i) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or its assets is liable, (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable if such amounts were advanced thereunder, (iii) all amounts required to be paid by such Person by contract and/or as a guaranteed payment (including, without limitation, any such amounts required to be paid to partners and/or as a preferred or special dividend, including any mandatory redemption of shares

or interests), (iv) all indebtedness incurred and/or guaranteed by such Person, directly or indirectly (including, without limitation, contractual obligations of such Person), (v) all obligations under leases that constitute capital leases for which such Person is liable, (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss and (vii) any property-assessed clean energy loans or similar indebtedness, including, without limitation, if such loans or indebtedness are made or otherwise provided by any Governmental Authority and/or secured or repaid (directly or indirectly) by any taxes or similar assessments.

"**Indemnified Parties**" shall mean (a) Lender, (b) any successor owner or holder of the Loan or participations in the Loan, (c) any Servicer or prior Servicer of the Loan, (d) any Investor or any prior Investor in any Securities, (e) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Investor or other third party, (f) any receiver or other fiduciary appointed in a foreclosure or other Creditors Rights Laws proceeding, (g) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, Affiliates or subsidiaries of any and all of the foregoing, and (h) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, Division, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Loan.

"**Independent Director**" shall have the meaning set forth in Section 5.2 hereof.

"**Individual Property**" shall mean each parcel of real property, the Improvements thereon and all personal property owned by Borrower and encumbered by the Security Instrument, together with all rights pertaining to such property and Improvements, as more particularly described in the granting clauses of the Security Instrument and referred to therein as the "Property."

"**Insurance Account**" shall have the meaning set forth in Section 8.6 hereof.

"**Insurance Payment Date**" shall mean, with respect to any applicable Policies, the date occurring 30 days prior to the date the applicable Insurance Premiums associated therewith are due and payable.

"**Insurance Premiums**" shall have the meaning set forth in Section 7.1 hereof.

"**Interest Accrual Period**" shall mean the period beginning on (and including) the sixth (6th) day of each calendar month during the term of the Loan and ending on (and including) the fifth (5th) day of the next succeeding calendar month.

"**Interest Rate**" shall mean a rate per annum equal to 5.02%.

"**Interest Shortfall**" shall have the meaning set forth in Section 2.7 hereof.

"**Investor**" shall mean any investor or potential investor in the Loan (or any portion thereof or interest therein) in connection with any Secondary Market Transaction.

"**IRS Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time or any successor statute.

"**Land**" shall mean, individually and/or collectively (as the context requires), the "Land" as defined in the Security Instrument.

"**Lease**" shall have the meaning set forth in the Security Instrument.

"**Leasing Reserve Account**" shall have the meaning set forth in Section 8.3 hereof.

"**Leasing Reserve Cap**" shall mean $2,250,000.

"**Leasing Reserve Funds**" shall have the meaning set forth in Section 8.3 hereof.

"**Leasing Reserve Monthly Deposit**" shall have the meaning set forth in Section 8.3 hereof.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower or the Property or any part thereof, or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Americans with Disabilities Act of 1990, and all Permits, authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower or the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof, or (ii) in any way limit the use and enjoyment thereof.

"**Liabilities**" shall have the meaning set forth in Section 11.2 hereof.

"**Loan**" shall mean the loan made by Lender to Borrower pursuant to this Agreement.

"**Loan Bifurcation**" shall have the meaning set forth in Section 11.1 hereof.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Environmental Indemnity, the Assignment of Management Agreement, the Guaranty and all other documents executed and/or delivered in connection with the Loan, as each of the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Losses**" shall mean any and all losses, damages, costs, fees, expenses, claims, suits, judgments, awards, liabilities (including, but not limited to, strict liabilities), obligations, debts, diminutions in value, fines, penalties, charges, amounts paid in settlement, foreseeable and unforeseeable consequential damages, litigation costs and attorneys' fees, in the case of each of

12

the foregoing, of whatever kind or nature and whether or not incurred in connection with any judicial or administrative proceedings, actions, claims, suits, judgments or awards.

"**Major Lease**" shall mean as to each Individual Property (i) any Lease which, individually or when aggregated with all other leases at the applicable Individual Property with the same Tenant or its Affiliate, either (A) accounts for seven and one-half percent (7.5%) or more of the total rental income for the applicable Individual Property, or (B) demises 7,500 square feet or more of the applicable Individual Property's gross leasable area, (ii) any Lease which contains any option, offer, right of first refusal or other similar entitlement to acquire or encumber all or any portion of the Property, and (iii) any instrument guaranteeing or providing credit support for any Lease meeting the requirements of (i) and/or (ii) above.

"**Management Agreement**" shall mean, individually and/or collectively (as the context may require), each management agreement entered into by and between Borrower and Manager, pursuant to which Manager is to provide management and other services with respect to the Property or any portion thereof, as the same may be amended, restated, replaced, extended, renewed, supplemented or otherwise modified from time to time.

"**Manager**" shall mean (i) Mike Barney Management, the Person associated therewith as set forth on Schedule VI hereof or (ii) such other Person selected as the manager of any applicable Individual Property in accordance with the terms of this Agreement or the other Loan Documents.

"**Material Action**" shall mean with respect to any Person, any action to consolidate or merge such Person with or into any Person, or sell all or substantially all of the assets of such Person, or to institute proceedings to have such Person be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against such Person or file a petition seeking, or consent to, reorganization or relief with respect to such Person under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of such Person or a substantial part of its property, or make any assignment for the benefit of creditors of such Person, or admit in writing such Person's inability to pay its debts generally as they become due, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate such Person.

"**Material Adverse Effect**" shall mean a material adverse effect on (i) the Property or any portion thereof, (ii) the business, profits, prospects, management, operations or condition (financial or otherwise) of Borrower, Guarantor, Sponsor or the Property or any portion thereof, (iii) the enforceability, validity, perfection or priority of the lien of the Security Instrument or the other Loan Documents, or (iv) the ability of Borrower and/or Guarantor to perform its obligations under the Security Instrument or the other Loan Documents.

"**Maturity Date**" shall mean the Stated Maturity Date or such other date on which the final payment of the principal amount of the Loan becomes due and payable as herein provided, whether at the Stated Maturity Date, by declaration of acceleration, or otherwise.

13

"**Maximum Legal Rate**" shall mean the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Member**" is defined in Section 5.1 hereof.

"**Mezzanine Borrower**" shall have the meaning set forth in Section 11.6 hereof.

"**Mezzanine Option**" shall have the meaning set forth in Section 11.6 hereof.

"**Minimum Disbursement Amount**" shall mean Twenty-Five Thousand and No/100 Dollars ($25,000).

"**Monthly Debt Service Payment Amount**" shall mean (i) for the First Monthly Payment Date and for each Monthly Payment Date occurring thereafter up to and including the Monthly Payment Date occurring in March, 2024, a payment equal to the amount of interest which has accrued during the preceding Interest Accrual Period computed at the Interest Rate and (ii) for the Monthly Payment Date occurring in April, 2024 and for each Monthly Payment Date occurring thereafter, a constant monthly payment of $134,511.15.

"**Monthly Insurance Deposit**" shall have the meaning set forth in Section 8.6 hereof.

"**Monthly Payment Date**" shall mean the First Monthly Payment Date and the sixth (6th) day of every calendar month occurring thereafter during the term of the Loan.

"**Monthly Tax Deposit**" shall have the meaning set forth in Section 8.6 hereof.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Net Proceeds**" shall mean: (i) the net amount of all insurance proceeds payable as a result of a Casualty to any Individual Property, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such insurance proceeds, or (ii) the net amount of the Award, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such Award.

"**Net Proceeds Deficiency**" shall have the meaning set forth in Section 7.4 hereof.

"**New Manager**" shall mean any Person replacing or becoming the assignee of the then current Manager, in each case, in accordance with the applicable terms and conditions hereof.

"**New Non-Consolidation Opinion**" shall mean a substantive non-consolidation opinion provided by outside counsel acceptable to Lender and the Rating Agencies and otherwise in form and substance acceptable to Lender and the Rating Agencies.

"**Non-Conforming Policy**" shall have the meaning set forth in Section 7.1 hereof.

"**Non-Consolidation Opinion**" shall mean that certain substantive non-consolidation opinion delivered to Lender by Neuberger Quinn Gielen Rubin Gibber P.A. in connection with the closing of the Loan.

"**Note**" shall mean that certain Promissory Note of even date herewith in the principal amount of $25,000,000.00, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time.

"**OFAC**" shall have the meaning set forth in Section 3.30 hereof.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by Responsible Officer of Borrower.

"**Op Ex Monthly Deposit**" shall have the meaning set forth in Section 8.4 hereof.

"**Operating Expense Account**" shall have the meaning set forth in Section 8.4 hereof.

"**Operating Expense Funds**" shall have the meaning set forth in Section 8.4 hereof.

"**Operating Expenses**" shall mean the total of all expenditures, computed in accordance with the Approved Accounting Method, of whatever kind relating to the operation, maintenance and management of the Property that are incurred on a regular monthly or other periodic basis, including without limitation, (and without duplication) (a) utilities, ordinary repairs and maintenance, insurance, license fees, property taxes and assessments, advertising expenses, payroll and related taxes, computer processing charges, management fees (equal to the greater of (x) three percent (3%) of the sum of (A) Operating Income for the trailing twelve (12) month period plus (B) Gross Rents or (y) actual management fees payable under the Management Agreement), operational equipment or other lease payments as approved by Lender, but specifically excluding (i) depreciation, (ii) Debt Service, (iii) non-recurring or extraordinary expenses, and (iv) deposits into the Reserve Funds; (b) normalized capital expenditures equal to $237,492.00 per annum; and (c) normalized tenant improvement and leasing commission expenditures equal to $35,628.00 per annum.

"**Operating Income**" shall mean all income, computed in accordance with the Approved Accounting Method, derived from the ownership and operation of the Property from whatever source, including, but not limited to common area maintenance, real estate tax recoveries, utility recoveries, other miscellaneous expense recoveries, percentage rent, and other miscellaneous income, but excluding rental income (other than percentage rent), sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, refunds and uncollectible accounts, sales of furniture, fixtures and equipment, interest income, insurance proceeds (other than business interruption or other loss of income insurance), Awards, unforfeited Security Deposits, utility and other similar deposits, non-recurring or extraordinary income, including, without limitation lease termination payments, and any disbursements to Borrower from the Reserve Funds. Operating Income shall not be diminished as a result of the Security Instrument or the creation of any intervening estate or interest in the Property or any part thereof. Notwithstanding the foregoing or anything to the contrary contained herein or in any other Loan Document, "Gross Rents" and "Operating Income" shall be calculated hereunder

without duplication of one another or of any individual item contained within the definitions thereof.

"**Other Charges**" shall mean all maintenance charges, impositions other than Taxes, and any other charges, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Patriot Act**" shall have the meaning set forth in Section 3.30 hereof.

"**PCA**" shall mean that certain Property Condition Report prepared by BBG as project number 0521012871 and dated December 15, 2021.

"**Permits**" shall mean all necessary certificates, licenses, permits, franchises, trade names, certificates of occupancy, consents, and other approvals (governmental and otherwise) required under applicable Legal Requirements for the operation of each Individual Property and the conduct of Borrower's business (including, without limitation, all required zoning, building code, land use, environmental, public assembly and other similar permits or approvals).

"**Permitted Encumbrances**" shall mean, with respect to each Individual Property, collectively, (a) the lien and security interests created by this Agreement and the other Loan Documents, (b) all liens, encumbrances and other matters disclosed in the applicable Title Insurance Policy, (c) liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent and (d) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"**Permitted Equipment Leases**" shall mean equipment leases or other similar instruments entered into with respect to the Personal Property; provided, that, in each case, such equipment leases or similar instruments (i) are entered into on commercially reasonable terms and conditions in the ordinary course of Borrower's business and (ii) relate to Personal Property which is (A) used in connection with the operation and maintenance of the applicable Individual Property in the ordinary course of Borrower's business and (B) readily replaceable without material interference or interruption to the operation of the applicable Individual Property.

"**Permitted Investments**" shall mean "permitted investments" as then defined and required by the Rating Agencies.

"**Person**" shall mean any individual, corporation (including a business trust), partnership, joint venture, joint stock company, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department, political subdivision or agency thereof and any other entity and, in each case, any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall mean, individually and/or collectively (as the context requires), the "Personal Property" as defined in the Security Instrument.

"**Policies**" shall have the meaning specified in Section 7.1 hereof.

"**Prohibited Entity**" means any Person which (i) is a statutory trust or similar Person, (ii) owns a direct or indirect interest in Borrower or the Property through a tenancy-in-common or other similar form of ownership interest and/or (iii) is a Crowdfunded Person.

"**Prohibited Transfer**" shall have the meaning set forth in Section 6.2 hereof.

"**Property**" and "**Properties**" shall mean, individually and/or collectively (as the context requires), each Individual Property which is subject to the terms hereof and of the other Loan Documents.

"**Property Document**" shall mean, individually or collectively (as the context may require), the following:  (i) Declaration of Protective Covenants made by The Estate of Crandall Melvin, the Estate of Myron S. Melvin, Emanuel J. Calocerinos, Frank J. Spina, Rowe Properties-Northfield, Emanuel J. Calocerinos, Inc., Rowe Development Company, James Dispenza, M.D. and Chemical Bank (Delaware) dated as of 9/1/1985 and recorded 9/13/1985 in Book 3202 of Deeds, Page 19 (affects Lots 6, 10 and more).

"**Property Document Event**" shall mean any event which would, directly or indirectly, cause a termination right, right of first refusal, first offer or any other similar right, cause any termination fees to be due or would cause a Material Adverse Effect to occur under any Property Document (in each case, beyond any applicable notice and cure periods under the applicable Property Document); provided, however, any of the foregoing shall not be deemed a Property Document Event to the extent Lender's prior written consent is obtained with respect to the same.

"**Property Document Provisions**" shall mean the representations, covenants and other terms and conditions of this Agreement and the other Loan Documents related to, in each case, any Property Document and/or other related matters (including, without limitation, Sections 3.34 and 4.22 of this Agreement).

"**Provided Information**" shall mean any information provided by or on behalf of any Borrower Party in connection with the Loan, the Property, such Borrower Party and/or any related matter or Person.

"**Prudent Lender Standard**" shall, with respect to any matter, be deemed to have been met if the matter in question (i) prior to a Securitization, is reasonably acceptable to Lender and (ii) after a Securitization, (A)  if permitted by REMIC Requirements applicable to such matter, would be reasonably acceptable to Lender or (B) if the Lender discretion in the foregoing subsection (A) is not permitted under such applicable REMIC Requirements, would be acceptable to a prudent lender of securitized commercial mortgage loans.

"**Qualified Insurer**" shall have the meaning set forth in Section 7.1 hereof.

"**Qualified Management Agreement**" shall mean a management agreement with a Qualified Manager with respect to the applicable Individual Property which is approved by Lender in writing (which such approval may be conditioned upon Lender's receipt of a Rating Agency Confirmation with respect to such management agreement).

17

"**Qualified Manager**" shall mean a Person approved by Lender in writing (which such approval may be conditioned upon Lender's receipt of a Rating Agency Confirmation with respect to such Person).

"**Rating Agencies**" shall mean each of S&P, Moody's, Fitch and any other nationally-recognized statistical rating agency designated by Lender (and any successor to any of the foregoing) in connection with and/or in anticipation of any Secondary Market Transaction.

"**Rating Agency Condition**" shall be deemed to exist if (i) any Rating Agency fails to respond to any request for a Rating Agency Confirmation with respect to any applicable matter or otherwise elects (orally or in writing) not to consider any applicable matter or (ii) Lender (or its Servicer) is not required to and/or elects not to obtain (or cause to be obtained) a Rating Agency Confirmation with respect to any applicable matter, in each case, pursuant to and in compliance with any pooling and servicing agreement(s) or similar agreement(s), in each case, relating to the servicing and/or administration of the Loan.

"**Rating Agency Confirmation**" shall mean (i) prior to a Securitization or if the Rating Agency Condition exists, that Lender has (in consultation with the Rating Agencies (if required by Lender)) approved the matter in question in writing based upon Lender's good faith determination of applicable Rating Agency standards and criteria and (ii) from and after a Securitization (to the extent the Rating Agency Condition does not exist), a written affirmation from each of the Rating Agencies (obtained at Borrower's sole cost and expense) that the credit rating of the Securities by such Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion.

"**Registrar**" shall have the meaning set forth in Section 11.7 hereof.

"**Regulation AB**" shall mean Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

"**Release Date**" shall mean the earlier to occur of (i) the fourth anniversary of the Closing Date and (ii) the date that is two (2) years from the "startup day" (within the meaning of Section 860G(a)(9) of the IRS Code) of the REMIC Trust established in connection with the last Securitization involving any portion of or interest in the Loan.

"**REMIC Opinion**" shall mean, as to any matter, an opinion as to the compliance of such matter with applicable REMIC Requirements (which such opinion shall be, in form and substance and from a provider, in each case, reasonably acceptable to Lender and acceptable to the Rating Agencies).

"**REMIC Payment**" shall have the meaning set forth in Section 7.3 hereof.

"**REMIC Requirements**" shall mean any applicable legal requirements relating to any REMIC Trust (including, without limitation, those relating to the continued treatment of the Loan (or the applicable portion thereof and/or interest therein) as a "qualified mortgage" held by such REMIC Trust, the continued qualification of such REMIC Trust as such under the IRS

18

Code, the non-imposition of any tax on such REMIC Trust under the IRS Code (including, without limitation, taxes on "prohibited transactions and "contributions") and any other constraints, rules and/or other regulations and/or requirements relating to the servicing, modification and/or other similar matters with respect to the Loan (or any portion thereof and/or interest therein) that may now or hereafter exist under applicable legal requirements (including, without limitation under the IRS Code)).

"**REMIC Trust**" shall mean any "real estate mortgage investment conduit" within the meaning of Section 860D of the IRS Code that holds any interest in all or any portion of the Loan.

"**Rent Roll**" shall have the meaning set forth in Section 3.18 hereof.

"**Rent Loss Proceeds**" shall have the meaning set forth in Section 7.1 hereof.

"**Rents**" shall have the meaning set forth in the Security Instrument.

"**Replacement Reserve Account**" shall have the meaning set forth in Section 8.2 hereof.

"**Replacement Reserve Funds**" shall have the meaning set forth in Section 8.2 hereof.

"**Replacement Reserve Monthly Deposit**" shall have the meaning set forth in Section 8.2 hereof.

"**Replacements**" for any period shall mean replacements and/or alterations to any Individual Property; provided, that, the same are (i) required to be capitalized according to the Approved Accounting Method and (ii) reasonably approved by Lender.

"**Replacement Tenant Debt Yield**" shall mean, as of any date of calculation, a ratio conveyed as a percentage in which: (i) the numerator is the Underwritable Cash Flow (which, for purposes of this calculation only and for the avoidance of doubt, shall not include any rents attributable to the applicable Specified Tenant causing a Specified Tenant Trigger Period within the definition of Specified Tenant Trigger Period); and (ii) the denominator is the then outstanding principal balance of the Loan.

"**Reporting Failure**" shall have the meaning set forth in Section 4.12 hereof.

"**Required Financial Item**" shall have the meaning set forth in Section 4.12 hereof.

"**Reserve Accounts**" shall mean the Tax Account, the Insurance Account, the Replacement Reserve Account, the Immediate Repair Account, the Alion Reserve Account, the Free Rent Reserve Account, the Leasing Reserve Account, the Excess Cash Flow Account, the Operating Expense Account and any other escrow account established by this Agreement or the other Loan Documents (but specifically excluding the Cash Management Account, the Restricted Account and the Debt Service Account).

"**Reserve Funds**" shall mean the Tax and Insurance Funds, the Replacement Reserve Funds, the Immediate Repair Funds, the Alion Reserve Funds, the Free Rent Reserve Funds, the

Leasing Reserve Funds, the Excess Cash Flow Funds, the Operating Expense Funds and any other escrow funds established by this Agreement or the other Loan Documents.

"**Responsible Officer**" means with respect to a Person, the chairman of the board, president, chief operating officer, chief financial officer, treasurer or vice president of such Person or such other similar officer of such Person reasonably acceptable to Lender.

"**Restoration**" shall mean, following the occurrence of a Casualty or a Condemnation which is of a type necessitating the repair of the Property (or any portion thereof), the completion of the repair and restoration of the Property (or applicable portion thereof) as nearly as possible to the condition the Property (or applicable portion thereof) was in immediately prior to such Casualty or Condemnation, with such alterations as may be reasonably approved by Lender.

"**Restoration Retainage**" shall have the meaning set forth in Section 7.4 hereof.

"**Restoration Threshold**" shall mean, with respect to each Individual Property, an amount equal to 5% of the outstanding principal amount of the Allocated Loan Amount attributable to such Individual Property.

"**Restricted Account**" shall have the meaning set forth in Section 9.1 hereof.

"**Restricted Account Agreement**" shall mean that certain Deposit Account Control Agreement by and among Borrower, Lender and SIGNATURE BANK dated as of the date hereof, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Restricted Party**" shall have the meaning set forth in Section 6.1 hereof.

"**Sale or Pledge**" shall have the meaning set forth in Section 6.1 hereof.

"**Sanctions**" shall have the meaning set forth in Section 3.30 hereof.

"**Sanctions Authority**" shall have the meaning set forth in Section 3.30 hereof.

"**Sanctioned Jurisdiction**" shall have the meaning set forth in Section 3.30 hereof.

"**Sanctioned Person**" shall have the meaning set forth in Section 3.30 hereof.

"**Scheduled Defeasance Payments**" "Scheduled Defeasance Payments" shall mean scheduled payments of interest and principal hereunder for all Monthly Payment Dates occurring after the Total Defeasance Date and up to and including the outstanding principal balance and accrued interest on the Loan as of the Stated Maturity Date, and all payments required after the Total Defeasance Date, if any, under the Loan Documents for servicing fees, rating surveillance charges (to the extent applicable) and other similar charges.

"**Secondary Market Transaction**" shall have the meaning set forth in Section 11.1 hereof.

"**Securities**" shall have the meaning set forth in Section 11.1 hereof.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Securitization**" shall have the meaning set forth in Section 11.1 hereof.

"**Security Agreement**" shall mean a pledge and security agreement in form and substance satisfying the Prudent Lender Standard pursuant to which Borrower grants Lender a perfected, first priority security interest in the Defeasance Collateral Account and the Total Defeasance Collateral.

"**Security Deposits**" shall mean any advance deposits or any other deposits collected with respect to the Property, whether in the form of cash, letter(s) of credit or other cash equivalents (including, without limitation, such deposits made in connection with any Lease).

"**Security Instrument**" shall mean that certain that certain first priority and Security Agreement dated the date hereof, executed and delivered by Borrower as security for the Loan and encumbering the Property (or any portion thereof), as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Security Instrument Taxes**" shall have the meaning set forth in Section 15.2 hereof.

"**Servicer**" shall have the meaning set forth in Section 11.4 hereof.

"**Severed Loan Documents**" shall have the meaning set forth in Article 10.

"**Significant Obligor**" shall have the meaning set forth in Item 1101(k) of Regulation AB under the Securities Act.

"**Single Purpose Entity**" shall mean an entity whose structure and organizational and governing documents are otherwise in form and substance acceptable to the Rating Agencies and satisfying the Prudent Lender Standard.

"**Special Member**" is defined in Section 5.1 hereof.

"**Specified Tenant**" shall mean, as applicable, (i) National Grange & Alion (or any replacement tenant approved by Lender in accordance with the terms hereof), (ii) any other lessee(s) of the Specified Tenant Space (or any portion thereof) and (iii) any parent company of any such Specified Tenant, and any Affiliate providing credit support for, or guarantor of, any such Specified Tenant Lease(s).

"**Specified Tenant Cure Conditions**" shall mean each of the following, as applicable (i) the applicable Specified Tenant has cured all defaults under the applicable Specified Tenant Lease, (ii) the applicable Specified Tenant is in actual, physical possession of the Specified Tenant Space (or applicable portion thereof), open to the public for business during customary hours and not "dark" in the Specified Tenant Space (or applicable portion thereof), (iii) the applicable Specified Tenant has revoked or rescinded all termination or cancellation notices with respect to the applicable Specified Tenant Lease and has re-affirmed the applicable Specified

Tenant Lease as being in full force and effect, (iv) in the event the Specified Tenant Trigger Period is due to the applicable Specified Tenant's failure to extend or renew the applicable Specified Tenant Lease in accordance with clause (vi) of the definition of "Specified Tenant Trigger Period", the applicable Specified Tenant has renewed or extended the applicable Specified Tenant Lease in accordance with the terms hereof and thereof for the applicable Specified Tenant Renewal Term, (v) with respect to any applicable bankruptcy or insolvency proceedings involving the applicable Specified Tenant and/or the applicable Specified Tenant Lease, the applicable Specified Tenant is no longer insolvent or subject to any bankruptcy or insolvency proceedings and has affirmed the applicable Specified Tenant Lease pursuant to final, non-appealable order of a court of competent jurisdiction (vi) the applicable Specified Tenant is paying full, unabated rent under the applicable Specified Tenant Lease and (vii) in the event the Specified Tenant Trigger Period is due to any of the issues set forth in clauses (iv) or (vi) of the definition of "Specified Tenant Trigger Period", then either (A) the entire applicable Specified Tenant Space is leased to a replacement Tenant or Tenants reasonably acceptable to Lender and in accordance with the terms and conditions of this Agreement or (B) both of the following conditions are met: (1) after the date of such Trigger Period, at least an additional 27,000 square feet at the Property has been leased to a Tenant reasonably acceptable to Lender and in accordance with the terms and conditions of this Agreement and (2) the Replacement Tenant Debt Yield shall exceed 9.25%.

"**Specified Tenant Extension Deadline**" shall mean the date occurring on the earlier of (a) twelve (12) months prior to the expiration of the then applicable term of the applicable Specified Tenant Lease and (b) the date on which Specified Tenant is required to give notice under and pursuant to the Specified Tenant Lease.

"**Specified Tenant Lease**" shall mean, collectively and/or individually (as the context requires), each Lease at the Property with Specified Tenant (including, without limitation, any guaranty or similar instrument furnished thereunder), as the same may have been or may hereafter be amended, restated, extended, renewed, replaced and/or otherwise modified.

"**Specified Tenant Renewal Term**" shall mean five (5) years.

"**Specified Tenant Space**" shall mean that portion of the Property demised as of the date hereof to the initial Specified Tenant pursuant to the initial Specified Tenant Lease. References herein to "applicable portions" of the Specified Tenant Space (or words of similar import) shall be deemed to refer to the portion of the Specified Tenant Space demised pursuant to the applicable Specified Tenant Lease(s) entered into after the date hereof in accordance with the applicable terms and conditions hereof.

"**Specified Tenant Trigger Period**" shall mean a period (A) commencing upon the first to occur of (i) Specified Tenant being in default under the applicable Specified Tenant Lease, (ii) Specified Tenant failing to be in actual, physical possession of the Specified Tenant Space (or applicable portion thereof), failing to be open to the public for business during customary hours and/or "going dark" in the Specified Tenant Space (or applicable portion thereof), (iii) Specified Tenant giving notice that it is terminating its Lease for all or any portion of the Specified Tenant Space (or applicable portion thereof), (iv) any termination or cancellation of any Specified Tenant Lease (including, without limitation, rejection in any bankruptcy or similar insolvency

22

proceeding) and/or any Specified Tenant Lease failing to otherwise be in full force and effect, (v) any bankruptcy or similar insolvency of Specified Tenant and (vi) Specified Tenant failing to extend or renew the applicable Specified Tenant Lease on or prior to the applicable Specified Tenant Extension Deadline in accordance with the applicable terms and conditions thereof and hereof for the applicable Specified Tenant Renewal Term; and (B) expiring upon the first to occur of Lender's receipt of evidence reasonably acceptable to Lender (which such evidence shall include, without limitation, a duly executed estoppel certificate from the applicable Specified Tenant in form and substance acceptable to Lender) of (1) the satisfaction of the Specified Tenant Cure Conditions or (2) Borrower leasing the entire Specified Tenant Space (or applicable portion thereof) in accordance with the applicable terms and conditions hereof, the applicable Tenant under such Lease being in actual, physical occupancy of, and open to the public for business in, the space demised under its Lease and paying the full amount of the rent due under its Lease.

"**SPE Component Entity**" shall have the meaning set forth in Section 5.1 hereof.

"**Sponsor**" shall mean Guarantor.

"**S&P**" shall mean S&P Global Ratings, a Standard & Poor's Financial Services, LLC business.

"**State**" shall mean the applicable state in which the applicable Individual Property is located.

"**Stated Maturity Date**" shall mean March 6, 2032.

"**Successor Borrower**" shall have the meaning set forth in Section 2.8 hereof.

"**Survey**" shall mean, individually or collectively (as the context requires), each survey of each Individual Property certified and delivered to Lender in connection with the closing of the Loan.

"**Tax Account**" shall have the meaning set forth in Section 8.6 hereof.

"**Tax and Insurance Funds**" shall have the meaning set forth in Section 8.6 hereof.

"**Taxes**" shall mean all taxes, assessments, water rates, sewer rents, and other governmental impositions, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Land, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Tax Payment Date**" shall mean, with respect to any applicable Taxes, the date occurring 30 days prior to the date the same are due and payable.

"**Tenant**" shall mean any Person leasing, subleasing or otherwise occupying any portion of the Property under a Lease or other occupancy agreement.

"**Tenant Direction Notice**" shall have the meaning set forth in Section 9.2 hereof.

"**Title Insurance Policy**" shall mean that certain ALTA mortgagee title insurance policy issued with respect to the Property and insuring the lien of the Security Instrument.

"**Total Defeasance Collateral**" shall mean Government Securities, which provide payments (i) on or prior to, but as close as possible to, the Business Day immediately preceding all Monthly Payment Dates and other scheduled payment dates, if any, hereunder after the Total Defeasance Date and up to and including the Stated Maturity Date, and (ii) in amounts equal to or greater than the Scheduled Defeasance Payments relating to such Monthly Payment Dates and other scheduled payment dates.

"**Total Defeasance Date**" shall have the meaning set forth in Section 2.8 hereof.

"**Total Defeasance Event**" shall have the meaning set forth in Section 2.8 hereof.

"**Trigger Period**" shall mean a period (A) commencing upon the earliest of (i) the occurrence and continuance of an Event of Default, (ii) the Debt Yield falling below 7.75% and (iii) the occurrence of a Specified Tenant Trigger Period; and (B) expiring upon (x) with regard to any Trigger Period commenced in connection with clause (i) above, the cure (if applicable) of such Event of Default, (y) with regard to any Trigger Period commenced in connection with clause (ii) above, the date that the Debt Yield is equal to or greater than 7.75% for two (2) consecutive calendar quarters and (z) with regard to any Trigger Period commenced in connection with clause (iii) above, a Specified Tenant Trigger Period ceasing to exist in accordance with the terms hereof.  Notwithstanding the foregoing, a Trigger Period shall not be deemed to expire in the event that a Trigger Period then exists for any other reason.

"**True Up Payment**" shall mean a payment into the applicable Reserve Account of a sum which, together with any applicable monthly deposits into the applicable Reserve Account, will be sufficient to discharge the obligations and liabilities for which such Reserve Account was established as and when reasonably appropriate.  The amount of the True Up Payment shall be determined by Lender in its reasonable discretion and shall be final and binding absent manifest error.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State of New York.

"**Unaffected Property**" shall have the meaning set forth in Section 11.8 hereof.

"**Uncrossed Loan**" shall have the meaning set forth in Section 11.8 hereof.

"**Uncrossed Loan Documents**" shall have the meaning set forth in Section 11.8 hereof.

"**Uncrossing Event**" shall have the meaning set forth in Section 11.8 hereof.

"**Underwritable Cash Flow**" shall mean an amount calculated by Lender on a monthly basis equal to the sum of Gross Rents plus the trailing twelve (12) months Operating Income, less the trailing twelve (12) months Operating Expenses, each of which shall be subject to Lender's application of the Cash Flow Adjustments.  Lender's calculation of Underwritable Cash Flow (including determination of items that do not qualify as Operating Income or Operating

24

Expenses) shall be calculated by Lender in good faith based upon Lender's determination of Rating Agency criteria and shall be final absent manifest error.

"**Underwriter Group**" shall have the meaning set forth in Section 11.2 hereof.

"**Updated Information**" shall have the meaning set forth in Section 11.1 hereof.

"**Upfront CapEx Work**" shall mean certain exterior façade maintenance, cleaning, calking and gasket replacement as more particularly set forth in the PCA.

"**U.S. Obligations**" shall mean direct full faith and credit obligations of the United States of America that are not subject to prepayment, call or early redemption.

"**Work Charge**" shall have the meaning set forth in Section 4.16 hereof.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

"**Yield Maintenance Premium**" shall mean an amount equal to the greater of (a) an amount equal to 1% of the amount prepaid; or (b) an amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the Stated Maturity Date determined by discounting such payments at the Discount Rate (as defined below). As used in this definition, the term "Calculated Payments" shall mean the monthly payments of interest only which would be due based on the principal amount of the Loan being prepaid on the date on which prepayment is made and assuming an interest rate per annum equal to the difference (if such difference is greater than zero) between (y) the Interest Rate and (z) the Yield Maintenance Treasury Rate (as defined below). As used in this definition, the term "Discount Rate" shall mean the rate which, when compounded monthly, is equivalent to the Yield Maintenance Treasury Rate (as defined below), when compounded semi-annually. As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the Stated Maturity Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender shall notify Borrower of the amount and the basis of determination of the required prepayment consideration. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

### Section 1.2    Principles of Construction.

All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including,

25

without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. References herein to "the Property or any portion thereof" and words of similar import shall be deemed to refer, as applicable, to any portion of the Property taken as a whole (including any Individual Property) and any portion of any Individual Property.

## ARTICLE 2

## GENERAL TERMS

**Section 2.1     Loan Commitment; Disbursement to Borrower**.  Except as expressly and specifically set forth herein, Lender has no obligation or other commitment to loan any funds to Borrower or otherwise make disbursements to Borrower.  Borrower hereby waives any right Borrower may have to make any claim to the contrary.

**Section 2.2     The Loan**.  Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan on the Closing Date.

**Section 2.3     Disbursement to Borrower**.  Borrower may request and receive only one borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be re-borrowed.

**Section 2.4     The Note and the other Loan Documents**.  The Loan shall be evidenced by the Note and this Agreement and secured by this Agreement and the other Loan Documents.

**Section 2.5     Interest Rate**.

(a)     Interest on the outstanding principal balance of the Loan shall accrue from the Closing Date at the Interest Rate until repaid in accordance with the applicable terms and conditions hereof.

(b)     Intentionally Omitted.

(c)     In the event that, and for so long as, any Event of Default shall have occurred and be continuing, (i) the then outstanding principal balance of the Loan shall accrue interest at the Default Rate, calculated from the date the applicable Default occurred without regard to any grace or cure periods contained herein, (ii) without limitation of any rights or remedies contained herein and/or in any other Loan Document, any interest accrued at the Default Rate in excess of the interest component of the Monthly Debt Service Payment Amount shall, to the extent not already paid and/or due and payable hereunder, be due and payable on each Monthly Payment Date and (iii) all references herein and/or in any other Loan Document to the "Interest Rate" shall be deemed to refer to the Default Rate.

26

(d)     Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (that is, the Interest Rate or the Default Rate, as then applicable, expressed as an annual rate divided by 360) by (c) the outstanding principal balance.  The accrual period for calculating interest due on each Monthly Payment Date shall be the Interest Accrual Period immediately prior to such Monthly Payment Date.  Borrower understands and acknowledges that such interest accrual requirement results in more interest accruing on the Loan than if either a thirty (30) day month and a three hundred sixty (360) day year or the actual number of days and a three hundred sixty-five (365) day year were used to compute the accrual of interest on the Loan.

(e)     This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required to pay interest on the principal balance of the Loan (including, to the extent applicable, any prepayment premium and/or penalty) at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder (including, to the extent applicable, any prepayment premium and/or penalty) at a rate in excess of the Maximum Legal Rate, the Interest Rate or the Default Rate, as the case may be, and/or, to the extent applicable, any prepayment premium and/or penalty shall, in each case, be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan (including, to the extent applicable, any prepayment premium and/or penalty) does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

(f)     Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any of the following Persons, Borrower, each Borrower Party and Lender acknowledge that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by (i) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and (ii) the effects of any Bail-in Action on any such liability, including, if applicable (A) a reduction in full or in part or cancellation of any such liability; (B) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; and/or (C) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

**Section 2.6    Loan Payments**.

(a)    Borrower shall make a payment to Lender of interest only on the Closing Date for the period from (and including) the Closing Date through (but excluding) the sixth (6th) day of either (i) the month in which the Closing Date occurs (if such Closing Date is after the first day of such month, but prior to the sixth (6th) day of such month) or (ii) if the Closing Date is after the sixth (6th) day of the then current calendar month, the month following the month in which the Closing Date occurs; provided, however, if the Closing Date is the sixth (6th) day of a calendar month, no such separate payment of interest shall be due.  Borrower shall make a payment to Lender of interest and, to the extent applicable, principal in the amount of the Monthly Debt Service Payment Amount on the First Monthly Payment Date and on each Monthly Payment Date occurring thereafter to and including the Maturity Date.  Each payment shall be applied first to accrued and unpaid interest and the balance to principal.  The non-interest only portion of Monthly Debt Service Payment Amount required hereunder is based upon a thirty (30) year amortization schedule.

(b)    Intentionally Omitted.

(c)    Borrower shall pay to Lender on the Maturity Date the outstanding principal balance of the Loan, all accrued and unpaid interest and all other amounts due hereunder and under the Note, the Security Instrument and the other Loan Documents.

(d)    If any principal, interest or any other sum due under the Loan Documents, other than the payment of principal due on the Maturity Date, is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Any such amount shall be secured by the Security Instrument and the other Loan Documents.

(i)    Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 1:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

(ii)    Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be deemed to be the immediately preceding Business Day.

(iii)    All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

151395847v8

**Section 2.7    Prepayments**.

(a)    Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part.  On or after the Monthly Payment Date occurring three (3) months prior to the Stated Maturity Date (such period, the "**Open Prepayment Period**"), Borrower may, provided no Event of Default has occurred and is continuing, at its option and upon thirty (30) days prior notice to Lender (or such shorter period of time as may be permitted by Lender in its sole discretion), prepay the Debt on any date without payment of any prepayment premium or penalty (including, without limitation, any Default Yield Maintenance Premium).  Such prepayment of the Debt shall be made in whole (and not in part).  Any prepayment received by Lender on a date other than a Monthly Payment Date shall include interest which would have accrued thereon to the next Monthly Payment Date (such amounts, the "**Interest Shortfall**") and such amounts (i.e., principal and interest prepaid by Borrower) shall be held by Lender as collateral security for the Loan in an interest bearing Eligible Account at an Eligible Institution, with interest accruing on such amounts to the benefit of Borrower; such amounts prepaid shall be applied to the Loan on the next Monthly Payment Date, with any interest on such funds paid to Borrower on such date provided no Event of Default then exists.

(b)    On each date on which Lender actually receives a distribution of Net Proceeds, and if Lender does not make such Net Proceeds available for Restoration or for disbursement as Rent Loss Proceeds (as applicable), in each case, in accordance with the applicable terms and conditions hereof, Borrower shall, at Lender's option, prepay the Debt in an amount equal to one hundred percent (100%) of such Net Proceeds together with any applicable Interest Shortfall.  Borrower shall make the REMIC Payment as and to the extent required hereunder.  No prepayment premium or penalty (including, without limitation, any Default Yield Maintenance Premium) shall be due in connection with any prepayment made pursuant to this Section 2.7(b) (including, without limitation, in connection with any REMIC Payment).  Any prepayment received by Lender pursuant to this Section 2.7(b) on a date other than a Monthly Payment Date shall be held by Lender as collateral security for the Loan in an interest bearing, Eligible Account at an Eligible Institution, with such interest accruing to the benefit of Borrower, and shall be applied by Lender on the next Monthly Payment Date, with any interest on such funds paid to Borrower on such date provided no Event of Default then exists.

(c)    After the occurrence and during the continuance of an Event of Default and notwithstanding any acceleration of the Debt in accordance with the applicable terms and conditions hereof, the Default Yield Maintenance Premium shall, in all cases, be deemed a portion of the Debt due and owing hereunder and under the other Loan Documents.  Without limitation of the foregoing, if, after the occurrence and during the continuance of an Event of Default, (i) payment of all or any part of the Debt is tendered by Borrower (voluntarily or involuntarily), a purchaser at foreclosure or any other Person, (ii) Lender obtains a recovery of all or a portion of the Debt (through an exercise of remedies hereunder or under the other Loan Documents or otherwise) or (iii) the Debt is deemed satisfied (in whole or in part) through an exercise of remedies hereunder or under the other Loan Documents or at law, the Default Yield Maintenance Premium, in addition to the outstanding principal balance, all accrued and unpaid interest and other amounts payable under the Loan Documents, shall be deemed due and payable hereunder.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, (i) any prepayment of the Debt shall be applied to the Debt in such order and priority

29

as may be determined by Lender in its sole discretion and (ii) the word "prepayment" when used herein and in the other Loan Documents shall also be deemed to mean repayment and payment.

**Section 2.8     Defeasance**.

(a)     Total Defeasance.

(i)     Provided no Event of Default shall have occurred and remain uncured, Borrower shall have the right at any time after the Release Date and prior to the Maturity Date to voluntarily defease the entire Loan and obtain a release of the lien of the Security Instrument by providing Lender with the Total Defeasance Collateral (hereinafter, a "**Total Defeasance Event**"), subject to the satisfaction of the following conditions precedent:

(A)     Borrower shall provide Lender not less than thirty (30) days notice (or such shorter period of time if permitted by Lender in its sole discretion) but not more than ninety (90) days notice specifying a date (the "**Total Defeasance Date**") on which the Total Defeasance Event is to occur;

(B)     Unless otherwise agreed to in writing by Lender, Borrower shall pay to Lender (1) all payments of principal and interest due and payable on the Loan to and including the Total Defeasance Date (provided, that, if such Total Defeasance Date is not a Monthly Payment Date, Borrower shall also pay to Lender all payments of principal and interest due on the Loan to and including the next occurring Monthly Payment Date); (2) all other sums, if any, due and payable under the Note, this Agreement, the Security Instrument and the other Loan Documents through and including the Total Defeasance Date (or, if the Total Defeasance Date is not a Monthly Payment Date, the next occurring Monthly Payment Date); (3) all escrow, closing, recording, legal, Rating Agency and other fees, costs and expenses paid or incurred by Lender or its agents in connection with the Total Defeasance Event, the release of the lien of Security Instrument on the Property, the review of the proposed Total Defeasance Collateral and the preparation of the Security Agreement, the Defeasance Collateral Account Agreement and related documentation; and (4) any revenue, documentary stamp, intangible or other taxes, charges or fees due in connection with the transfer or assumption of the Note or the Total Defeasance Event;

(C)     Borrower shall deposit the Total Defeasance Collateral into the Defeasance Collateral Account and otherwise comply with the provisions of Section 2.8(c) hereof;

(D)     Borrower shall execute and deliver to Lender a Security Agreement in respect of the Defeasance Collateral Account and the Total Defeasance Collateral;

30

(E) Borrower shall deliver to Lender (1) an opinion of counsel for Borrower that is standard in commercial lending transactions and subject only to customary qualifications, assumptions and exceptions opining, among other things, that (I) Lender has a legal and valid perfected first priority security interest in the Defeasance Collateral Account and the Total Defeasance Collateral; (II) the Total Defeasance Event will not result in a deemed exchange for purposes of the IRS Code and will not adversely affect the status of the Note as indebtedness for federal income tax purposes; and (III) delivery of the Total Defeasance Collateral and the grant of a security interest therein to Lender shall not constitute an avoidable preference under Section 547 of the Bankruptcy Code or applicable state law; and (2) a REMIC Opinion with respect to the Total Defeasance Event;  and (3) a New Non-Consolidation Opinion with respect to Successor Borrower;

(F) Borrower shall deliver to Lender a Rating Agency Confirmation as to the Total Defeasance Event;

(G) Borrower shall deliver an Officer's Certificate certifying that the requirements set forth in this Section 2.8 have been satisfied;

(H) Borrower shall deliver a certificate of a nationally recognized public accounting firm acceptable to Lender certifying that the Total Defeasance Collateral will generate monthly amounts equal to or greater than the Scheduled Defeasance Payments; and

(I) Borrower shall deliver such other certificates, opinions, documents and instruments as Lender may reasonably request.

(ii) If Borrower has elected to defease the entire Loan and the requirements of this Section 2.8 have been satisfied, the Property shall be released from the lien of the Security Instrument and the Total Defeasance Collateral pledged pursuant to the Security Agreement shall be the sole source of collateral securing the Loan.  In connection with the release of the lien, Borrower shall submit to Lender, not less than thirty (30) days prior to the Total Defeasance Date (or such shorter time as is acceptable to Lender in its sole discretion), a release of lien (and related Loan Documents) for execution by Lender. Such release shall be in a form appropriate in each jurisdiction in which each Individual Property is located and that contains standard provisions protecting the rights of the releasing lender.  In addition, Borrower shall provide all other documentation Lender reasonably requires to be delivered by Borrower in connection with such release, together with an Officer's Certificate certifying that such documentation (1) is in compliance with all Legal Requirements, and (2) will effect such release in accordance with the terms of this Agreement.  Except as set forth in this Article 2, no repayment, prepayment or defeasance of all or any portion of the Loan shall cause, give rise to a right to require, or otherwise result in, the release of the lien of the Security Instrument.

# ARTICLE 3

# REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants as of the Closing Date that:

**Section 3.1     Legal Status and Authority**.  Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of formation; (b) is duly qualified to transact business and is in good standing in the State; and (c) has all necessary approvals, governmental and otherwise, and full power and authority to own, operate and lease the applicable Individual Properties.  Borrower has full power, authority and legal right to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the Property pursuant to the terms hereof and to keep and observe all of the terms of this Agreement, the Note, the Security Instrument and the other Loan Documents on Borrower's part to be performed.

**Section 3.2     Validity of Documents**.  (a) The execution, delivery and performance of this Agreement, the Note, the Security Instrument and the other Loan Documents by Borrower and Guarantor and the borrowing evidenced by the Note and this Agreement (i) are within the power and authority of such parties; (ii) have been authorized by all requisite organizational action of such parties; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a material default under any provision of law, any order or judgment of any court or Governmental Authority, any license, certificate or other approval required to operate the Property or any portion thereof, any applicable organizational documents, or any applicable indenture, agreement or other instrument, including, without limitation, the Management Agreement; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby and by the other Loan Documents; and (vi) will not require any authorization or license from, or any filing with, any Governmental Authority (except for the recordation of the Security Instrument in appropriate land records in each applicable State and except for Uniform Commercial Code filings relating to the security interest created hereby), (b) this Agreement, the Note, the Security Instrument and the other Loan Documents have been duly executed and delivered by Borrower and Guarantor and (c) this Agreement, the Note, the Security Instrument and the other Loan Documents constitute the legal, valid and binding obligations of Borrower and Guarantor.   The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Creditors Rights Laws, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)).   Neither Borrower nor Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect to the Loan Documents.

**Section 3.3     Litigation**.   There is no action, suit, proceeding or governmental investigation, in each case, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's knowledge, threatened or contemplated against Borrower, Sponsor or Guarantor or against or affecting the Property other

32

than those that are both (i) fully covered by insurance and (ii) would not otherwise have a Material Adverse Effect.

**Section 3.4    Agreements**.  Borrower is not a party to any agreement or instrument or subject to any restriction which would reasonably be expected to result in, or constitute, a Material Adverse Effect.  Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or the Property (or any portion thereof) is bound which would be reasonably expected to result in, or constitute a Material Adverse Effect.  Borrower has no material financial obligation under any agreement or instrument to which Borrower is a party or by which Borrower or the Property (or any portion thereof) is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation of the Property, and (b) obligations that have been disclosed to Lender by Borrower in writing in connection with the closing of the Loan.  There is no agreement or instrument to which Borrower is a party or by which Borrower is bound that would require the subordination in right of payment of any of Borrower's obligations hereunder or under the Note to an obligation owed to another party.

**Section 3.5    Financial Condition**.

(a)    Borrower is solvent and Borrower has received reasonably equivalent value for the granting of the Security Instrument.  No proceeding under Creditors Rights Laws with respect to any Borrower Party has been initiated.

(b)    In the last ten (10) years, no (i) petition in bankruptcy has been filed by or against any Borrower Party and (ii) Borrower Party has ever made any assignment for the benefit of creditors or taken advantage of any Creditors Rights Laws.

(c)    No Borrower Party is contemplating either the filing of a petition by it under any Creditors Rights Laws or the liquidation of its assets or property and Borrower has no knowledge of any Person contemplating the filing of any such petition against any Borrower Party.

(d)    With respect to any loan or financing in which any Borrower Party or any Affiliate thereof has been directly or indirectly obligated for or has, in connection therewith, otherwise provided any guaranty, indemnity or similar surety, none of such loans or financings has ever been (i) more than 30 days in default or (ii) transferred to special servicing.

**Section 3.6    Disclosure**.  Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that is reasonably likely to cause any representation or warranty made herein to be materially misleading.

**Section 3.7    No Plan Assets; FIRRMA**.

(a)    As of the date hereof and until the Debt is repaid in accordance with the applicable terms and conditions hereof, (a) Borrower is not and will not be an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, (b) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, (c) transactions by or with Borrower are not and will not be subject to any state statute regulating

33

investments of, or fiduciary obligations with respect to, governmental plans and (d) none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA. As of the date hereof, neither Borrower, nor any member of a "controlled group of corporations" (within the meaning of Section 414 of the IRS Code), maintains, sponsors or contributes to a "defined benefit plan" (within the meaning of Section 3(35) of ERISA) or a "multiemployer pension plan" (within the meaning of Section 3(37)(A) of ERISA).

(b)    Each of Borrower, the Constituent Owners of Borrower, the Property and acquisition thereof have complied with and are in compliance with FIRRMA. Borrower has provided to Lender with copies of any and all FIRRMA Documents it has received. No non-U.S. government (including any state owned enterprises or sovereign wealth funds) owns any equity interests (direct or indirect) in Borrower. Borrower has not made any voluntary filings relating to FIRRMA and Borrower is not required to make any mandatory filings relating to FIRRMA.

**Section 3.8    Not a Foreign Person**. Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the IRS Code.

**Section 3.9    Intentionally Omitted**.

**Section 3.10    Business Purposes**. The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

**Section 3.11    Borrower's Principal Place of Business**. Borrower's principal place of business and its chief executive office as of the date hereof is 2604 Elmwood Avenue, Suite 210 Rochester, New York 14618. Borrower's mailing address, as set forth in the opening paragraph hereof or as changed in accordance with the provisions hereof, is true and correct. Borrower's organizational identification number, if any, assigned by the state of its incorporation or organization is 6426899. Borrower's federal tax identification number is 87-3753260. Borrower is not subject to back-up withholding taxes.

**Section 3.12    Status of Property**.

(a)    Borrower has obtained all Permits required for the legal use, occupancy and operation of the Property, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification.

(b)    To Borrower's knowledge, except as disclosed in the Third Party Reports, each Individual Property and the present and contemplated use and occupancy thereof are in full compliance with all applicable zoning ordinances, building codes, land use laws, Environmental Laws and other similar Legal Requirements.

(c)    Each Individual Property is served by all utilities required for the current or contemplated use thereof. All utility service is provided by public utilities and each Individual Property has accepted or is equipped to accept such utility service.

(d)    All public roads and streets necessary for service of and access to each Individual Property for the current or contemplated use thereof have been completed, are serviceable and

all-weather and are physically and legally open for use by the public. Each Individual Property has either direct access to such public roads or streets or access to such public roads or streets by virtue of a perpetual easement or similar agreement inuring in favor of Borrower and any subsequent owners of the applicable Individual Property.

(e)     Each Individual Property is served by public water and sewer systems.

(f)     The Property is free from damage caused by fire or other casualty. To Borrower's knowledge, except as otherwise expressly disclosed in the Third Party Reports, the Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects, ordinary wear and tear expected. To Borrower's Knowledge, there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

(g)     All costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full. There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under applicable Legal Requirements could give rise to any such liens) affecting the Property which are or may be prior to or equal to the lien of the Security Instrument, which has not been bonded or insured over pursuant to the Title Insurance Policy to the reasonable satisfaction of Lender.

(h)     Borrower has paid in full for, and is the owner of, all furnishings, fixtures and equipment (other than Tenants' property) used in connection with the operation of the Property, free and clear of any and all security interests, liens or encumbrances, except for Permitted Encumbrances, the lien and security interest created by this Agreement, the Note, the Security Instrument and the other Loan Documents.

(i)     To Borrower's knowledge, except as otherwise disclose by the Third Party Reports, all liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in compliance with all Legal Requirements.

(j)     Except as expressly disclosed on the Survey, no portion of the Improvements is located in an area identified by the Federal Emergency Management Agency or any successor thereto as an area having special flood hazards pursuant to the Flood Insurance Acts. No part of the Property consists of or is classified as wetlands, tidelands or swamp and overflow lands.

(k)     Except as disclosed in the survey, all the Improvements lie within the boundaries of the Land and any building restriction lines applicable to the Land.

35

(l)     To Borrower's knowledge, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(m)     Borrower has not (i) made, ordered or contracted for any construction, repairs, alterations or improvements to be made on or to the Property which have not been completed and paid for in full, (ii) ordered materials for any such construction, repairs, alterations or improvements which have not been paid for in full or (iii) attached any fixtures to the Property which have not been paid for in full, or otherwise in each case to the extent not fully insured to the satisfaction of Lender by the title company issuing the Title Insurance Policy. There is no such construction, repairs, alterations or improvements ongoing at the Property as of the Closing Date. There are no outstanding or disputed claims for any Work Charges and there are no outstanding liens or security interests in connection with any Work Charges.

(n)     Borrower has no direct employees. All other personnel employed at or in connection with the Property are the direct employees of Manager.

**Section 3.13   Financial Information**. All financial data, including, without limitation, the balance sheets, statements of cash flow, statements of income and operating expense and rent rolls, that have been delivered to Lender in respect of Borrower, Sponsor, Guarantor and/or the Property (a) are true, complete and correct in all material respects, (b) accurately represent the financial condition of Borrower, Sponsor, Guarantor or the Property, as applicable, as of the date of such reports, and (c) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with the Approved Accounting Method throughout the periods covered, except as disclosed therein. Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a Material Adverse Effect, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower, Sponsor or Guarantor from that set forth in said financial statements.

**Section 3.14   Condemnation**. No Condemnation or other proceeding has been commenced or, to Borrower's knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of the access to any Individual Property.

**Section 3.15   Separate Lots**. Each Individual Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements is assessed and taxed together with any Individual Property or any portion thereof.

**Section 3.16   Insurance**. Borrower has obtained and has delivered to Lender certified copies of all Policies (or such other evidence acceptable to Lender) reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. There are no present claims of any material nature under any of the Policies, and to Borrower's knowledge, no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

36

**Section 3.17   Use of Property**.  Each Individual Property is used exclusively as an office building and other appurtenant and related uses.

**Section 3.18   Leases and Rent Roll**.  Except as disclosed in the rent roll for the each Individual Property delivered to, certified to and approved by Lender in connection with the closing of the Loan (the "**Rent Roll**"), (a) Borrower is the sole owner of the entire lessor's interest in the Leases; (b) the Leases are valid and enforceable and in full force and effect; (c) all of the Leases are arms-length agreements with bona fide, independent third parties; (d) except as set forth in the Tenant estoppel certificates delivered to Lender prior to the closing of the Loan, no party under any Lease is in (i) monetary default and (ii) to Borrower's Knowledge, non-monetary default beyond applicable notice and cure periods; (e) except as set forth in the Tenant estoppel certificates delivered to Lender prior to the closing of the Loan, all Rents due have been paid in full and no Tenant is in arrears in its payment of Rent; (f) the terms of all alterations, modifications and amendments to the Leases are reflected (in all material respects) in the certified occupancy statement delivered to and approved by Lender in connection with the origination of the Loan; (g) none of the Rents reserved in the Leases have been assigned or otherwise pledged or hypothecated (except in connection with the liens contemplated by the Loan Documents); (h) none of the Rents have been collected for more than one (1) month in advance (except a Security Deposit shall not be deemed rent collected in advance); (i) except as set forth in the Tenant estoppel certificates delivered to Lender prior to the closing of the Loan, the premises demised under the Leases have been completed, all improvements, repairs, alterations or other work required to be furnished on the part of Borrower under the Leases have been completed, the Tenants under the Leases have accepted the premises demised thereunder and have taken possession of the same on a rent-paying basis and any payments, credits or abatements required to be given by Borrower to the Tenants under the Leases have been made in full; (j) except as set forth in the Tenant estoppel certificates delivered to Lender prior to the closing of the Loan, there exist no offsets or defenses to the payment of any portion of the Rents and Borrower has no monetary obligation to any Tenant under any Lease; (k) Borrower has received no notice from any Tenant challenging the validity or enforceability of any Lease; (l) except as set forth in the Tenant estoppel certificates delivered to Lender prior to the closing of the Loan, there are no agreements with the Tenants under the Leases other than expressly set forth in each Lease; (m) Intentionally Omitted; (n) except as set forth in the Tenant estoppel certificates delivered to Lender prior to the closing of the Loan, no Lease contains an option to purchase, right of first refusal to purchase, right of first refusal to lease additional space at the Property, or any other similar provision; (o) no Person has any possessory interest in, or right to occupy, the Property except under and pursuant to a Lease; (p) all Security Deposits relating to the Leases are reflected on the Rent Roll and have been collected by Borrower; (q) no brokerage commissions or finders fees are due and payable regarding any Lease; (r) except as set forth in the Tenant estoppel certificates delivered to Lender prior to the closing of the Loan, each Tenant is in actual, physical occupancy of the premises demised under its Lease; (s) there are no actions or proceedings (voluntary or otherwise) pending against any Tenants or guarantors under Leases, in each case, under bankruptcy or similar insolvency laws or regulations; and (t) except as set forth in the Tenant estoppel certificates delivered to Lender prior to the closing of the Loan, Borrower has no knowledge that any event has occurred giving any Tenant the right to cease operations at its leased premises (i.e., "go dark"), terminate its Lease or pay reduced or alternative Rent to Borrower under any of the terms of such Lease, such as a co-tenancy

provision. Prior to the Closing Date, Borrower has requested Tenant estoppel certificates from each Tenant.

**Section 3.19    Filing and Recording Taxes**.  All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of this Agreement, the Security Instrument, the Note and the other Loan Documents, including, without limitation, the Security Instrument, have been paid or will be paid, and, under current Legal Requirements, the Security Instrument and the other Loan Documents are enforceable in accordance with their terms by Lender (or any subsequent holder thereof), except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Creditors Rights Laws, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**Section 3.20    Management Agreement**.  The Management Agreement is in full force and effect and there is no default thereunder by any party thereto and, to Borrower's knowledge, no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.  As of the date hereof, no management fees under the Management Agreement are due and payable.

**Section 3.21    Illegal Activity/Forfeiture**.

(a)    No portion of the Property has been or will be purchased, improved, equipped or furnished with proceeds of any illegal activity and to Borrower's knowledge, there are no illegal activities or activities relating to controlled substances at the Property.

(b)    There has not been and shall never be committed by Borrower or, to Borrower's knowledge, any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any state or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under this Agreement, the Note, the Security Instrument or the other Loan Documents.  Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

**Section 3.22    Taxes**.  Borrower has filed all federal, state, county, municipal, and city income, personal property and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it.  Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

**Section 3.23    Permitted Encumbrances**.  None of the Permitted Encumbrances, individually or in the aggregate, materially interferes with the benefits of the security intended to be provided by this Agreement, the Security Instrument, the Note and the other Loan Documents, materially and adversely affects the value or marketability of the Property (or any material portion thereof), impairs the use or the operation of the Property or impairs Borrower's ability to pay its obligations in a timely manner.

**Section 3.24 Third Party Representations**. Each of the representations and the warranties made by Sponsor and Guarantor in the other Loan Documents (if any) are true, complete and correct in all material respects.

**Section 3.25 Non-Consolidation Opinion Assumptions**. All of the assumptions made in the Non-Consolidation Opinion, including, but not limited to, any exhibits attached thereto and/or certificates delivered in connection therewith, are true, complete and correct.

**Section 3.26 Federal Reserve Regulations**. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement, the Security Instrument, the Note or the other Loan Documents. None of Borrower, Guarantor, Sponsor, and/or any Constituent Owner of the foregoing is affiliated with or is an insider with respect to Lender (or its affiliates) in any manner that implicates either Regulation W or Regulation O of the Federal Reserve Act (as each of the same may be amended, modified, supplemented, and/or replaced from time to time). Neither the Loan nor any transaction contemplated herein and/or in the other Loan Documents is in violation of Regulation W and/or Regulation O.

**Section 3.27 Investment Company Act**. Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; or (b) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

**Section 3.28 Fraudulent Conveyance**. Borrower (a) has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed or contingent liabilities. The fair saleable value of Borrower's assets is and will, immediately following the execution and delivery of the Loan Documents, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

**Section 3.29 Intentionally Omitted**.

**Section 3.30 Anti-Money Laundering and Economic Sanctions**. Borrower hereby represents, warrants and covenants that each Borrower Party, each and every Person Affiliated

with any Borrower Party and their directors, officers, employees or agents and any Person that has an economic interest in any Borrower Party, in each case, has not, and at all times throughout the term of the Loan, including after giving effect to any transfers of interests permitted pursuant to the Loan Documents, shall not:  (i) be (or have been) a Sanctioned Person or organized, located or resident in a Sanctioned Jurisdiction; (ii) fail to operate (or have operated) under policies, procedures and practices (including, without limitation, recordkeeping and reporting), if any, that are in compliance with (and ensure compliance with) the Patriot Act, AC Laws, AML Laws and Sanctions; (iii) directly or indirectly use (or have used) any part of the proceeds of the Loan (including, without limitation, any sums disbursed from time to time hereunder) or otherwise lend, contribute or make the same available (or have lent, contributed or made the same available), in each case, (A) to fund or facilitate any activities or business (I) of or with any Sanctioned Person or (II) of or in any Sanctioned Jurisdiction, (B) in any manner that would result in a violation of any Sanctions by any Person or (C) in violation of any applicable laws (including, without limitation, the Patriot Act, AC Laws, AML Laws and/or Sanctions), (iv) be (or have been) a Person who has been determined by competent authority to be subject to any of the prohibitions contained in the Patriot Act; or (v) be (or have been) owned or controlled by or be (or have been) acting for or on behalf of, in each case, any Person who has been determined to be subject to the prohibitions contained in the Patriot Act.  Without limitation of any other term or provision contained herein, it shall be an Event of Default hereunder if any Borrower Party or any other party to any Loan Document becomes the subject of Sanctions or is indicted, arraigned or custodially detained on charges involving Sanctions, the Patriot Act, AC Laws and/or AML Laws and/or predicate crimes to AC Laws, the Patriot Act, AML Laws and Sanctions.  Borrower hereby represents and covenants that none of the execution, delivery or performance of the Loan Documents or any activities, transactions, services, collateral and/or security contemplated thereunder has or shall result in a breach of the Patriot Act, AC Laws, AML Laws and/or Sanctions by any party to the Loan Documents or their respective Affiliates.  All capitalized words and phrases and all defined terms used in the Patriot Act are incorporated into this Section.  As used herein, (A) "**AC Laws**" shall mean collectively (i) all laws, rules and regulations concerning or relating to bribery or corruption, including, without limitation, the U.S. Foreign Corrupt Practices Act of 1977 and all other applicable anti-bribery and corruption laws and (ii) any amendment, extension, replacement or other modification of any of the foregoing from time to time and any corresponding provisions of future laws; (B) "**AML Laws**" shall mean collectively (i) all laws, rules, regulations and guidelines concerning or relating to money laundering issued, administered and/or enforced by any governmental and/or regulatory agency and (ii) any amendment, extension, replacement or other modification of any of the foregoing from time to time and any corresponding provisions of future laws; (C) "**OFAC**" shall mean the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State; (D) "**Patriot Act**" shall mean collectively (i) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as the same was restored and amended by Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline Over Monitoring Act (USA FREEDOM Act) of 2015, (ii) all statutes, orders, rules and regulations of the United States government and its various executive departments, agencies and offices related to applicable anti-money laundering laws, rules and regulations and (iii) any amendment, extension, replacement or other modification of any of the foregoing from time to time and any corresponding provisions of future laws; (E) "**Sanctions**" shall mean economic, trade and/or

40

financial sanction, requirements and/or embargoes, in each case, imposed, administered and/or enforced from time to time by any Sanctions Authority; (F) "**Sanctions Authority**" shall mean the United States (including, without limitation, OFAC) and any other relevant sanctions authority; (G) "**Sanctioned Jurisdiction**" shall mean, at any time, a country or territory that is, or whose government is, the subject of Sanction; and (H) "**Sanctioned Person**" shall mean, at any time, (i) any Person listed in any Sanctions related list maintained by any Sanctions Authority, (ii) any Person located, organized or resident in a Sanctioned Jurisdiction and/or (iii) any other subject of Sanctions (including, without limitation, any Person Controlled or 50% or more owned (in each case, directly and/or indirectly and in the aggregate) by (or acting for, on behalf of or at the direction of) any Person or Persons described in subsections (i) and/or (ii) of this definition).

**Section 3.31    Organizational Chart**.  The organizational chart attached as <u>Schedule III</u> hereto (the "**Organizational Chart**"), relating to Borrower and certain Affiliates and other parties, is true, complete and correct on and as of the date hereof.

**Section 3.32    Bank Holding Company**.  Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

**Section 3.33    Intentionally Omitted**.

**Section 3.34    Property Document Representations**.  With respect to each Property Document, Borrower hereby represents that (a) each Property Document is in full force and effect and has not been amended, restated, replaced or otherwise modified (except, in each case, as expressly set forth herein), (b) there are no defaults under any Property Document by any party thereto and, to Borrower's knowledge, no event has occurred which, but for the passage of time, the giving of notice, or both, would constitute a default under any Property Document, (c) all rents, additional rents and other sums due and payable under the Property Documents have been paid in full, (d) no party to any Property Document has commenced any action or given or received any notice for the purpose of terminating any Property Document, (e) the representations made in any estoppel or similar document delivered with respect to any Property Document in connection with the Loan are true, complete and correct and are hereby incorporated by reference as if fully set forth herein.

**Section 3.35    No Change in Facts or Circumstances; Disclosure**.

All information submitted by (or on behalf of) Borrower, Guarantor or Sponsor to Lender and in all financial statements, rent rolls, and, to Borrower's knowledge, in all other reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower, Sponsor and/or Guarantor in this Agreement or in the other Loan Documents, are accurate, complete and correct in all material respects unless Borrower has subsequently notified Lender prior to the closing of the Loan in writing that such information, statement of fact or document is unreliable, incorrect or uncertain or has otherwise replaced such information, statement of fact prior to the Closing Date with replacement information, statement of fact or documents that are accurate, complete, and correct

in all material respects. To Borrower's knowledge, there has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise have a Material Adverse Effect. Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

Borrower agrees that, unless expressly provided otherwise, all of the representations and warranties of Borrower set forth in this Article 3 and elsewhere in this Agreement and the other Loan Documents shall survive for so long as any portion of the Debt remains owing to Lender. All representations, warranties, covenants and agreements made in this Agreement and in the other Loan Documents shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## ARTICLE 4

## BORROWER COVENANTS

From the date hereof and until payment and performance in full of all obligations of Borrower under this Agreement, the Security Instrument, the Note and the other Loan Documents or the earlier release of the lien of the Security Instrument (and all related obligations) in accordance with the terms of this Agreement, the Security Instrument, the Note and the other Loan Documents, Borrower hereby covenants and agrees with Lender that:

**Section 4.1    Existence**.  Borrower will continuously maintain (a) its existence and shall not dissolve or permit its dissolution, (b) its rights to do business in the State and (c) its franchises and trade names, if any.

**Section 4.2    Legal Requirements**.

(a)    Borrower shall promptly comply and shall cause the Property to comply with all Legal Requirements affecting the Property or the use thereof (which such covenant shall be deemed to (i) include Environmental Laws and (ii) require Borrower to keep all Permits in full force and effect).

(b)    Borrower shall from time to time, upon Lender's request, provide Lender with evidence reasonably satisfactory to Lender that the Property complies with all Legal Requirements or is exempt from compliance with Legal Requirements.

(c)    Borrower shall give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Legal Requirements and of the commencement of any proceedings or investigations which relate to compliance with Legal Requirements.

(d)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or any Individual Property or any alleged violation of any Legal Requirement, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding

42

shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be permitted by and conducted in accordance with all applicable Legal Requirements; (iii) neither the applicable Individual Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (v) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower or the applicable Individual Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or as may be requested by Lender, to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith. Lender may apply any such security or part thereof, as necessary to cause compliance with such Legal Requirement at any time when, in the reasonable judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the applicable Individual Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost.

**Section 4.3    Maintenance and Use of Property**.  Borrower shall cause the Property to be maintained in a good and safe condition and repair, reasonable wear and tear excepted.  The Improvements and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Personal Property) without the consent of Lender or as otherwise permitted pursuant to Section 4.21 hereof or as otherwise provided in this Agreement. Subject to the terms and conditions herein, Borrower shall perform (or shall cause to be performed) the prompt repair, replacement and/or rebuilding of any part of the Property which may be destroyed by any casualty, or become damaged, worn or dilapidated or which may be affected by any proceeding of the character referred to in Section 3.14 hereof and shall complete and pay for (or cause the completion and payment for) any structure at any time in the process of construction or repair on the Land except where the failure to repair, replace or rebuild is not required by the terms of this Agreement.  Borrower shall operate the Property for the same uses as the Property is currently operated and Borrower shall not, without the prior written consent of Lender (which consent shall not be unreasonably withheld, conditioned or delayed), (i) change the use of the Property or (ii) initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof.  If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or the nonconforming Improvement to be abandoned without the express written consent of Lender.

**Section 4.4    Waste**.  Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that would result, or is reasonably likely to result in, a Material Adverse Effect. Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Property, regardless of the depth thereof or the method of mining or extraction thereof.

43

### Section 4.5   Taxes and Other Charges.

(a)      Subject to the contest rights provided in Section 4.5(b) below, Borrower shall pay (or cause to be paid) all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable; provided, however, prior to the occurrence and continuance of an Event of Default, Borrower's obligation to directly pay Taxes shall be suspended for so long as Borrower complies with the terms and provisions of Section 8.6 hereof.   Upon Lender's written request to Borrower, Borrower shall furnish to Lender receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided, however, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to Section 8.6 hereof).  Borrower shall not suffer and shall, subject to the contest rights provided in Section 4.5(b) below, promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Property (or any portion thereof), and shall promptly pay for all utility services provided to the Property (or any portion thereof).

(b)      After prior written notice to Lender, Borrower, at its own expense, may contest (or permit to be contested) by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be permitted by and conducted in accordance with all applicable Legal Requirements; (iii) neither the applicable Individual Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the applicable Individual Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or deliver to Lender such reserve deposits as may be reasonably requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon (provided, that, Lender shall not require such reserve if Lender reasonably determines that all applicable Taxes and Other Charges have been paid in full (together with all interest, penalties or other sums due) pending resolution of the applicable contest).  Lender may pay over any such cash deposit or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the applicable Individual Property (or part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, canceled or lost or there shall be any danger of the lien of the Security Instrument being primed by any related lien.

### Section 4.6   Litigation.  Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or, to Borrower's knowledge, threatened in writing against Borrower which might have a Material Adverse Effect.

### Section 4.7   Access to Property.  Subject to the rights of Tenants under Leases, Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours, provided Lender shall give reasonable notice in writing to

Borrower (which notice shall not be required in the case of an imminent threat to human health and safety or other material harm to the Property in Lender's reasonable determination) of the date and time of such inspection (which inspection shall be during normal business). Except during the continuance of an Trigger Period, such inspections shall not occur more frequently than two (2) times per calendar year for all agents, representatives and employees of Lender, as the case may be. Upon Borrower's request, Lender shall provide to Borrower a copy of any written inspection report prepared in connection with this Section 4.7 (to the extent the same is not confidential in nature).

**Section 4.8    Notice of Default**.  Borrower shall promptly advise Lender of any material adverse change in Borrower's, Sponsor's and/or Guarantor's condition (financial or otherwise) or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

**Section 4.9    Cooperate in Legal Proceedings**.  Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or any rights obtained by Lender under any of the Note, the Security Instrument or the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

**Section 4.10    Performance by Borrower**.  Borrower hereby acknowledges and agrees that Borrower's observance, performance and fulfillment of each and every covenant, term and provision to be observed and performed by Borrower under this Agreement, the Security Instrument, the Note and the other Loan Documents is a material inducement to Lender in making the Loan.

**Section 4.11    HVCRE and Federal Reserve Regulations**.  Lender must be satisfied, in its sole but good faith discretion, that there is no material risk that the Loan could be classified as an HVCRE Loan and Borrower shall take any and all actions required by applicable regulations so as to ensure the same.  Borrower shall, from time to time, provide Lender with such information relating to Borrower, any SPE Component Entity, Guarantor, Sponsor, and/or any Constituent Owner thereof as Lender shall deem necessary (in Lender's sole and absolute discretion) in determining Lender's ongoing compliance with Regulation W and Regulation O of the Federal Reserve Act (as each of the same may be amended, modified, supplemented, and/or replaced from time to time).  Notwithstanding anything to the contrary contained herein, none of Borrower, any SPE Component Entity, Guarantor, Sponsor, and/or any Constituent Owner thereof shall take any action that will cause Lender and/or the Loan to violate Regulation W and/or Regulation O.

**Section 4.12    Books and Records**.

(a)        Borrower shall furnish to Lender:

(i)        quarterly (and prior to a Securitization (if requested by Lender), monthly) certified rent rolls for each Individual Property within ten (10) days after the end of each calendar month or thirty (30) days after the end of each calendar quarter, as applicable;

(ii)     quarterly (and prior to a Securitization (if requested by Lender), monthly) operating statements of each Individual Property detailing the revenues received, the expenses incurred and the components of Underwritable Cash Flow before and after Debt Service and major capital improvements for the period of calculation and containing appropriate year-to-date information, within ten (10) days after the end of each calendar month or thirty (30) days after the end of each calendar quarter, as applicable;

(iii)     within eighty-five (85) days after the close of each fiscal year of Borrower (or such shorter time period as Lender shall determine in its reasonable discretion is necessary to comply with any applicable Legal Requirements (including, without limitation, Regulation AB), provided that, (I) Lender shall notify Borrower in writing that such a shorter time period is required and (II) unless there is a change in Regulation AB or any other applicable Legal Requirement after the Closing Date, in no event shall such time period be shortened to sooner than eighty five (85) days after the close of each fiscal year of Borrower), (A) with respect to Borrower, an annual balance sheet, and statement of cash flow and (B) an annual operating statement, in each case, detailing the revenues received, the expenses incurred and the components of Underwritable Cash Flow before and after Debt Service and major capital improvements for the period of calculation and containing appropriate year-to-date information;

(iv)     by no later than December 15 of each calendar year, an annual operating budget for the next succeeding calendar year presented on a monthly basis consistent with the annual operating statement described above for each Individual Property, including cash flow projections for the upcoming year and all proposed capital replacements and improvements, which such budget shall not take effect until approved by Lender (after such approval has been given in writing, each such approved budget shall be referred to herein, individually or collectively (as the context requires), as the "**Approved Annual Budget**").  The Annual Budget for the fiscal year 2023 is attached hereto as Schedule V is approved by Lender.  Until such time that Lender approves a proposed Annual Budget, which approval shall not be unreasonably withheld, conditioned or delayed, (1) to the extent that an Approved Annual Budget does not exist for the immediately preceding calendar year, other than (x) non-discretionary expenses payable by Borrower to third parties (i.e., taxes, insurance, utilities) incurred in the ordinary course of business and for which Borrower provides Lender with written documented evidencing same or (y) any expenditures required pursuant to the terms of the Loan Documents, all operating expenses of the Property for the then current calendar year shall be deemed extraordinary expenses of the Property and shall be subject to Lender's prior written approval (not to be unreasonably withheld or delayed) and (2) to the extent that an Approved Annual Budget exists for the immediately preceding calendar year, such Approved Annual Budget shall apply to the then current calendar year; provided, that such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Insurance Premiums and utilities expenses and other non-discretionary expenses payable by Borrower to third parties, incurred by Borrower in the ordinary course of business and for which Borrower provides Lender with written documented evidencing same and (y) any expenditures required pursuant to the terms of the Loan Documents. Without limiting the foregoing, any amendments or modifications to an Approved Annual Budget shall require Lender's prior written consent not to be

unreasonably withheld, conditioned or delayed and shall not take effect until so approved;

(v)      by no later than ten (10) days after and as of the end of each calendar month during the period prior to Securitization, and thereafter by no later than thirty (30) days after and as of the end of each calendar quarter, (A) a calculation of the then current Debt Service Coverage Ratio, together with such back-up information as Lender shall reasonably require and (B) a calculation of the amount of Excess Cash Flow generated by each Individual Property for such period together with such back-up information as Lender shall require; and

(b)      Upon request from Lender, Borrower shall furnish in a timely manner to Lender:

(i)      [intentionally omitted];

(ii)      an accounting of all Security Deposits, including the nature and type of Security Deposit, the name and identification number of the accounts in which such Security Deposits are held (if applicable), such details regarding any Security Deposit not held in the form of cash as Lender may reasonably require, the name and address of the financial institutions in which such Security Deposits are held or have been otherwise issued by and the name of the Person to contact at such financial institution, along with any authority or release necessary for Lender to obtain information regarding such accounts or other information directly from such financial institutions (such request not to be made more than one (1) time during any calendar quarter (unless the request is being made during the continuance of a Trigger Period); and

(iii)      evidence reasonably acceptable to Lender of compliance with the terms and conditions of Articles 5 and 9 hereof.

(c)      Borrower shall, within ten (10) days of request, furnish Lender (and shall cause Sponsor and/or Guarantor to furnish to Lender) with such other additional financial or management information (including State and Federal tax returns) as may, from time to time, be reasonably required by Lender in form and substance satisfactory to Lender.  Borrower shall furnish to Lender and its agents convenient facilities for the examination and audit of any such books and records; provided, however, in lieu thereof, to the extent Lender deems the same to be sufficient in form and substance (in its reasonable discretion), Borrower may provide Lender with electronic records for Lender's audit.

(d)      Borrower agrees that (i) Borrower shall keep adequate books and records of account and (ii) all Required Financial Items (defined below) to be delivered to Lender pursuant to Section 4.12 shall: (A) be complete and correct; (B) present fairly the financial condition of the applicable Person; (C) disclose all liabilities that are required to be reflected or reserved against; (D) be prepared (1) in substantially the same form as delivered in connection with the closing of the Loan or otherwise in a form reasonably required by Lender and, in each case, certified by a Responsible Officer of Borrower (2) in hardcopy and electronic formats and (3) in accordance with the Approved Accounting Method; (E) not include any Person other than Borrower and shall show each Borrower and each Individual Property individually and on a

47

combined, aggregate basis with all Borrowers and all Individual Properties; and (F) upon request of Lender, be audited by an independent certified public accountant acceptable to Lender. Borrower shall be deemed to warrant and represent that, as of the date of delivery of any such financial statement, there has been no material adverse change in financial condition, nor have any assets or properties been sold, transferred, assigned, mortgaged, pledged or encumbered since the date of such financial statement except as disclosed by Borrower in a writing delivered to Lender. Borrower agrees that all Required Financial Items shall not contain any misrepresentation or omission of a material fact.

(e) Borrower acknowledges the importance to Lender of the timely delivery of each of the items required by this Section 4.12 and the other financial reporting items required by this Agreement (each, a "**Required Financial Item**" and, collectively, the "**Required Financial Items**"). In the event Borrower fails to deliver to Lender any of the Required Financial Items within five (5) Business Days of the giving of notice by Lender or Borrower of Borrower's failure to deliver the same within the time frame specified herein (each such event, a "**Reporting Failure**"), the same shall, at Lender's option, constitute an immediate Event of Default hereunder and, without limiting Lender's other rights and remedies with respect to the occurrence of such an Event of Default, Borrower shall pay to Lender the sum of $2,500.00 per occurrence for each Reporting Failure. It shall constitute a further Event of Default hereunder if any such payment is not received by Lender within thirty (30) days of the date on which such payment is due, and Lender shall be entitled to the exercise of all of its rights and remedies provided hereunder.

(f) If Borrower shall consist of more than one Person, then the annual financial statements required to be delivered hereunder shall be in the form of an annual combined balance sheet of each Borrower (and no other Person), together with the related combined statements of operations, members' capital and cash flows with respect to each Borrower, including a combined balance sheet and a statement of income for the Property on a combined basis.

### Section 4.13   Estoppel Certificates.

(a) After request by Lender, Borrower, within ten (10) days of such request (such request not to be made more than one (1) time during any twelve (12) month period unless the request is being made during the continuance of Trigger Period), shall furnish Lender or any proposed assignee with a statement, duly acknowledged and certified, setting forth (i) the original principal amount of the Loan, (ii) the unpaid principal amount of the Loan, (iii) the rate of interest of the Loan, (iv) the terms of payment and maturity date of the Loan, (v) the date installments of interest and/or principal were last paid, (vi) that, except as provided in such statement, to Borrower's knowledge, no Event of Default exists, (vii) that this Agreement, the Note, the Security Instrument and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification, (viii) whether any offsets or defenses exist against the obligations secured hereby and, if any are alleged to exist, a detailed description thereof, (ix) that all Leases are in full force and effect and have not been modified (or if modified, setting forth all modifications), (x) the date to which the Rents thereunder have been paid pursuant to the Leases, (xi) whether or not, to the knowledge of Borrower, any of the lessees under the Leases are in default under the Leases, and, if any of the lessees are in default, setting forth the specific nature of all such defaults, (xii) the amount of

48

Security Deposits held by Borrower under each Lease and that such amounts are consistent with the amounts required under each Lease, and (xiii) as to any other matters reasonably requested by Lender and reasonably related to the Leases, the obligations created and evidenced hereby and by the Security Instrument or the Property.

(b) Borrower shall use commercially reasonable efforts to deliver to Lender, within a reasonable time after request (such request not to be made more than one (1) time during any twelve (12) month period unless the request is being made during the continuance of a Trigger Period), duly executed estoppel certificates from any one or more Tenants as may be reasonably required by Lender attesting to such facts regarding the Lease as Lender may require, including, but not limited to, attestations that each Lease covered thereby is in full force and effect with no defaults thereunder on the part of any party, that none of the Rents have been paid more than one month in advance, except as security, no free rent or other concessions are due lessee and that the lessee claims no defense or offset against the full and timely performance of its obligations under the Lease.

(c) Borrower shall deliver to Lender, within ten (10) days of request (such request not to be made more than one (1) time during any twelve (12) month period unless the request is being made during the continuance of a Trigger Period), estoppel certificates from each party under any Property Document (which certificates shall (if applicable) be in the same form and substance as were delivered in connection with the origination of the Loan with such modifications as Lender may request in its reasonable discretion).

**Section 4.14   Leases and Rents**.

(a) Unless otherwise consented to in writing by Lender, all Leases and all renewals of Leases executed after the date hereof shall (i) provide for rental rates comparable to existing local market rates for similar properties, (ii) be with unaffiliated, third parties on commercially reasonable terms and conditions (including, without limitation, terms and conditions relating to free rent, tenant improvements and other allowances) which are, in each case, commercially reasonable and comparable to existing local market terms and conditions for similar properties, (iii) provide that such Lease is subordinate to the Security Instrument and that the lessee will attorn to Lender and any purchaser at a foreclosure sale (or the applicable Tenant shall enter into a subordination, non-disturbance and attornment agreement with Lender in accordance with clause (e) below, and (iv) not contain any terms which would have a Material Adverse Effect. Notwithstanding anything to the contrary contained herein, Borrower shall not, without the prior written approval of Lender (which approval shall not be unreasonably withheld, conditioned or delayed), enter into, renew, extend, amend, modify, permit any assignment of or subletting under, waive any provisions of, release any party to, terminate, reduce rents under, accept a surrender of space under, or shorten the term of, in each case, any Major Lease (it being acknowledged that any approval of a Major Lease by Lender pursuant to the terms hereof shall be deemed to include, without limitation, approval by Lender of any form of subordination, non-disturbance and attornment agreement that is attached as an exhibit to the applicable Major Lease). Notwithstanding the foregoing, (i) Lender shall have no right to consent to a termination of a Major Lease that occurs automatically or pursuant to any other termination by the Tenant thereunder resulting from a casualty or condemnation or pursuant to any other termination option specifically set forth in the Major Lease for which, in each case, Borrower's consent is not

49

required, and (ii) Lender's consent shall not be unreasonably withheld, conditioned or delayed with respect to a termination or surrender of any Major Lease by reason of a default by the tenant thereunder.

(b)     Without limitation of subsection (a) above, Borrower (i) shall observe and perform the obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (ii) shall enforce the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed in a commercially reasonable manner; (iii) shall not collect any of the Rents more than one (1) month in advance (other than Security Deposits or, subject to clause (d) below, any Lease Termination Fees); (iv) shall not execute any assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (v) shall not, without Lender's prior written consent, alter, modify or change any Lease to the extent the same would, individually or in the aggregate, (A) cause any such Lease to violate 4.14(a)(i) through (iii) above or (B) have a Material Adverse Effect; and (vi) shall hold all Security Deposits in accordance with Legal Requirements.  Upon request, Borrower shall furnish Lender with executed copies of all Leases.  Notwithstanding the foregoing, Lender acknowledges that Borrower shall be permitted to terminate Leases that do not qualify as Major Leases hereunder without Lender's consent provided that: (a) Borrower's decision to terminate the applicable Lease is commercially reasonable and (b) the applicable termination is not reasonably likely to cause a Material Adverse Effect and (c) no Event of Default is continuing.

(c)     Notwithstanding anything contained herein to the contrary, Borrower shall not willfully withhold from Lender any information regarding renewal, extension, amendment, modification, waiver of provisions of, termination, rental reduction of, surrender of space of, or shortening of the term of, any Lease during the term of the Loan.  Borrower agrees to provide Lender with written notice of any event of default under a Major Lease within ten (10) Business Days after Borrower's knowledge of the occurrence of any such event of default (it being acknowledged that the ten (10) Business Day period within which to provide such notice shall not begin to run until after the expiration of all applicable notice and/or grace periods under such Major Lease).  Borrower's failure to provide any of the aforesaid notices shall, at Lender's option, constitute an Event of Default.

(d)     Borrower shall notify Lender in writing, within two (2) Business Days following receipt thereof, of Borrower's receipt of any early termination fee or payment or other termination fee or payment paid by any Tenant under any Lease (each such payment, a "**Lease Termination Fee**"). The parties acknowledge that (i) provided no Trigger Period is continuing, Borrower shall be permitted to retain any Lease Termination Fee if such fee or payment is less than or equal to Forty Thousand Dollars ($40,000) individually or, when aggregated with all other Lease Termination Fees have been paid in the preceding twelve (12) month period, less than Seventy-Five Thousand Dollars ($75,000) and (ii) to the extent Borrower is not expressly permitted to retain any Lease Termination Fee pursuant to the foregoing clause (i), Lender may require that the applicable Lease Termination Fee be deposited into the Leasing Reserve Account (it being agreed that such deposit shall not count towards any "cap" or similar limit on the amount of Reserve Funds held by Lender in the Leasing Reserve Account), provided, however, that notwithstanding the foregoing, in the event that any one Tenant occupies 5,000 square feet or more pursuant to the terms of their applicable lease, regardless of whether (i) of this paragraph is satisfied, any such termination funds shall be deposited into the Leasing Reserve Account (it

50

being agreed that such deposit shall not count towards any "cap" or similar limit on the amount of Reserve Funds held by Lender in the Leasing Reserve Account).

(e)  To the extent that the Deemed Approval Requirements are fully satisfied in connection with any Borrower request for Lender consent under this Section (other than subsection (e) above) and Lender thereafter fails to respond, Lender's approval shall be deemed given with respect to the matter for which approval was requested.

(f)  Upon the occurrence of an Event of Default, Borrower shall, within thirty (30) days of demand by Lender, deliver to Lender all Security Deposits. Without limitation of any other term or provision contained herein, for purposes of clarification, for a Security Deposit to be deemed "delivered to Lender" in connection with the foregoing, the same must be in the form of cash or in a letter of credit solely in Lender's name.

**Section 4.15  Management Agreement**.

(a)  Borrower shall (i) diligently and promptly perform, observe and enforce all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed, observed and enforced to the end that all things shall be done which are necessary to keep unimpaired the rights of Borrower under the Management Agreement, (ii) upon Borrower's obtaining knowledge of such, promptly notify Lender of any default under the Management Agreement; (iii) promptly deliver to Lender a copy of any notice of default or other material notice received by Borrower under the Management Agreement; (iv) promptly give notice to Lender of any notice or information that Borrower receives which indicates that either Manager is terminating the Management Agreement or that Manager is otherwise discontinuing its management of the Property; and (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement.

(b)  Borrower shall not, without the prior written consent of Lender which consent shall not be unreasonably withheld, conditioned or delayed, (i) surrender, terminate or cancel the Management Agreement, consent to any assignment of the Manager's interest under the Management Agreement or otherwise replace the Manager or renew or extend any Management Agreement (exclusive of, in each case, any automatic renewal or extension in accordance with its terms) or enter into any other new or replacement management agreement with respect to the Property; provided, however, that Borrower may replace either Manager and/or consent to the assignment of Manager's interest under the Management Agreement, in each case, in accordance with the applicable terms and conditions hereof and of the other Loan Documents; (ii) reduce or consent to the reduction of the term of the Management Agreement; (iii) increase or consent to the increase of the amount of any charges under the Management Agreement; or (iv) otherwise modify, change, alter or amend, in any material respect, or waive or release any of its material rights and remedies under, the Management Agreement in any material respect.

(c)  If Borrower shall default in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed beyond all applicable notice and cure periods thereunder and such default would either immediately or, with the passage of time, the giving of notice, or both, give Manager the right to

51

terminate the Management Agreement (pursuant to the terms thereof or under applicable law), then, without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed to be promptly performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under the Management Agreement shall be kept unimpaired and free from default. To the extent necessary in connection with the foregoing and subject to the rights of Tenants and other parties to any Property Documents, Lender and any Person designated by Lender shall have, and are hereby granted, the right to enter upon the Property at any time and from time to time during normal business hours for the purpose of taking any such action. If Manager shall deliver to Lender a copy of any notice sent to Borrower of default under the Management Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon. Borrower shall notify Lender if the Manager sub-contracts to a third party or an Affiliate any or all of its management responsibilities under the Management Agreement.

(d)     Borrower shall, from time to time, use its best efforts to obtain from Manager under the Management Agreement such certificates of estoppel with respect to compliance by Borrower with the terms of the Management Agreement as may be requested by Lender. Except to the extent otherwise as approved by Lender in writing, Borrower shall exercise each individual option, if any, to extend or renew the term of the Management Agreement upon demand by Lender made at any time within one (1) year of the last day upon which any such option may be exercised, and Borrower hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.

(e)     In the event that the Management Agreement is scheduled to expire at any time during the term of the Loan, Borrower shall submit to Lender by no later than 10 days prior to such expiration a draft replacement management agreement for approval in accordance with the terms and conditions hereof. Borrower's failure to submit the same within such time-frame shall, at Lender's option, constitute an immediate Event of Default.

(f)     Borrower shall have the right to replace Manager or consent to the assignment of Manager's rights under the Management Agreement, in each case, to the extent that (i) no Event of Default has occurred and is continuing, (ii) Lender receives at least thirty (30) days prior written notice of the same, (iii) such replacement or assignment (as applicable) will not result in a Property Document Event and (iv) the applicable New Manager is a Qualified Manager engaged pursuant to a Qualified Management Agreement. Manager shall not (and Borrower shall not permit Manager to) resign as Manager or otherwise cease managing the Property until a New Manager is engaged to manage the Property in accordance with the applicable terms and conditions hereof and of the other Loan Documents.

(g)     Without limitation of the foregoing, if the Management Agreement is terminated or expires (including, without limitation, pursuant to the Assignment of Management Agreement), comes up for renewal or extension (exclusive of, in each case, any automatic

52

renewal or extension in accordance with its terms), ceases to be in full force or effect or is for any other reason no longer in effect (including, without limitation, in connection with any Sale or Pledge), then Lender, at its option, may require Borrower to engage, in accordance with the terms and conditions set forth herein and in the Assignment of Management Agreement, a New Manager to manage the Property, which such New Manager shall (i) to the extent a Trigger Period is continuing and if opted by Lender, be selected by Lender and (ii) be a Qualified Manager and shall be engaged pursuant to a Qualified Management Agreement.

(h)     As conditions precedent to any engagement of a New Manager hereunder, (i) New Manager and Borrower shall execute an Assignment of Management Agreement in the form required by Lender (with such changes thereto as may be required by the Rating Agencies), and (ii) to the extent that such New Manager is an Affiliated Manager, Borrower shall deliver to Lender a New Non-Consolidation Opinion with respect to such New Manager and new management agreement and (iii) if requested by Lender, Borrower shall deliver to Lender evidence that the engagement of such New Manager will not result in a Property Document Event.

(i)     Borrower shall notify Lender in writing, within two (2) Business Days following receipt thereof, of Borrower's receipt of any early termination fee or similar payment or other termination fee or similar payment paid by any Manager, and Borrower further covenants and agrees that Borrower shall hold any such termination fee or payment in trust for the benefit of Lender and that any use of such termination fee or payment shall be subject in all respects to Lender's prior written consent in Lender's sole discretion (which consent may include, without limitation, a requirement by Lender that such termination fee or payment be placed in reserve with Lender to be disbursed by Lender for replacing such Manager and/or for payment of the Debt or otherwise in connection with the Loan evidenced by the Note and/or the Property, as so determined by Lender). The foregoing consent right of Lender (including, without limitation, any reserve requirement) shall not be subject to any "cap" or similar limit on the amount of Reserve Funds held by Lender.

(j)     Any sums expended by Lender pursuant to this Section shall bear interest at the Default Rate from the date such cost is incurred to the date of payment to Lender, shall be deemed to constitute a portion of the Debt, shall be secured by the lien of the Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

### Section 4.16   Payment for Labor and Materials.

(a)     Subject to Section 4.16(b) below, Borrower will promptly pay (or cause to be paid) when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property (any such bills and costs, a **"Work Charge"**) and never permit to exist in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests created hereby and by the Security Instrument, except for the Permitted Encumbrances.

(b)      After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the validity of any Work Charge, the applicability of any Work Charge to Borrower or to any Individual Property or any alleged non-payment of any Work Charge and defer paying the same, provided that (i) no Event of Default has occurred and is continuing; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable Legal Requirements; (iii) neither the applicable Individual Property nor any part thereof or interest therein will be in imminent danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof pay (or cause to be paid) any such contested Work Charge determined to be valid, applicable or unpaid; (v) such proceeding shall suspend the collection of such contested Work Charge from the applicable Individual Property or Borrower shall have paid the same (or shall have caused the same to be paid) under protest; and (vi) Borrower shall furnish (or cause to be furnished) such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure payment of such Work Charge, together with all interest and penalties payable in connection therewith.  Lender may apply any such security or part thereof, as necessary to pay for such Work Charge at any time when, in the judgment of Lender, the validity, applicability or non-payment of such Work Charge is finally established or the applicable Individual Property (or any part thereof or interest therein) shall be in present danger of being sold, forfeited, terminated, cancelled or lost.

**Section 4.17  Performance of Other Agreements**.   Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property (or any portion thereof), or given by Borrower to Lender for the purpose of further securing the Debt and any amendments, modifications or changes thereto (to the extent that Borrower's failure to so observe and/or perform each and every term and/or agreement would reasonably be expected to result in, or constitute, a Material Adverse Effect).

**Section 4.18  Debt Cancellation**.   Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

**Section 4.19  ERISA; FIRRMA**.

(a)      Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights hereunder or under the other Loan Documents) to be a non-exempt prohibited transaction under ERISA.

(b)      Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Security Instrument, as requested by Lender in its reasonable discretion, that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, or other retirement arrangement, which is subject to Title I of ERISA or Section 4975 of the IRS Code, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to state statutes regulating investments and

fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true:

(A) Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3 101(b)(2);

(B) Less than 25 percent of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R.§ 2510.3 101(f)(2); or

(C) Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R § 2510.3 101(c) or (e) or an investment company registered under The Investment Company Act of 1940, as amended.

(c) Borrower shall not maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any member of Borrower's "controlled group of corporations" to maintain, sponsor, contribute to or become obligated to contribute to a "defined benefit plan" or a "multiemployer pension plan". The terms in quotes above are defined in Section 3.7 of this Agreement.

(d) Within three (3) Business Days of Borrower's receipt of any FIRRMA Document, Borrower shall provide Lender a copy of the same. Concurrently with Borrower's delivery of any FIRRMA Document, Borrower shall provide Lender a copy thereof. In the event that Borrower or any of its Affiliates meets with any Governmental Authority for any purpose relating to FIRRMA, Borrower shall provide Lender with a written summary of such meeting within three (3) Business Days thereafter. In the event that any review, investigation or other proceeding is commenced relating to FIRRMA and involving Borrower, the Constituent Owners of Borrower and/or the Property, Borrower shall provide Lender with a written summary of the status of such matters on a monthly, or if requested by Lender, more frequent, basis, including such information as Lender shall reasonably request. Borrower shall (and shall cause its Constituent Owners to) (i) comply with FIRRMA and (ii) respond to, and comply with, all requests, orders, and directives from any Governmental Authority related to FIRRMA; provided, however, the foregoing subsections (i) and (ii) shall not limit any obligation of Borrower to otherwise comply with any other applicable terms and conditions hereof and of the other Loan Documents. Notwithstanding anything contained herein to the contrary, each of any FIRRMA Prohibited Transfer and FIRRMA Prohibited Filing Event shall be deemed prohibited hereunder as a breach hereof and Borrower shall not permit the same to occur without Lender's prior written consent.

**Section 4.20  No Joint Assessment**.  Borrower shall not suffer, permit or initiate the joint assessment of any Individual Property with (a) any other real property constituting a tax lot separate from the applicable Individual Property, or (b) any portion of the applicable Individual Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the applicable Individual Property.

55

**Section 4.21 Alterations**. Notwithstanding anything contained herein (including, without limitation, Article 8 hereof) to the contrary, Lender's prior approval, not to be unreasonably withheld, conditioned or delayed, shall be required in connection with any alterations to any Improvements (a) that could reasonably be expected to have a Material Adverse Effect, (b) the cost of which (including any related alteration, improvement or replacement) is reasonably anticipated to exceed the applicable Alteration Threshold or (c) that are structural in nature, which approval may be granted or withheld in Lender's sole discretion. If the total unpaid amounts incurred and to be incurred with respect to any alterations to the Improvements shall at any time exceed the applicable Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following: (i) cash, (ii) U.S. Obligations, (iii) other security reasonably acceptable to Lender, (provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same), or (iv) a completion bond (provided that Lender shall have received a Rating Agency Confirmation as to the form and issuer of same) (items (i) through (iv) above, the "**Alteration Security**"). Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and anticipated to be incurred with respect to such alterations to the Improvements over the applicable Alteration Threshold. Upon delivery of an Officer's Certificate to Lender that states that all applicable Alterations have been completed and all amounts in connection therewith have been paid in full, which Officer's Certificate shall include or attach copies of invoices, final lien waivers and such other evidence as Lender may reasonably require in connection with the completion of such Alterations, Lender shall release the Alteration Security.

**Section 4.22 Property Document Covenants**. Without limiting the other provisions of this Agreement and the other Loan Documents, Borrower shall (i) promptly perform and/or observe, in all material respects, all of the covenants and agreements required to be performed and observed by it under the Property Documents and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (ii) promptly notify Lender of any material default under the Property Documents of which it is aware; (iii) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, notice, report and estimate received by it under the Property Documents; (iv) enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed under the Property Documents in a commercially reasonable manner; (v) cause the applicable Individual Property to be operated, in all material respects, in accordance with the Property Documents; and (vi) not, without the prior written consent (not to be unreasonably withheld, conditioned or delayed) of Lender (unless such action is expressly permitted in accordance with the terms hereof and is consummate in accordance with such terms), (A) enter into any new Property Document or replace or execute modifications to any existing Property Documents or renew or extend the same (exclusive of, in each case, any automatic renewal or extension in accordance with its terms), (B) surrender, terminate or cancel the Property Documents, (C) reduce or consent to the reduction of the term of the Property Documents, (D) increase or consent to the increase of the amount of any charges under the Property Documents, (E) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Property Documents in any material respect or (F) following the occurrence and during the continuance of an Event of Default, exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Property Documents.

**Section 4.23  Upfront CapEx Work.** Borrower shall complete the UpFront CapEx Work in a good and workmanlike manner and in accordance with all applicable Legal Requirements within a commercially reasonable and prudent time.

## ARTICLE 5

## ENTITY COVENANTS

**Section 5.1     Single Purpose Entity/Separateness**.

(a)      Borrower has not and will not:

(i)      engage in any business or activity other than the ownership, development, holding, sale, leasing, transferring, management, operation and maintenance of the applicable Individual Property, and activities incidental thereto;

(ii)      acquire or own any assets other than (A) the applicable Individual Property, and (B) such incidental Personal Property as may be necessary for the ownership, leasing, maintenance and operation of such applicable Individual Property;

(iii)      merge into or consolidate with any Person, divide or otherwise engage in or permit any Division or have the power to engage in or permit any Division or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure.  As used herein, the term "**Division**" shall mean, as to any Person, such Person dividing and/or otherwise engaging in and/or becoming subject to, in each case, any division (whether pursuant to plan of division or otherwise), including, without limitation and to the extent applicable, pursuant to §18-217 of the Limited Liability Company Act of the State of Delaware;

(iv)      fail to observe all organizational formalities, or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the provisions of its organizational documents (provided, that, such organizational documents may be amended or modified to the extent that, in addition to the satisfaction of the requirements related thereto set forth therein, Lender's prior written consent and, if required by Lender, a Rating Agency Confirmation are first obtained);

(v)      own any subsidiary, or make any investment in, any Person (other than, with respect to any SPE Component Entity, in the applicable Borrower);

(vi)      commingle its funds or assets with the funds or assets of any other Person (it being acknowledged that any funds that are being held by Lender or Servicer pursuant to the Loan Documents shall not be deemed commingled funds);

(vii)      incur any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (A) the Debt, (B) trade and operational indebtedness incurred in the ordinary course of business with trade creditors,

57

provided such indebtedness is (1) unsecured, (2) not evidenced by a note, (3) on commercially reasonable terms and conditions, and (4) due not more than ninety (90) days past the date incurred and paid on or prior to such date, (C) Permitted Equipment Leases; (D) tenant improvement costs and tenant allowances payable to Tenants in accordance with the terms hereof, and/or (E) Taxes that are not yet delinquent provided however, the aggregate amount of the indebtedness described in (B) and (C) shall not exceed at any time three percent (3%) of the aggregate Allocated Loan Amounts associated with the portions of the Property owned by the applicable Borrower. No Indebtedness other than the Debt may be secured (senior, subordinate or pari passu) by the Property;

(viii)   fail to maintain all of its books, records, financial statements and bank accounts separate from those of any other Person (including, without limitation, any Affiliates).  Borrower's assets have not and will not be listed as assets on the financial statement of any other Person; provided, however, that Borrower's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such Affiliates and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) such assets shall be listed on Borrower's own separate balance sheet.  Borrower has maintained and will maintain its books, records, resolutions and agreements as official records;

(ix)   enter into any contract or agreement with any partner, member, shareholder, principal or Affiliate, except, in each case, upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties;

(x)   maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xi)   assume or guaranty the debts of any other Person, hold itself out to be responsible for the debts of any other Person, or otherwise pledge its assets for the benefit of any other Person or hold out its credit as being available to satisfy the obligations of any other Person;

(xii)   make any loans or advances to any Person;

(xiii)   fail to file its own tax returns (unless prohibited by applicable Legal Requirements from doing so or is a disregarded entity for tax purposes and not required by any applicable Legal Requirements to file);

(xiv)   fail to (A) hold itself out to the public and identify itself, in each case, as a legal entity separate and distinct from any other Person and not as a division or part of any other Person, (B) conduct its business solely in its own name, (C) hold its assets in its own name or (D) correct any known misunderstanding regarding its separate identity;

(xv)    fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (to the extent there exists sufficient cash flow from the applicable Individual Property to do so, it being agreed that (x) this provision shall not require any direct and/or indirect equity owners of Borrower to make any loans or capital contribution to Borrower and (y) this provision shall not limit Borrower's rights to make distributions to its equity owners in accordance with its organizational documents provided such distributions do not violate the terms of the Loan Documents (including, without limitations, this clause (xv));

(xvi)    without the prior unanimous written consent of all of its partners, shareholders or members, as applicable, the prior unanimous written consent of its board of directors or managers, as applicable, and the prior written consent of each Independent Director (regardless of whether such Independent Director is engaged at the Borrower or SPE Component Entity level), (a) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors Rights Laws, (b) seek or consent to the appointment of a receiver, liquidator or any similar official, (c) take any action that might cause such entity to become insolvent, (d) make an assignment for the benefit of creditors or (e) take any Material Action with respect to Borrower or any SPE Component Entity (provided, that, none of any member, shareholder or partner (as applicable) of Borrower or any SPE Component Entity or any board of directors or managers (as applicable) of Borrower or any SPE Component Entity may vote on or otherwise authorize the taking of any of the foregoing actions unless, in each case, there are at least two (2) Independent Directors then serving in such capacity in accordance with the terms of the applicable organizational documents and each of such Independent Directors has consented to such foregoing action);

(xvii)    fail to allocate shared expenses (including, without limitation, shared office space) or fail to use separate stationery, invoices and checks;

(xviii)    fail to pay its own liabilities (including, without limitation, salaries of its own employees, if any) from its own funds or fail to maintain a sufficient number of employees in light of its contemplated business operations (in each case to the extent there exists sufficient cash flow from the applicable Individual Property to do so);

(xix)    acquire obligations or securities of its partners, members, shareholders or other Affiliates, as applicable;

(xx)    identify its partners, members, shareholders or other Affiliates, as applicable, as a division or part of it; or

(xxi)    violate or cause to be violated the assumptions made with respect to Borrower and its principals in the Non-Consolidation Opinion or in any New Non-Consolidation Opinion.

(b)    If Borrower is a partnership or limited liability company (other than an Acceptable LLC), each general partner (in the case of a partnership) and at least one member (in

the case of a limited liability company) of Borrower, as applicable, shall be a corporation or an Acceptable LLC (each an "**SPE Component Entity**") whose sole asset is its interest in Borrower. Each SPE Component Entity (i) will at all times comply with each of the covenants, terms and provisions contained in Section 5.1(a)(iii) - (vi) (inclusive) and (viii) – (xxi) (inclusive) and, if such SPE Component Entity is an Acceptable LLC, Section 5.1(c) and (d) hereof, as if such representation, warranty or covenant was made directly by such SPE Component Entity; (ii) will not engage in any business or activity other than owning an interest in Borrower; (iii) will not acquire or own any assets other than its partnership, membership, or other equity interest in Borrower; (iv) will at all times continue to own no less than a 0.5% direct equity ownership interest in Borrower; (v) will not incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation); and (vi) will cause Borrower to comply with the provisions of this Section 5.1.

      (c)     In the event Borrower or any SPE Component Entity is an Acceptable LLC, the limited liability company agreement of Borrower or such SPE Component Entity (as applicable) (the "**LLC Agreement**") shall provide that (i) upon the occurrence of any event that causes the last remaining member of Borrower or such SPE Component Entity (as applicable) ("**Member**") to cease to be the member of Borrower or such SPE Component Entity (as applicable) (other than (A) upon an assignment by Member of all of its limited liability company interest in Borrower or such SPE Component Entity (as applicable) and the admission of the transferee in accordance with the Loan Documents and the LLC Agreement, or (B) the resignation of Member and the admission of an additional member of Borrower or such SPE Component Entity (as applicable) in accordance with the terms of the Loan Documents and the LLC Agreement), any person acting as Independent Director of Borrower or such SPE Component Entity (as applicable) shall, without any action of any other Person and simultaneously with the Member ceasing to be the member of Borrower or such SPE Component Entity (as applicable) automatically be admitted to Borrower or such SPE Component Entity (as applicable) as a member with a 0% economic interest ("**Special Member**") and shall continue Borrower or such SPE Component Entity (as applicable) without dissolution and (ii) Special Member may not resign from Borrower or such SPE Component Entity (as applicable) or transfer its rights as Special Member unless (A) a successor Special Member has been admitted to Borrower or such SPE Component Entity (as applicable) as a Special Member in accordance with requirements of Delaware law and (B) after giving effect to such resignation or transfer, there remains at least two (2) Independent Directors of such SPE Component Entity or Borrower (as applicable) in accordance with Section 5.2 below. The LLC Agreement shall further provide that (i) Special Member shall automatically cease to be a member of Borrower or such SPE Component Entity (as applicable) upon the admission to Borrower or such SPE Component Entity (as applicable) of the first substitute member, (ii) Special Member shall be a member of Borrower or such SPE Component Entity (as applicable) that has no interest in the profits, losses and capital of Borrower or such SPE Component Entity (as applicable) and has no right to receive any distributions of the assets of Borrower or such SPE Component Entity (as applicable), (iii) pursuant to the applicable provisions of the limited liability company act of the State of Delaware (the "**Act**"), Special Member shall not be required to make any capital contributions to Borrower or such SPE Component Entity (as applicable) and shall not receive a limited liability company interest in Borrower or such SPE Component Entity (as applicable), (iv) Special Member, in its capacity as Special Member, may not bind Borrower or such SPE Component Entity (as applicable) and (v) except as required by any mandatory provision of the Act, Special

Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, Borrower or such SPE Component Entity (as applicable) including, without limitation, the merger, consolidation or conversion of Borrower or such SPE Component Entity (as applicable); provided, however, such prohibition shall not limit the obligations of Special Member, in its capacity as Independent Director, to vote on such matters required by the Loan Documents or the LLC Agreement.  In order to implement the admission to Borrower or such SPE Component Entity (as applicable) of Special Member, Special Member shall execute a counterpart to the LLC Agreement.  Prior to its admission to Borrower or such SPE Component Entity (as applicable) as Special Member, Special Member shall not be a member of Borrower or such SPE Component Entity (as applicable), but Special Member may serve as an Independent Director of Borrower or such SPE Component Entity (as applicable).

(d)      The LLC Agreement shall further provide that (i) upon the occurrence of any event that causes the Member to cease to be a member of Borrower or such SPE Component Entity (as applicable) to the fullest extent permitted by law, the personal representative of Member shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of Member in Borrower or such SPE Component Entity (as applicable) agree in writing (A) to continue Borrower or such SPE Component Entity (as applicable) and (B) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower or such SPE Component Entity (as applicable) effective as of the occurrence of the event that terminated the continued membership of Member in Borrower or such SPE Component Entity (as applicable), (ii) any action initiated by or brought against Member or Special Member under any Creditors Rights Laws shall not cause Member or Special Member to cease to be a member of Borrower or such SPE Component Entity (as applicable) and upon the occurrence of such an event, the business of Borrower or such SPE Component Entity (as applicable) shall continue without dissolution and (iii) each of Member and Special Member waives any right it might have to agree in writing to dissolve Borrower or such SPE Component Entity (as applicable) upon the occurrence of any action initiated by or brought against Member or Special Member under any Creditors Rights Laws, or the occurrence of an event that causes Member or Special Member to cease to be a member of Borrower or such SPE Component Entity (as applicable).

### Section 5.2    Independent Director.

(a)      The organizational documents of Borrower (to the extent Borrower is a corporation or an Acceptable LLC) or the applicable SPE Component Entity, as applicable, shall provide that at all times there shall be at least two duly appointed independent directors or managers of such entity (each, an "**Independent Director**") who each shall (I) not have been at the time of each such individual's initial appointment, and shall not have been at any time during the preceding five years, and shall not be at any time while serving as Independent Director, (i) a shareholder (or other equity owner) of, or an officer, director (other than in its capacity as Independent Director), partner, member or employee of, Borrower, the applicable SPE Component Entity or any of their respective shareholders, partners, members, subsidiaries or Affiliates, (ii) a customer of, or supplier to, or other Person who derives any of its purchases or revenues from its activities with, Borrower, the applicable SPE Component Entity or any of their respective shareholders, partners, members, subsidiaries or Affiliates, (iii) a Person who Controls

61

or is under common Control with any such shareholder, officer, director, partner, member, employee supplier, customer or other Person, (iv) a member of the immediate family of any such shareholder, officer, director, partner, member, employee, supplier, customer or other Person or (v) a trustee or similar Person in any proceeding under Creditors Rights Laws involving Borrower, the applicable SPE Component Entity or any of their respective shareholders, partners, members, subsidiaries or Affiliates (II) shall have, at the time of their appointment, had at least three (3) years experience in serving as an independent director and (III) be employed by, in good standing with and engaged by Borrower in connection with, in each case, an Approved ID Provider. Notwithstanding anything to the contrary contained herein, it shall be an additional covenant and requirement under this Article that any entity housing an Independent Director (whether any Borrower and/or any SPE Component Entity) shall be an Acceptable LLC.

(b) The organizational documents of Borrower and each SPE Component Entity shall further provide that (I) the board of directors or managers of Borrower and each SPE Component Entity and the constituent equity owners of such entities (constituent equity owners, the **"Constituent Members"**) shall not take any action set forth in Section 5.1(a)(xvi or any other action which, under the terms of any organizational documents of Borrower or any SPE Component Entity, requires the vote of the Independent Director unless, in each case, at the time of such action there shall be at least two Independent Directors engaged as provided by the terms hereof and such Independent Directors vote in favor of or otherwise consent to such action; (II) any resignation, removal or replacement of any Independent Director shall not be effective without (1) prior written notice to Lender and the Rating Agencies (which such prior written notice must be given on the earlier of five (5) days or three (3) Business Days prior to the applicable resignation, removal or replacement) and (2) evidence that the replacement Independent Director satisfies the applicable terms and conditions hereof and of the applicable organizational documents (which such evidence must accompany the aforementioned notice); (III) to the fullest extent permitted by applicable law, including Section 18-1101(c) of the Act and notwithstanding any duty otherwise existing at law or in equity, the Independent Directors shall consider only the interests of the Constituent Members and Borrower and each SPE Component Entity (including Borrower's and each SPE Component Entity's respective creditors) in acting or otherwise voting on the matters provided for herein and in Borrower's and each SPE Component Entity's organizational documents (which such fiduciary duties to the Constituent Members and Borrower and each SPE Component Entity (including Borrower's and each SPE Component Entity's respective creditors), in each case, shall be deemed to apply solely to the extent of their respective economic interests in Borrower or the applicable SPE Component Entity (as applicable) exclusive of (x) all other interests (including, without limitation, all other interests of the Constituent Members), (y) the interests of other Affiliates of the Constituent Members, Borrower and each SPE Component Entity and (z) the interests of any group of Affiliates of which the Constituent Members, Borrower or any SPE Component Entity is a part)); (IV) other than as provided in subsection (III) above, the Independent Directors shall not have any fiduciary duties to any Constituent Members, any directors of Borrower or any SPE Component Entity or any other Person; (V) the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing under applicable law; (VI) to the fullest extent permitted by applicable law, including Section 18-1101(e) of the Act, an Independent Director shall not be liable to Borrower, any SPE Component Entity, any Constituent Member or any other Person for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director acted in bad faith or engaged in willful misconduct; and (VII) except as

provided in the foregoing subsections (III) through (VI), the Independent Directors shall, in exercising their rights and performing their duties under the applicable organizational documents, have a fiduciary duty of loyalty and care similar to that of a director of a business corporation organized under the General Corporation Law of the State of Delaware.

Section 5.3    **Change of Name, Identity or Structure**.  Borrower shall not change (or permit to be changed) Borrower's or any SPE Component Entity's (a) name, (b) identity (including its trade name or names), (c) principal place of business set forth on the first page of this Agreement or (d) if not an individual, Borrower's or any SPE Component Entity's corporate, partnership or other structure or state of formation, without, in each case, notifying Lender of such change in writing at least fifteen (15) days prior to the effective date of such change and, in the case of a change in Borrower's or any SPE Component Entity's structure or state of formation, without first obtaining the prior written consent of Lender and, if required by Lender, a Rating Agency Confirmation with respect thereto.  Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein.  At the reasonable request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower or the applicable SPE Component Entity intends to operate the applicable Individual Property, and representing and warranting that Borrower or the applicable SPE Component Entity does business under no other trade name with respect to the applicable Individual Property.

Section 5.4    **Business and Operations**.  Borrower will continue to engage in the businesses now conducted by it as and to the extent the same are necessary for the ownership, maintenance, management and operation of the Property.  Borrower will qualify to do business and will remain in good standing under the laws of the State and each other applicable jurisdiction in which the Property is located, in each case, as and to the extent the same are required for the ownership, maintenance, management and operation of the Property.

# ARTICLE 6

# NO SALE OR ENCUMBRANCE

Section 6.1    **Transfer Definitions**.  As used herein and in the other Loan Documents, "**Restricted Party**" shall mean Borrower, Sponsor, Guarantor, any SPE Component Entity, any Affiliated Manager, or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, Sponsor, Guarantor, any SPE Component Entity, any Affiliated Manager or any non-member manager; and a "**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, grant of any options with respect to, or any other transfer or disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of a legal or beneficial interest.

Section 6.2    **No Sale/Encumbrance**.

63

(a)     It shall be an Event of Default hereof if, without the prior written consent of Lender, a Sale or Pledge of the Property or any part thereof or any legal or beneficial interest therein (including, without limitation, the Loan and/or Loan Documents) occurs, a Sale or Pledge of an interest in any Restricted Party occurs and/or Borrower shall acquire any real property in addition to the real property owned by Borrower as of the Closing Date (each of the foregoing, collectively, a "**Prohibited Transfer**"), other than (i) pursuant to Leases of space in the Improvements to Tenants in accordance with the provisions of Section 4.14, (ii) as permitted pursuant to the express terms of this Article 6 and (iii) Permitted Encumbrances.

(b)     A Prohibited Transfer shall (except to the extent expressly excluded in Section 6.2(a) above) include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a Tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any (A) Leases or any Rents or (B) Property Documents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general or limited partner or any profits or proceeds relating to such partnership interests or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger, Division or consolidation or the change, removal, resignation or addition of a managing member, or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of any member or any profits or proceeds relating to such membership interest; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests in a Restricted Party or the revocation, rescission or termination of a Restricted Party; (vii) the removal or the resignation of Manager (including, without limitation, an Affiliated Manager) or the engagement of a New Manager, in each case, other than in accordance with Section 4.15; (viii) any action for partition of the Property (or any portion thereof or interest therein) or any similar action instituted or prosecuted by Borrower or by any other Person, pursuant to any contractual agreement or other instrument or under applicable law (including, without limitation, common law); and/or (ix) the incurrence of any property-assessed clean energy loans or similar indebtedness with respect to Borrower and/or the Property, including, without limitation, if such loans or indebtedness are made or otherwise provided by any Governmental Authority and/or secured or repaid (directly or indirectly) by any taxes or similar assessments; and/or (x) any other action instituted by (or at the behest of) Borrower or its Affiliates or consented to or acquiesced in by Borrower or its Affiliates which results in a Property Document Event.

**Section 6.3     Permitted Equity Transfers**.  Notwithstanding the restrictions contained in this Article 6, the following transfers shall be permitted without Lender's consent:  (a) a transfer (but not a pledge) by devise or descent or by operation of law upon the death of a Restricted Party or any member, partner or shareholder of a Restricted Party, (b) the transfer (but not the pledge), in one or a series of transactions, of the stock, partnership interests or membership interests (as the case may be) in a Restricted Party (c) the sale, transfer or issuance

of shares of common stock in any Restricted Party that is a publicly traded entity, provided such shares of common stock are listed on the New York Stock Exchange or another nationally recognized stock exchange or (d) a sale, transfer or hypothecation for estate planning purposes of a partnership, shareholder or membership interest in any Restricted Party whichever the case may be, by the partner(s), shareholder(s), or member(s), as applicable, to an immediate family member (i.e. parents, spouses, siblings and/or children) of such partner, or shareholder or member or to a trust for the benefit of such partner, shareholder, member or such immediate family member of such partner, shareholder, or member (provided, that, the foregoing provisions of clauses (a), (b), (c) and (d) above shall not be deemed to waive, qualify or otherwise limit Borrower's obligation to comply (or to cause the compliance with) the other covenants set forth herein and in the other Loan Documents (including, without limitation, the covenants contained herein relating to ERISA and FIRRMA matters)); provided, further, that, with respect to the transfers listed in clauses (a), (b) or (d) above, (A) Lender shall receive not less than thirty (30) days prior written notice of such transfers (provided, that, (I) for purposes of clarification, with respect to the transfers contemplated in subsection (a) above, the aforesaid notice shall only be deemed to be required thirty (30) days prior to the consummation of the applicable transfers made as a result of probate or similar process following such death (as opposed to prior notice of the applicable death)) and (II) no notice shall be required with respect to any transfer that (x) does not result in a change to the direct ownership interest of the Borrower pursuant to the organizational chart delivered to Lender in connection with the origination of the Loan (y) does not result in any Person (together with its Affiliates) owning more than a ten percent (10%) direct and/or indirect interest in the aggregate in Borrower that did not own said interest prior to consummation of the transfer and (z) does not cause a change in Control (whether direct or indirect) in Borrower, Guarantor and/or any SPE Component Entity); provided that, in each case, Borrower provides :ender an updated organizational chart upon request); (B) no such transfers shall result in a change in Control of Sponsor, Guarantor or Affiliated Manager; (C) after giving effect to such transfers, Sponsor shall (I) own at least a 51% direct or indirect equity ownership interest in each of Borrower and any SPE Component Entity; (II) Control Borrower and any SPE Component Entity and (III) control the day-to-day operation of the Property; (D) after giving effect to such transfers, the Property shall continue to be managed by Manager or a New Manager approved in accordance with the applicable terms and conditions hereof; (E) in the case of the transfer of any direct equity ownership interests in Borrower or in any SPE Component Entity, such transfers shall be conditioned upon continued compliance with the relevant provisions of Article 5 hereof; (F) in the case of (1) the transfer of the management of the Property (or any portion thereof) to a new Affiliated Manager in accordance with the applicable terms and conditions hereof, (2) the addition and/or replacement of a Guarantor and/or Sponsor in accordance with the applicable terms and conditions hereof and of the Guaranty or (3) the transfer of any equity ownership interests (I) directly in Borrower or in any SPE Component Entity, or (II) in any Restricted Party whose sole asset is a direct or indirect equity ownership interest in Borrower or in any SPE Component Entity, such transfers shall be conditioned upon delivery to Lender of a New Non-Consolidation Opinion addressing such transfer, addition and/or replacement; (G) such transfers shall be conditioned upon Borrower's ability to, after giving effect to the transfer in question (I) remake the representations contained herein relating to ERISA and FIRRMA matters (and, upon Lender's request, Borrower shall deliver to Lender an Officer's Certificate containing such updated representations effective as of the date of the consummation of the applicable transfer) and (II) continue to comply with the covenants

65

contained herein relating to ERISA and FIRRMA matters; (H) such transfers shall be permitted pursuant to the terms of the Property Documents; and (I) after giving effect to such transfers, the Guarantor Control Condition shall continue to be satisfied.  Upon request from Lender, Borrower shall promptly provide Lender with (y) a revised version of the organizational chart delivered to Lender in connection with the Loan reflecting any transfer consummated in accordance with this Section 6.3 and (z) "know your client" searches (in form, scope and substance and from a provider, in each case, reasonably acceptable to Lender) with respect to any transfer to which this Article applies (provided, that, notwithstanding the foregoing provisions of this Section, satisfaction of this subsection (z) shall, at Lender's option, be a condition precedent to any such transfer).

**Section 6.4**     **Permitted Property Transfer (Assumption)**.

(a)     <u>Total Assumption</u>.  Notwithstanding the foregoing provisions of this Article 6, at any time other than the sixty (60) days prior to and following any Secondary Market Transaction, Lender shall not unreasonably withhold consent to a one-time transfer of the Property in its entirety to, and the related assumptions of the Loan by, any Person (a "**Transferee**") provided that each of the following terms and conditions are satisfied:

(i)     no Default or Event of Default has occurred and is continuing;

(ii)     Borrower shall have (A) delivered written notice to Lender of the terms of such prospective transfer not less than sixty (60) days before the date on which such transfer is scheduled to close and, concurrently therewith, all such information concerning the proposed Transferee as Lender shall reasonably require and (B) paid to Lender a non-refundable processing fee in the amount of $25,000.  Lender shall have the right to approve or disapprove the proposed transfer based on its then current underwriting and credit requirements for similar loans secured by similar properties which loans are sold in the secondary market, such approval not to be unreasonably withheld, conditioned or delayed.  In determining whether to give or withhold its approval of the proposed transfer, Lender shall reasonably consider the experience and track record of Transferee and its principals in owning and operating facilities similar to the Property, the financial strength of Transferee and its principals, the general business standing of Transferee and its principals and Transferee's and its principals' relationships and experience with contractors, vendors, tenants, lenders and other business entities; provided, however, that, notwithstanding Lender's agreement to consider the foregoing factors in determining whether to give or withhold such approval, such approval shall be given or withheld based on what Lender determines to be commercially reasonable and, if given, may be given subject to such conditions as Lender may deem reasonably appropriate;

(iii)     Borrower shall have paid to Lender, concurrently with the closing of such prospective transfer, (A) a non-refundable assumption fee in an amount equal to one percent (1%) of the then outstanding principal balance of the Loan, (B) all out-of-pocket costs and expenses, including reasonable attorneys' fees, incurred by Lender in connection therewith and (C) all fees, costs and expenses of all third parties and the Rating Agencies incurred in connection therewith;

(iv)     Transferee assumes and agrees to pay the Debt as and when due subject to the provisions of Article 13 hereof and, prior to or concurrently with the closing of such transfer, Transferee and its constituent partners, members, shareholders, Affiliates or sponsors as Lender may require, shall execute, without any cost or expense to Lender, such documents and agreements as Lender shall reasonably require to evidence and effectuate said assumption and an Affiliate of Transferee reasonably acceptable to Lender (but in all events able to satisfy the net worth, liquidity and other similar covenants in the Guaranty (unless otherwise agreed to by Lender)) shall execute a recourse guaranty and an environmental indemnity in form and substance identical to the Guaranty and Environmental Indemnity, respectively, with such changes to each of the foregoing as may be reasonably required by Lender;

(v)     Borrower and Transferee, without any cost to Lender, shall furnish any information reasonably requested by Lender for the preparation of, and shall authorize Lender to file, new financing statements and financing statement amendments and other documents to the fullest extent permitted by applicable Legal Requirements, and shall execute any additional documents reasonably requested by Lender;

(vi)     Borrower shall have delivered to Lender, without any cost or expense to Lender, such endorsements to Lender's Title Insurance Policy insuring that fee simple or leasehold title to the Property, as applicable, is vested in Transferee (subject to Permitted Encumbrances), hazard insurance endorsements or certificates and other similar materials as Lender may deem necessary at the time of the transfer, all in form and substance satisfactory to Lender;

(vii)     Transferee shall have furnished to Lender all appropriate papers evidencing Transferee's organization and good standing, and the qualification of the signers to execute the assumption of the Debt, which papers shall include certified copies of all documents relating to the organization and formation of Transferee and of the entities, if any, which are partners or members of Transferee.  Transferee and such constituent partners, members or shareholders of Transferee (as the case may be), as Lender shall require, shall comply with the covenants set forth in Article 5 hereof;

(viii)     Transferee shall assume the obligations of Borrower under any Management Agreement or provide a new management agreement with a new manager which meets with the requirements of the Assignment of Management Agreement and Section 4.15 hereof and assign to Lender as additional security such new management agreement;

(ix)     Transferee shall furnish to Lender a REMIC Opinion, a New Non-Consolidation Opinion and an additional opinion of counsel satisfactory to Lender and its counsel (A) that Transferee's formation documents provide for the matters described in subparagraph (vii) above, (B) that the assumption of the Debt has been duly authorized, executed and delivered, and that the assumption agreement and the other Loan Documents are valid, binding and enforceable against Transferee in accordance with their terms (except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Creditors Rights Laws, and by general

principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)), (C) that Transferee and any entity which is a controlling stockholder, member or general partner of Transferee, have been duly organized, and are in existence and good standing and (D) with respect to such other matters as Lender may reasonably request;

(x)     if reasonably required by Lender, Lender shall have received (A) a Rating Agency Confirmation with respect to such transfer and (B) evidence that the proposed transfer will not result in a Property Document Event;

(xi)     Borrower's obligations under the contract of sale pursuant to which the transfer is proposed to occur shall expressly be subject to the satisfaction of the terms and conditions of this Section 6.4; and

Upon the consummation of the transfer of the Property pursuant to and in accordance with this Section 6.4 (including, without limitation, subsection (d) hereof), the existing Guarantor and Borrower (as distinguished from the applicable Transferee that is assuming the Loan and Affiliate of Transferee delivering a new recourse guaranty and new environmental indemnity (to the extent applicable) in connection with such transfer of the Property) shall be conditionally released from liability under the Loan Documents for events first occurring (as distinguished from events first discovered) subsequent to the effective date of such consummation, except to the extent that such events are the proximate result of acts, events, conditions, or circumstances that existed on or prior to the effective date of such consummation, which such conditional release shall be documented pursuant to Lender's standard form release documentation; provided however, such conditional release shall be automatically null and void and of no further force or effect whatsoever and shall be deemed automatically revoked, in each case, upon the occurrence of any successful reversal of (or other challenge to) such transfer or the related assumption of the Loan, in each case, including without limitation, any fraudulent conveyance challenge, preferential transfer challenge or other similar challenge. The Affiliate of Transferee delivering a new recourse guaranty and new environmental indemnity (to the extent applicable) in connection with such transfer of the Property shall only have recourse liability pursuant to the Guaranty and Environmental Indemnity, as applicable, for events first occurring (as distinguished from events first discovered) subsequent to the effective date of the consummation of the transfer of the Property pursuant to and in accordance with this Section 6.4, provided, however, in no event shall any such limitation on liability affect Lender's ability to exercise any remedies it has with respect to an Event of Default as set forth in this Agreement and the other Loan Documents), and provided, further, that to the extent there is a dispute regarding the date when any events giving rise to liability first arose, the existing Guarantor and Borrower and the Transferee and the Affiliate of Transferee delivering a new recourse guaranty and new environmental indemnity (to the extent applicable) shall be jointly and severally liable until such dispute is adjudicated in a court of law or similar proceeding. Lender agrees that, at Borrower's cost, it shall execute standard and customary documentation necessary to effectuate the agreements set forth in this paragraph.

**Section 6.5     Lender's Rights**.  Lender reserves the right to condition the consent to a Prohibited Transfer requested hereunder upon (a) a modification of the terms hereof and on assumption of this Agreement and the other Loan Documents as so modified by the proposed

Prohibited Transfer, (b) payment of a transfer fee of 1% of outstanding principal balance of the Loan and all of Lender's expenses incurred in connection with such Prohibited Transfer, (c) receipt of a Rating Agency Confirmation with respect to the Prohibited Transfer, (d) the proposed transferee's continued compliance with the covenants set forth in this Agreement, including, without limitation, the covenants in Article 5, (e) receipt of a New Non-Consolidation Opinion with respect to the Prohibited Transfer and/or (f) such other conditions and/or legal opinions as Lender shall determine in its sole discretion to be in the interest of Lender. All expenses incurred by Lender shall be payable by Borrower whether or not Lender consents to the Prohibited Transfer. Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Prohibited Transfer without Lender's consent. This provision shall apply to every Prohibited Transfer, whether or not Lender has consented to any previous Prohibited Transfer.

**Section 6.6  Economic Sanctions, Anti-Money Laundering and Transfers**. Borrower shall (and shall cause its Constituent Owners and Affiliates to) (a) at all times comply with the representations and covenants contained in Section 3.30 such that the same remain true, correct and not violated or breached and (b) not permit a Prohibited Transfer to occur and shall cause the ownership requirements specified in this Article 6 (including, without limitation, those stipulated in Section 6.3 hereof) to be complied with at all times. Borrower hereby represents that, other than in connection with the Loan, the Loan Documents and any Permitted Encumbrances, as of the date hereof, there exists no Sale or Pledge of (i) the Property or any part thereof or any legal or beneficial interest therein or (ii) any interest in any Restricted Party. For purposes of clarification, references hereunder and/or under the other Loan Documents to "equity ownership interest" or words of similar import shall be deemed to refer to the legal and/or beneficial interests in a Person (as applicable); provided, that, when hereunder or under the other Loan Documents a specified percentage of the aforesaid "equity ownership interest" (or words of similar import) in a Person is required to be held, the same shall be deemed to refer to both the legal and beneficial interest in such Person. Notwithstanding anything to the contrary contained herein or in any other Loan Document (including, without limitation Sections 6.3 and 6.4 hereof), in no event shall Borrower or any SPE Component Entity be (I) a Prohibited Entity, (II) Controlled (directly or indirectly) by any Prohibited Entity or (III) more than 49% owned (directly or indirectly) by any Prohibited Entities (whether individually or in the aggregate), unless, in the case of each of the foregoing, Lender's prior written consent is first obtained (which such consent shall be given or withheld in Lender's sole discretion and may be conditioned on, among other things, Lender's receipt of a Rating Agency Confirmation).

**Section 6.7  Immaterial Easements, Etc.**  Borrower may, without the consent of Lender, grant or convey to third parties easements, licenses, restrictions, covenants, reservations, conditions and rights of way that Borrower may deem reasonable or necessary in the ordinary course of business for pedestrian or vehicular access, water and sewer lines, telephone or other fiber optic or other data transmission lines, electric lines or other utilities or for other similar purposes, provided that, (x) no Event of Default shall be continuing, (y) no such conveyance or encumbrance shall be (i) reasonably expected to materially impair the utility and operation of the Property or (ii) reasonably be expected to, or does, have a Material Adverse Effect (each, an "**Immaterial Easement**"). In connection with any conveyance or encumbrance permitted pursuant to this Section 6.7, Lender shall execute and deliver any instrument reasonably

69

necessary or appropriate to subordinate the lien of the Security Instrument to such easements, restrictions, covenants, reservations and rights of way or other similar grants upon receipt by Lender of:

(i)      thirty (30) days' prior written notice thereof;

(ii)     a copy of the instrument or instruments of transfer, conveyance or encumbrance;

(iii)    a Borrower's Certificate stating (1) with respect to any conveyance or encumbrance, the consideration, if any, being paid for such transfer, conveyance or encumbrance, and (2) that such conveyance or encumbrance does not materially impair the utility and operation of the Property and would not reasonably be expected to have and does not have a Material Adverse Effect; and

(iv)    reimbursement of all of Lender's reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred in connection with such conveyance or encumbrance.

## ARTICLE 7

## INSURANCE; CASUALTY; CONDEMNATION; RESTORATION

### Section 7.1    Insurance.

(a)    Borrower shall obtain and maintain, or cause to be obtained and maintained, insurance for Borrower and each Individual Property providing at least the following coverages:

(i)    insurance with respect to the Improvements and the Personal Property insuring against any peril now or hereafter included within the classification "All Risk" or "Special Perils" (including, without limitation, fire, lightning, windstorm / named storms, hail, terrorism and similar acts of sabotage, explosion, riot, riot attending a strike, civil commotion, vandalism, aircraft, vehicles and smoke), in each case (A) in an amount equal to 100% of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value exclusive of costs of excavations, foundations, underground utilities and footings, with a waiver of depreciation; (B) containing an agreed amount endorsement waiving all coinsurance provisions or shall be written on a no coinsurance form; (C) providing for no deductible in excess of $25,000 except: (I) with respect to windstorm/named storms, which such insurance shall provide for no deductible in relation to such coverage in excess of 5% of the total insurable value of the Property and (II)] as otherwise expressly and specifically permitted herein; (D) at all times insuring against at least those hazards that are commonly insured against under a "special causes of loss" form of policy, as the same shall exist on the date hereof, and together with any increase in the scope of coverage provided under such form after the date hereof; and (E) providing coverage for Loss to the Undamaged Portion of the Building, Demolition Costs and Increased Cost of Construction each in amounts acceptable to Lender. The Full Replacement Cost shall be re-determined from time to time (but not more frequently than once in any twelve (12) calendar months) at the request of Lender by an appraiser or contractor designated and paid by Borrower and approved by Lender, or by an engineer or appraiser in the regular employ of the insurer.

After the first appraisal, additional appraisals may be based on construction cost indices customarily employed in the trade. No omission on the part of Lender to request any such ascertainment shall relieve Borrower of any of its obligations under this Subsection;

(ii) commercial general liability insurance against all claims for personal injury, bodily injury, death or property damage occurring upon, in or about the applicable Individual Property, including "Dram Shop" or other liquor liability coverage if alcoholic beverages are sold, manufactured or distributed from the applicable Individual Property, such insurance (A) to be on the so-called "occurrence" form with a general aggregate limit of not less than $2,000,000 and a per occurrence limit of not less than $1,000,000, with no deductible or self insured retention; (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) contractual liability for all insured contracts; (5) contractual liability covering the indemnities contained in Article 13 hereof to the extent the same is available; and (6) acts of terrorism and similar acts of sabotage;

(iii) loss of rents and/or business interruption insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in Subsection 7.1(a)(i), (iv) and (vi) through (viii); (C) in an amount equal to 100% of the projected gross income from the applicable Individual Property (on an actual loss sustained basis) for a period continuing until the Restoration of the applicable Individual Property is completed; the amount of such business interruption/loss of rents insurance shall be determined prior to the Closing Date and at least once each year thereafter based on Lender's determination of the projected gross income from the applicable Individual Property for a twelve (12) month period; and (D) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and the Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of six (6) months from the date that the applicable Individual Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. Notwithstanding anything to the contrary contained herein or in any other Loan Documents, to the extent that insurance proceeds are payable to Lender pursuant to this Subsection (the "**Rent Loss Proceeds**") and Borrower is entitled to disbursement of Net Proceeds for Restoration in accordance with the terms hereof, (1) a Trigger Period shall be deemed to exist and (2) such Rent Loss Proceeds shall be deposited by Lender in the Cash Management Account and disbursed as provided in Article 9 hereof; provided, however, that (I) nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured hereunder on the respective dates of payment provided for in the Note except to the extent such amounts are actually paid out of the Rent Loss Proceeds and (II) in the event the Rent Loss Proceeds are paid in a lump sum in advance and Borrower is entitled to disbursement of such Rent Loss Proceeds in accordance with the terms hereof, Lender or Servicer shall hold such Rent Loss Proceeds in a segregated interest-bearing Eligible Account (which shall deemed to be included within the definition of the "Accounts" hereunder) and Lender or Servicer shall estimate

71

the number of months required for Borrower to restore the damage caused by the applicable Casualty, shall divide the applicable aggregate Rent Loss Proceeds by such number of months and shall disburse such monthly installment of Rent Loss Proceeds from such Eligible Account into the Cash Management Account each month during the performance of such Restoration;

(iv)     at all times during which structural construction, repairs or alterations are being made with respect to the Improvements (and only if the existing property and/or liability coverage forms do not otherwise apply) (A) commercial general liability and umbrella liability insurance covering claims related to the construction, repairs or alterations being made which are not covered by or under the terms or provisions of the commercial general liability and umbrella insurance policies required hereunder; and (B) the insurance provided for in Subsection 7.1(a)(i) written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against and on terms consistent with the coverages required pursuant to Subsections 7.1(a)(i), (iii) and (vi) through (viii), (3) including permission to occupy the applicable Individual Property, and (4) with an agreed amount endorsement waiving co-insurance provisions;

(v)     workers' compensation, subject to the statutory limits of the state in which the applicable Individual Property is located, and employer's liability insurance with a limit of at least $1,000,000 per accident and per disease per employee, and $1,000,000 for disease aggregate in respect of any work or operations on or about the applicable Individual Property, or in connection with the applicable Individual Property or its operation (if applicable);

(vi)     comprehensive boiler and machinery insurance and equipment breakdown coverage, in each case, covering all mechanical and electrical equipment and pressure vessels and boilers in an amount not less than their replacement cost or in such other amount as shall be reasonably required by Lender;

(vii)     if any portion of the Improvements is at any time located in an area identified by (A) the Federal Emergency Management Agency in the Federal Register as an area having special flood hazards and/or (B) the Secretary of Housing and Urban Development or any successor thereto as an area having special flood hazards pursuant to the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, or any successor law (the "**Flood Insurance Acts**"), flood hazard insurance (1) in an amount equal to the maximum limit of coverage available for the applicable Individual Property under the Flood Insurance Acts subject to a deductible reasonably acceptable to Lender and coverage under a supplemental private Policy with a deductible reasonably acceptable to Lender plus (2) such additional amount as may be reasonably acceptable to Lender, subject to a deductible not to exceed an amount equal to the maximum available through the Flood Insurance Acts;

(viii)     earthquake, sinkhole and mine subsidence insurance, if required, in amounts equal to one and one half times (1.5x) the scenario expected loss (SEL) of the applicable Individual Property plus business income, in each case, as determined by

Lender in its sole discretion and in form and substance satisfactory to Lender, subject to a deductible not to exceed 5% of the total insurable value of the applicable Individual Property, provided that the insurance pursuant to this Subsection (viii) shall otherwise be on terms consistent with the all risk insurance policy required under Section 7.1(a)(i);

(ix) umbrella liability insurance in an amount not less than Five Million and 00/100 Dollars ($5,000,000) per occurrence and in the aggregate per asset on terms consistent with the commercial general liability insurance policy required under subsection (ii) above;

(x) [Intentionally Omitted];

(xi) motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of One Million and No/100 Dollars ($1,000,000); and

(xii) such other insurance and in such amounts as (A) may be required pursuant to the terms of the Property Documents and (B) Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the applicable Individual Property located in or around the region in which the applicable Individual Property is located.

(b) All insurance provided for in Subsection 7.1(a) hereof shall be obtained under valid and enforceable policies (the "**Policies**" or in the singular, the "**Policy**"), in such forms, amounts, coverages, deductibles, loss payees and insureds, in each case, as may be satisfactory to Lender, issued by financially sound and responsible insurance companies authorized to do business in the state in which the applicable Individual Property is located and approved by Lender. Such insurance companies must have a general policy rating of A or better and a financial class of X or better by A.M. Best Company, Inc., and a claims paying ability/financial strength rating of "A-" (or its equivalent) or better by S&P (each such insurer shall be referred to below as a "**Qualified Insurer**"). Not less than fifteen (15) days prior to the expiration dates of the Policies theretofore furnished to Lender pursuant to Subsection 7.1(a), Borrower shall deliver certified copies of the Policies marked "premium paid" or accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder (the "**Insurance Premiums**"), provided, however, that in the case of renewal Policies, Borrower may furnish Lender with binders and Acord Form 28 Certificates therefor to be followed by the original Policies when issued. At least once per calendar year, Borrower shall provide Lender with updated flood zone certifications for the Property (in form and substance acceptable to Lender), which such flood zone certifications shall be delivered to Lender upon the earlier to occur of (i) December 1 of each calendar year or (ii) the renewal of the applicable Policy providing flood insurance coverage during the applicable calendar year.

(c) Borrower shall not obtain (or permit to be obtained) (i) any umbrella or blanket liability or casualty Policy unless, in each case, such Policy is approved in advance in writing by Lender (such approval not to be unreasonably withheld), Lender's interest is included therein as provided in this Agreement, such Policy is issued by a Qualified Insurer and such Policy includes such changes to the coverages and requirements set forth herein as may be required by Lender

73

(including, without limitation, increases to the amount of coverages required herein) or (ii) separate insurance concurrent in form or contributing in the event of loss with that required in Subsection 7.1(a) to be furnished by, or which may be reasonably required to be furnished by, Borrower.  In the event Borrower obtains (or causes to be obtained) separate insurance or an umbrella or a blanket Policy, Borrower shall notify Lender of the same and shall cause complete copies of each Policy to be delivered as required in Subsection 7.1(a).  Notwithstanding Lender's approval of any umbrella or blanket liability or casualty Policy hereunder, Lender reserves the right, in its sole discretion, to require Borrower to obtain a separate Policy in compliance with this Section 7.1.  Without limitation of any provision hereof, (i) Lender's consent required hereunder with respect to any umbrella or blanket policy shall include the schedule of locations and values with respect to the same and (ii) any umbrella or blanket Policy shall specifically allocate to each Individual Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only such Individual Property in compliance with the provisions of Section 7.1(a).

(d)  All Policies of insurance provided for or contemplated by Subsection 7.1(a) shall name Borrower as the insured and, in the case of liability Policies (except for the Policies referenced in Subsections 7.1(a)(v) and (xi)), shall name Lender as an additional insured, as their respective interests may appear, and, in the case of property damage Policies (including, but not limited to, terrorism, rent loss, business interruption, boiler and machinery, earthquake and flood insurance), such Policies shall contain a standard noncontributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender.

(e)  All Policies of insurance provided for in Subsection 7.1(a) shall contain clauses or endorsements to the effect that:

(i)  the following shall in no way affect the validity or enforceability of the Policy insofar as Lender is concerned:  (A) any act or negligence of Borrower, of anyone acting for Borrower or of any other Person named as an insured, additional insured and/or loss payee, (B) any foreclosure or other similar exercise of remedies and (C) the failure to comply with the provisions of the Policy which might otherwise result in a forfeiture of the insurance or any part thereof;

(ii)  the Policy shall not be materially changed (other than to increase the coverage provided thereby), terminated or cancelled without at least 30 days' written notice (via overnight delivery service or certified mail, postage prepaid, return receipt requested) to Lender and any other party named therein as an insured;

(iii)  If obtainable by Borrower using commercially reasonable efforts, the issuer(s) of the Policy shall give written notice to Lender (via certified mail, postage prepaid, return receipt requested) if the Policy has not been renewed thirty (30) days prior to its expiration;

(iv)  Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments or commissions thereunder and that the related issuer(s) waive any related claims to the contrary;

74

(v)     Lender shall, at its option and with no obligation to do so, have the right to directly pay Insurance Premiums in order to avoid cancellation, expiration and/or termination of the Policy due to non-payment of Insurance Premiums; and

(vi)     the Policy shall not exclude coverage for acts of terror or similar acts of sabotage.

(f)     By no later than ten (10) days following the expiration date of any Policies, Borrower shall furnish to Lender a statement certified by Borrower or a Responsible Officer of Borrower of the amounts of insurance maintained in compliance herewith, of the risks covered by such insurance and of the insurance company or companies which carry such insurance and, if requested by Lender, verification of the adequacy of such insurance by an independent insurance broker or appraiser acceptable to Lender.  Without limitation of the foregoing, Borrower shall also comply with the foregoing within ten (10) days of written request of Lender.  Borrower shall promptly forward to Lender a copy of each written notice received by any Borrower Party of any modification, reduction or cancellation of any of the Policies or of any of the coverages afforded under any of the Policies.

(g)     If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Security Instrument and shall bear interest at the Default Rate.

(h)     In the event of a foreclosure of the Security Instrument or other transfer of title to any Individual Property (or any portion thereof) in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to the Policies then in force concerning the applicable Individual Property (or any portion thereof) and all proceeds payable thereunder shall thereupon vest exclusively in Lender or the purchaser at such foreclosure or other transferee in the event of such other transfer of title.

(i)     As an alternative to the Policies required to be maintained pursuant to the preceding provisions of this Section 7.1, Borrower will not be in default under this Section 7.1 if Borrower maintains (or causes to be maintained) Policies which (i) have coverages, deductibles and/or other related provisions other than those specified above and/or (ii) are provided by insurance companies not meeting the credit ratings requirements set forth above (any such Policy, a "**Non-Conforming Policy**"), provided, that, prior to obtaining such Non-Conforming Policies (or permitting such Non-Conforming Policies to be obtained), Borrower shall have (1) received Lender's prior written consent thereto and (2) confirmed that Lender has received a Rating Agency Confirmation with respect to any such Non-Conforming Policy.  Notwithstanding the foregoing, Lender hereby reserves the right to deny its consent to any Non-Conforming Policy regardless of whether or not Lender has consented to the same on any prior occasion.

(j)     Borrower shall cooperate with Lender in obtaining for Lender the benefits of any Awards or insurance proceeds lawfully or equitably payable in connection with any Individual Property (or any portion thereof), and Lender shall be reimbursed for any expenses incurred in connection therewith (including reasonable, actual attorneys' fees and disbursements, and the payment by Borrower of the expense of an appraisal on behalf of Lender in case of a Casualty or Condemnation affecting any Individual Property or any part thereto) out of such Awards or insurance proceeds.  Any Net Proceeds related to such Awards or insurance proceeds shall be deposited with Lender and held and applied in accordance with the applicable terms and conditions hereof.

(k)     Borrower hereby represents that the physical address(es) for each portion of the Improvements for all purposes (including, without limitation, insurance purposes) are as follows: 200, 220, 231 Salina Meadows Parkway & 301 Plainfield Road, Syracuse, New York.

**Section 7.2     Casualty**.  If any Individual Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall give prompt notice of such damage to Lender and shall promptly commence and diligently prosecute the completion of the Restoration of the applicable Individual Property and otherwise comply with the provisions of Section 7.4.  Borrower shall pay all costs of Restoration (including, without limitation, any applicable deductibles under the Policies) whether or not such costs are covered by the Net Proceeds.  Lender may, but shall not be obligated to, make proof of loss if not made promptly by Borrower.

**Section 7.3     Condemnation**.  Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of any Individual Property (or any portion thereof) of which Borrower has knowledge and shall deliver to Lender copies of any and all papers served in connection with such proceedings.  Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation.  Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings.  Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt.  Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note.  If any Individual Property or any portion thereof is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 7.4.Borrower shall pay all costs of Restoration whether or not such costs are covered by the Net Proceeds.  If any Individual Property (or any portion thereof) is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.  Notwithstanding the foregoing or anything to the contrary contained herein, if, in connection with any Casualty or Condemnation, a prepayment of

76

the Debt (in whole or in part) is required under REMIC Requirements, (a) the applicable Net Proceeds shall be applied to the Debt in accordance with Section 7.4(c) hereof and (b) to the extent that the amount of the applicable Net Proceeds actually applied to the Debt in connection therewith is insufficient under REMIC Requirements, Borrower shall, within five (5) days of demand by Lender, prepay the principal amount of the Debt in accordance with the applicable terms and conditions hereof in an amount equal to such insufficiency plus the amount of any then applicable Interest Shortfall (such prepayment, together with any related Interest Shortfall payment, collectively, the **"REMIC Payment"**).  Lender may, in its reasonable discretion, require Borrower to deliver a REMIC Opinion in connection with each of the foregoing.

**Section 7.4     Restoration**.  The following provisions shall apply in connection with the Restoration of any Individual Property:

(a)     If the Net Proceeds shall be less than the Restoration Threshold and the costs of completing the Restoration shall be less than the Restoration Threshold, the Net Proceeds will be disbursed by Lender to Borrower upon receipt, provided that all of the conditions set forth in Section 7.4(b)(i) are met and Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.

(b)     If the Net Proceeds are equal to or greater than the Restoration Threshold or the costs of completing the Restoration are equal to or greater than the Restoration Threshold, Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Section 7.4.

(i)     The Net Proceeds shall be made available for Restoration provided that each of the following conditions are met:

(A)     no Event of Default shall have occurred and be continuing;

(B)     (1) in the event the Net Proceeds are insurance proceeds, less than thirty-five percent (35%) of each of (i) fair market value of the applicable Individual Property as reasonably determined by Lender, and (ii) rentable area of the applicable Individual Property immediately prior to the applicable Casualty has been damaged, destroyed or rendered unusable as a result of a Casualty or (2) in the event the Net Proceeds are condemnation proceeds, less than fifteen percent (15%) of each of (i) the fair market value of the applicable Individual Property immediately prior to the applicable Condemnation as reasonably determined by Lender and (ii) rentable area of the applicable Individual Property is taken, such land is located along the perimeter or periphery of the applicable Individual Property, no portion of the Improvements consisting of buildings is located on such land and such taking does not materially impair the existing access to the applicable Individual Property;

(C)     Leases demising in the aggregate a percentage amount equal to or greater than 75% of the total rentable space in the applicable Individual Property

which has been demised under executed and delivered Leases in effect as of the date of the occurrence of such fire or other casualty or taking, whichever the case may be, shall remain in full force and effect during and after the completion of the Restoration, notwithstanding the occurrence of any such Casualty or Condemnation, whichever the case may be, and Borrower furnishes to Lender evidence satisfactory to Lender that all Tenants under Major Leases shall continue to operate their respective space at the applicable Individual Property after the completion of the Restoration;

(D)     Borrower shall commence (or shall cause the commencement of) the Restoration as soon as reasonably practicable (but in no event later than sixty (60) days after the issuance of a building permit with respect thereto) and shall diligently pursue the same to satisfactory completion in compliance with all applicable Legal Requirements, including, without limitation, all applicable Environmental Laws, and the applicable requirements of the Property Documents, it being acknowledged and agreed that the Restoration shall be deemed to have "commenced" hereunder on the day that Borrower has prepared (or caused to be prepared) final plans and specifications for such Restoration;

(E)     Lender shall be satisfied that any operating deficits which will be incurred with respect to the applicable Individual Property as a result of the occurrence of any such fire or other casualty or taking will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in Section 7.1(a)(iii) above, or (3) by other funds of Borrower;

(F)     Lender shall be reasonably satisfied that the Net Proceeds together with any cash or cash equivalent deposited by Borrower with Lender are sufficient to cover the cost of the Restoration;

(G)     Lender shall be satisfied that, (I) upon the completion of the Restoration, the fair market value and cash flow of the applicable Individual Property will not be less than the fair market value and cash flow of the applicable Individual Property as the same existed immediately prior to the applicable Casualty or Condemnation and (II) Restoration of the Improvements related to such applicable Individual Property on the Land related to such applicable Individual Property (as existed immediately prior to the applicable casualty or condemnation (with such changes to such Improvements as may be reasonably acceptable to Lender, taking into account subsection (I) above)) is permitted under applicable Legal Requirements and the Property Documents;

(H)     Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (1) six (6) months prior to the Maturity Date, (2) twelve (12) months after the occurrence of such fire or other casualty or taking, (3) the earliest date required for such completion under

the terms of any Leases and the Property Documents, (4) such time as may be required under applicable Legal Requirements or (5) the expiration of the insurance coverage referred to in Section 7.1(a)(iii) above;

(I)     Borrower and Guarantor shall execute and deliver to Lender a completion guaranty in form and substance satisfactory to Lender and its counsel pursuant to the provisions of which Borrower and Guarantor shall jointly and severally guaranty to Lender the lien-free completion by Borrower of the Restoration in accordance with the provisions of this Subsection 7.4(b);

(J)     the applicable Individual Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements and the Property Documents;

(K)     the Restoration shall be done and completed in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements and the Property Documents;

(L)     the Property Documents will remain in full force and effect during and after the Restoration and a Property Document Event shall not occur as a result of the applicable Casualty, Condemnation and/or Restoration; and

(M)     Lender shall be satisfied that making the Net Proceeds available for Restoration shall be permitted pursuant to REMIC Requirements and, in that regard, Lender may require Borrower to deliver a REMIC Opinion in connection therewith.

(ii)     The Net Proceeds shall be held by Lender and, until disbursed in accordance with the provisions of this Section 7.4(b), shall constitute additional security for the Debt and other obligations under this Agreement, the Security Instrument, the Note and the other Loan Documents. The Net Proceeds (other than the Rent Loss Proceeds) shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the related Restoration item have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company issuing the Title Insurance Policy.

(iii)     All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "**Casualty Consultant**"). Lender shall have the use of the plans and specifications and all permits, licenses and

approvals required or obtained in connection with the Restoration. The identity of the contractors, subcontractors and materialmen engaged in the Restoration shall be subject to prior review and acceptance by Lender and the Casualty Consultant (which consent, in the case of Lender, shall not be unreasonably withheld, conditioned or delayed); provided, however, no such consent shall be required for the identity of any such contractor, subcontractors and/or materialmen to the extent the applicable party (x) is a reputable and experienced provider and (y) will not be providing services that cost (in total) more than $50,000. All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower. Borrower shall have the right to settle all claims under the Policies jointly with Lender, provided that (a) no Event of Default exists, (b) Borrower promptly and with commercially reasonable diligence negotiates a settlement of any such claims and (c) the insurer with respect to the Policy under which such claim is brought has not raised any act of the insured as a defense to the payment of such claim. If an Event of Default exists, Lender shall, at its election, have the exclusive right to settle or adjust any claims made under the Policies in the event of a Casualty.

(iv)     In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Restoration Retainage. The term "**Restoration Retainage**" as used in this Subsection 7.4(b) shall mean an amount equal to 10% of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until such time as the Casualty Consultant certifies to Lender that Net Proceeds representing 50% of the required Restoration have been disbursed. There shall be no Restoration Retainage with respect to costs actually incurred by Borrower for work in place in completing the last 50% of the required Restoration. The Restoration Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Subsection 7.4(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Restoration Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Subsection 7.4(b) and that all approvals necessary for the re-occupancy and use of the applicable Individual Property have been obtained from all appropriate governmental and quasi-governmental authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Restoration Retainage, provided, however, that Lender will release the portion of the Restoration Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, and the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company insuring the lien of the Security Instrument. If required by Lender, the release of any such portion of the Restoration Retainage shall be approved by the surety company, if

any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of Lender in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made.  The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 7.4(b) shall constitute additional security for the Debt and other obligations under this Agreement, the Security Instrument, the Note and the other Loan Documents.

(vii)     The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 7.4(b), and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing under this Agreement, the Security Instrument, the Note or any of the other Loan Documents.

(c)     All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Subsection 7.4(b)(vii) shall be retained and applied by Lender toward the payment of the Debt (but without any prepayment premium or penalty) whether or not then due and payable in such order, priority and proportions as Lender in its discretion shall deem proper.  If Lender shall receive and retain Net Proceeds, the lien of the Security Instrument shall be reduced only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt. Notwithstanding anything to the contrary herein, in the event Net Proceeds are in excess of the Restoration Threshold, such Net Proceeds are applied to the Debt in accordance with this Section 7.4 and such Net Proceeds are not sufficient to repay the Debt in its entirety, Borrower shall have the right, to be exercised by Borrower, if at all, by written notice (the "**Borrower Mandatory Prepayment Notice**") delivered within fifteen (15) days after the date on which Lender notifies Borrower in writing that Lender is applying, or intends to apply, such Net Proceeds to the Debt (the "**Lender Net Proceeds Application Notice**"), to prepay the Debt in full and obtain the release of the Property from the lien of the Security Instrument and related Loan Documents, provided, that, (i) Borrower shall have satisfied the requirements of Section 2.7(a) hereof (except with respect to any requirement to pay a Yield Maintenance Premium or Default Yield Maintenance Premium, as applicable, and any prohibitions on prepayment prior to the Release Date), and (ii) Borrower shall make such prepayment of the Debt in full in accordance with

151395847v8

Section 2.7(b). For the avoidance of doubt, the failure of Borrower to prepay the Debt in accordance with this Section shall in no event in and of itself constitute an Event of Default.

## ARTICLE 8

## RESERVE FUNDS

**Section 8.1    Immediate Repair Funds**.

(a)    Borrower shall perform the repairs at the Property as set forth on <u>Schedule I</u> hereto (all such repairs are hereinafter referred to as "**Immediate Repairs**") and shall complete each of the Immediate Repairs on or before the respective deadline for each repair as set forth on Schedule I hereto (as such deadlines may be extended by Lender in its sole discretion). On the Closing Date, Borrower shall deposit into an Eligible Account held by Lender or Servicer (the "**Immediate Repair Account**") an amount equal to $3,875.00, such amount representing 125% of the estimated costs of the Immediate Repairs. Amounts deposited pursuant to this Section 8.1 are referred to herein as the "**Immediate Repair Funds**".

(b)    Lender shall disburse to Borrower (or, at Borrower's request, shall disburse such funds directly to those Persons performing work and services relating thereto pursuant to disbursement instructions provided by Borrower and in form and substance reasonably acceptable to Lender) the Immediate Repair Funds upon satisfaction by Borrower of each of the following conditions: (i) Borrower shall submit a request for payment to Lender at least ten (10) days prior to the date on which Borrower requests such payment be made and specifies the Immediate Repairs to be paid; (ii) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured; (iii) Lender shall have received a certificate from Borrower (A) stating that all Immediate Repairs to be funded by the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, such certificate to be accompanied by a copy of any license, permit or other approval by any Governmental Authority required in connection with the Immediate Repairs, (B) identifying each Person that supplied materials or labor in connection with the Immediate Repairs to be funded by the requested disbursement, and (C) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by lien waivers, invoices and/or other evidence of payment satisfactory to Lender; (iv) at Lender's option, if the cost of the Immediate Repairs exceeds $25,000, Lender shall have received a title search for the applicable Individual Property indicating that the applicable Individual Property is free from all liens, claims and other encumbrances other than Permitted Encumbrances; (v) at Lender's option, if the cost of the Immediate Repairs exceeds $25,000, Lender shall have received a report satisfactory to Lender in its reasonable discretion from an architect or engineer approved by Lender in respect of such architect or engineer's inspection of the required repairs; and (vi) Lender shall have received such other evidence as Lender shall reasonably request that the Immediate Repairs to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower. Lender shall not be required to disburse Immediate Repair Funds more frequently than once each calendar month nor in an amount less than the Minimum Disbursement Amount (or a lesser amount if the total Immediate Repair Funds is less than the

Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the account shall be made).

**Section 8.2    Replacement Reserve Funds**.

(a)    On the Closing Date, Borrower shall deposit into an Eligible Account held by Lender or Servicer (the "**Replacement Reserve Account**") an amount equal to $143,723.00 (the "**Initial CapEx Deposit**") and on each Monthly Payment Date an amount equal to $2,968.70 (the "**Replacement Reserve Monthly Deposit**") for the Replacements. Amounts deposited pursuant to this Section 8.2 are referred to herein as the "**Replacement Reserve Funds**". Lender may, in its reasonable discretion, reassess its estimate of the amount necessary for Replacements from time to time, and may require Borrower to increase the monthly deposits required pursuant to this Section 8.2 upon thirty (30) days' notice to Borrower if Lender determines in its reasonable discretion that an increase is necessary to maintain proper operation of the Property.

(b)    Lender shall disburse Replacement Reserve Funds only for Replacements. Lender shall disburse to Borrower (or, at Borrower's request, shall disburse such funds directly to those Persons performing work and services relating thereto pursuant to disbursement instructions provided by Borrower and in form and substance reasonably acceptable to Lender) the Replacement Reserve Funds upon satisfaction by Borrower of each of the following conditions: (i) Borrower shall submit a request for payment to Lender at least ten (10) days prior to the date on which Borrower requests such payment be made and specifies the Replacements to be paid; (ii) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured, (iii) Lender shall have received a certificate from Borrower (A) stating that the items to be funded by the requested disbursement are Replacements, (B) stating that all Replacements at the applicable Individual Property to be funded by the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, such certificate to be accompanied by a copy of any license, permit or other approval required by any Governmental Authority in connection with the Replacements, (C) identifying each Person that supplied materials or labor in connection with the Replacements to be funded by the requested disbursement and (D) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by lien waivers, invoices and/or other evidence of payment satisfactory to Lender; (iv) at Lender's option, if the cost of any individual Replacement exceeds $100,000, Lender shall have received a title search for the applicable Individual Property indicating that the applicable Individual Property is free from all liens, claims and other encumbrances other than Permitted Encumbrances; (v) at Lender's option, if the cost of any individual Replacement exceeds $100,000, Lender shall have received a report satisfactory to Lender in its reasonable discretion from an architect or engineer approved by Lender in respect of such architect or engineer's inspection of the required repairs; and (vi) Lender shall have received such other evidence as Lender shall reasonably request that the Replacements at the Property to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower. Lender shall not be required to disburse Replacement Reserve Funds more frequently than once each calendar month nor in an amount less than the Minimum Disbursement Amount (or a lesser amount if the total amount of Replacement Reserve Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the account shall be made). Notwithstanding

the foregoing, the Initial CapEx Reserve Deposit shall only be disbursed to Borrower in in accordance with this Section 8.2(b) but only in connection with the Up-Front CapEx Work.

(c) Nothing in this Section 8.2 shall (i) make Lender responsible for making or completing the Replacements; (ii) require Lender to expend funds in addition to the Replacement Reserve Funds to complete any Replacements; (iii) obligate Lender to proceed with the Replacements; or (iv) obligate Lender to demand from Borrower additional sums to complete any Replacements.

(d) Borrower shall permit Lender and Lender's agents and representatives (including, without limitation, Lender's engineer, architect, or inspector) or third parties to enter onto the Property during normal business hours (subject to the rights of Tenants under their Leases) to inspect the progress of any Replacements and all materials being used in connection therewith and to examine all plans and shop drawings relating to such Replacements. Borrower shall cause all contractors and subcontractors to cooperate with Lender or Lender's representatives or such other Persons described above in connection with inspections described in this Section.

### Section 8.3    Leasing Reserve Funds.

(a) On the closing date, Borrower shall deposit with Lender the sum of $1,500,000 into an Eligible Account held by Lender or Servicer (the "**Leasing Reserve Account**") and, on each on each Monthly Payment Date the sum of $19,791.33 (the "**Leasing Reserve Monthly Deposit**") for tenant improvements and leasing commissions that may be incurred following the date hereof, provided, however, that notwithstanding the foregoing, Borrower shall have no obligation to make the Leasing Reserve Monthly Deposit on any Monthly Payment Date to the extent the amount of Leasing Reserve Funds on deposit in the Leasing Reserve Account on such Monthly Payment Date would, as a result thereof, equal or exceed the Leasing Reserve Cap. Amounts deposited pursuant to this Section 8.3 are referred to herein as the "**Leasing Reserve Funds**".

(b) Lender shall disburse to Borrower (or, at Borrower's request, shall disburse such funds directly to those Persons performing work and services relating thereto pursuant to disbursement instructions provided by Borrower and in form and substance reasonably acceptable to Lender) the Leasing Reserve Funds upon satisfaction by Borrower of each of the following conditions: (i) Borrower shall submit a request for payment to Lender at least ten (10) days prior to the date on which Borrower requests such payment be made and specifies the tenant improvement costs and leasing commissions to be paid; (ii) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured; (iii) Lender shall have reviewed and approved the Lease (solely to the extent Lender's approval is required pursuant to Section 4.14 hereof) and related leasing commissions in respect of which Borrower is obligated to pay or reimburse certain tenant improvement costs and leasing commissions; (iv) Lender shall have received and approved a budget for tenant improvement costs (it being acknowledged that no such budget approval shall be required for Leases that have either been approved by Lender in accordance with Section 4.14 hereof or do not require Lender's approval pursuant to Section 4.14 hereof provided that, in either case, the tenant improvement costs payable in connection with said Leases are at standard market rates taking into account the size, location and character of the Property and the terms of the

84

applicable Lease) and a schedule of leasing commissions payments and the requested disbursement will be used to pay all or a portion of such costs and payments; (v) Lender shall have received a certificate from Borrower (A) stating that all tenant improvements at the applicable Individual Property to be funded by the requested disbursement have been completed in good and workmanlike manner and in accordance with all applicable federal, state and local laws, rules and regulations, such certificate to be accompanied by a copy of any license, permit or other approval by any Governmental Authority required in connection with the tenant improvements, (B) identifying each Person that supplied materials or labor in connection with the tenant improvements to be funded by the requested disbursement and (C) stating that each such Person has been paid in full or will be paid in full upon such disbursement, such certificate to be accompanied by lien waivers, invoices and/or other evidence of payment satisfactory to Lender; (vi) at Lender's option, if the cost of any individual tenant improvement exceeds $100,000, Lender shall have received a title search for the applicable Individual Property indicating that the applicable Individual Property is free from all liens, claims and other encumbrances not previously approved by Lender; and (vii) Lender shall have received such other evidence as Lender shall reasonably request that the tenant improvements at the applicable Individual Property and/or leasing commissions to be funded by the requested disbursement have been completed (to the extent applicable), are due and payable and are paid for or will be paid upon such disbursement to Borrower. Lender shall not be required to disburse Leasing Reserve Funds more frequently than once each calendar month nor in an amount less than the Minimum Disbursement Amount (or a lesser amount if the total amount of Leasing Reserve Funds is less than the Minimum Disbursement Amount, in which case only one disbursement of the amount remaining in the account shall be made).

**Section 8.4     Operating Expense Funds.**  On each Monthly Payment Date occurring on and after the occurrence and continuance of a Trigger Period, Borrower shall deposit (or shall cause there to be deposited) into an Eligible Account held by Lender or Servicer (the "**Operating Expense Account**") an amount equal to the aggregate amount of Approved Operating Expenses and Approved Extraordinary Expenses to be incurred by Borrower for the then current Interest Accrual Period (such amount, the "**Op Ex Monthly Deposit**").  Amounts deposited pursuant to this Section 8.4 are referred to herein as the "**Operating Expense Funds**". Provided no Event of Default has occurred and is continuing, Lender shall disburse the Operating Expense Funds to Borrower to pay Approved Operating Expenses and/or Approved Extraordinary Expenses upon Borrower's request (which such request shall be accompanied by an Officer's Certificate detailing the applicable expenses to which the requested disbursement relates and attesting that such expense shall be paid with the requested disbursement). Provided no Event of Default has occurred and is continuing, any Operating Expense Funds remaining in the Operating Expense Account shall be disbursed to Borrower upon the expiration of any Trigger Period. Upon either indefeasible payment of the Debt in full or consummation of a Defeasance of the Debt in full, in each case, in accordance with the terms hereof, to the extent any Operating Expense Funds are remaining in the Operating Expense Account (and to the extent such funds were not credited against the applicable payoff or Defeasance), said funds shall be promptly disbursed to Borrower.

**Section 8.5     Excess Cash Flow Funds**.  On each Monthly Payment Date occurring on and after the occurrence and continuance of a Trigger Period, Borrower shall deposit (or cause to be deposited) into an Eligible Account with Lender or Servicer (the "**Excess Cash Flow**

151395847v8

Account") an amount equal to the Excess Cash Flow generated by the Property for the immediately preceding Interest Accrual Period (each such monthly deposit being herein referred to as the "**Monthly Excess Cash Flow Deposits**" and the amounts on deposit in the Excess Cash Flow Account being herein referred to as the "**Excess Cash Flow Funds**"). Provided no Event of Default has occurred and is continuing, any Excess Cash Flow Funds remaining in the Excess Cash Flow Account shall be disbursed to Borrower upon the expiration of all Trigger Periods in accordance with the applicable terms and conditions hereof. Upon either indefeasible payment of the Debt in full or consummation of a Defeasance of the Debt in full, in each case, in accordance with the terms hereof, to the extent any Excess Cash Flow Funds are remaining in the Excess Cash Flow Account (and to the extent such funds were not credited against the applicable payoff or Defeasance), said funds shall be promptly disbursed to Borrower.

**Section 8.6    Tax and Insurance Funds**.  In addition to the initial deposits with respect to Taxes and, if applicable, Insurance Premiums made by Borrower to Lender on the Closing Date to be held in Eligible Accounts by Lender or Servicer and hereinafter respectively referred to as the "**Tax Account**" and the "**Insurance Account**", Borrower shall pay (or cause to be paid) to Lender on each Monthly Payment Date (a) one-twelfth of an amount which would be sufficient to pay the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months assuming that said Taxes are to be paid in full on the Tax Payment Date (the "**Monthly Tax Deposit**"), each of which such deposits shall be held in the Tax Account, and (b) at the option of Lender, if the liability or casualty Policy maintained by Borrower covering the Property (or any portion thereof) shall not constitute an approved blanket or umbrella Policy pursuant to Subsection 7.1(c) hereof, or Lender shall require Borrower to obtain a separate Policy pursuant to Subsection 7.1(c) hereof, one-twelfth of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies on the Insurance Payment Date (the "**Monthly Insurance Deposit**"), each of which such deposits shall be held in the Insurance Account (amounts held in the Tax Account and the Insurance Account are collectively herein referred to as the "**Tax and Insurance Funds**").  In the event Lender shall elect, after the Closing Date, to collect payments in escrow for Insurance Premiums, Borrower shall make a True Up Payment with respect to the same into the applicable Reserve Account.  Additionally, if, at any time, Lender determines that amounts on deposit in or scheduled to be deposited in (i) the Tax Account will be insufficient to pay all applicable Taxes in full on the Tax Payment Date and/or (ii) the Insurance Account will be insufficient to pay all applicable Insurance Premiums in full on the Insurance Payment Date, Borrower shall make a True Up Payment with respect to such insufficiency into the applicable Reserve Account.  Borrower agrees to notify Lender promptly of any changes to the amounts, schedules and instructions for payment of any Taxes and Insurance Premiums of which it has or obtains knowledge and authorizes Lender or its agent to obtain the bills for Taxes directly from the appropriate taxing authority.  Provided there are sufficient amounts in the Tax Account and Insurance Account, respectively, and no Event of Default exists, Lender shall be obligated to pay the Taxes and Insurance Premiums as they become due on their respective due dates on behalf of Borrower by applying the Tax and Insurance Funds to the payment of such Taxes and Insurance Premiums.  If the amount of the Tax and Insurance Funds shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Sections 4.5 and 7.1 hereof, Lender shall, in its discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax and Insurance Funds.

**Section 8.7      The Accounts Generally**.

(a)      Borrower grants to Lender a first-priority perfected security interest in each of the Accounts and any and all sums now or hereafter deposited in the Accounts as additional security for payment of the Debt.  Until expended or applied in accordance herewith, the Accounts and the funds deposited therein shall constitute additional security for the Debt.  The provisions of this Section 8.7 (together with the other related provisions of the other Loan Documents) are intended to give Lender and/or Servicer "control" of the Accounts and the Account Collateral and serve as a "security agreement" and a "control agreement" with respect to the same, in each case, within the meaning of the UCC.  Borrower acknowledges and agrees that the Accounts are subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, subject to the terms hereof, and Borrower shall have no right of withdrawal with respect to any Account except with the prior written consent of Lender or as otherwise provided herein.  The funds on deposit in the Accounts shall not constitute trust funds and may be commingled with other monies held by Lender.  Notwithstanding anything to the contrary contained herein, unless otherwise consented to in writing by Lender, Borrower shall only be permitted to request (and Lender shall only be required to disburse) Reserve Funds on account of the liabilities, costs, work and other matters (as applicable) for which said sums were originally reserved hereunder, in each case, as reasonably determined by Lender.

(b)      Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in the Accounts or the sums deposited therein or permit any lien to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.  Borrower hereby authorizes Lender to file a financing statement or statements under the UCC in connection with any of the Accounts and the Account Collateral in the form required to properly perfect Lender's security interest therein.  Borrower agrees that at any time and from time to time, at the expense of Borrower, Borrower will promptly execute and deliver all further instruments and documents, and take all further action, that may be reasonably necessary or desirable, or that Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby (including, without limitation, any security interest in and to any Permitted Investments) or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Account or Account Collateral.

(c)      Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon the occurrence and during the continuance of an Event of Default, without notice from Lender or Servicer (i) Borrower shall have no rights in respect of the Accounts, (ii) Lender may liquidate and transfer any amounts then invested in Permitted Investments pursuant to the applicable terms hereof to the Accounts or reinvest such amounts in other Permitted Investments as Lender may reasonably determine is necessary to perfect or protect any security interest granted or purported to be granted hereby or pursuant to the other Loan Documents or to enable Lender to exercise and enforce Lender's rights and remedies hereunder or under any other Loan Document with respect to any Account or any Account Collateral, and (iii) Lender shall have all rights and remedies with respect to the Accounts and the amounts on deposit therein and the Account Collateral as described in this Agreement and in the Security Instrument, in addition to all of the rights and remedies available to a secured party under the UCC, and, notwithstanding anything to the contrary contained in this Agreement or in the

Security Instrument, may apply the amounts of such Accounts as Lender determines in its sole discretion including, but not limited to, payment of the Debt.

(d)     The insufficiency of funds on deposit in the Accounts shall not absolve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

(e)     Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys fees and expenses) arising from or in any way connected with the Accounts, the sums deposited therein or the performance of the obligations for which the Accounts were established, except to the extent arising from the gross negligence or willful misconduct of Lender, its agents or employees.  Borrower shall assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Accounts; provided, however, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

(f)     Borrower and Lender (or Servicer on behalf of Lender) shall maintain each applicable Account as an Eligible Account, except as otherwise expressly agreed to in writing by Lender.  In the event that Lender or Servicer no longer satisfies the criteria for an Eligible Institution, Borrower shall cooperate with Lender in transferring the applicable Accounts to an institution that satisfies such criteria.  Borrower hereby grants Lender power of attorney (irrevocable for so long as the Loan is outstanding or has not been defeased in full in accordance with the applicable terms and conditions hereof) with respect to any such transfers and the establishment of accounts with a successor institution, provided, however, that Lender shall only exercise such power of attorney during the continuance of an Event of Default.

(g)     Interest accrued on any Account other than an Interest Bearing Account shall not be required to be remitted either to Borrower or to any Account and may instead be retained by Lender.

(h)     Borrower acknowledges and agrees that it solely shall be, and shall at all times remain, liable to Lender or Servicer for all fees, charges, costs and expenses in connection with the Accounts, this Agreement and the enforcement hereof, including, without limitation, any monthly or annual fees or charges as may be assessed by Lender or Servicer in connection with the administration of the Accounts and the reasonable fees and expenses of legal counsel to Lender and Servicer as needed to enforce, protect or preserve the rights and remedies of Lender and/or Servicer under this Agreement.

**Section 8.8     Alion Reserve Funds**

(a)     On the Closing Date, Borrower shall deposit into an Eligible Account held by Lender or Servicer (the "**Alion Reserve Account**") the sum of $250,000.00, representing an amount reserved for the leasing and/or renewal of the space currently demised to Alion.

Amounts deposited pursuant to this Section 8.8 are referred to herein as the "Alion Reserve Funds".

(b)     Upon the occurrence of a Alion Reserve Release Event, Lender shall disburse all Alion Reserve Funds then on deposit in the Alion Reserve Account either (i) so long as no Trigger Period then exists, to Borrower or (ii) if a Trigger Period then exists, into the Cash Management Account to be applied in accordance with Section 9.3 hereof. In the event that Alion elects to exercise its termination option pursuant to Section 22.30 of the Alion Lease, provided no Event of Default is then continuing, funds on deposit in the Alion Reserve Account may be used by Borrower to re-lease the Alion Space in which case such funds shall be disbursed by Lender in accordance with Section 8.3(b) hereof.

(c)     Nothing contained in this Section 8.8 including, without limitation, the existence of the Alion Reserve Account, shall in any way abrogate any of Borrower's obligations under the Loan Documents to make all payments as and when due thereunder.

**Section 8.9     Free Rent Reserve Funds**.

(a)     Borrower shall deposit into an Eligible Account with Lender or Servicer (the "**Free Rent Reserve Account**") on the date hereof an amount equal to $300,465.22 for free rent owed to certain Tenants in the amounts set forth on Schedule IV(a) attached hereto.  Amounts deposited pursuant to this Section 8.9 are referred to herein as the "**Free Rent Reserve Funds**".

(b)     On the Monthly Payment Date occurring in each month and year for the applicable Tenant shown on the "**Free Rent Reserve Disbursement Schedule**" attached hereto as Schedule IV(b), Lender shall disburse the applicable amount shown on such schedule from the Free Rent Reserve Account either (i) so long as no Trigger Period then exists, to Borrower or (ii) if a Trigger Period then exists, into the Cash Management Account to be applied in accordance with Section 9.3 hereof.

# ARTICLE 9

# CASH MANAGEMENT

**Section 9.1     Establishment of Certain Accounts**.

(a)     Borrower shall, simultaneously herewith, establish an Eligible Account (the "**Restricted Account**") pursuant to the Restricted Account Agreement in the name of Borrower for the sole and exclusive benefit of Lender into which Borrower shall cause tenants to deposit all revenue generated by the Property.  Pursuant to the Restricted Account Agreement, funds on deposit in the Restricted Account shall be transferred on each Business Day to or at the direction of Borrower unless a Trigger Period exists, in which case such funds shall be transferred on each Business Day to the Cash Management Account.

(b)     Upon the first occurrence of a Trigger Period, Lender, on Borrower's behalf, shall establish an Eligible Account (the **"Cash Management Account"**) with Lender or

Servicer, as applicable, in the name of Borrower for the sole and exclusive benefit of Lender. Upon the first occurrence of a Trigger Period, Lender, on Borrower's behalf, shall also establish with Lender or Servicer an Eligible Account into which Borrower shall deposit, or cause to be deposited the amounts required for the payment of Debt Service under the Loan (the "**Debt Service Account**").

     **Section 9.2     Deposits into the Restricted Account; Maintenance of Restricted Account**.

     (a)     Borrower represents, warrants and covenants that, so long as the Debt remains outstanding, (i) Borrower shall, or shall cause Manager to, deposit all revenue derived from the Property and received by Borrower or Manager, as the case may be, into the Restricted Account within two (2) Business Days of Borrower's or Manager's, as applicable, receipt thereof; (ii) Borrower shall instruct Manager to deposit within two (2) Business Days of Manager's receipt thereof (A) all revenue derived from the Property collected by Manager, if any, pursuant to the Management Agreement (or otherwise) into the Restricted Account and (B) all funds otherwise payable to Borrower by Manager pursuant to the Management Agreement (or otherwise in connection with the Property) into the Restricted Account; (iii) (A) within five (5) days after the Closing Date, Borrower shall have sent a notice, substantially in the form of Exhibit A attached hereto, to all Tenants occupying space at the Property directing them to pay all rent and other sums due under the Lease to which they are a party into the Restricted Account (**such notice, the "Tenant Direction Notice**"), and (B) simultaneously with the execution of any Lease entered into on or after the date hereof, in accordance with the applicable terms and conditions hereof, Borrower shall furnish each Tenant under each such Lease the Tenant Direction Notice; (iv) there shall be no other accounts maintained by Borrower or any other Person into which revenues from the ownership and operation of the Property are directly deposited; and (v) neither Borrower nor any other Person shall open any other such account with respect to the direct deposit of income in connection with the Property.  Until deposited into the Restricted Account, any Rents and other revenues from the Property held by Borrower shall be deemed to be collateral and shall be held in trust by it for the benefit, and as the property, of Lender pursuant to the Security Instrument and shall not be commingled with any other funds or property of Borrower.  Borrower warrants and covenants that it shall not rescind, withdraw or change any notices or instructions required to be sent by it pursuant to this Section 9.2 without Lender's prior written consent.

     (b)     Borrower shall maintain the Restricted Account for so long as the Debt remains outstanding, which Restricted Account shall be under the sole dominion and control of Lender (subject to the terms hereof and of the Restricted Account Agreement).  The Restricted Account shall have a title evidencing the foregoing in a manner reasonably acceptable to Lender. Borrower hereby grants to Lender a first-priority security interest in the Restricted Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Restricted Account.  Borrower hereby authorizes Lender to file UCC Financing Statements and continuations thereof to perfect Lender's security interest in the Restricted Account and all deposits at any time contained therein and the proceeds thereof.  All costs and expenses for establishing and maintaining the Restricted Account (or any successor thereto) shall be paid by Borrower.  All monies now or hereafter deposited into the Restricted Account shall be deemed

additional security for the Debt. Borrower shall pay all sums due under and otherwise comply with the Restricted Account Agreement. Borrower shall not alter or modify either the Restricted Account or the Restricted Account Agreement, in each case without the prior written consent of Lender. The Restricted Account Agreement shall provide (and Borrower shall provide) Lender online access to bank and other financial statements relating to the Restricted Account (including, without limitation, a listing of the receipts being collected therein). In connection with any Secondary Market Transaction, Lender shall have the right to cause the Restricted Account to be entitled with such other designation as Lender may select to reflect an assignment or transfer of Lender's rights and/or interests with respect to the Restricted Account. Lender shall provide Borrower with prompt written notice of any such renaming of the Restricted Account. Borrower shall not further pledge, assign or grant any security interest in the Restricted Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto. The Restricted Account (i) shall be an Eligible Account and (ii) shall not be commingled with other monies held by Borrower or Bank. Upon (A) Bank ceasing to be an Eligible Institution, (B) the Restricted Account ceasing to be an Eligible Account, (C) any resignation by Bank or termination of the Restricted Account Agreement by Bank or Lender and/or (D) the occurrence and continuance of an Event of Default, Borrower shall, within fifteen (15) days of Lender's request, (1) terminate the existing Restricted Account Agreement, (2) appoint a new Bank (which such Bank shall (I) be an Eligible Institution, (II) other than during the continuance of an Event of Default, be selected by Borrower and approved by Lender and (III) during the continuance of an Event of Default, be selected by Lender), (3) cause such Bank to open a new Restricted Account (which such account shall be an Eligible Account) and enter into a new Restricted Account Agreement with Lender on substantially the same terms and conditions as the previous Restricted Account Agreement and (4) send new Tenant Direction Notices and the other notices required pursuant to the terms hereof relating to such new Restricted Account Agreement and Restricted Account. Borrower constitutes and appoints Lender its true and lawful attorney-in-fact with full power of substitution to complete or undertake any action required of Borrower under this Section 9.2 in the name of Borrower in the event Borrower fails to do the same. Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked, provided, however, Lender shall not exercise any rights under such power except upon and during the occurrence of an Event of Default.

**Section 9.3   Disbursements from the Cash Management Account.**   On each Monthly Payment Date, Lender or Servicer, as applicable, shall allocate all funds, if any, on deposit in the Cash Management Account and disburse such funds in the following amounts and order of priority:

(a)     First, funds sufficient to pay the Monthly Tax Deposit due for the then applicable Monthly Payment Date, if any, shall be deposited in the Tax Account;

(b)     Second, funds sufficient to pay the Monthly Insurance Deposit due for the then applicable Monthly Payment Date, if any, shall be deposited in the Insurance Account;

(c)     Third, funds sufficient to pay any interest accruing at the Default Rate and late payment charges, if any, shall be deposited into the Debt Service Account;

(d)     Fourth, funds sufficient to pay the Debt Service due on the then applicable Monthly Payment Date (without duplication of any portion thereof already deposited therein under subsection (c) above) shall be deposited in the Debt Service Account;

(e)     Fifth, funds sufficient to pay the Replacement Reserve Monthly Deposit for the then applicable Monthly Payment Date, if any, shall be deposited in the Replacement Reserve Account;

(f)     Sixth, funds sufficient to pay the Leasing Reserve Monthly Deposit for the then applicable Monthly Payment Date, if any, shall be deposited in the Leasing Reserve Account;

(g)     Seventh, funds sufficient to pay any other amounts due and owing to Lender and/or Servicer pursuant to the terms hereof and/or of the other Loan Documents, if any, shall be deposited with or as directed by Lender;

(h)     Eighth, to the extent that a Trigger Period has occurred and is continuing, funds sufficient to pay the Op Ex Monthly Deposit for the then applicable Monthly Payment Date, if any, shall be deposited in the Operating Expense Account; and

(i)     Ninth, all amounts remaining in the Cash Management Account after deposits for items (a) through (i) above ("**Excess Cash Flow**") shall (i) to the extent that a Trigger Period has occurred and is continuing, be deposited into the Excess Cash Flow Account and (ii) to the extent that no Trigger Period exists, be disbursed to Borrower.

**Section 9.4     Withdrawals from the Debt Service Account.**  Prior to the occurrence and continuance of an Event of Default, funds on deposit in the Debt Service Account, if any, shall be used to pay Debt Service when due, together with any late payment charges.

**Section 9.5     Payments Received Under this Agreement**.  Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, provided no Event of Default has occurred and is continuing, Borrower's obligations with respect to the monthly payment of Debt Service and amounts due for the Reserve Accounts shall (provided Lender is not prohibited from withdrawing or applying any funds in the applicable Accounts by operation of law or otherwise) be deemed satisfied to the extent sufficient amounts are deposited in applicable Accounts to satisfy such obligations on the dates each such payment is required, regardless of whether any of such amounts are so applied by Lender.

# ARTICLE 10

# EVENTS OF DEFAULT; REMEDIES

**Section 10.1   Event of Default**.

The occurrence of any one or more of the following events shall constitute an "**Event of Default**":

(a)     if (A) any monthly Debt Service payment or the payment due on the Maturity Date is not paid when due, (B) any deposit to any of the Accounts required hereunder or under

the other Loan Documents is not paid when due and such non-payment continues for five (5) days following notice to Borrower (it being acknowledged that no notice shall be required from Lender if such deposit was included in the monthly invoice provided to Borrower) or (C) any other portion of the Debt is not paid when due and such non-payment continues for five (5) days following notice to Borrower that the same is due and payable;

(b)     subject to Section 4.5 hereof, if any of the Taxes or Other Charges are not paid when the same are due and payable except to the extent (A) sums sufficient to pay the Taxes or Other Charges in question had been reserved hereunder (including as described in Section 9.5 hereof) prior to the applicable due date for the Taxes or Other Charges in question for the express purpose of paying the Taxes or Other Charges in question and Lender failed to pay the Taxes or Other Charges in question when required hereunder, (B) Lender's access to such sums was not restricted or constrained in any manner and (C) no Event of Default was continuing;

(c)     if the Policies are not kept in full force and effect or if evidence of the same is not delivered to Lender as provided in Section 7.1 hereof;

(d)     if any of the representations or covenants contained in Article 5, Article 6, Section 3.34 or Section 4.22 hereof or in the Property Document Provisions are breached or violated;

(e)     if any representation or warranty made herein, in the Guaranty or in the Environmental Indemnity or in any other guaranty, or in any certificate, report, financial statement or other instrument or document furnished to Lender in connection with the Loan shall have been false or misleading in any material adverse respect when made;

(f)     if (i) Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor shall commence any case, proceeding or other action (A) under any Creditors Rights Laws seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, liquidation or dissolution, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Borrower or any managing member or general partner of Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor shall make a general assignment for the benefit of its creditors; (ii) there shall be commenced against Borrower or any managing member or general partner of Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor any case, proceeding or other action of a nature referred to in clause (i) above (other than any case, action or proceeding already constituting an Event of Default by operation of the other provisions of this subsection) which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of ninety (90) days; (iii) there shall be commenced against Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets (other than any case, action or proceeding already constituting an Event of Default by operation of the other provisions of this subsection) which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within ninety (90) days from the entry thereof; (iv) Borrower, any SPE Component Entity, any Affiliated Manager,

93

Sponsor or Guarantor shall take any action in furtherance of, in collusion with respect to, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; (v) Borrower, any SPE Component Entity, any Affiliated Manager, Sponsor or Guarantor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; (vi) any Restricted Party is substantively consolidated with any other entity in connection with any proceeding under the Bankruptcy Code or any other Creditors Rights Laws involving Sponsor or its subsidiaries; or (vii) a Bankruptcy Event occurs;

(g)     if Borrower shall be in default beyond applicable notice and grace periods under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to the Security Instrument;

(h)     subject to Borrower's right to contest the same in accordance with the applicable terms and conditions hereof, if the Property (or any portion thereof) becomes subject to any mechanic's, materialman's or other lien other than a lien for any Taxes not then due and payable and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days (which such thirty (30) day period shall be deemed extended hereunder for a period not to exceed an additional thirty (30) days so long as no foreclosure proceeding or similar action has been instituted with respect to such lien and neither the Property nor any part thereof or interest therein will be in imminent danger of being sold, forfeited, terminated, cancelled or lost);

(i)     subject to Borrower's right to contest the same in accordance with the applicable terms of this Agreement, if any federal tax lien is filed against Borrower, any SPE Component Entity, Sponsor, Guarantor or the Property (or any portion thereof) and same is not discharged of record (by payment, bonding or otherwise) within thirty (30) days after same is filed (which such thirty (30) day period shall be deemed extended hereunder for a period not to exceed an additional thirty (30) days so long as no foreclosure proceeding or similar action has been instituted with respect to such lien and neither the Property nor any part thereof or interest therein will be in imminent danger of being sold, forfeited, terminated, cancelled or lost);

(j)     if Borrower shall fail to deliver to Lender, within ten (10) days after request by Lender, the estoppel certificates required by Section 4.13(a) or (d) hereof;

(k)     if any default occurs under any guaranty or indemnity executed in connection herewith (including, without limitation, the Environmental Indemnity and/or the Guaranty) and such default continues after the expiration of applicable notice, grace and/or cure periods, if any;

(l)     if any of the assumptions contained in the Non-Consolidation Opinion, or in any New Non-Consolidation Opinion (including, without limitation, in any schedules thereto and/or certificates delivered in connection therewith) are untrue or shall become untrue in any material respect;

(m)     if Borrower defaults under the Management Agreement beyond the expiration of applicable notice and grace periods, if any, thereunder and such default would give the Manager thereunder the rights to terminate the same (whether by contract, operation of law, or otherwise) or if the Management Agreement is canceled, terminated or surrendered, expires pursuant to its

terms or otherwise ceased to be in full force and effect, unless, in each such case, Borrower, contemporaneously with such cancellation, termination, surrender, expiration or cessation, enters into a Qualified Management Agreement with a Qualified Manager in accordance with the applicable terms and provisions hereof;

(n)     if Borrower fails to appoint a New Manager upon the request of Lender and/or fails to comply with any limitations on instructing the Manager, each as required by and in accordance with, as applicable, the terms and provisions of, this Agreement, the Assignment of Management Agreement and the Security Instrument and only to the extent such failure continues after the expiration of any applicable notice, grace and/or cure periods (to the extent there are any express notice, grace and/or cure periods pursuant to the terms hereof and/or the other Loan Documents);

(o)     if any representation and/or covenant herein relating to ERISA and/or FIRRMA matters is breached;

(p)     if (A) Borrower shall fail (beyond any applicable notice or grace period) to pay any rent, additional rent or other charges payable under any Property Document as and when payable thereunder (provided Borrower is notified in writing of such default and fails to cure such default within the cure period set forth in such document, if any), (B) Borrower otherwise defaults under the Property Documents (provided Borrower is notified in writing of such default and fails to cure such default within the cure period set forth in such document, if any), (C) any of the Property Documents are amended, supplemented, replaced, restated or otherwise modified without Lender's prior written consent or if Borrower consents to a transfer of any party's interest thereunder without Lender's prior written consent, not to be unreasonably withheld, conditioned or delayed (D) any Property Document and/or the estate created thereunder is canceled, rejected, terminated or surrendered (excluding any Property Document that expires pursuant to its terms, unless in such case Borrower enters into a replacement thereof as reasonably required by Lender in accordance with the applicable terms and provisions hereof, or (E) a Property Document Event occurs (unless, in any such case, such action or event is expressly permitted pursuant to the terms hereof);

(q)     With respect to any default or breach of any term, covenant or condition of this Agreement not specified in subsections (a) through (p) above or not otherwise specifically specified as an Event of Default in this Agreement, if the same is not cured (i) within ten (10) days after notice from Lender (in the case of any default which can be cured by the payment of a sum of money) or (ii) for thirty (30) days after notice from Lender (in the case of any other default or breach); provided, that, with respect to any default or breach specified in subsection (ii), if the same cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure the same within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure the same, it being agreed that no such extension shall be for a period in excess of ninety (90) days. Any notice from Lender to Borrower pursuant to this subsection shall state the specific event that Lender claims is a default; or

(r)     if any default exists under any of the other Loan Documents beyond any applicable cure periods contained in such Loan Documents or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt.

**Section 10.2    Remedies**.

(a)     Upon the occurrence and during the continuance of an Event of Default (other than an Event of Default described in Section 10.1(f) above with respect to Borrower or any SPE Component Entity) and at any time thereafter Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement, the Security Instrument, the Note and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in this Agreement, the Security Instrument, the Note and the other Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity.  Upon any Event of Default described in Section 10.1(f) above with respect to Borrower or any SPE Component Entity, the Debt and all other obligations of Borrower under this Agreement, the Security Instrument, the Note and the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in the Security Instrument, the Note and the other Loan Documents to the contrary notwithstanding.

(b)     Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement, the Security Instrument, the Note or the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under this Agreement, the Security Instrument, the Note or the other Loan Documents with respect to the Property.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by applicable law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by applicable law, equity or contract or as set forth herein or in the Security Instrument, the Note or the other Loan Documents.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

(c)     With respect to Borrower and the Properties, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to any Individual Property

for the satisfaction of any of the Debt in preference or priority to any other Individual Property, and Lender may seek satisfaction out of all of the Properties or any part thereof, in its absolute discretion in respect of the Debt.  In addition, Lender shall have the right from time to time to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances:  (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose on the Security Instrument to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Security Instrument to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect.  Notwithstanding one or more partial foreclosures, the Properties shall remain subject to the Security Instrument to secure payment of sums secured by the Security Instrument and not previously recovered.

(d)    Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, security instruments and other security documents (the "**Severed Loan Documents**") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until three (3) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power or during the continuance of an Event of Default.  Borrower shall not be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents and the Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date and the Severed Loan Documents, severance agreement and other documents shall not modify or amend any Loan Document in connection with the foregoing if such modification or amendment would (i) change the interest rate, the stated maturity or the amortization of principal set forth therein (except in connection with a severance which may result in varying fixed interest rates and amortization schedules, but which shall have the same weighted average coupon of the original promissory note, except that Borrower acknowledges that the weighted average coupon may change pursuant to application among components of payments and recoveries after an Event of Default or application of insurance proceeds or condemnation awards following a Casualty or Condemnation), (ii) adversely change any other obligation, right or privilege of Borrower contained in the Loan Documents (other than to a de minimis extent), or (iii) except as described above, increase Borrower's obligations and liabilities or decrease Borrower's rights under the Loan Documents other than to a de minimis extent.

(e)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, any amounts recovered from the Property (or any portion thereof) or any other collateral for the Loan and/or paid to or received by Lender may, after an Event of Default, be applied by Lender toward the Debt in such order, priority and proportions as Lender in its sole discretion shall determine.

(f)     Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder or being deemed to have cured any Event of Default hereunder, make, do or perform any obligation of Borrower hereunder in such manner and to such extent as Lender may deem necessary (if Borrower has failed to so do or perform such obligation and such failure shall continue for a period of five (5) Business Days after Borrower's receipt of written notice thereof from Lender (other than with respect to covenants or obligations with respect to Policies or otherwise where there is imminent danger of the occurrence of a Material Adverse Effect and Lender believes it must act to protect the Property or its security interest therein, in which event no such notice shall be required). Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property for such purposes, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by applicable law), with interest as provided in this Section, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand.   All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate, for the period after such cost or expense was incurred until the date of payment to Lender.   All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by the liens, claims and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefore.

## ARTICLE 11

### SECONDARY MARKET

**Section 11.1   Securitization**.

(a)     Lender shall have the right (i) to sell or otherwise transfer the Loan (or any portion thereof and/or interest therein), (ii) to sell participation interests in the Loan (or any portion thereof and/or interest therein) or (iii) to securitize the Loan (or any portion thereof and/or interest therein) in a single asset securitization or a pooled asset securitization.   The transactions referred to in clauses (i), (ii) and (iii) above shall hereinafter be referred to collectively as "**Secondary Market Transactions**" and the transactions referred to in clause (iii) shall hereinafter be referred to as a "**Securitization**".   Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "**Securities**".

(b)     If requested by Lender, Borrower shall (subject to the limitations set forth below, and provided that doing so shall not, except as expressly provided below, modify or amend any material economic term of the Loan or increase the liability or decrease the rights of Borrower or Guarantor under any of the Loan Documents other than to a de minimis extent) assist Lender in

satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with any Secondary Market Transactions, including, without limitation, to:

(i)       provide (A) updated financial and other information with respect to the Property, the business operated at the Property, Borrower, Guarantor, Sponsor, SPE Component Entity and Manager, (B) updated budgets relating to the Property, and (C) updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the "**Updated Information**"), together, if customary, with appropriate verification of the Updated Information through letters of auditors or opinions of counsel acceptable to Lender and the Rating Agencies and (D) revisions to and other agreements with respect to the Property Documents in form and substance acceptable to Lender and the Rating Agencies;

(ii)      provide new and/or updated opinions of counsel, which may be relied upon by Lender, the Rating Agencies and their respective counsel, agents and representatives, as to substantive non-consolidation, fraudulent conveyance, matters of Delaware and federal bankruptcy law relating to limited liability companies, true sale, true lease and any other opinion customary in Secondary Market Transactions or required by the Rating Agencies with respect to the Property, Property Documents, Borrower and Borrower's Affiliates, which counsel and opinions shall be satisfactory in form and substance to Lender and the Rating Agencies;

(iii)     provide updated, as of the closing date of the Secondary Market Transaction, representations and warranties made in the Loan Documents and such additional representations and warranties as the Rating Agencies may require; and

(iv)      execute such amendments to the Loan Documents, the Property Documents and Borrower's or any SPE Component Entity's organizational documents as may be reasonably requested by Lender or requested by the Rating Agencies or otherwise to effect any Secondary Market Transaction, including, without limitation, (A) to amend and/or supplement the Independent Director provisions provided herein and therein, in each case, in accordance with the applicable requirements of the Rating Agencies (including, without limitation, if necessary to consummate the required changes herein and to the Borrower's organizational documents, replacement of the current Independent Directors with replacement Independent Directors from an Acceptable ID Provider), (B) bifurcating the Loan into two or more components and/or additional separate notes and/or creating additional senior/subordinate note structure(s) (any of the foregoing, a "**Loan Bifurcation**") and (C) to modify all operative dates (including but not limited to payment dates, interest period start dates and end dates, etc.) under the Loan Documents, by up to ten (10) days; provided, that Borrower shall not be required to modify or amend any Loan Document in connection with the foregoing if such modification or amendment would (i) change the interest rate, the stated maturity (except as provided in subclause (C) above) or the amortization of principal set forth herein (except in connection with any Loan Bifurcation which may result in varying fixed interest rates and amortization schedules, but which shall have the same initial weighted average coupon of the original Note and

provide for the same aggregate interest payments over the life of the Loan (except that such weighted average coupon and such aggregate interest payments may increase solely as a result of interest rate "creep" following any prepayment of the Loan during the continuance of an Event of Default or in connection with a prepayment of the Loan as a result of a Casualty or Condemnation), (ii) change the aggregate outstanding principal balance of the Loan, (iii) materially and adversely alter the material restrictions on equity transfers in Borrower or transfers of the Property, in each case, contained herein, (iv) materially and adversely alter any material limitations on recourse against Borrower contained herein or (v) except as provided above, materially and adversely change any other material obligation, material right or material privilege of Borrower or Guarantor contained in the Loan Documents (except, in the case of each of the foregoing, to the extent the same would have existed had the Loan Bifurcation existed as of the Loan Closing Date.

(c)       Upon request, Borrower shall furnish to Lender from time to time such financial data and financial statements as Lender reasonably determines to be necessary, advisable or appropriate for complying with any applicable legal requirements (including those applicable to Lender or any Servicer (including, without limitation and to the extent applicable, Regulation AB)) within the timeframes necessary, advisable or appropriate in order to comply with such legal requirements.

**Section 11.2   Disclosure**.

(a)       Borrower (on its own behalf and on behalf of each other Borrower Party) understands that information provided to Lender by Borrower, any other Borrower Party and/or their respective agents, counsel and representatives may be (i) included in (A) the Disclosure Documents and (B) filings under the Securities Act and/or the Exchange Act and (ii) made available to Investors, the Rating Agencies and service providers, in each case, in connection with any Secondary Market Transaction.

(b)       Borrower shall indemnify Lender and its officers, directors, partners, employees, representatives, agents and affiliates against any losses, claims, damages or liabilities (collectively, the "**Liabilities**") to which Lender and/or its officers, directors, partners, employees, representatives, agents and/or affiliates may become subject in connection with (x) any Disclosure Document and/or any Covered Rating Agency Information, in each case, insofar as such Liabilities arise out of or are based upon any untrue statement of any material fact in the Provided Information and/or arise out of or are based upon the omission to state a material fact in the Provided Information required to be stated therein or necessary in order to make the statements in the applicable Disclosure Document and/or Covered Rating Agency Information, in light of the circumstances under which they were made, not misleading and (y) after a Securitization, any indemnity obligations incurred by Lender or Servicer in connection with any Rating Agency Confirmation required hereunder or for which Lender determines is required as a condition to granting any consent or approval as required hereunder, in each case, insofar as such indemnity obligations arise out of or are based upon any untrue statement of any material fact in the Provided Information and/or are based upon the omission to state a material fact in the Provided Information required to be stated therein or necessary in order to make the statements in the applicable Disclosure Document and/or Covered Rating Agency Information in

100

light of the circumstances under which they were made, not misleading. Notwithstanding the foregoing, Borrower shall not be liable for any Liabilities arising from Lender's failure to provide Borrower with any such Disclosure Document and/or Covered Rating Agency Information (including any summary or other Lender-prepared information submitted to the Rating Agencies) to review or to revise any Disclosure Document and/or Covered Rating Agency Information (including any summary or other Lender-prepared information submitted to the Rating Agencies) in accordance with Borrower's comments thereto.

**Section 11.3   Reserves/Escrows**.  In the event that Securities are issued in connection with the Loan, all funds held by Lender in escrow or pursuant to reserves in accordance with this Agreement and the other Loan Documents shall be deposited in "eligible accounts" at "eligible institutions" and, to the extent applicable, invested in "permitted investments" as then defined and required by the Rating Agencies.

**Section 11.4   Servicer**.  At the option of Lender, the Loan may be serviced by a servicer/special servicer/trustee selected by Lender (collectively, the "**Servicer**") and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to such Servicer pursuant to a servicing agreement between Lender and such Servicer.

**Section 11.5   Rating Agency Costs and REMIC Savings Clause**.

(a)      In connection with any Rating Agency Confirmation or other Rating Agency consent, approval or review required hereunder (other than the initial review of the Loan by the Rating Agencies in connection with a Securitization), Borrower shall pay all of the costs and expenses of Lender, Servicer and each Rating Agency in connection therewith, and, if applicable, shall pay any fees imposed by any Rating Agency in connection therewith.

(b)      Notwithstanding anything to the contrary contained herein, if, in connection with any release of any portion of the Property constituting real property, a prepayment of the Debt (in whole or in part) is required under REMIC Requirements, Borrower shall make the applicable REMIC Payment (if any) as and when set forth herein (or, if not otherwise set forth herein, as and when required in order to satisfy REMIC Requirements). Lender may require Borrower to deliver a REMIC Opinion in connection with each of the foregoing.

**Section 11.6   Mezzanine Option**.  Lender shall have the option (the "**Mezzanine Option**") at any time to divide the Loan into two parts, a mortgage loan and a mezzanine loan, provided, that   Borrower shall not be required to modify or amend any Loan Document in connection with the New Mezzanine Option if such modification or amendment would (i) cause the total loan amounts for such mortgage loan and such mezzanine loan to be greater than the then outstanding amount of the Loan immediately prior to Lender's exercise of the New Mezzanine Option, (ii) cause the interest rate, the stated maturity or the amortization of principal to change (except which may result in varying fixed interest rates and amortization schedules, but which shall have the same initial weighted average coupon of the original Note), (iii) materially and adversely alter the material restrictions on equity transfers in Borrower or transfers of the Property, in each case, contained herein, (iv) materially and adversely alter any material limitations on recourse against Borrower contained herein or (v) materially and

adversely change any other material obligation, right or privilege of Borrower contained in the Loan Documents (except, in the case of each of the foregoing, to the extent the same would have existed had the mezzanine loan existed as of the Loan Closing Date). Borrower shall cooperate with Lender in Lender's exercise of the Mezzanine Option in good faith and in a timely manner, which such cooperation shall include, but not be limited to, (i) executing such amendments to the Loan Documents and Borrower or any SPE Component Entity's organizational documents as may be reasonably requested by Lender or requested by the Rating Agencies, (ii) creating one or more Single Purpose Entities (the "**Mezzanine Borrower**"), which such Mezzanine Borrower shall (A) own, directly or indirectly, 100% of the equity ownership interests in Borrower (the "**Equity Collateral**"), and (B) together with such constituent equity owners of such Mezzanine Borrower as may be designated by Lender, execute such agreements, instruments and other documents as may be required by Lender in connection with the mezzanine loan (including, without limitation, a promissory note evidencing the mezzanine loan and a pledge and security agreement pledging the Equity Collateral to Lender as security for the mezzanine loan); and (iii) delivering such opinions, title endorsements, UCC title insurance policies, documents and/or instruments relating to the Property Documents and other materials as may be required by Lender or the Rating Agencies.

**Section 11.7   Conversion to Registered Form**.  At the request of Lender, Borrower shall appoint, as its agent, a registrar and transfer agent (the "**Registrar**") reasonably acceptable to Lender which shall maintain, subject to such reasonable regulations as it shall provide, such books and records as are necessary for the registration and transfer of the Note in a manner that shall cause the Note to be considered to be in registered form for purposes of Section 163(f) of the IRS Code.  The option to convert the Note into registered form once exercised may not be revoked.  Any agreement setting out the rights and obligation of the Registrar shall be subject to the reasonable approval of Lender.  Borrower may revoke the appointment of any particular person as Registrar, effective upon the effectiveness of the appointment of a replacement Registrar.  The Registrar shall not be entitled to any fee from Borrower or Lender or any other lender in respect of transfers of the Note and other Loan Documents.

**Section 11.8   Uncross of Properties**.

(a)      Borrower agrees that at any time Lender shall have the unilateral right to elect to, from time to time, uncross any of the Properties (such uncrossed Property or Properties, collectively, the "**Affected Property**" and the remaining Property or Properties, collectively, the "**Unaffected Property**") in order to separate the Loan from the portion of the Debt to be secured by the Affected Property (such portion of the Debt to be secured by the Affected Property, the "**Uncrossed Loan**" and the remaining portion of the Debt secured by the Unaffected Property, the "**Remaining Loan**").  In furtherance thereof, Lender shall have the right to (i) sever and/or divide the Note and the other Loan Documents so that (A) the original Loan Documents (collectively, the "**Remaining Loan Documents**") evidence and secure only the Remaining Loan and relate only to the Unaffected Property and (B) amended and/or new documents and other instruments (collectively, the "**Uncrossed Loan Documents**") evidence and secure only the Uncrossed Loan and relate only to the Affected Property, (ii) allocate the applicable portion of each of the Reserve Funds relating to the Affected Property to the Uncrossed Loan, (iii) release any cross-default and/or cross-collateralization provisions applicable to such Affected Property (but such Affected Property shall be cross-defaulted and cross-collateralized

151395847v8

with each other Affected Property) and (iv) take such additional actions consistent therewith (including, without limitation, requiring delivery of the Uncrossed Loan Documents and amendments to the Loan Documents, in each case, to give effect to the foregoing); provided, that the Uncrossed Loan Documents and the Remaining Loan Documents, shall not, in the aggregate, increase (A) any material monetary obligation of Borrower under the Loan Documents or (B) any other material obligation of Borrower under the Loan Documents in any material respect. In connection with the uncrossing of any such Affected Property as provided for in this Section 11.8 (an **"Uncrossing Event"**), the Remaining Loan shall be reduced by an amount equal to amount of the Uncrossed Loan and the Uncrossed Loan shall be in an amount equal to the Allocated Loan Amount applicable to the Affected Property.

(b)      Borrower shall (and shall cause each Borrower Party to) fully cooperate with Lender to effectuate each Uncrossing Event. Without limitation of the foregoing, upon Lender's request, Borrower shall (and shall cause each Borrower Party to), among other things, (i) deliver evidence to Lender that the single purpose nature and bankruptcy remoteness of the Borrower(s) owning Properties other than the Affected Property following such Uncrossing Event have not been adversely affected and are in accordance with the terms and provisions of the Remaining Loan Documents; (ii) deliver evidence to Lender that the single purpose nature and bankruptcy remoteness of the Borrower(s) owning the Affected Property following such release have not been adversely affected and are in accordance with the terms and provisions of the Uncrossed Loan Documents; (iii) deliver to Lender such legal opinions and updated legal opinions as Lender or the Rating Agencies shall require (including, without limitation, a New Non-Consolidation Opinion and a REMIC Opinion); (iv) take the actions contemplated in subsection (a) above (including, without limitation, executing the Uncrossed Loan Documents and amendments to the Loan Documents); and (v) deliver such title endorsements, title insurance policies, documents and/or instruments relating to the Property Documents and other materials as may be required by Lender or the Rating Agencies.

## ARTICLE 12

## INDEMNIFICATIONS

**Section 12.1   General Indemnification**. Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (d) any failure of the Property (or any portion thereof) to be in compliance with any applicable Legal Requirements; (e) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease, management agreement or any Property Document; (f) the payment of any commission, charge or brokerage fee to anyone (other than a

103

broker or other agent retained by Lender) which may be payable in connection with the funding of the Loan evidenced by the Note and secured by the Security Instrument; and/or (g) the holding or investing of the funds on deposit in the Accounts or the performance of any work or the disbursement of funds in each case in connection with the Accounts; provided, however, that Borrower shall not have any liability hereunder to the Indemnified Parties to the extent that any such indemnified liabilities are as a direct result of the gross negligence, illegal acts, fraud or willful misconduct of the Indemnified Parties.  Any amounts payable to Lender by reason of the application of this Section 12.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid.

Section 12.2   **Mortgage and Intangible Tax Indemnification**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of the Security Instrument, the Note or any of the other Loan Documents.

Section 12.3   **ERISA and FIRRMA Indemnification**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Sections 3.7 or 4.19 of this Agreement.

Section 12.4   **Duty to Defend, Legal Fees and Other Fees and Expenses**.  Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties.   Notwithstanding the foregoing, any Indemnified Parties may, in their sole discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding.  Upon demand, Borrower shall pay or, in the sole discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

Section 12.5   **Survival**.  The obligations and liabilities of Borrower under this Article 12 shall fully survive indefinitely notwithstanding any termination, satisfaction, assignment, entry of a judgment of foreclosure, exercise of any power of sale, or delivery of a deed in lieu of foreclosure of the Security Instrument.

Section 12.6   **Environmental Indemnity**.   Simultaneously herewith, Borrower and Guarantor have executed and delivered the Environmental Indemnity to Lender, which Environmental Indemnity is not secured by the Security Instrument.

# ARTICLE 13

# EXCULPATION

**Section 13.1    Exculpation**.

(a)        Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Security Instrument or the other Loan Documents by any action or proceeding wherein a money judgment or any deficiency judgment or other judgment establishing personal liability shall be sought against Borrower or any principal, director, officer, employee, beneficiary, shareholder, partner, member, trustee, agent, or Affiliate of Borrower or any legal representatives, successors or assigns of any of the foregoing (collectively, the "**Exculpated Parties**"), except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement, the Security Instrument and the other Loan Documents, or in the Property (or any portion thereof), the Rents, or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Security Instrument and the other Loan Documents, shall not sue for, seek or demand any deficiency judgment against Borrower or any of the Exculpated Parties in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement, the Security Instrument or the other Loan Documents.  The provisions of this Section shall not, however, (1) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (2) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Security Instrument; (3) affect the validity or enforceability of any indemnity, guaranty or similar instrument (including, without limitation, indemnities set forth in Article 12 hereof, Section 11.2 hereof, in the Guaranty and the Environmental Indemnity) made in connection with the Loan or any of the rights and remedies of Lender thereunder (including, without limitation, Lender's right to enforce said rights and remedies against Borrower and/or Guarantor (as applicable) personally and without the effect of the exculpatory provisions of this Article 13); (4) impair the rights of Lender to (A) obtain the appointment of a receiver and/or (B) enforce its rights and remedies provided in Articles 8 and 9 hereof; (5) impair the enforcement of the assignment of leases and rents contained in the Security Instrument and in any other Loan Documents; (6) impair the right of Lender to enforce Section 4.12(e) of this Agreement; (7) constitute a prohibition against Lender to seek a deficiency judgment against Borrower in order to fully realize the security granted by the Security Instrument or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against the Property (or any portion thereof); or (8) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any Loss incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following:

(i)        fraud or intentional misrepresentation by any Borrower Party in connection with the Loan;

(ii)    the gross negligence or willful misconduct of any Borrower Party;

(iii)    any litigation or other legal proceeding related to the Debt filed by any Borrower Party or any other action of any Borrower Party that delays, opposes, impedes, obstructs, hinders, enjoins or otherwise interferes with or frustrates the efforts of Lender to exercise any rights and remedies available to Lender as provided herein and in the other Loan Documents;

(iv)    waste to the Property (or any portion thereof) caused by the intentional acts or intentional omissions of any Borrower Party and/or the removal or disposal of any portion of the Property after an Event of Default (unless with respect to removal of Personal Property, such Personal Property is obsolete or contemporaneously replaced with Personal Property of equal or greater value and utility);

(v)    the misappropriation, conversion or intentional misapplication by any Borrower Party of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Property (or any portion thereof), (B) any Awards or other amounts received in connection with the Condemnation of all or a portion of the Property, (C) any Rents, (D) any Security Deposits or Rents collected in advance or (E) any other monetary collateral for the Loan (including, without limitation, any Reserve Funds and/or any portion thereof disbursed to (or at the direction of) Borrower);

(vi)    failure to pay Taxes, charges for labor or materials or other charges that can create liens on any portion of the Property in accordance with the terms and provisions of the Loan Documents, except to the extent that (A) the Property does not generate sufficient gross revenue for the immediately preceding six (6) month period to pay the same or (B) if Lender fails to pay the portion of such amounts required to be paid from adequate funds on deposit in the applicable Tax Account (unless Lender's access to such sums is restricted or constrained in any manner by a Borrower Party or any applicable Legal Requirement) in accordance with the terms and conditions of the Loan Documents;

(vii)    failure to pay Insurance Premiums, to maintain the Policies in full force and effect and/or to provide Lender evidence of the same, in each case, as expressly provided herein, except to the extent that (A) the Property does not generate sufficient gross revenue for the immediately preceding six (6) month period to pay the same, or (B) if Lender fails to pay the portion of such amounts required to be paid from adequate funds on deposit in the applicable Insurance Account (unless Lender's access to such sums is restricted or constrained in any manner by a Borrower Party or any applicable Legal Requirement) in accordance with the terms and conditions of the Loan Documents;

(viii)    any Security Deposits delivered to Borrower by any Tenant which are not delivered to Lender upon foreclosure of the Property or action in lieu thereof within the timeframe required hereunder except to the extent any such Security Deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the applicable Event of Default.  For purposes of clarification, for a

Security Deposit to be deemed "delivered to Lender" in connection with the foregoing, the same must be in the form of cash or in a letter of credit solely in Lender's name;

(ix)    any tax on the making and/or recording of the Security Instrument, the Note or any of the other Loan Documents or any transfer or similar taxes (whether due upon the making of the same or upon Lender's exercise of its remedies under the Loan Documents), but excluding any income, franchise or other similar taxes;

(x)    any violation or breach of any applicable law by any Borrower Party which mandates the forfeiture or seizure of the Property (or any portion thereof and/or interest therein as a consequence of the conduct or purported conduct of criminal activity in connection therewith);

(xi)    the failure to make any REMIC Payment and/or any True Up Payment, to permit on-site inspections of the Property (or any portion thereof) and/or to provide the Required Financial Items, in each case, as and when required herein, beyond all applicable grace or cure periods;

(xii)    any violation or breach of the Property Document Provisions and/or any Property Document Event beyond any applicable notice and/or cure period set forth herein; and/or

(xiii)    any indemnity obligations of Lender to Bank under the Restricted Account Agreement.

(b)    Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Borrower in the event that: (i) the first full monthly payment of principal and interest under the Note is not paid when due; (ii) Borrower fails to comply with any Cash Management Provisions or fails to appoint a new property manager upon the request of Lender or fails to comply with any limitations on instructing the property manager, each as required by and in accordance with, as applicable, the terms and provisions of, this Agreement and the other Loan Documents; (iii) any representation, warranty or covenant contained in Article 5 or Article 6 hereof is violated or breached; (iv) a Bankruptcy Event occurs; or (v) Sections 11.1 or 11.6 hereof are violated or breached.

# ARTICLE 14

## NOTICES

**Section 14.1   Notices**.  All notices or other written communications hereunder shall be deemed to have been properly given (a) upon delivery, if delivered in person or by facsimile transmission with receipt acknowledged by the recipient thereof and confirmed by telephone by sender, (b) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (c) three (3) Business Days after having been deposited in

any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Borrower:            Aevri Salina Meadows LLC
                           2604 Elmwood Avenue, Suite 210
                           Rochester, New York 14618
                           Attention: Moshe Rothman

With a copy to:            Book Law Group LLC
                           2 Perlman Drive, Suite 201
                           Spring Valley, New York 10977
                           Attention: Mordechai Book, Esq.
                           email: mbook@booklawgroup.com

If to Lender:              Bank of Montreal
                           388 Greenwich Street, 8th Floor
                           New York, New York 10013
                           Attention : Commercial Real Estate Group
                           Facsimile No.: (646) 328-2938

With a copy to:            Midland Loan Services, a Division of PNC Bank, National
                           Association
                           P.O. Box 25965
                           Shawnee Mission, KS 66225-5965
                           Attention: Executive Vice President - Division Head
                           Facsimile No.: (913) 253-9001

                           or if by hand delivery:

                           Midland Loan Services, a Division of PNC Bank, National
                           Association
                           10851 Mastin, Suite 300
                           Overland Park, KS 66210
                           Attention: Executive Vice President - Division Head

                           Katten Muchin Rosenman LLP
                           575 Madison Avenue
                           New York, New York 10022
                           Attention: Peter M. Doyle, Jr., Esq.
                           Facsimile No.: (704) 444-2050

With a copy to:

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

108

# ARTICLE 15

# FURTHER ASSURANCES

**Section 15.1   Replacement Documents**.   Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note, this Agreement or any of the other Loan Documents which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of the Note, this Agreement or such other Loan Document, Borrower will issue, in lieu thereof, a replacement thereof, dated the date of the Note, this Agreement or such other Loan Document, as applicable, in the same principal amount thereof and otherwise of like tenor.

**Section 15.2   Recording of Security Instrument, etc**.

(a)   Borrower forthwith upon the execution and delivery of the Security Instrument and thereafter, from time to time, will cause the Security Instrument and any of the other Loan Documents creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property.   Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, the Security Instrument, this Agreement, the other Loan Documents, any note, deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Security Instrument, any deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by applicable law so to do.   The foregoing taxes, fees, expenses, duties, imposts, assessments and charges, as applicable, are herein referred to as the **"Security Instrument Taxes"**.

(b)   Borrower represents that it has paid all Security Instrument Taxes imposed upon the execution and recordation of each Security Instrument.   If at any time Lender determines, based on applicable Legal Requirements, that Lender is not being afforded the maximum amount of security available from any one or more of the Properties as a direct or indirect result of applicable Security Instrument Taxes not having been paid with respect to any Individual Property, Borrower agrees that Borrower will execute, acknowledge and deliver to Lender, immediately upon Lender's request, supplemental affidavits increasing the amount of the Debt attributable to any such Individual Property to an amount determined by Lender to be equal to the lesser of (i) the greater of the fair market value of the applicable Individual Property (1) as of the date hereof and (2) as of the date such supplemental affidavits are to be delivered to Lender, and (ii) the amount of the Debt attributable to any such Individual Property (as set forth on Schedule V hereof), and Borrower shall, on demand, pay any additional Security Instrument Taxes.

**Section 15.3   Further Acts, etc**.  Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, deeded, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing, registering or recording the Security Instrument, or for complying with all Legal Requirements.  Borrower, on demand, will execute and deliver, and in the event it shall fail to so execute and deliver, hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements to evidence more effectively the security interest of Lender in the Property.  Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation, such rights and remedies available to Lender pursuant to this Section 15.3; which such power of attorney may not be exercised by Lender until Borrower's breach of the foregoing provision or during the continuance of an Event of Default. Notwithstanding the foregoing, Borrower shall in no event be required to take any action under this Section 15.3 if same would increase the material obligations or material liabilities of any Borrower Party under this Agreement or any of the other Loan Documents in any material respect beyond the original transactions and related security intended hereby.

**Section 15.4   Changes in Tax, Debt, Credit and Documentary Stamp Laws**.

(a)     If any law is enacted or adopted or amended after the date of this Agreement which deducts the Debt from the value of the Property for the purpose of taxation and which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any.  If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury then Lender shall have the option by written notice of not less than one hundred twenty (120) days to declare the Debt immediately due and payable.

(b)     Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of the Security Instrument or the Debt.  If such claim, credit or deduction shall be required by applicable law, Lender shall have the option, by written notice of not less than one hundred (120) days, to declare the Debt immediately due and payable.

(c)     If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, the Security Instrument, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

(d)     Borrower shall not be required to defease the Loan or to pay any prepayment premium, fee or penalty whatsoever in connection with any mandatory prepayment required pursuant to this Section 15.4.

# ARTICLE 16

## WAIVERS

### Section 16.1   Remedies Cumulative; Waivers.

The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement, the Security Instrument, the Note or the other Loan Documents, or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

### Section 16.2   Modification, Waiver in Writing.

No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, the Security Instrument, the Note and the other Loan Documents, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.   Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

### Section 16.3   Delay Not a Waiver.

Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege under this Agreement, the Security Instrument, the Note or the other Loan Documents, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Security Instrument, the Note or the other Loan Documents, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Security Instrument, the Note and the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

**Section 16.4   Waiver of Trial by Jury**.

BORROWER AND LENDER, BY ACCEPTANCE OF THIS AGREEMENT, HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THIS AGREEMENT, THE NOTE, THE SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER OR BORROWER.

**Section 16.5   Waiver of Notice**.

Borrower shall not be entitled to any notices of any nature whatsoever from Lender except (a) with respect to matters for which this Agreement specifically and expressly provides for the giving of notice by Lender to Borrower and (b) with respect to matters for which Lender is required by applicable law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement does not specifically and expressly provide for the giving of notice by Lender to Borrower.

**Section 16.6   Remedies of Borrower**.

In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by applicable law or under this Agreement, the Security Instrument, the Note and the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment. Lender agrees that, in such event, it shall cooperate in expediting any action seeking injunctive relief or declaratory judgment.

**Section 16.7   Marshalling and Other Matters**.

Borrower hereby waives, to the extent permitted by applicable Legal Requirements, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale under the Security Instrument of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of the Security Instrument on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of the Security Instrument and on behalf of all persons to the extent permitted by applicable Legal Requirements.

**Section 16.8   Waiver of Statute of Limitations**.

To the extent permitted by applicable Legal Requirements, Borrower hereby expressly waives and releases to the fullest extent permitted by applicable Legal Requirements, the

151395847v8

pleading of any statute of limitations as a defense to payment of the Debt or performance of its obligations hereunder, under the Note, Security Instrument or other Loan Documents.

**Section 16.9   Waiver of Counterclaim**.   Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

**Section 16.10 Sole Discretion of Lender**.   Wherever pursuant to this Agreement (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision to approve or disapprove all decisions that arrangements or terms are satisfactory or not satisfactory, and all other decisions and determinations made by Lender, shall be in the sole discretion of Lender, except as may be otherwise expressly and specifically provided herein.

## ARTICLE 17

## MISCELLANEOUS

**Section 17.1   Survival**.   This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth in this Agreement, the Security Instrument, the Note or the other Loan Documents.   Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.   All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**Section 17.2   Governing Law**.   **THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS IN REAL PROPERTY (INCLUDING ALL IMPROVEMENTS**

AND FIXTURES THEREON) CREATED PURSUANT TO THE LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS WILL, AT LENDER'S OPTION, BE INSTITUTED IN (OR, IF PREVIOUSLY INSTITUTED, MOVED TO) ANY FEDERAL OR STATE COURT DESIGNATED BY LENDER IN THE CITY OF NEW YORK, COUNTY OF NEW YORK.  BORROWER HEREBY (I) WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING AND (II) IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  BORROWER AND LENDER HEREBY ACKNOWLEDGE AND AGREE THAT THE FOREGOING AGREEMENT, WAIVER AND SUBMISSION ARE MADE PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

BORROWER DOES HEREBY DESIGNATE AND APPOINT:

> MORDECHAI BOOK, ESQ.
> BOOK LAW GROUP LLC
> 2 PERLMAN DRIVE
> SUITE 201
> SPRING VALLEY, NEW YORK 10977

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE

114

AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

**Section 17.3   Headings**.  Notwithstanding anything to the contrary contained herein, (i) the Article and/or Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose and (ii) covenants contained in Articles and/or Sections hereof labeled or otherwise primarily containing representations (and vice versa) shall, in each case, be deemed fully effective hereunder and shall not be otherwise affected by virtue of the foregoing.

**Section 17.4   Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Legal Requirements, but if any provision of this Agreement shall be prohibited by or invalid under applicable Legal Requirements, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 17.5   Preferences**.  Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder.  To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Creditors Rights Laws, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 17.6   Expenses**.  Subject to the express terms of this Agreement, Borrower covenants and agrees to pay its own costs and expenses and pay, or, if Borrower fails to pay, to reimburse, Lender, upon receipt of written notice from Lender, for Lender's reasonable costs and expenses (including reasonable, actual attorneys' fees and disbursements) in each case, incurred by Lender in accordance with this Agreement in connection with (i) the preparation, negotiation, execution and delivery of this Agreement, the Security Instrument, the Note and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including without limitation any opinions requested by Lender as to any legal matters arising under this Agreement, the Security Instrument, the Note and the other Loan Documents with respect to the Property); (ii) Borrower's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Agreement, the Security Instrument, the Note and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (iii) Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement, the Security Instrument, the Note and the other Loan Documents on

115

its part to be performed or complied with after the Closing Date (including, without limitation, those contained in Articles 8 and 9 hereof); (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement, the Security Instrument, the Note and the other Loan Documents and any other documents or matters requested by Lender; (v) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement; (vi) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the lien in favor of Lender pursuant to this Agreement, the Security Instrument, the Note and the other Loan Documents; (vii) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the Security Instrument, the Note, the other Loan Documents, the Property, or any other security given for the Loan; (viii) servicing the Loan (including, without limitation, enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the Security Instrument, the Note and the other Loan Documents or with respect to the Property) or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings); and (ix) the preparation, negotiation, execution, delivery, review, filing, recording or administration of any documentation associated with the exercise of any of Borrower's rights hereunder and/or under the other Loan Documents regardless of whether or not any such right is consummated (including, without limitation, Borrower's rights hereunder to defease the Loan and to permit or undertake transfers (including under Sections 6.3 and 6.4 hereof), in each case, in accordance with the applicable terms and conditions hereof); provided, however, that, with respect to each of subsections (i) through (ix) above, (A) none of the foregoing subsections shall be deemed to be mutually exclusive or limit any other subsection, (B) the same shall be deemed to (I) include, without limitation and in each case, any related special servicing fees, liquidation fees, modification fees, work-out fees and other similar costs or expenses payable to any Servicer, trustee and/or special servicer of the Loan (or any portion thereof and/or interest therein) and (II) exclude any requirement that Borrower directly pay the base monthly servicing fees due to any master servicer on account of the day to day, routine servicing of the Loan (provided, further, that the foregoing subsection (II) shall not be deemed to otherwise limit any fees, costs, expenses or other sums required to be paid to Lender under this Section, the other terms and conditions hereof and/or of the other Loan Documents) and (C) Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender.

    **Section 17.7   Cost of Enforcement**.   In the event (a) that the Security Instrument is foreclosed in whole or in part, (b) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or any of its constituent Persons or an assignment by Borrower or any of its constituent Persons for the benefit of its creditors, or (c) Lender exercises any of its other remedies under this Agreement, the Security Instrument, the Note and the other Loan Documents, Borrower shall be chargeable with and agrees to pay all costs of collection and defense, including attorneys' fees and costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post judgment action involved therein, together with all required service or use taxes.

Section 17.8 **Schedules Incorporated**.  The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 17.9 **Offsets, Counterclaims and Defenses**.  Any assignee of Lender's interest in and to this Agreement, the Security Instrument, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 17.10 **No Joint Venture or Partnership; No Third Party Beneficiaries**.

(a)     Borrower and Lender intend that the relationships created under this Agreement, the Security Instrument, the Note and the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)     This Agreement, the Security Instrument, the Note and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement, the Security Instrument, the Note or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein.  All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

(c)     The general partners, members, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property.  Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.

(d)     Notwithstanding anything to the contrary contained herein, Lender is not undertaking the performance of (i) any obligations related to the Property (including, without limitation, under the Leases); or (ii) any obligations with respect to any agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents to which any Borrower Party and/or the Property (or any portion thereof) is subject.

117

(e)     By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Agreement, the Security Instrument, the Note or the other Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

(f)     Borrower recognizes and acknowledges that in accepting this Agreement, the Note, the Security Instrument and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the representations and warranties set forth in Article 3 of this Agreement without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof, that the warranties and representations are a material inducement to Lender in making the Loan; and that Lender would not be willing to make the Loan and accept this Agreement, the Note, the Security Instrument and the other Loan Documents in the absence of the warranties and representations as set forth in Article 3 of this Agreement.

**Section 17.11 Publicity**.  All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public which refers to this Agreement, the Note, the Security Instrument or the other Loan Documents or the financing evidenced by this Agreement, the Note, the Security Instrument or the other Loan Documents, to Lender or any of its Affiliates shall be subject to the prior written approval of Lender, not to be unreasonably withheld.  Without limitation of any other term or provision hereof, nothing contained herein or in the other Loan Documents shall be deemed to restrict Lender and/or Servicer from disseminating (and Lender and/or Servicer shall be authorized to disseminate) to any Person any and all information it obtains in connection with the Loan as Lender and/or Servicer deems necessary or appropriate.

**Section 17.12 Limitation of Liability**.  No claim may be made by Borrower, or any other Person against Lender or its Affiliates, directors, officers, employees, attorneys or agents of any of such Persons for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any act, omission or event occurring in connection therewith; and Borrower hereby waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

**Section 17.13 Conflict; Construction of Documents; Reliance**.  In the event of any conflict between the provisions of this Agreement and the Security Instrument, the Note or any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Agreement, the Note, the Security Instrument and the other Loan Documents and this Agreement, the Note, the Security Instrument and the other Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner

on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under this Agreement, the Note, the Security Instrument and the other Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse-to or competitive with the business of Borrower or its Affiliates.

Section 17.14 **Entire Agreement**. This Agreement, the Note, the Security Instrument and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written between Borrower and Lender are superseded by the terms of this Agreement, the Note, the Security Instrument and the other Loan Documents.

Section 17.15 **Liability**. If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

Section 17.16 **Duplicate Originals; Counterparts**. This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 17.17 **Brokers**. Borrower agrees (i) to pay any and all fees imposed or charged by all brokers, mortgage bankers and advisors (each a **"Broker"**) hired or contracted by any Borrower Party or their Affiliates in connection with the transactions contemplated by this Agreement and (ii) to indemnify and hold Lender harmless from and against any and all claims, demands and liabilities for brokerage commissions, assignment fees, finder's fees or other compensation whatsoever arising from this Agreement or the making of the Loan which may be asserted against Lender by any Person. The foregoing indemnity shall survive the termination of this Agreement and the payment of the Debt. Borrower hereby represents and warrants that the only Broker engaged by any Borrower Party in connection with the transactions contemplated by this Agreement is Skyline Capital. Lender hereby agrees to pay any and all fees imposed or charged by any Broker hired solely by Lender. Borrower acknowledges and agrees that (a) any Broker is not an agent of Lender and has no power or authority to bind Lender, (b) Lender is not responsible for any recommendations or advice given to any Borrower Party by any Broker, (c) Lender and the Borrower Parties have dealt at arms-length with each other in connection with the Loan, (d) no fiduciary or other special relationship exists or shall be deemed or construed to exist among Lender and the Borrower Parties and (e) none of the Borrower Parties shall be entitled to rely on any assurances or waivers given, or statements made or actions taken, by any Broker which purport to bind Lender or modify or otherwise affect this Agreement or the Loan, unless Lender has, in its sole discretion, agreed in writing with any such Borrower Party to such assurances, waivers, statements, actions or modifications. Borrower acknowledges and agrees

that Lender may, in its sole discretion, pay fees or compensation to any Broker in connection with or arising out of the closing and funding of the Loan.  Such fees and compensation, if any, (i) shall be in addition to any fees which may be paid by any Borrower Party to such Broker and (ii) create a potential conflict of interest for Broker in its relationship with the Borrower Parties. Such fees and compensation, if applicable, may include a direct, one-time payment, servicing fees and/or incentive payments based on volume and size of financings involving Lender and such Broker.

**Section 17.18 Set-Off**.  In addition to any rights and remedies of Lender provided by this Agreement and by law, Lender shall have the right in its sole discretion, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate thereof to or for the credit or the account of Borrower; provided however, Lender may only exercise such right during the continuance of an Event of Default.  Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

**Section 17.19 Cross-Default; Cross-Collateralization**.

(a)    Borrower acknowledges that Lender has made the Loan to Borrower upon the security of its collective interest in the Properties and in reliance upon the aggregate of the Properties taken together being of greater value as collateral security than the sum of each Individual Property taken separately.  Borrower agrees that each of the Loan Documents (including, without limitation, the Security Instruments) are and will be cross collateralized and cross defaulted with each other so that (i) an Event of Default under any of Loan Documents shall constitute an Event of Default under each of the other Loan Documents; (ii) an Event of Default hereunder shall constitute an Event of Default under the Security Instrument; (iii) the Security Instrument shall constitute security for the Note as if a single blanket lien were placed on all of the Properties as security for the Note; and (iv) such cross collateralization shall in no event be deemed to constitute a fraudulent conveyance and Borrower waives any claims related thereto.

(b)    To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Properties, or to a sale in inverse order of alienation in the event of foreclosure of all or any of the Security Instruments, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Properties for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Properties in preference to every other claimant whatsoever.  In addition, Borrower, for itself and its

120

successors and assigns, waives in the event of foreclosure of any or all of the Security Instruments, any equitable right otherwise available to Borrower which would require the separate sale of the Properties or require Lender to exhaust its remedies against any Individual Property or any combination of the Properties before proceeding against any other Individual Property or combination of Properties; and further in the event of such foreclosure Borrower does hereby expressly consent to and authorize, at the option of Lender, the foreclosure and sale either separately or together of any combination of the Properties.

**[NO FURTHER TEXT ON THIS PAGE]**



**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

**AEVRI SALINA MEADOWS LLC**
a Delaware limited liability company

By: _____
Name:  Moshe Rothman
Title:    President

**LENDER**:

**BANK OF MONTREAL**

By: _____

Name: Michael S. Birajiclian
Title: Authorized Signatory

**SCHEDULE I**

**IMMEDIATE REPAIRS**

| Item | Estimated Cost | Deadline for Completion (from closing date of loan) |
|---|---|---|
| 1.      Roof Repairs at 301 Plainfield | $0.00 | Twelve (12) Months from the Closing Date |
| 2.      AST Secondary Containment | $1,500.00 | Twelve (12) Months from the Closing Date |
| 3.      ADA - Install Drain Pipe Covers in Bathrooms | $1,600.00 | Twelve (12) Months from the Closing Date |
| **Total** | $3,100.00 | |

Amount deposited in the Immediate Repair Account = $3,875 (125%) of the total cost of the required repairs).

\* In each case, as more particularly described in the PCA.

**SCHEDULE II**

**INTENTIONALLY OMITTED**

151395847v8

**SCHEDULE III**

**<u>ORGANIZATIONAL CHART</u>**

**(attached hereto)**

151395847v8



Moshe Rothman
(100%)

AEVRI SALINA MANAGER
LLC (DE LLC)
Manager 0.01%

*INDIVIDUAL INVESTORS

99.99%

| | |
|---|---|
| Moshe Rothman | 46% |
| Kalman Rubenstein | 9% |
| Allen Azoulay | 9% |
| Hannah Gottesman | 9% |
| David Helfgott | 9% |
| Gavriel Herzig | 9% |
| Shmuel Friedman | 9% |

AEVRI SALINA MANAGER LLC
(DE LLC)
EIN:  87-3843548

AEVRI SALINA INVESTORS LLC (DE)
EIN: 87-3884361
99.9%

AEVRI SALINA MEADOWS SPE LLC (DE)
EIN: 87-3998674
100%

AEVRI SALINA MEADOWS LLC (DE, QUALIFIED
IN NY)
EIN:  87-3753260
100%

FOUR
PROPERTIES

*Except as shown hereon, (1) no person or entity, individually or together with its affiliates and/or immediate family members,
(a) owns 10% or more of Borrower, or (b) possesses control over Borrower, and (2) no foreign person or entity, individually
or together with its affiliates and/or immediate family members, owns 10% or more of Borrower.

**SCHEDULE IV(a)**

**FREE RENT**

| **Tenant** | **Amount of Free Rent** |
|:---:|:---:|
| Corvel Health Care | $289,989.25 |
| Globe Life Insurance Company | $10,475.97 |

## SCHEDULE IV(b)

## FREE RENT RESERVE DISBURSEMENT SCHEDULE

| Date | Tenant for which Free Rent Reserve Disbursement Applies | Amount of Free Rent Reserve Funds to be Disbursed |
| --- | --- | --- |
| July, 2022 | Globe Life | $5,237.98 |
| August, 2022 | Corvel | $24,165.77 |
| August, 2022 | Globe Life | $5,237.98 |
| September, 2022 | Corvel | $24,165.77 |
| October, 2022 | Corvel | $24,165.77 |
| November, 2022 | Corvel | $24,165.77 |
| December, 2022 | Corvel | $24,165.77 |
| January, 2023 | Corvel | $24,165.77 |
| October, 2023 | Corvel | $24,165.77 |
| November, 2023 | Corvel | $24,165.77 |
| December, 2023 | Corvel | $24,165.77 |
| October, 2024 | Corvel | $24,165.77 |
| November, 2024 | Corvel | $24,165.77 |
| December, 2024 | Corvel | $24,165.77 |

151395847v8

**SCHEDULE V**

**2023 APPROVED BUDGET**

**(attached)**

## 2023 Budget
**200-231 Salina Meadows & 300 Plainfield Rd**
Syracuse, NY

|  | 2023 Budget |
|---|---|
| **Income** | |
| Rental Income | $4,298,719 |
| Electric Income | $179,426 |
| RE Tax Reimbursements | $57,445 |
| Operating Escalations | $50,000 |
| Conference Room | $6,000 |
| Misc Income | $0 |
| Vacancy | -$229,280 |
| **Effective Gross Income** | **$4,362,311** |
| **Expenses** | |
| Real Estate Taxes | $568,083 |
| Insurance | $46,066 |
| Water & Sewer | $17,438 |
| Gas | $57,612 |
| Electric | $358,853 |
| Management | $122,511 |
| Payroll, Repairs & Maintenance | $474,992 |
| Misc | $5,029 |
| **Total  Expenses** | **$1,650,584** |
| **Net Operating Income** | **$2,711,727** |

## SCHEDULE VI

### [Allocated Loan Amounts]

**200 Salina - $4,640,000.00**

**220 Salina - $5,240,000.00**

**231 Salina - $4,240,000.00**

**301 Plainfield - $10,880,000.00**

151395847v8

# EXHIBIT A

## [Form of Notice Letter - Tenants]

_____, 20[__]

[TENANT]

Re:     [Describe Lease] (the "Lease")

To Whom it May Concern:

      A new cash management system has been adopted in connection with our loan from [_____], its successors and/or assigns ("**Lender**").  Consequently, from and after the date of this letter, all payments due under the Lease should be delivered as follows:

(i)     If by check, money order, or its equivalent, please mail such items to:

**[INSERT RESTRICTED ACCT. INFO]**

_____

_____

Attention: _____

Facsimile No.: _____

(ii)    If by wire transfer to:

**[INSERT RESTRICTED ACCT. INFO]**

Payee: _____

ABA Routing #: _____

For Account: _____

Account #: _____

Bank Contact: _____

      This payment direction may not be rescinded or altered, except by a written direction signed by the Lender or its agent.

      We appreciate your cooperation.

151395847v8

Very truly yours,

**[BORROWER]**

151395847v8

# EXHIBIT 8

Lisa Dell, County Clerk
401 Montgomery Street
Room 200
Syracuse, NY 13202
(315) 435-2229

## Onondaga County Clerk Recording Cover Sheet

**Received From :**
SIMPLIFILE

**Return To :**
SIMPLIFILE

**Method Returned :** ERECORDING

### First PARTY 1

| BANK OF MONTREAL | - |
|---|---|

### First PARTY 2

| BBCMS MORTGAGE TRUST 2022 C15 COMMERCIAL MORTGAGE PASS THROUGH CERTIFICATES SERIES 2022 C15 |
|---|

**Index Type :** Land Records

**Instr Number :** 2022-00033776

**Book :**  **Page :**

**Type of Instrument :** Assignment Of Mortgage
**Type of Transaction :** Asmt-Release Mtg
**Recording Fee:** $86.00

**Recording Pages :** 9

**Recorded Information**

State of New York

County of Onondaga

I hereby certify that the within and foregoing was
recorded in the Clerk's office for Onondaga
County, New York

On (Recorded Date) : 08/18/2022

At (Recorded Time) . 1:33:29 PM

Lisa Dell, County Clerk

This sheet constitutes the Clerks endorsement required by Section 319 of Real Property Law of the State of New York

Entered By: BHARPER Printed On : 08/18/2022 At : 1:35:01PM

## ASSIGNMENT OF MORTGAGE

BANK OF MONTREAL
(Assignor)

to

WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT
OF THE REGISTERED HOLDERS OF BBCMS MORTGAGE TRUST 2022-C15,
COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2022-C15, AND
THE RR INTEREST OWNER
(Assignee)

Effective as of April 13, 2022

Property Address(es): 200, 220, 231 Salina Meadows Parkway and 301 Plainfield Road,
Syracuse, NY 13212
County of Onondaga
State of New York

DOCUMENT PREPARED BY AND WHEN RECORDED, RETURN TO:
McCoy & Orta, P.C.
100 North Broadway, 26th Floor
Oklahoma City, Oklahoma 73102
Telephone: 888-236-0007

This assignment is not subject to the requirements of Section 275 of the Real Property Law of
the State of New York because it is an assignment within the secondary mortgage market.

## ASSIGNMENT OF MORTGAGE

Effective as of the 13th day of April, 2022, BANK OF MONTREAL, having an address at 4 Times Square, New York, NY 10036 ("Assignor"), as the holder of the instrument hereinafter described and for valuable consideration hereby assigns, sells, transfers and delivers to WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE REGISTERED HOLDERS OF BBCMS MORTGAGE TRUST 2022-C15, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2022-C15, AND THE RR INTEREST OWNER, having an address at 1100 North Market Street, Wilmington, DE 19890 ("Assignee"), its successors, participants and assigns, without recourse or warranty, all right, title and interest of Assignor in and to those certain:

MORTGAGE AND SECURITY AGREEMENT made by AEVRI SALINA MEADOWS LLC, a Delaware limited liability company to Assignor, dated as of February 16, 2022 and recorded on March 7, 2022, as Instrument Number 2022-00009536 in the Recorder's Office of Onondaga County, New York (as the same may have been amended, modified, restated, supplemented, renewed or extended), securing payment of note(s) of even date therewith, in the original principal amount of $25,000,000.00, and creating a first lien on the property described in Exhibit A attached hereto and by this reference made a part hereof.

Together with any and all other liens, privileges, security interests, rights, entitlements, equities, claims and demands as to which Assignor hereunder possesses or to which Assignor is otherwise entitled as additional security for the payment of the notes and other obligations described herein.

This instrument shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

[SIGNATURE(S) ON THE FOLLOWING PAGE]

Reference No.: 5206.004
Matter Name: Salina Meadows Office Park
Pool: BBCMS 2022-C15

*9th* IN WITNESS WHEREOF, the Assignor has caused this instrument to be executed this _____ day of May, 2022, to be effective as of the date first written above.

**ASSIGNOR:**

BANK OF MONTREAL

By: _____
Name: Michael Birajiclian
Title: Managing Director

STATE OF *New York* §
COUNTY OF *New York* §

On the *9th* day of May, 2022, before me, the undersigned, a Notary Public in and for said state, personally appeared Michael Birajiclian, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, as Managing Director of Bank of Montreal, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

WITNESS my hand and official seal.

My Commission Expires:   5/23/2024

Signature: _____
Notary Public

NATASHA LEBLANC
Notary Public - State of New York
NO. 01LE6342580
Qualified in New York County
My Commission Expires May 23, 2024

Reference No.: 5206.004
Matter Name: Salina Meadows Office Park
Pool: BBCMS 2022-C15

## EXHIBIT A

## LEGAL DESCRIPTION

ALL that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Town of Salina, in the County of Onondaga, State of NY:

TRACT 1:

LOT 6

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, BELONGING, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK, AND BEING DESIGNATED AS LOT 6 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK, AMENDMENT NO. 3, PART OF MILITARY LOTS 2, 3, 17 AND 18, TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED ON THE CLERK'S OFFICE AS MAP 7196.

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY, THE NORTHEAST CORNER OF LOT 6 AND THE NORTHWEST CORNER OF LOT 10. SAID POINT BEING THE POINT OF BEGINNING.

RUNNING THENCE LEAVING SAID SOUTHERLY RIGHT-OF-WAY SOUTH 06° 54' 25" WEST ALONG THE EASTERLY BOUNDARY LINE OF LOT 6 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE 481.53 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 83° 05' 35" WEST ALONG THE SOUTHERLY BOUNDARY LINE OF LOT 6 AND THE NORTHERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 282.00 FEET TO A MAG NAIL;

THENCE NORTH 38° 05' 35" WEST ALONG THE WESTERLY BOUNDARY LINE OF LOT 6 AND THE EASTERLY BOUNDARY LINE OF LOT 7 A DISTANCE 281.48 FEET TO A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY;

THENCE NORTH 45° 24' 54" EAST ALONG SAID SOUTHERLY RIGHT-OF-WAY A DISTANCE 202.21 FEET TO A MAG NAIL AT A POINT OF CURVATURE.

THENCE ALONG A CURVE TO THE RIGHT SAID CURVE HAVING A RADIUS OF 352.96 FEET AND AN ARC LENGTH OF 396.82 FEET TO THE POINT OF BEGINNING.

Reference No.: 5206.004
Matter Name: Salina Meadows Office Park
Pool: BBCMS 2022-C15

LOT 10

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, BELONGING, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK AND BEING DESIGNATED AS LOT 10 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK, AMENDMENT NO. 3, PART OF MILITARY LOT 2, 3, 17 AND 18, TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196.

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY, THE NORTHEAST CORNER OF LOT 6 AND THE NORTHWEST CORNER OF LOT 10, SAID POINT BEING THE POINT OF BEGINNING.

RUNNING THENCE ALONG A CURVE TO THE RIGHT TO A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 352.96 FEET AND AN ARC LENGTH OF 36.63 FEET TO A CAPPED IRON ROD SET;

THENCE SOUTH 64° 13' 24" EAST CONTINUING ALONG THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS A DISTANCE OF 170.00 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE LEFT TO A CAPPED IRON ROD SET AT A POINT OF REVERSE CURVE, SAID CURVE HAVING A RADIUS OF 600.00 FEET AND AN ARC LENGTH OF 151.63 FEET;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY ON THE WESTERLY RIGHT-OF-WAY LINE OF PLAINFIELD ROAD, SAID CURVE HAVING A RADIUS OF 25.00 FEET AND AN ARC LENGTH OF 37.07 FEET TO A CAPPED IRON ROD SET;

THENCE SOUTH 06° 14' 53" WEST ALONG SAID WESTERLY RIGHT-OF-WAY LINE A DISTANCE OF 211.20 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 540.37 FEET AND AN ARC LENGTH OF 415.87 FEET;

THENCE SOUTH 50° 20' 35" WEST A DISTANCE OF 173.84 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 320.00 FEET AND AN ARC LENGTH OF 260.06 FEET;

THENCE NORTH NORTH 83° 05' 35" WEST A DISTANCE OF 164.88 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 06° 54' 25" EAST ALONG THE EASTERLY BOUNDARY LINE OF LOT 7 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 453.76 FEET TO A DRILL HOLE SET;

THENCE SOUTH 83° 05' 35" EAST ALONG THE NORTHERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 295.00 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 06° 54' 25" EAST ALONG THE EASTERLY BOUNDARY LINE OF LOT 6 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 481.53 FEET TO A CAPPED IRON ROD SET AT THE POINT OF BEGINNING.

Being the same premises conveyed to Salina Park, LLC by deed made by SCCP SALINA I, LIMITED PARTNERSHIP, a Delaware limited partnership dated 06/06/2016, recorded 06/14/2016 in the Office of the County Clerk, Onondaga County in Book 5376 page 591.


TRACT 2:

LOT 3:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK CONTAINING 4.620 ACRES AND BEING DESIGNATED AS LOT 3 AS SHOWN ON THAT CERTAIN PLAT ENTITLED" FINAL PLAN SALINA MEADOWS OFFICE PARK AMENDMENT NO. 3 PART OF MILITARY LOTS 2,3, 17 AND 18 TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196 BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY, WHICH POINT IS THE DIVIDING LINE BETWEEN LOTS 3 AND 13 AS SHOWN ON SAID MAP;

RUNNING THENCE ALONG SAID DIVIDING LINE, NORTH 42° 02' 10" WEST, 338.15 FEET TO LOT 8 AS SHOWN ON SAID MAP;

THENCE ALONG SAID LAST MENTIONED LOT, NORTH 45° 24' 54" EAST, 407.00 FEET TO LAND NOW OR FORMERLY OF DONALD W. KNIGHT;

THENCE ALONG SAID LAST MENTIONED LAND, SOUTH 82° 25' 16" EAST, 285.00 FEET TO LOT 1 ON SAID MAP;

THENCE ALONG SAID LAST MENTIONED LOT, SOUTH 7° 34' 44" WEST, 439.29 FEET TO THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 412.96 FEET, A DISTANCE OF 301.66 FEET TO THE POINT OR PLACE OF BEGINNING.

BEING THE SAME PREMISES CONVEYED TO ROWE PROPERTIES-SALINA MEADOWS IV LIMITED PARTNERSHIP BY DEED FROM ROWE DEVELOPMENT COMPANY, A VIRGINIA CORPORATION, TO ROWE PROPERTIES-SALINA MEADOWS IV LIMITED PARTNERSHIP, A VIRGINIA LIMITED PARTNERSHIP, DATED JULY 2, 1987 AND RECORDED IN ONONDAGA COUNTY CLERK'S OFFICE JULY 27, 1987 ON BOOK 3371 OF DEEDS AT PAGE 165.

LOT 7:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK CONTAINING 4.161 ACRES AND BEING DESIGNATED AS LOT 7 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK AMENDMENT NO. 3 PART OF MILITARY LOTS 2, 3, 17 AND 18 TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, WHICH POINT IS THE DIVIDING LINE BETWEEN LOTS 7 AND 6 AS SHOWN ON SAID MAP;

RUNNING THENCE ALONG SAID DIVIDING LINE SOUTH 38° 05' 35" EAST, 281.48 FEET TO LOT 10 AS SHOWN ON SAID FILED MAP;

THENCE ALONG THE DIVIDING LINE BETWEEN LOTS 7 AND 10, NORTH 83° 05' 35" WEST, 13.00 FEET TO A POINT;

THENCE STILL, ALONG THE DIVIDING LINE BETWEEN LOTS 7 AND 10, SOUTH 6° 54' 25" WEST, 453.76 FEET TO THE NORTHERLY SIDE OF PLAINFIELD ROAD;

THENCE ALONG THE NORTHERLY AND NORTHEASTERLY SIDES OF PLAINFIELD ROAD THE FOLLOWING 4 COURSES AND DISTANCES:

1. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 203.77 FEET, A DISTANCE OF 153.83 FEET;

2. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 801.50 FEET, A DISTANCE OF 208.36 FEET;

3. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 271.60 FEET, A DISTANCE OF 221.81 FEET;

4. NORTH 5° 58' 33" WEST, 79.40 FEET TO THE EXTREME SOUTHERLY END OF THE ARC OF A CURVE CONNECTING THE EASTERLY SIDE OF PLAINFIELD ROAD WITH THE SOUTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE NORTHEASTERLY, ALONG THE ARC OF SAID CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 25.00 FEET, A DISTANCE OF 36.60 FEET TO THE SOUTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE NORTHEASTERLY ALONG THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 489.54 FEET, A DISTANCE OF 277.45 feet.

THENCE NORTHEASTERLY ALONG THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, NORTH 45 DEGREES 24 MINUTES 54 SECONDS EAST, 34.36 FEET TO THE POINT OR PLACE OF BEGINNING.

Address Reference: 220 Salina Meadows Parkway and 301 Plainfield Road (as to Tract 1) and 231 Salina Meadows Parkway and 200 Salina (as to Tract 2), Syracuse, NY 13212 (For Information Only)

Being the same premises conveyed to Salina Park, LLC by deed made by SCCP SALINA II, LIMITED PARTNERSHIP, a Delaware limited partnership dated 06/06/2016 recorded 06/14/2016 in the Office of the County Clerk, Onondaga County in Book 5376 page 604.

For Information Only:

Said Premises being known as 200 Salina Meadows Pkwy, Syracuse, NY.

Section: 50 Block: 1 Lot: 1.7

Premises: **200 Salina Meadows Pkwy, Town of Salina**
County: Onondaga State: NY Sec.: **50** Block: **1** Lot: **1.7**

Premises: **220 Salina Meadows Pkwy, Town of Salina**
County: Onondaga State: NY Sec.: **50** Block: **1** Lot: **1.6**

Premises: **231 Salina Meadows Pkwy, Town of Salina**
County: Onondaga State: NY Sec.: **50** Block: **1** Lot: **1.3**

Premises: **301 Plainfield Rd, Town of Salina**
County: Onondaga State: NY Sec.: **50** Block: **1** Lot: **2.0**

Reference No.: 5206.004
Matter Name: Salina Meadows Office Park
Pool: BBCMS 2022-C15

THIS DOCUMENT HAS BEEN
ELECTRONICALLY RECORDED

## ASSIGNMENT OF MORTGAGE

BANK OF MONTREAL
(Assignor)

to

WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT
OF THE REGISTERED HOLDERS OF BBCMS MORTGAGE TRUST 2022-C15,
COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2022-C15, AND
THE RR INTEREST OWNER
(Assignee)

Effective as of April 13, 2022

Property Address(es): 200, 220, 231 Salina Meadows Parkway and 301 Plainfield Road,
Syracuse, NY 13212
County of Onondaga
State of New York

DOCUMENT PREPARED BY AND WHEN RECORDED, RETURN TO:
McCoy & Orta, P.C.
100 North Broadway, 26th Floor
Oklahoma City, Oklahoma 73102
Telephone: 888-236-0007

This assignment is not subject to the requirements of Section 275 of the Real Property Law of
the State of New York because it is an assignment within the secondary mortgage market.

## ASSIGNMENT OF MORTGAGE

Effective as of the 13th day of April, 2022, BANK OF MONTREAL, having an address at 4 Times Square, New York, NY 10036 ("Assignor"), as the holder of the instrument hereinafter described and for valuable consideration hereby assigns, sells, transfers and delivers to WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE REGISTERED HOLDERS OF BBCMS MORTGAGE TRUST 2022-C15, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2022-C15, AND THE RR INTEREST OWNER, having an address at 1100 North Market Street, Wilmington, DE 19890 ("Assignee"), its successors, participants and assigns, without recourse or warranty, all right, title and interest of Assignor in and to those certain:

MORTGAGE AND SECURITY AGREEMENT made by AEVRI SALINA MEADOWS LLC, a Delaware limited liability company to Assignor, dated as of February 16, 2022 and recorded on March 7, 2022, as Instrument Number 2022-00009536 in the Recorder's Office of Onondaga County, New York (as the same may have been amended, modified, restated, supplemented, renewed or extended), securing payment of note(s) of even date therewith, in the original principal amount of $25,000,000.00, and creating a first lien on the property described in Exhibit A attached hereto and by this reference made a part hereof.

Together with any and all other liens, privileges, security interests, rights, entitlements, equities, claims and demands as to which Assignor hereunder possesses or to which Assignor is otherwise entitled as additional security for the payment of the notes and other obligations described herein.

This instrument shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

[SIGNATURE(S) ON THE FOLLOWING PAGE]

Reference No.: 5206.004
Matter Name: Salina Meadows Office Park
Pool: BBCMS 2022-C15

IN WITNESS WHEREOF, the Assignor has caused this instrument to be executed this _____ day of May, 2022, to be effective as of the date first written above.

**ASSIGNOR:**

BANK OF MONTREAL

By: _____

Name: Michael Birajiclian

Title: Managing Director

STATE OF _New York_ §

COUNTY OF _New York_ §

On the _9th_ day of May, 2022, before me, the undersigned, a Notary Public in and for said state, personally appeared Michael Birajiclian, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, as Managing Director of Bank of Montreal, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

WITNESS my hand and official seal.

My Commission Expires:

5/23/2024

Signature: _____

Notary Public

NATASHA LEBLANC
Notary Public - State of New York
NO. 01LE6342580
Qualified in New York County
My Commission Expires May 23, 2024

Reference No.: 5206.004
Matter Name: Salina Meadows Office Park
Pool: BBCMS 2022-C15

## EXHIBIT A

## LEGAL DESCRIPTION

ALL that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Town of Salina, in the County of Onondaga, State of NY:

TRACT 1:

LOT 6

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, BELONGING, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK, AND BEING DESIGNATED AS LOT 6 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK, AMENDMENT NO. 3, PART OF MILITARY LOTS 2, 3, 17 AND 18, TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED ON THE CLERK'S OFFICE AS MAP 7196.

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY, THE NORTHEAST CORNER OF LOT 6 AND THE NORTHWEST CORNER OF LOT 10. SAID POINT BEING THE POINT OF BEGINNING.

RUNNING THENCE LEAVING SAID SOUTHERLY RIGHT-OF-WAY SOUTH 06° 54' 25" WEST ALONG THE EASTERLY BOUNDARY LINE OF LOT 6 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE 481.53 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 83° 05' 35" WEST ALONG THE SOUTHERLY BOUNDARY LINE OF LOT 6 AND THE NORTHERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 282.00 FEET TO A MAG NAIL;

THENCE NORTH 38° 05' 35" WEST ALONG THE WESTERLY BOUNDARY LINE OF LOT 6 AND THE EASTERLY BOUNDARY LINE OF LOT 7 A DISTANCE 281.48 FEET TO A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY;

THENCE NORTH 45° 24' 54" EAST ALONG SAID SOUTHERLY RIGHT-OF-WAY A DISTANCE 202.21 FEET TO A MAG NAIL AT A POINT OF CURVATURE.

THENCE ALONG A CURVE TO THE RIGHT SAID CURVE HAVING A RADIUS OF 352.96 FEET AND AN ARC LENGTH OF 396.82 FEET TO THE POINT OF BEGINNING.

LOT 10

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, BELONGING, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK AND BEING DESIGNATED AS LOT 10 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK, AMENDMENT NO. 3, PART OF MILITARY LOT 2, 3, 17 AND 18, TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196.

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY, THE NORTHEAST CORNER OF LOT 6 AND THE NORTHWEST CORNER OF LOT 10, SAID POINT BEING THE POINT OF BEGINNING.

RUNNING THENCE ALONG A CURVE TO THE RIGHT TO A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 352.96 FEET AND AN ARC LENGTH OF 36.63 FEET TO A CAPPED IRON ROD SET;

THENCE SOUTH 64° 13' 24" EAST CONTINUING ALONG THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS A DISTANCE OF 170.00 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE LEFT TO A CAPPED IRON ROD SET AT A POINT OF REVERSE CURVE, SAID CURVE HAVING A RADIUS OF 600.00 FEET AND AN ARC LENGTH OF 151.63 FEET;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY ON THE WESTERLY RIGHT-OF-WAY LINE OF PLAINFIELD ROAD, SAID CURVE HAVING A RADIUS OF 25.00 FEET AND AN ARC LENGTH OF 37.07 FEET TO A CAPPED IRON ROD SET;

THENCE SOUTH 06° 14' 53" WEST ALONG SAID WESTERLY RIGHT-OF-WAY LINE A DISTANCE OF 211.20 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 540.37 FEET AND AN ARC LENGTH OF 415.87 FEET;

THENCE SOUTH 50° 20' 35" WEST A DISTANCE OF 173.84 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 320.00 FEET AND AN ARC LENGTH OF 260.06 FEET;

THENCE NORTH NORTH 83° 05' 35" WEST A DISTANCE OF 164.88 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 06° 54' 25" EAST ALONG THE EASTERLY BOUNDARY LINE OF LOT 7 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 453.76 FEET TO A DRILL HOLE SET;

THENCE SOUTH 83° 05' 35" EAST ALONG THE NORTHERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 295.00 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 06° 54' 25" EAST ALONG THE EASTERLY BOUNDARY LINE OF LOT 6 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 481.53 FEET TO A CAPPED IRON ROD SET AT THE POINT OF BEGINNING.

*Being the same premises conveyed to Salina Park, LLC by deed made by SCCP SALINA I, LIMITED PARTNERSHIP, a Delaware limited partnership dated 06/06/2016, recorded 06/14/2016 in the Office of the County Clerk, Onondaga County in Book 5376 page 591.*

TRACT 2:

LOT 3:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK CONTAINING 4.620 ACRES AND BEING DESIGNATED AS LOT 3 AS SHOWN ON THAT CERTAIN PLAT ENTITLED" FINAL PLAN SALINA MEADOWS OFFICE PARK AMENDMENT NO. 3 PART OF MILITARY LOTS 2,3, 17 AND 18 TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196 BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY, WHICH POINT IS THE DIVIDING LINE BETWEEN LOTS 3 AND 13 AS SHOWN ON SAID MAP;

RUNNING THENCE ALONG SAID DIVIDING LINE, NORTH 42° 02' 10" WEST, 338.15 FEET TO LOT 8 AS SHOWN ON SAID MAP;

THENCE ALONG SAID LAST MENTIONED LOT, NORTH 45° 24' 54" EAST, 407.00 FEET TO LAND NOW OR FORMERLY OF DONALD W. KNIGHT;

THENCE ALONG SAID LAST MENTIONED LAND, SOUTH 82° 25' 16" EAST, 285.00 FEET TO LOT 1 ON SAID MAP;

THENCE ALONG SAID LAST MENTIONED LOT, SOUTH 7° 34' 44" WEST, 439.29 FEET TO THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 412.96 FEET, A DISTANCE OF 301.66 FEET TO THE POINT OR PLACE OF BEGINNING.

BEING THE SAME PREMISES CONVEYED TO ROWE PROPERTIES-SALINA MEADOWS IV LIMITED PARTNERSHIP BY DEED FROM ROWE DEVELOPMENT COMPANY, A VIRGINIA CORPORATION, TO ROWE PROPERTIES-SALINA MEADOWS IV LIMITED PARTNERSHIP, A VIRGINIA LIMITED PARTNERSHIP, DATED JULY 2, 1987 AND RECORDED IN ONONDAGA COUNTY CLERK'S OFFICE JULY 27, 1987 ON BOOK 3371 OF DEEDS AT PAGE 165.

LOT 7:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK CONTAINING 4.161 ACRES AND BEING DESIGNATED AS LOT 7 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK AMENDMENT NO. 3 PART OF MILITARY LOTS 2, 3, 17 AND 18 TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, WHICH POINT IS THE DIVIDING LINE BETWEEN LOTS 7 AND 6 AS SHOWN ON SAID MAP;

RUNNING THENCE ALONG SAID DIVIDING LINE SOUTH 38° 05' 35" EAST, 281.48 FEET TO LOT 10 AS SHOWN ON SAID FILED MAP;

THENCE ALONG THE DIVIDING LINE BETWEEN LOTS 7 AND 10, NORTH 83° 05' 35" WEST, 13.00 FEET TO A POINT;

THENCE STILL ALONG THE DIVIDING LINE BETWEEN LOTS 7 AND 10, SOUTH 6° 54' 25" WEST, 453.76 FEET TO THE NORTHERLY SIDE OF PLAINFIELD ROAD;

THENCE ALONG THE NORTHERLY AND NORTHEASTERLY SIDES OF PLAINFIELD ROAD THE FOLLOWING 4 COURSES AND DISTANCES:

1. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 203.77 FEET, A DISTANCE OF 153.83 FEET;

2. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 801.50 FEET, A DISTANCE OF 208.36 FEET;

3. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 271.60 FEET, A DISTANCE OF 221.81 FEET;

4. NORTH 5° 58' 33" WEST, 79.40 FEET TO THE EXTREME SOUTHERLY END OF THE ARC OF A CURVE CONNECTING THE EASTERLY SIDE OF PLAINFIELD ROAD WITH THE SOUTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE NORTHEASTERLY, ALONG THE ARC OF SAID CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 25.00 FEET, A DISTANCE OF 36.60 FEET TO THE SOUTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE NORTHEASTERLY ALONG THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 489.54 FEET, A DISTANCE OF 277.45 feet.

THENCE NORTHEASTERLY ALONG THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, NORTH 45 DEGREES 24 MINUTES 54 SECONDS EAST, 34.36 FEET TO THE POINT OR PLACE OF BEGINNING.

Address Reference: 220 Salina Meadows Parkway and 301 Plainfield Road (as to Tract 1) and 231 Salina Meadows Parkway and 200 Salina (as to Tract 2), Syracuse, NY 13212 (For Information Only)

Being the same premises conveyed to Salina Park, LLC by deed made by SCCP SALINA II, LIMITED PARTNERSHIP, a Delaware limited partnership dated 06/06/2016 recorded 06/14/2016 in the Office of the County Clerk, Onondaga County in Book 5376 page 604.

For Information Only:

Said Premises being known as 200 Salina Meadows Pkwy, Syracuse, NY.

Section: 50 Block: 1 Lot: 1.7

Premises: **200 Salina Meadows Pkwy, Town of Salina**
County: **Onondaga** State: **NY** Sec.: **50** Block: **1** Lot: **1.7**

Premises: **220 Salina Meadows Pkwy, Town of Salina**
County: **Onondaga** State: **NY** Sec.: **50** Block: **1** Lot: **1.6**

Premises: **231 Salina Meadows Pkwy, Town of Salina**
County: **Onondaga** State: **NY** Sec.: **50** Block: **1** Lot: **1.3**

Premises: **301 Plainfield Rd, Town of Salina**
County: **Onondaga** State: **NY** Sec.: **50** Block: **1** Lot: **2.0**

Reference No.: 5206.004
Matter Name: Salina Meadows Office Park
Pool: BBCMS 2022-C15

# EXHIBIT 9

Lisa Dell, County Clerk
401 Montgomery Street
Room 200
Syracuse, NY 13202
(315) 435-2229

## Onondaga County Clerk Recording Cover Sheet

Received From :
SIMPLIFILE

Return To :
SIMPLIFILE

Method Returned : ERECORDING

**First PARTY 1**

| BANK OF MONTREAL |
|---|

**First PARTY 2**

| BBCMS MORTGAGE TRUST 2022 C15 COMMERCIAL MORTGAGE PASS THROUGH CERTIFICATES SERIES 2022 C15 |
|---|

Index Type : Land Records

*Instr Number :* 2022-00033777

**Book :**                         **Page :**

Type of Instrument : Assignment Of Assign Of Leases And Rents

Type of Transaction : Asmt-Release Mtg

Recording Fee:                    $86.00

Recording Pages :                 9

### Recorded Information

State of New York

County of Onondaga

I hereby certify that the within and foregoing was recorded in the Clerk's office for Onondaga County, New York

On (Recorded Date) : 08/18/2022

At (Recorded Time) . 1.34:58 PM

*Lisa Dell*

Lisa Dell, County Clerk

**ASSIGNMENT OF ASSIGNMENT OF LEASES AND RENTS**

BANK OF MONTREAL
(Assignor)

to

WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT
OF THE REGISTERED HOLDERS OF BBCMS MORTGAGE TRUST 2022-C15,
COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2022-C15, AND
THE RR INTEREST OWNER
(Assignee)

Effective as of April 13, 2022

Property Address(es): 200, 220, 231 Salina Meadows Parkway and 301 Plainfield Road,
Syracuse, NY 13212
County of Onondaga
State of New York

DOCUMENT PREPARED BY AND WHEN RECORDED, RETURN TO:
McCoy & Orta, P.C.
100 North Broadway, 26ᵗʰ Floor
Oklahoma City, Oklahoma 73102
Telephone: 888-236-0007

This assignment is not subject to the requirements of Section 275 of the Real Property Law of
the State of New York because it is an assignment within the secondary mortgage market.

## ASSIGNMENT OF ASSIGNMENT OF LEASES AND RENTS

Effective as of the 13th day of April, 2022, BANK OF MONTREAL, having an address at 4 Times Square, New York, NY 10036 ("Assignor"), as the holder of the instrument hereinafter described and for valuable consideration hereby assigns, sells, transfers and delivers to WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE REGISTERED HOLDERS OF BBCMS MORTGAGE TRUST 2022-C15, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2022-C15, AND THE RR INTEREST OWNER, having an address at 1100 North Market Street, Wilmington, DE 19890 ("Assignee"), its successors, participants and assigns, without recourse or warranty, all right, title and interest of Assignor in and to that certain:

ASSIGNMENT OF LEASES AND RENTS made by AEVRI SALINA MEADOWS LLC, a Delaware limited liability company to Assignor, dated as of February 16, 2022 and recorded on March 7, 2022, as Instrument Number 2022-00009537 in the Recorder's Office of Onondaga County, New York (as the same may have been amended, modified, restated, supplemented, renewed or extended), securing payment of note(s) of even date therewith, in the original principal amount of $25,000,000.00, and creating a first lien on the property described in Exhibit A attached hereto and by this reference made a part hereof.

Together with any and all other liens, privileges, security interests, rights, entitlements, equities, claims and demands as to which Assignor hereunder possesses or to which Assignor is otherwise entitled as additional security for the payment of the notes and other obligations described herein.

This instrument shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

[SIGNATURE(S) ON THE FOLLOWING PAGE]

Reference No.: 5206.004
Matter Name: Salina Meadows Office Park
Pool: BBCMS 2022-C15

*9th* IN WITNESS WHEREOF, the Assignor has caused this instrument to be executed this ___*9th*___ day of May, 2022, to be effective as of the date first written above.

ASSIGNOR:

BANK OF MONTREAL

By: _____

Name: Michael Birajiclian
Title: Managing Director

STATE OF *New York* §
§
COUNTY OF *New York* §

    On the ___*9th*___ day of May, 2022, before me, the undersigned, a Notary Public in and for said state, personally appeared Michael Birajiclian, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, as Managing Director of Bank of Montreal, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

    WITNESS my hand and official seal.

My Commission Expires: 5/23/2024

Signature: _____
           Notary Public

NATASHA LEBLANC
Notary Public - State of New York
NO. 01LE6342580
Qualified in New York County
My Commission Expires May 23, 2024

Reference No.: 5206.004
Matter Name: Salina Meadows Office Park
Pool: BBCMS 2022-C1S

# EXHIBIT A

## LEGAL DESCRIPTION

ALL that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Town of Salina, in the County of Onondaga, State of NY:

TRACT 1:

LOT 6

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, BELONGING, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK, AND BEING DESIGNATED AS LOT 6 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK, AMENDMENT NO. 3, PART OF MILITARY LOTS 2, 3, 17 AND 18, TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED ON THE CLERK'S OFFICE AS MAP 7196.

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY, THE NORTHEAST CORNER OF LOT 6 AND THE NORTHWEST CORNER OF LOT 10. SAID POINT BEING THE POINT OF BEGINNING.

RUNNING THENCE LEAVING SAID SOUTHERLY RIGHT-OF-WAY SOUTH 06° 54' 25" WEST ALONG THE EASTERLY BOUNDARY LINE OF LOT 6 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE 481.53 FEET TO A CAPPED IRON ROD SET:

THENCE NORTH 83° 05' 35" WEST ALONG THE SOUTHERLY BOUNDARY LINE OF LOT 6 AND THE NORTHERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 282.00 FEET TO A MAG NAIL;

THENCE NORTH 38° 05' 35" WEST ALONG THE WESTERLY BOUNDARY LINE OF LOT 6 AND THE EASTERLY BOUNDARY LINE OF LOT 7 A DISTANCE 281.48 FEET TO A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY;

THENCE NORTH 45° 24' 54" EAST ALONG SAID SOUTHERLY RIGHT-OF-WAY A DISTANCE 202.21 FEET TO A MAG NAIL AT A POINT OF CURVATURE.

THENCE ALONG A CURVE TO THE RIGHT SAID CURVE HAVING A RADIUS OF 352.96 FEET AND AN ARC LENGTH OF 396.82 FEET TO THE POINT OF BEGINNING.

Reference No.: 5206.004
Matter Name: Salina Meadows Office Park
Pool: BBCMS 2022-C15

LOT 10

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, BELONGING, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK AND BEING DESIGNATED AS LOT 10 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK, AMENDMENT NO. 3, PART OF MILITARY LOT 2, 3, 17 AND 18, TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196.

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY, THE NORTHEAST CORNER OF LOT 6 AND THE NORTHWEST CORNER OF LOT 10, SAID POINT BEING THE POINT OF BEGINNING.

RUNNING THENCE ALONG A CURVE TO THE RIGHT TO A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 352.96 FEET AND AN ARC LENGTH OF 36.63 FEET TO A CAPPED IRON ROD SET;

THENCE SOUTH 64° 13' 24" EAST CONTINUING ALONG THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS A DISTANCE OF 170.00 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE LEFT TO A CAPPED IRON ROD SET AT A POINT OF REVERSE CURVE, SAID CURVE HAVING A RADIUS OF 600.00 FEET AND AN ARC LENGTH OF 151.63 FEET;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY ON THE WESTERLY RIGHT-OF-WAY LINE OF PLAINFIELD ROAD, SAID CURVE HAVING A RADIUS OF 25.00 FEET AND AN ARC LENGTH OF 37.07 FEET TO A CAPPED IRON ROD SET;

THENCE SOUTH 06° 14' 53" WEST ALONG SAID WESTERLY RIGHT-OF-WAY LINE A DISTANCE OF 211.20 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 540.37 FEET AND AN ARC LENGTH OF 415.87 FEET;

THENCE SOUTH 50° 20' 35" WEST A DISTANCE OF 173.84 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 320.00 FEET AND AN ARC LENGTH OF 260.06 FEET;

THENCE NORTH NORTH 83° 05' 35" WEST A DISTANCE OF 164.88 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 06° 54' 25" EAST ALONG THE EASTERLY BOUNDARY LINE OF LOT 7 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 453.76 FEET TO A DRILL HOLE SET;

THENCE SOUTH 83° 05' 35" EAST ALONG THE NORTHERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 295.00 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 06° 54' 25" EAST ALONG THE EASTERLY BOUNDARY LINE OF LOT 6 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 481.53 FEET TO A CAPPED IRON ROD SET AT THE POINT OF BEGINNING.

Being the same premises conveyed to Salina Park, LLC by deed made by SCCP SALINA I, LIMITED PARTNERSHIP, a Delaware limited partnership dated 06/06/2016, recorded 06/14/2016 in the Office of the County Clerk, Onondaga County in Book 5376 page 591.


TRACT 2:

LOT 3:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK CONTAINING 4.620 ACRES AND BEING DESIGNATED AS LOT 3 AS SHOWN ON THAT CERTAIN PLAT ENTITLED" FINAL PLAN SALINA MEADOWS OFFICE PARK AMENDMENT NO. 3 PART OF MILITARY LOTS 2,3, 17 AND 18 TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196 BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY, WHICH POINT IS THE DIVIDING LINE BETWEEN LOTS 3 AND 13 AS SHOWN ON SAID MAP;

RUNNING THENCE ALONG SAID DIVIDING LINE, NORTH 42° 02' 10" WEST, 338.15 FEET TO LOT 8 AS SHOWN ON SAID MAP;

THENCE ALONG SAID LAST MENTIONED LOT, NORTH 45° 24' 54" EAST, 407.00 FEET TO LAND NOW OR FORMERLY OF DONALD W. KNIGHT;

THENCE ALONG SAID LAST MENTIONED LAND, SOUTH 82° 25' 16" EAST, 285.00 FEET TO LOT 1 ON SAID MAP;

THENCE ALONG SAID LAST MENTIONED LOT, SOUTH 7° 34' 44" WEST, 439.29 FEET TO THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 412.96 FEET, A DISTANCE OF 301.66 FEET TO THE POINT OR PLACE OF BEGINNING.

BEING THE SAME PREMISES CONVEYED TO ROWE PROPERTIES-SALINA MEADOWS IV LIMITED PARTNERSHIP BY DEED FROM ROWE DEVELOPMENT COMPANY, A VIRGINIA CORPORATION, TO ROWE PROPERTIES-SALINA MEADOWS IV LIMITED PARTNERSHIP, A VIRGINIA LIMITED PARTNERSHIP, DATED JULY 2, 1987 AND RECORDED IN ONONDAGA COUNTY CLERK'S OFFICE JULY 27, 1987 ON BOOK 3371 OF DEEDS AT PAGE 165.

LOT 7:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK CONTAINING 4.161 ACRES AND BEING DESIGNATED AS LOT 7 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK AMENDMENT NO. 3 PART OF MILITARY LOTS 2, 3, 17 AND 18 TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, WHICH POINT IS THE DIVIDING LINE BETWEEN LOTS 7 AND 6 AS SHOWN ON SAID MAP:

RUNNING THENCE ALONG SAID DIVIDING LINE SOUTH 38° 05' 35" EAST, 281.48 FEET TO LOT 10 AS SHOWN ON SAID FILED MAP;

THENCE ALONG THE DIVIDING LINE BETWEEN LOTS 7 AND 10, NORTH 83° 05' 35" WEST, 13.00 FEET TO A POINT:

THENCE STILL ALONG THE DIVIDING LINE BETWEEN LOTS 7 AND 10, SOUTH 6° 54' 25" WEST, 453.76 FEET TO THE NORTHERLY SIDE OF PLAINFIELD ROAD;

THENCE ALONG THE NORTHERLY AND NORTHEASTERLY SIDES OF PLAINFIELD ROAD THE FOLLOWING 4 COURSES AND DISTANCES:

1. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 203.77 FEET, A DISTANCE OF 153.83 FEET;

2. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 801.50 FEET, A DISTANCE OF 208.36 FEET;

3. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 271.60 FEET, A DISTANCE OF 221.81 FEET;

4. NORTH 5° 58' 33" WEST, 79.40 FEET TO THE EXTREME SOUTHERLY END OF THE ARC OF A CURVE CONNECTING THE EASTERLY SIDE OF PLAINFIELD ROAD WITH THE SOUTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE NORTHEASTERLY, ALONG THE ARC OF SAID CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 25.00 FEET, A DISTANCE OF 36.60 FEET TO THE SOUTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE NORTHEASTERLY ALONG THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 489.54 FEET, A DISTANCE OF 277.45 feet.

THENCE NORTHEASTERLY ALONG THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, NORTH 45 DEGREES 24 MINUTES 54 SECONDS EAST, 34.36 FEET TO THE POINT OR PLACE OF BEGINNING.

Address Reference: 220 Salina Meadows Parkway and 301 Plainfield Road (as to Tract 1) and 231 Salina Meadows Parkway and 200 Salina (as to Tract 2), Syracuse, NY 13212 (For Information Only)

Being the same premises conveyed to Salina Park, LLC by deed made by SCCP SALINA II, LIMITED PARTNERSHIP, a Delaware limited partnership dated 06/06/2016 recorded 06/14/2016 in the Office of the County Clerk, Onondaga County in Book 5376 page 604.

For Information Only:

Said Premises being known as 200 Salina Meadows Pkwy, Syracuse, NY.

Section: 50 Block: 1 Lot: 1.7

Premises: **200 Salina Meadows Pkwy, Town of Salina**
County:   **Onondaga** State: NY   Sec.: **50** Block: **1**   Lot: **1.7**

Premises: **220 Salina Meadows Pkwy, Town of Salina**
County:   **Onondaga** State: NY   Sec.: **50** Block: **1**   Lot: **1.6**

Premises: **231 Salina Meadows Pkwy, Town of Salina**
County:   **Onondaga** State: NY   Sec.: **50** Block: **1**   Lot: **1.3**

Premises: **301 Plainfield Rd, Town of Salina**
County:   **Onondaga** State: NY   Sec.: **50** Block: **1**   Lot: **2.0**

Reference No.: 5206.004
Matter Name: Salina Meadows Office Park
Pool: BBCMS 2022-C15

*THIS DOCUMENT HAS BEEN ELECTRONICALLY RECORDED*

## ASSIGNMENT OF ASSIGNMENT OF LEASES AND RENTS

BANK OF MONTREAL
(Assignor)

to

WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT
OF THE REGISTERED HOLDERS OF BBCMS MORTGAGE TRUST 2022-C15,
COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2022-C15, AND
THE RR INTEREST OWNER
(Assignee)

Effective as of April 13, 2022

Property Address(es): 200, 220, 231 Salina Meadows Parkway and 301 Plainfield Road,
Syracuse, NY 13212
County of Onondaga
State of New York

DOCUMENT PREPARED BY AND WHEN RECORDED, RETURN TO:
McCoy & Orta, P.C.
100 North Broadway, 26th Floor
Oklahoma City, Oklahoma 73102
Telephone: 888-236-0007

This assignment is not subject to the requirements of Section 275 of the Real Property Law of
the State of New York because it is an assignment within the secondary mortgage market.

**ASSIGNMENT OF ASSIGNMENT OF LEASES AND RENTS**

Effective as of the 13th day of April, 2022, BANK OF MONTREAL, having an address at 4 Times Square, New York, NY 10036 ("Assignor"), as the holder of the instrument hereinafter described and for valuable consideration hereby assigns, sells, transfers and delivers to WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE REGISTERED HOLDERS OF BBCMS MORTGAGE TRUST 2022-C15, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2022-C15, AND THE RR INTEREST OWNER, having an address at 1100 North Market Street, Wilmington, DE 19890 ("Assignee"), its successors, participants and assigns, without recourse or warranty, all right, title and interest of Assignor in and to that certain:

ASSIGNMENT OF LEASES AND RENTS made by AEVRI SALINA MEADOWS LLC, a Delaware limited liability company to Assignor, dated as of February 16, 2022 and recorded on March 7, 2022, as Instrument Number 2022-00009537 in the Recorder's Office of Onondaga County, New York (as the same may have been amended, modified, restated, supplemented, renewed or extended), securing payment of note(s) of even date therewith, in the original principal amount of $25,000,000.00, and creating a first lien on the property described in Exhibit A attached hereto and by this reference made a part hereof.

Together with any and all other liens, privileges, security interests, rights, entitlements, equities, claims and demands as to which Assignor hereunder possesses or to which Assignor is otherwise entitled as additional security for the payment of the notes and other obligations described herein.

This instrument shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

[SIGNATURE(S) ON THE FOLLOWING PAGE]

Reference No.: 5206.004
Matter Name: Salina Meadows Office Park
Pool: BBCMS 2022-C15

_9th_ IN WITNESS WHEREOF, the Assignor has caused this instrument to be executed this _9th_ day of May, 2022, to be effective as of the date first written above.

**ASSIGNOR:**

BANK OF MONTREAL

By: _____

Name: Michael Birajiclian

Title: Managing Director

STATE OF _New York_ §
                                          §
COUNTY OF _New York_ §

On the _9th_ day of May, 2022, before me, the undersigned, a Notary Public in and for said state, personally appeared Michael Birajiclian, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, as Managing Director of Bank of Montreal, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

WITNESS my hand and official seal.

My Commission Expires: _5/23/2024_

Signature: _____
                                                        Notary Public

NATASHA LEBLANC
Notary Public - State of New York
NO. 01LE6342580
Qualified in New York County
My Commission Expires May 23, 2024

Reference No.: 5206.004
Matter Name: Salina Meadows Office Park
Pool: BBCMS 2022-C15

# EXHIBIT A

## LEGAL DESCRIPTION

ALL that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Town of Salina, in the County of Onondaga, State of NY:

TRACT 1:

LOT 6

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, BELONGING, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK, AND BEING DESIGNATED AS LOT 6 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK, AMENDMENT NO. 3, PART OF MILITARY LOTS 2, 3, 17 AND 18, TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED ON THE CLERK'S OFFICE AS MAP 7196.

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY, THE NORTHEAST CORNER OF LOT 6 AND THE NORTHWEST CORNER OF LOT 10, SAID POINT BEING THE POINT OF BEGINNING.

RUNNING THENCE LEAVING SAID SOUTHERLY RIGHT-OF-WAY SOUTH 06° 54' 25" WEST ALONG THE EASTERLY BOUNDARY LINE OF LOT 6 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE 481.53 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 83° 05' 35" WEST ALONG THE SOUTHERLY BOUNDARY LINE OF LOT 6 AND THE NORTHERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 282.00 FEET TO A MAG NAIL;

THENCE NORTH 38° 05' 35" WEST ALONG THE WESTERLY BOUNDARY LINE OF LOT 6 AND THE EASTERLY BOUNDARY LINE OF LOT 7 A DISTANCE 281.48 FEET TO A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY;

THENCE NORTH 45° 24' 54" EAST ALONG SAID SOUTHERLY RIGHT-OF-WAY A DISTANCE 202.21 FEET TO A MAG NAIL AT A POINT OF CURVATURE.

THENCE ALONG A CURVE TO THE RIGHT SAID CURVE HAVING A RADIUS OF 352.96 FEET AND AN ARC LENGTH OF 396.82 FEET TO THE POINT OF BEGINNING.

LOT 10

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, BELONGING, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK AND BEING DESIGNATED AS LOT 10 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK, AMENDMENT NO. 3, PART OF MILITARY LOT 2, 3, 17 AND 18, TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196.

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY, THE NORTHEAST CORNER OF LOT 6 AND THE NORTHWEST CORNER OF LOT 10, SAID POINT BEING THE POINT OF BEGINNING.

RUNNING THENCE ALONG A CURVE TO THE RIGHT TO A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 352.96 FEET AND AN ARC LENGTH OF 36.63 FEET TO A CAPPED IRON ROD SET;

THENCE SOUTH 64° 13' 24" EAST CONTINUING ALONG THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS A DISTANCE OF 170.00 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE LEFT TO A CAPPED IRON ROD SET AT A POINT OF REVERSE CURVE, SAID CURVE HAVING A RADIUS OF 600.00 FEET AND AN ARC LENGTH OF 151.63 FEET;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY ON THE WESTERLY RIGHT-OF-WAY LINE OF PLAINFIELD ROAD, SAID CURVE HAVING A RADIUS OF 25.00 FEET AND AN ARC LENGTH OF 37.07 FEET TO A CAPPED IRON ROD SET;

THENCE SOUTH 06° 14' 53" WEST ALONG SAID WESTERLY RIGHT-OF-WAY LINE A DISTANCE OF 211.20 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 540.37 FEET AND AN ARC LENGTH OF 415.87 FEET;

THENCE SOUTH 50° 20' 35" WEST A DISTANCE OF 173.84 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 320.00 FEET AND AN ARC LENGTH OF 260.06 FEET;

THENCE NORTH NORTH 83° 05' 35" WEST A DISTANCE OF 164.88 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 06° 54' 25" EAST ALONG THE EASTERLY BOUNDARY LINE OF LOT 7 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 453.76 FEET TO A DRILL HOLE SET;

THENCE SOUTH 83° 05' 35" EAST ALONG THE NORTHERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 295.00 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 06° 54' 25" EAST ALONG THE EASTERLY BOUNDARY LINE OF LOT 6 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 481.53 FEET TO A CAPPED IRON ROD SET AT THE POINT OF BEGINNING.

Being the same premises conveyed to Salina Park, LLC by deed made by SCCP SALINA I, LIMITED PARTNERSHIP, a Delaware limited partnership dated 06/06/2016, recorded 06/14/2016 in the Office of the County Clerk, Onondaga County in Book 5376 page 591.

TRACT 2:

LOT 3:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK CONTAINING 4.620 ACRES AND BEING DESIGNATED AS LOT 3 AS SHOWN ON THAT CERTAIN PLAT ENTITLED" FINAL PLAN SALINA MEADOWS OFFICE PARK AMENDMENT NO. 3 PART OF MILITARY LOTS 2,3, 17 AND 18 TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196 BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY, WHICH POINT IS THE DIVIDING LINE BETWEEN LOTS 3 AND 13 AS SHOWN ON SAID MAP;

RUNNING THENCE ALONG SAID DIVIDING LINE, NORTH 42° 02' 10" WEST, 338.15 FEET TO LOT 8 AS SHOWN ON SAID MAP;

THENCE ALONG SAID LAST MENTIONED LOT, NORTH 45° 24' 54" EAST, 407.00 FEET TO LAND NOW OR FORMERLY OF DONALD W. KNIGHT;

THENCE ALONG SAID LAST MENTIONED LAND, SOUTH 82° 25' 16" EAST, 285.00 FEET TO LOT 1 ON SAID MAP;

THENCE ALONG SAID LAST MENTIONED LOT, SOUTH 7° 34' 44" WEST, 439.29 FEET TO THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 412.96 FEET, A DISTANCE OF 301.66 FEET TO THE POINT OR PLACE OF BEGINNING.

BEING THE SAME PREMISES CONVEYED TO ROWE PROPERTIES-SALINA MEADOWS IV LIMITED PARTNERSHIP BY DEED FROM ROWE DEVELOPMENT COMPANY, A VIRGINIA CORPORATION, TO ROWE PROPERTIES-SALINA MEADOWS IV LIMITED PARTNERSHIP, A VIRGINIA LIMITED PARTNERSHIP, DATED JULY 2, 1987 AND RECORDED IN ONONDAGA COUNTY CLERK'S OFFICE JULY 27, 1987 ON BOOK 3371 OF DEEDS AT PAGE 165.

LOT 7:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK CONTAINING 4.161 ACRES AND BEING DESIGNATED AS LOT 7 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK AMENDMENT NO. 3 PART OF MILITARY LOTS 2, 3, 17 AND 18 TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, WHICH POINT IS THE DIVIDING LINE BETWEEN LOTS 7 AND 6 AS SHOWN ON SAID MAP;

RUNNING THENCE ALONG SAID DIVIDING LINE SOUTH 38° 05' 35" EAST, 281.48 FEET TO LOT 10 AS SHOWN ON SAID FILED MAP;

THENCE ALONG THE DIVIDING LINE BETWEEN LOTS 7 AND 10, NORTH 83° 05' 35" WEST, 13.00 FEET TO A POINT;

THENCE STILL ALONG THE DIVIDING LINE BETWEEN LOTS 7 AND 10, SOUTH 6° 54' 25" WEST, 453.76 FEET TO THE NORTHERLY SIDE OF PLAINFIELD ROAD;

THENCE ALONG THE NORTHERLY AND NORTHEASTERLY SIDES OF PLAINFIELD ROAD THE FOLLOWING 4 COURSES AND DISTANCES:

1. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 203.77 FEET, A DISTANCE OF 153.83 FEET;

2. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 801.50 FEET, A DISTANCE OF 208.36 FEET;

3. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 271.60 FEET, A DISTANCE OF 221.81 FEET;

4. NORTH 5° 58' 33" WEST, 79.40 FEET TO THE EXTREME SOUTHERLY END OF THE ARC OF A CURVE CONNECTING THE EASTERLY SIDE OF PLAINFIELD ROAD WITH THE SOUTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE NORTHEASTERLY, ALONG THE ARC OF SAID CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 25.00 FEET, A DISTANCE OF 36.60 FEET TO THE SOUTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE NORTHEASTERLY ALONG THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 489.54 FEET, A DISTANCE OF 277.45 feet.

THENCE NORTHEASTERLY ALONG THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, NORTH 45 DEGREES 24 MINUTES 54 SECONDS EAST, 34.36 FEET TO THE POINT OR PLACE OF BEGINNING.

Address Reference: 220 Salina Meadows Parkway and 301 Plainfield Road (as to Tract 1) and 231 Salina Meadows Parkway and 200 Salina (as to Tract 2), Syracuse, NY 13212 (For Information Only)

Being the same premises conveyed to Salina Park, LLC by deed made by SCCP SALINA II, LIMITED PARTNERSHIP, a Delaware limited partnership dated 06/06/2016 recorded 06/14/2016 in the Office of the County Clerk, Onondaga County in Book 5376 page 604.

For Information Only:

Said Premises being known as 200 Salina Meadows Pkwy, Syracuse, NY.

Section: 50 Block: 1 Lot: 1.7

Premises: **200 Salina Meadows Pkwy, Town of Salina**
County:   **Onondaga** State: **NY**   Sec.: **50** Block: **1**   Lot: **1.7**

Premises: **220 Salina Meadows Pkwy, Town of Salina**
County:   **Onondaga** State: **NY**   Sec.: **50** Block: **1**   Lot: **1.6**

Premises: **231 Salina Meadows Pkwy, Town of Salina**
County:   **Onondaga** State: **NY**   Sec.: **50** Block: **1**   Lot: **1.3**

Premises: **301 Plainfield Rd, Town of Salina**
County:   **Onondaga** State: **NY**   Sec.: **50** Block: **1**   Lot: **2.0**

Reference No.: 5206.004
Matter Name: Salina Meadows Office Park
Pool: BBCMS 2022-C15

# EXHIBIT 10



**VENABLE** LLP

750 E. PRATT STREET   SUITE 900   BALTIMORE, MD 21202
**T** 410.244.7400   **F** 410.244.7742   www.Venable.com

June 29, 2023

t 410.244.7862
f 410.244.7742
BWProcida@Venable.com

**VIA UPS OVERNIGHT MAIL**

Aevri Salina Meadows, LLC
2604 Elmwood Avenue, Suite 210
Rochester, New York 14618
Attention: Moshe Rothman

> Re:   That certain loan (the "**Loan**") in the original principal amount of $25,000,000 as evidenced by a Promissory Note dated February 16, 2022 ("**Note**") executed by Aevri Salina Meadows, LLC, a Delaware limited liability company ("**Borrower**") and made payable to the Bank of Montreal, ("**Original Lender**"), which Note is currently held by Wilmington Trust, National Association, as Trustee for BBCMS Mortgage Trust 2022-C15 ("**Lender**"). Additional terms and conditions of the Loan are set forth in a Loan Agreement ("**Loan Agreement**") and Cash Management Agreement ("**Cash Management Agreement**") of even date with the Note. The Note is secured by, among other things, a Mortgage and Security Agreement ("**Mortgage**") of even date executed by Borrower. The Loan is subject to a Limited Recourse Guaranty of even date ("**Guaranty**") made by Moshe Rothman ("**Guarantor**"). The Note, Loan Agreement, Cash Management Agreement, Mortgage, Guaranty and all other documents executed in connection with the Loan shall be collectively referred to as the "Loan Documents". Capitalized terms not otherwise defined shall have the meanings given to them in the Loan Documents.

Rialto Loan # 30508596

Dear Borrower:

The above-mentioned Loan is administered on behalf of the Lender by Rialto Capital Advisors LLC ("**Rialto**"), as Special Servicer. I write as counsel to Rialto acting solely in its capacity as Special Servicer to the Lender. On behalf of Rialto and in accordance with Rialto's policies and procedures, you are hereby notified that an **EVENT OF DEFAULT** has occurred under the terms of the Loan Documents due to the Borrower's failure to make the Loan payment due on May 6, 2023, and each payment due thereafter.

Aevri Salina Meadows, LLC
June 29, 2023
Page 2


Please be further advised that pursuant to the Mortgage the Borrower's **REVOCABLE LICENSE TO COLLECT RENTS** payable by tenants or occupants occupying the real property covered by the Mortgage has **AUTOMATICALLY TERMINATED** and a **TRIGGER PERIOD** exists as a result of the above-referenced Event of Default. Accordingly, Lender demands that all rental payments received by the Borrower, its agents, servants or employees be immediately deposited into a Restricted Account as required by the Loan Agreement. Other Borrower payments should be made pursuant to the following wire instructions:

> Wiring Information:
> PNC Bank NA
> Bank ID: 043000096
> Acct#: 1006967647
> Attn: Midland Loan Services, a PNC Real Estate Business
> Loan#: 030508596

Acceptance of any payment or partial payment pursuant to these wire instructions shall not be deemed a waiver of the Borrower's immediate obligation to cooperate in the establishment of a Restricted Account (if and to the extent such an account does not already exist), nor of any default or remedy resulting from the failure to establish such Restricted Account.

Note that, by reason of the above defaults, the Lender may be entitled, in its sole discretion, to exercise certain rights and remedies under the Loan Documents. Notwithstanding the exercise of the foregoing rights or the commencement or continuation of discussions or negotiations, the acceptance of partial payments, or the postponement or delay in taking action or exercising rights or remedies, the Lender has not and does not waive the existence of the default or Trigger Period referred to above or waive the existence of any other defaults or Trigger Periods which may exist. The Lender shall not be limited or restricted from enforcing any rights or remedies available to it, including, without limitation, commencing judicial or non-judicial foreclosure proceedings and/or seeking the appointment of a receiver to collect rents and profits, or otherwise administer the collateral.

No negotiations, making or acceptance of partial payments, delay in making demand or enforcing rights or remedies, or other action or inaction undertaken pursuant to this letter or under the Loan Documents shall constitute a waiver of the Lender's rights at law or under the Loan Documents unless specifically stated in a written agreement signed by the Lender.

Very truly yours,

Brent W. Procida

Aevri Salina Meadows, LLC
June 29, 2023
Page 3


cc:     <u>Via Ups Overnight Mail</u>
        Book Law Group, LLC
        2 Perlman Drive, Suite 201
        Spring Valley, New York 10977
        Attn: Mordechai Book, Esq.

        <u>Via Electronic Mail</u>
        Nate Kritzer;  nkritzer@Steptoe.com
        Jim Carolan;  jcarolan@Steptoe.com

# EXHIBIT 11



August 2, 2023

t 410.244.7862
f 410.244.7742
BWProcida@Venable.com

**VIA UPS OVERNIGHT MAIL**

Aevri Salina Meadows, LLC
2604 Elmwood Avenue, Suite 210
Rochester, New York 14618
Attention: Moshe Rothman

      Re:    That certain loan (the "**Loan**") in the original principal amount of $25,000,000 as evidenced by a Promissory Note dated February 16, 2022 ("**Note**") executed by Aevri Salina Meadows, LLC, a Delaware limited liability company ("**Borrower**") and made payable to the Bank of Montreal, ("**Original Lender**"), which Note is currently held by Wilmington Trust, National Association, as Trustee for BBCMS Mortgage Trust 2022-C15 ("**Lender**"). Additional terms and conditions of the Loan are set forth in a Loan Agreement ("**Loan Agreement**") and Cash Management Agreement ("**Cash Management Agreement**") of even date with the Note. The Note is secured by, among other things, a Mortgage and Security Agreement ("**Mortgage**") of even date executed by Borrower. The Loan is subject to a Limited Recourse Guaranty of even date ("**Guaranty**") made by Moshe Rothman ("**Guarantor**"). The Note, Loan Agreement, Cash Management Agreement, Mortgage, Guaranty and all other documents executed in connection with the Loan shall be collectively referred to as the "Loan Documents". Capitalized terms not otherwise defined shall have the meanings given to them in the Loan Documents.

      Rialto Loan # 30508596

Dear Borrower:

      The above-mentioned Loan is administered on behalf of the Lender by Rialto Capital Advisors LLC ("**Rialto**"), as Special Servicer to the Lender. I write as counsel to Rialto acting solely in its capacity as Special Servicer to the Lender. You have previously been notified by letter dated June 29, 2023, that an **EVENT OF DEFAULT** existed due to the Borrower's failure to make payments as and when due under the Loan Documents, that the Borrower's **REVOCABLE LICENSE TO COLLECT RENTS** payable by tenants or occupants occupying the real property had **AUTOMATICALLY TERMINATED** and a that **TRIGGER PERIOD** existed under the Cash Management Agreement as a result of the default.

      Although the Borrower made a partial payment of $320,000 on or about July 3, 2023, this amount was insufficient to satisfy the accrued interest and made no contribution to past due escrow payments. The Borrower subsequently failed to make any payment on account of the Loan installment due on July 6, 2023, and consequently an **EVENT OF DEFAULT** continues to exist due to the Borrower's failure to make payments as and when due under the Loan Documents. An additional **EVENT OF DEFAULT** exists due to the Borrower's failure to comply with the Cash Management Agreement after notice and demand by the Lender.



Aevri Salina Meadows, LLC
August 2, 2023
Page 2

By reason of said defaults, and without waiver of other defaults that may exist, the Borrower is hereby notified that pursuant to the terms of the Loan Documents, the Lender has exercised its option to **ACCELERATE** the maturity of the unpaid balance of the Loan and has declared and does hereby declare due and payable the entire principal balance under the Loan Documents, as well as all accrued interest and other amounts owing under the Loan Documents. In addition to the accelerated amounts of principal and interest now due and owing, the Borrower is also obligated to pay the costs of collection, including reasonable attorneys' fees and disbursements. **DEMAND IS HEREBY MADE** for the payment of all amounts unpaid now due and owing.

Note that, by reason of the above defaults, the Lender may be entitled, in its sole discretion, to exercise certain rights and remedies under the Loan Documents. Notwithstanding the exercise of the foregoing rights or the commencement or continuation of discussions or negotiations, the acceptance of payments, or the postponement or delay in taking action or exercising rights or remedies, the Lender has not and does not waive the existence of the default or Trigger Period referred to above or waive the existence of any other defaults or Trigger Periods which may exist. The Lender shall not be limited or restricted from enforcing any rights or remedies available to it, including, without limitation, commencing judicial or non-judicial foreclosure proceedings and/or seeking the appointment of a receiver to collect rents and profits, or otherwise administer the collateral.

No negotiations, making or acceptance of payments, delay in making demand or enforcing rights or remedies, or other action or inaction undertaken pursuant to this letter or under the Loan Documents shall constitute a waiver of the Lender's rights at law or under the Loan Documents unless specifically stated in a written agreement signed by the Lender.

Very truly yours,

Brent W. Procida

60842936

cc:    Book Law Group, LLC (via Overnight Delivery)
2 Perlman Drive, Suite 201
Spring Valley, New York 10977
Attn: Mordechai Book, Esq.

Nate Kritzer; nkritzer@Steptoe.com (via Electronic Mail)
Jim Carolan; jcarolan@Steptoe.com (via Electronic Mail)

# EXHIBIT 12



SIGNATURE BANK
565 Fifth Avenue, 12th Floor
New York, NY 10017

From  August    01, 2023
To    August    31, 2023
Page    1 of    2

PRIVATE CLIENT GROUP 837
130 BATTERY STREET
SAN FRANCISCO, CA 94111

AEVRI SALINA MEADOWS LLC                8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                       See Back for Important Information

                                Primary Account: 1504652609          0

    BEGINNING AUGUST 9TH, SIGNATURE INTERNET BANKING WILL BECOME
    FLAGSTAR COMMERCIAL & PRIVATE INTERNET BANKING. LOG IN AT
    FLAGSTAR.COM/COMMERCIAL-PRIVATE AND YOU WILL BE ABLE TO
    USE THE SAME LOGIN CREDENTIALS THAT YOU HAVE BEEN USING
    FOR SIGNATURE INTERNET BANKING.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | 2,525.00 | 2,250.00 |
| | | |
| RELATIONSHIP TOTAL | | 2,250.00 |


**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From August    01, 2023
To    August    31, 2023
Page    2 of    2

PRIVATE CLIENT GROUP 837
130 BATTERY STREET
SAN FRANCISCO, CA 94111

AEVRI SALINA MEADOWS LLC              8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                    See Back for Important Information

                                     Primary Account: 1504652609          0

MONOGRAM CHECKING          1504652609


Summary

  Previous Balance as of August    01, 2023                              2,525.00
          1 Debits                                                         275.00
  Ending Balance as of    August    31, 2023                             2,250.00

Withdrawals and Other Debits
  Aug 25  ANALYSIS - DIRECT FEE                                           275.00

Daily Balances
  Jul 31    2,525.00                    Aug 25      2,250.00

Rates for this statement period - Overdraft
          Aug 01, 2023   18.250000  %



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From July    01, 2023
To   July    31, 2023
Page    1 of     2

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                              See Back for Important Information

                                    Primary Account: 1504652609          0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT! FLAGSTAR BANK, N.A. WILL NEVER
ASK YOU TO PROVIDE PERSONAL OR BUSINESS ACCOUNT INFORMATION THROUGH
E-MAIL. IF YOU RECEIVE ANY E-MAIL OR OTHER INQUIRY THAT APPEARS TO COME
FROM FLAGSTAR BANK, N.A., DO NOT RESPOND TO IT OR CLICK ON ANY LINKS
INCLUDED IN THE E-MAIL. INSTEAD, CALL US TOLL-FREE AT 1-866-744-5463 OR
CONTACT YOUR ACCOUNT OFFICER. FOR MORE INFORMATION ON IDENTITY THEFT,
VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM. CLICK ON "ABOUT US",
"PRIVACY & SECURITY", "IDENTITY THEFT" FOR MORE INFORMATION ON
SAFEGUARDING YOUR IDENTITY AND PERSONAL INFORMATION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | 2,800.00 | 2,525.00 |
| RELATIONSHIP TOTAL | | 2,525.00 |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From July    01, 2023
To   July    31, 2023
Page     2 of     2

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC              8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                          See Back for Important Information

                                  Primary Account: 1504652609            0

MONOGRAM CHECKING              1504652609

Summary

 Previous Balance as of July      01, 2023                           2,800.00
      1 Debits                                                         275.00
 Ending Balance as of    July    31, 2023                           2,525.00

Withdrawals and Other Debits
 Jul 25  ANALYSIS - DIRECT FEE                                        275.00

Daily Balances
 Jun 30      2,800.00                  Jul 25        2,525.00

Rates for this statement period - Overdraft
            Jul 27, 2023   18.250000  %
            Jul 01, 2023   18.000000  %



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From June    01, 2023
To   June    30, 2023
Page    1 of    2

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC              8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                              See Back for Important Information

                                   Primary Account: 1504652609          0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT! FLAGSTAR BANK, N.A. WILL NEVER
ASK YOU TO PROVIDE PERSONAL OR BUSINESS ACCOUNT INFORMATION THROUGH
E-MAIL. IF YOU RECEIVE ANY E-MAIL OR OTHER INQUIRY THAT APPEARS TO COME
FROM FLAGSTAR BANK, N.A., DO NOT RESPOND TO IT OR CLICK ON ANY LINKS
INCLUDED IN THE E-MAIL. INSTEAD, CALL US TOLL-FREE AT 1-866-744-5463 OR
CONTACT YOUR ACCOUNT OFFICER. FOR MORE INFORMATION ON IDENTITY THEFT,
VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM. CLICK ON "ABOUT US",
"PRIVACY & SECURITY", "IDENTITY THEFT" FOR MORE INFORMATION ON
SAFEGUARDING YOUR IDENTITY AND PERSONAL INFORMATION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | 3,075.00 | 2,800.00 |
| RELATIONSHIP TOTAL | | 2,800.00 |




**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From June    01, 2023
To   June    30, 2023
Page    2 of    2

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC              8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                     See Back for Important Information

                                      Primary Account: 1504652609          0

MONOGRAM CHECKING          1504652609


Summary

  Previous Balance as of June     01, 2023                               3,075.00
        1 Debits                                                           275.00
  Ending Balance as of    June    30, 2023                              2,800.00

Withdrawals and Other Debits
  Jun 26  ANALYSIS - DIRECT FEE                                            275.00

Daily Balances
  May 31      3,075.00                    Jun 26        2,800.00

Rates for this statement period - Overdraft
             Jun 01, 2023   18.000000  %



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From May    01, 2023
To   May    31, 2023
Page   1 of    2

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                           See Back for Important Information

                                  Primary Account: 1504652609         0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT! FLAGSTAR BANK, N.A. WILL NEVER
ASK YOU TO PROVIDE PERSONAL OR BUSINESS ACCOUNT INFORMATION THROUGH
E-MAIL. IF YOU RECEIVE ANY E-MAIL OR OTHER INQUIRY THAT APPEARS TO COME
FROM FLAGSTAR BANK, N.A., DO NOT RESPOND TO IT OR CLICK ON ANY LINKS
INCLUDED IN THE E-MAIL. INSTEAD, CALL US TOLL-FREE AT 1-866-744-5463 OR
CONTACT YOUR ACCOUNT OFFICER. FOR MORE INFORMATION ON IDENTITY THEFT,
VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM. CLICK ON "ABOUT US",
"PRIVACY & SECURITY", "IDENTITY THEFT" FOR MORE INFORMATION ON
SAFEGUARDING YOUR IDENTITY AND PERSONAL INFORMATION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | 3,350.00 | 3,075.00 |
| RELATIONSHIP TOTAL | | 3,075.00 |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                           See Back for Important Information

                                            Primary Account: 1504652609          0

MONOGRAM CHECKING              1504652609


Summary

 Previous Balance as of May    01, 2023                                3,350.00
       1 Debits                                                          275.00
 Ending Balance as of    May   31, 2023                               3,075.00

Withdrawals and Other Debits
 May 24  ANALYSIS - DIRECT FEE                                          275.00

Daily Balances
 Apr 30      3,350.00                    May 24       3,075.00

Rates for this statement period - Overdraft
             May 04, 2023  18.000000  %
             May 01, 2023  17.750000  %



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From April  01, 2023
To   April  30, 2023
Page     1 of     2

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                       See Back for Important Information

                                        Primary Account: 1504652609          0

     IMPORTANT NOTICE:  ACCOUNT DOCUMENTATION HAS BEEN UPDATED TO REFLECT
     THE TRANSFER OF YOUR ACCOUNT AND SERVICES TO FLAGSTAR BANK, N.A. EFFECTIVE
     MARCH 20, 2023. YOUR CONTINUED USE OF THE ACCOUNT AND SERVICES WILL BE YOUR
     ACCEPTANCE OF THE UPDATED TERMS OF THE ACCOUNT DOCUMENTATION. THERE HAVE
     NOT BEEN ANY OTHER SUBSTANTIVE CHANGES IN THE ACCOUNT DOCUMENTATION OR THE
     WAY YOU HAVE EXPERIENCED YOUR ACCOUNT AND SERVICES TO DATE. PLEASE VISIT
     HTTPS://WWW.SIGNATURENY.COM/ABOUT-US/AGREEMENTS-DISCLOSURES TO VIEW THE
     ENTIRETY OF THIS IMPORTANT NOTICE AND THE FULL TEXT OF YOUR UPDATED ACCOUNT
     AGREEMENTS AND DISCLOSURES AND PRODUCT TERMS AND CONDITIONS.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | 3,625.00 | 3,350.00 |
| RELATIONSHIP TOTAL | | 3,350.00 |





SIGNATURE BANK
565 Fifth Avenue, 12th Floor
New York, NY 10017

From April   01, 2023
To   April   30, 2023
Page     2 of     2

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC              8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                         See Back for Important Information

                                       Primary Account: 1504652609          0

MONOGRAM CHECKING           1504652609

Summary

  Previous Balance as of April    01, 2023                                  3,625.00
        1 Debits                                                              275.00
  Ending Balance as of    April   30, 2023                                  3,350.00

Withdrawals and Other Debits
  Apr 24  ANALYSIS - DIRECT FEE                                              275.00

Daily Balances
  Mar 31      3,625.00                  Apr 24        3,350.00

Rates for this statement period - Overdraft
            Apr 01, 2023   17.750000  %



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From March    01, 2023
To   March    31, 2023
Page    1 of     2

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC              8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                     See Back for Important Information

                                      Primary Account: 1504652609        0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT! SIGNATURE BANK WILL NEVER
ASK YOU TO PROVIDE PERSONAL OR BUSINESS ACCOUNT INFORMATION THROUGH
E-MAIL. IF YOU RECEIVE ANY E-MAIL OR OTHER INQUIRY THAT APPEARS TO COME
FROM SIGNATURE, DO NOT RESPOND TO IT OR CLICK ON ANY LINKS INCLUDED IN
THE E-MAIL. INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE OR CONTACT
YOUR ACCOUNT OFFICER. FOR MORE INFORMATION ON IDENTITY THEFT, VISIT
OUR WEBSITE AT WWW.SIGNATURENY.COM. CLICK ON "ABOUT US", "PRIVACY
& SECURITY", "IDENTITY THEFT" FOR MORE INFORMATION ON SAFEGUARDING YOUR
IDENTITY AND PERSONAL INFORMATION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | 3,900.00 | 3,625.00 |
| RELATIONSHIP TOTAL | | 3,625.00 |


Case 2:23-cv-08842-PKC-JRC Document 43-112 Filed 03/04/24 Page 322 of 390

**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC            8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                   See Back for Important Information

                                    Primary Account: 1504652609        0

MONOGRAM CHECKING          1504652609


Summary

 Previous Balance as of March    01, 2023                          3,900.00
        1 Debits                                                     275.00
 Ending Balance as of    March   31, 2023                          3,625.00

Withdrawals and Other Debits
 Mar 24  ANALYSIS - DIRECT FEE                                       275.00

Daily Balances
 Feb 28       3,900.00              Mar 24       3,625.00

Rates for this statement period - Overdraft
             Mar 23, 2023   17.750000  %
             Mar 01, 2023   17.500000  %



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From February 01, 2023
To    February  28, 2023
Page   1 of   2

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                          See Back for Important Information

                                    Primary Account: 1504652609        0

        IMPORTANT MESSAGE ABOUT IDENTITY THEFT! SIGNATURE BANK WILL NEVER
        ASK YOU TO PROVIDE PERSONAL OR BUSINESS ACCOUNT INFORMATION THROUGH
        E-MAIL. IF YOU RECEIVE ANY E-MAIL OR OTHER INQUIRY THAT APPEARS TO COME
        FROM SIGNATURE, DO NOT RESPOND TO IT OR CLICK ON ANY LINKS INCLUDED IN
        THE E-MAIL. INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE OR CONTACT
        YOUR ACCOUNT OFFICER. FOR MORE INFORMATION ON IDENTITY THEFT, VISIT
        OUR WEBSITE AT WWW.SIGNATURENY.COM. CLICK ON "ABOUT US", "PRIVACY
        & SECURITY", "IDENTITY THEFT" FOR MORE INFORMATION ON SAFEGUARDING YOUR
        IDENTITY AND PERSONAL INFORMATION.

Signature Relationship Summary                    Opening Bal.        Closing Bal.

BANK DEPOSIT ACCOUNTS
1504652609    MONOGRAM CHECKING               4,175.00            3,900.00

              RELATIONSHIP TOTAL                                  3,900.00



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From February  01, 2023
To    February  28, 2023
Page   2 of   2

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                          See Back for Important Information

                                           Primary Account: 1504652609          0

MONOGRAM CHECKING             1504652609


Summary

 Previous Balance as of February  01, 2023                              4,175.00
         1 Debits                                                         275.00
 Ending Balance as of    February  28, 2023                            3,900.00

Withdrawals and Other Debits
 Feb 22  ANALYSIS - DIRECT FEE                                           275.00

Daily Balances
 Jan 31         4,175.00              Feb 22        3,900.00

Rates for this statement period - Overdraft
            Feb 02, 2023   17.500000  %
            Feb 01, 2023   17.250000  %



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From January  01, 2023
To   January  31, 2023
Page   1 of   2

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                          See Back for Important Information

Primary Account: 1504652609          0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT! SIGNATURE BANK WILL NEVER
ASK YOU TO PROVIDE PERSONAL OR BUSINESS ACCOUNT INFORMATION THROUGH
E-MAIL. IF YOU RECEIVE ANY E-MAIL OR OTHER INQUIRY THAT APPEARS TO COME
FROM SIGNATURE, DO NOT RESPOND TO IT OR CLICK ON ANY LINKS INCLUDED IN
THE E-MAIL. INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE OR CONTACT
YOUR ACCOUNT OFFICER. FOR MORE INFORMATION ON IDENTITY THEFT, VISIT
OUR WEBSITE AT WWW.SIGNATURENY.COM. CLICK ON "ABOUT US", "PRIVACY
& SECURITY", "IDENTITY THEFT" FOR MORE INFORMATION ON SAFEGUARDING YOUR
IDENTITY AND PERSONAL INFORMATION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | 4,450.00 | 4,175.00 |
| | | |
| RELATIONSHIP TOTAL | | 4,175.00 |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From January 01, 2023
To January 31, 2023
Page 2 of 2

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC               8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                          See Back for Important Information

                                        Primary Account: 1504652609         0

MONOGRAM CHECKING          1504652609

Summary

  Previous Balance as of January   01, 2023                          4,450.00
        1 Debits                                                        275.00
  Ending Balance as of    January   31, 2023                         4,175.00

Withdrawals and Other Debits
  Jan 24  ANALYSIS - DIRECT FEE                                         275.00

Daily Balances
  Dec 31        4,450.00                Jan 24        4,175.00

Rates for this statement period - Overdraft
           Jan 01, 2023   17.250000  %



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From December  01, 2022
To   December  31, 2022
Page   1 of   2

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                          See Back for Important Information

Primary Account: 1504652609           0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT! SIGNATURE BANK WILL NEVER
ASK YOU TO PROVIDE PERSONAL OR BUSINESS ACCOUNT INFORMATION THROUGH
E-MAIL. IF YOU RECEIVE ANY E-MAIL OR OTHER INQUIRY THAT APPEARS TO COME
FROM SIGNATURE, DO NOT RESPOND TO IT OR CLICK ON ANY LINKS INCLUDED IN
THE E-MAIL. INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE OR CONTACT
YOUR ACCOUNT OFFICER. FOR MORE INFORMATION ON IDENTITY THEFT, VISIT
OUR WEBSITE AT WWW.SIGNATURENY.COM. CLICK ON "ABOUT US", "PRIVACY
& SECURITY", "IDENTITY THEFT" FOR MORE INFORMATION ON SAFEGUARDING YOUR
IDENTITY AND PERSONAL INFORMATION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | 4,725.00 | 4,450.00 |
| RELATIONSHIP TOTAL | | 4,450.00 |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From December 01, 2022
To   December 31, 2022
Page    2 of    2

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                 8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                            See Back for Important Information

Primary Account: 1504652609            0

MONOGRAM CHECKING            1504652609

Summary

  Previous Balance as of December  01, 2022                        4,725.00
        1 Debits                                                     275.00
  Ending Balance as of    December  31, 2022                       4,450.00

Withdrawals and Other Debits
  Dec 23  ANALYSIS - DIRECT FEE                                      275.00

Daily Balances
  Nov 30        4,725.00             Dec 23        4,450.00

Rates for this statement period - Overdraft
              Dec 15, 2022  17.250000  %
              Dec 01, 2022  16.750000  %



SIGNATURE BANK
565 Fifth Avenue, 12th Floor
New York, NY 10017

From November 01, 2022
To   November 30, 2022
Page    1 of   2

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC          8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                        See Back for Important Information

                                   Primary Account: 1504652609        0

    IMPORTANT MESSAGE ABOUT IDENTITY THEFT! SIGNATURE BANK WILL NEVER
    ASK YOU TO PROVIDE PERSONAL OR BUSINESS ACCOUNT INFORMATION THROUGH
    E-MAIL. IF YOU RECEIVE ANY E-MAIL OR OTHER INQUIRY THAT APPEARS TO COME
    FROM SIGNATURE, DO NOT RESPOND TO IT OR CLICK ON ANY LINKS INCLUDED IN
    THE E-MAIL. INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE OR CONTACT
    YOUR ACCOUNT OFFICER. FOR MORE INFORMATION ON IDENTITY THEFT, VISIT
    OUR WEBSITE AT WWW.SIGNATURENY.COM. CLICK ON "ABOUT US", "PRIVACY
    & SECURITY", "IDENTITY THEFT" FOR MORE INFORMATION ON SAFEGUARDING YOUR
    IDENTITY AND PERSONAL INFORMATION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | 5,000.00 | 4,725.00 |
| RELATIONSHIP TOTAL | | 4,725.00 |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From November 01, 2022
To   November  30, 2022
Page    2 of    2

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                                See Back for Important Information

                                     Primary Account: 1504652609          0

MONOGRAM CHECKING            1504652609

Summary

 Previous Balance as of November  01, 2022                               5,000.00
          1 Debits                                                        275.00
 Ending Balance as of    November  30, 2022                             4,725.00

Withdrawals and Other Debits
 Nov 23  ANALYSIS - DIRECT FEE                                            275.00

Daily Balances
 Oct 31         5,000.00                 Nov 23        4,725.00

Rates for this statement period - Overdraft
              Nov 03, 2022  16.750000  %
              Nov 01, 2022  16.000000  %



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From October   01, 2022
To    October   31, 2022
Page     1 of    3

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC               8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                          See Back for Important Information

Primary Account: 1504652609        0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT! SIGNATURE BANK WILL NEVER
ASK YOU TO PROVIDE PERSONAL OR BUSINESS ACCOUNT INFORMATION THROUGH
E-MAIL. IF YOU RECEIVE ANY E-MAIL OR OTHER INQUIRY THAT APPEARS TO COME
FROM SIGNATURE, DO NOT RESPOND TO IT OR CLICK ON ANY LINKS INCLUDED IN
THE E-MAIL. INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE OR CONTACT
YOUR ACCOUNT OFFICER. FOR MORE INFORMATION ON IDENTITY THEFT, VISIT
OUR WEBSITE AT WWW.SIGNATURENY.COM. CLICK ON "ABOUT US", "PRIVACY
& SECURITY", "IDENTITY THEFT" FOR MORE INFORMATION ON SAFEGUARDING YOUR
IDENTITY AND PERSONAL INFORMATION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | 4,725.00 | 5,000.00 |
| RELATIONSHIP TOTAL | | 5,000.00 |



SIGNATURE BANK
565 Fifth Avenue, 12th Floor
New York, NY 10017

From October  01, 2022
To   October  31, 2022
Page    2 of   3

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                        See Back for Important Information

                                        Primary Account: 1504652609            0

MONOGRAM CHECKING          1504652609

Summary

  Previous Balance as of October   01, 2022                              4,725.00
         1 Credits                                                      19,001.07
         2 Debits                                                       18,726.07
  Ending Balance as of    October   31, 2022                             5,000.00

Deposits and Other Credits
  Oct 24  ACH DEPOSIT              ck/ref no.   7306857                  19,001.07
          JLL CAS        550707       000000000044739
          RMR*IK*550707\
          RMR*IK*550707\
          AEVRI SALINA MEADOWS L

Withdrawals and Other Debits
  Oct 24  ANALYSIS - DIRECT FEE                                            275.00
  Oct 25  SWEEP WIRE                                                     18,451.07
          REF#  20221025B6B7261F000531
          TO:   AEVRI SALINA MEADOWS LLC        ABA:   221272031
          BANK: INVESTORS SB              ACCT# 1001846692

Daily Balances
  Sep 30        4,725.00                  Oct 25        5,000.00
  Oct 24       23,451.07



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From October   01, 2022
To   October   31, 2022
Page     3 of   3

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                          See Back for Important Information

Primary Account: 1504652609           0

Rates for this statement period - Overdraft
            Oct 01, 2022   16.000000  %



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                           See Back for Important Information

                                  Primary Account: 1504652609          0

    IMPORTANT MESSAGE ABOUT IDENTITY THEFT! SIGNATURE BANK WILL NEVER
    ASK YOU TO PROVIDE PERSONAL OR BUSINESS ACCOUNT INFORMATION THROUGH
    E-MAIL. IF YOU RECEIVE ANY E-MAIL OR OTHER INQUIRY THAT APPEARS TO COME
    FROM SIGNATURE, DO NOT RESPOND TO IT OR CLICK ON ANY LINKS INCLUDED IN
    THE E-MAIL. INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE OR CONTACT
    YOUR ACCOUNT OFFICER. FOR MORE INFORMATION ON IDENTITY THEFT, VISIT
    OUR WEBSITE AT WWW.SIGNATURENY.COM. CLICK ON "ABOUT US", "PRIVACY
    & SECURITY", "IDENTITY THEFT" FOR MORE INFORMATION ON SAFEGUARDING YOUR
    IDENTITY AND PERSONAL INFORMATION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | 5,000.00 | 4,725.00 |
| RELATIONSHIP TOTAL | | 4,725.00 |

**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From September 01, 2022
To  September 30, 2022
Page   2 of  3

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

```
AEVRI SALINA MEADOWS LLC                8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                         See Back for Important Information
```

Primary Account: 1504652609          0

MONOGRAM CHECKING        1504652609

Summary

```
Previous Balance as of September 01, 2022                          5,000.00
       4 Credits                                                 26,618.81
       5 Debits                                                  26,893.81
Ending Balance as of   September 30, 2022                          4,725.00
```

Deposits and Other Credits

```
Sep 01  ACH DEPOSIT           ck/ref no.    43919                  6,477.07
        WALGREENCO        PAYMENTS      2000007564
        ISA*00*       *00*      *01*008965063
        ISA*00*       *00*      *01*008965063JP3  *01*006981
        815    *220831*174
        0011AEVRI SALINA MEA
Sep 06  ACH DEPOSIT           ck/ref no.   696964                  1,090.67
        JLL CAS         520521        000000000041165
        RMR*IK*520521\
        RMR*IK*520521\
        AEVRI SALINA MEADOWS L
Sep 21  ACH DEPOSIT           ck/ref no.  2644536                     50.00
        WALGREENCO        PAYMENTS      2000121031
        ISA*00*       *00*      *01*008965063
        ISA*00*       *00*      *01*008965063JP3  *01*006981
        815    *220920*051
        0009AEVRI SALINA MEA
Sep 21  ACH DEPOSIT           ck/ref no.  2869149                 19,001.07
        JLL CAS         550234        000000000042244
        RMR*IK*550234\
        RMR*IK*550234\
        AEVRI SALINA MEADOWS L
```



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From  September 01, 2022
To    September 30, 2022
Page     3 of    3

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                           See Back for Important Information

Primary Account: 1504652609              0

Withdrawals and Other Debits
 Sep 01  SWEEP WIRE                                                    6,477.07
         REF#  20220901B6B7261F001480
         TO:   AEVRI SALINA MEADOWS LLC        ABA:   221272031
         BANK: INVESTORS SB            ACCT# 1001846692
 Sep 07  SWEEP WIRE                                                    1,090.67
         REF#  20220907B6B7261F000901
         TO:   AEVRI SALINA MEADOWS LLC        ABA:   221272031
         BANK: INVESTORS SB            ACCT# 1001846692
 Sep 21  SWEEP WIRE                                                       50.00
         REF#  20220921B6B7261F000693
         TO:   AEVRI SALINA MEADOWS LLC        ABA:   221272031
         BANK: INVESTORS SB            ACCT# 1001846692
 Sep 22  SWEEP WIRE                                                   19,001.07
         REF#  20220922B6B7261F000582
         TO:   AEVRI SALINA MEADOWS LLC        ABA:   221272031
         BANK: INVESTORS SB            ACCT# 1001846692
 Sep 26  ANALYSIS - DIRECT FEE                                           275.00

Daily Balances
 Aug 31         5,000.00            Sep 21         24,001.07
 Sep 06         6,090.67            Sep 22          5,000.00
 Sep 07         5,000.00            Sep 26          4,725.00

Rates for this statement period - Overdraft
Sep 22, 2022  16.000000 %
Sep 01, 2022  15.250000 %



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From August   01, 2022
To   August   31, 2022
Page    1 of    5

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC              8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                     See Back for Important Information

Primary Account: 1504652609          0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT! SIGNATURE BANK WILL NEVER
ASK YOU TO PROVIDE PERSONAL OR BUSINESS ACCOUNT INFORMATION THROUGH
E-MAIL. IF YOU RECEIVE ANY E-MAIL OR OTHER INQUIRY THAT APPEARS TO COME
FROM SIGNATURE, DO NOT RESPOND TO IT OR CLICK ON ANY LINKS INCLUDED IN
THE E-MAIL. INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE OR CONTACT
YOUR ACCOUNT OFFICER. FOR MORE INFORMATION ON IDENTITY THEFT, VISIT
OUR WEBSITE AT WWW.SIGNATURENY.COM. CLICK ON "ABOUT US", "PRIVACY
& SECURITY", "IDENTITY THEFT" FOR MORE INFORMATION ON SAFEGUARDING YOUR
IDENTITY AND PERSONAL INFORMATION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | 5,000.00 | 5,000.00 |
| RELATIONSHIP TOTAL | | 5,000.00 |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From August   01, 2022
To   August   31, 2022
Page    2 of   5

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC              8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                        See Back for Important Information

                                Primary Account: 1504652609          0

MONOGRAM CHECKING          1504652609


Summary

 Previous Balance as of August    01, 2022                              5,000.00
       16 Credits                                                     133,171.63
       10 Debits                                                      133,171.63
 Ending Balance as of    August    31, 2022                             5,000.00

Deposits and Other Credits
 Aug 01  ACH DEPOSIT           ck/ref no.   5698394                      1,911.53
         SENTRY INSURANCE    ACCT PAY     137170211
         AUG 2022 RENT PAYMENT\
         AUG 2022 RENT PAYMENT\
         AEVRI SALINA MEADOWS L
 Aug 01  ACH DEPOSIT           ck/ref no.   5549819                      6,477.07
         WALGREENCO        PAYMENTS      2002162806
         ISA*00*        *00*        *01*008965063
         ISA*00*        *00*        *01*008965063JP3  *01*006981
         815    *220729*051
         0011AEVRI SALINA MEA
 Aug 02  ACH DEPOSIT           ck/ref no.   5846522                      1,700.50
         NU ERA LOGISTICS    RENT PMT       AEVRI SALINA
         002 00000000001700501980575540
 Aug 04  ACH DEPOSIT           ck/ref no.   6311969                      8,922.27
         SEFCU MORTGAGE S    VENDOR PAY    10320
         RMT*IV*08012022*8922.27\DTM*003*220801\
         RMT*IV*08012022*8922.27\DTM*003*220801\
         AEVRI SALINA MEADOWS L
 Aug 18  ACH DEPOSIT           ck/ref no.   8464238                     14,395.67
         OSMOSE UTILITIES    ACH          344067
         002 00000000001439567135217531Ø
 Aug 19  ACH DEPOSIT           ck/ref no.   8487085                     11,380.88
         NATIONAL SAFETY     AP BILLS     V0998992
         002 00000000001138088136216780Ø



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From August   01, 2022
To   August   31, 2022
Page    3 of    5

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                        See Back for Important Information

                                  Primary Account: 1504652609          0

| Date | Description | | | Amount |
|---|---|---|---|---|
| Aug 19 | ACH DEPOSIT | ck/ref no. | 8427915 | 31,508.33 |
| | PARSONS SERVICES | PAYMENT | LB129 | |
| Aug 22 | ACH DEPOSIT | ck/ref no. | 8429483 | 6,486.67 |
| | J AND S R - 8581 | CASHCD | JAS RENT | |
| | 002 00000000006486672263563988 | | | |
| Aug 23 | ACH DEPOSIT | ck/ref no. | 8821021 | 7,125.49 |
| | BANKERS CONSECO | VENDOR EFT | 1139422 | |
| Aug 23 | ACH DEPOSIT | ck/ref no. | 8790847 | 7,281.28 |
| | BKLY INS CO-SLIA | ACH | AP0001777725 | |
| | MONTHLY RENT SYRACUSE OFFICE | | | |
| | MONTHLY RENT SYRACUSE OFFICE | | | |
| | AEVRI SALINA MEADOWS L | | | |
| Aug 24 | ACH DEPOSIT | ck/ref no. | 8988141 | 1,800.00 |
| | COLONIAL LIFE & | UNUM PMT | S-107800 | |
| | S-107800_2022-08-19\ | | | |
| | S-107800_2022-08-19\ | | | |
| | AEVRI SALINA MEADOWS | | | |
| Aug 25 | ACH DEPOSIT | ck/ref no. | 8894238 | 3,178.63 |
| | DUSCKAS ADVISORY | LEASE | | |
| | 002 00000000003178631461207955 | | | |
| Aug 25 | ACH DEPOSIT | ck/ref no. | 9104848 | 4,427.00 |
| | FDIC/FEDERAL DEP | EPOSPYMNTS | .CORP.700179002 | |
| | ISA*00*      *00*      *ZZ*072000326 | | | |
| | ISA*00*      *00*      *ZZ*072000326      *ZZ*026013 | | | |
| | 576    *220824*180 | | | |
| | 0007AEVRL SALINA MEA | | | |
| Aug 25 | ACH DEPOSIT | ck/ref no. | 9234965 | 19,001.07 |
| | JLL CAS | 549801 | 000000000040546 | |
| | RMR*IK*549801\ | | | |
| | RMR*IK*549801\ | | | |
| | AEVRI SALINA MEADOWS L | | | |
| Aug 26 | ACH DEPOSIT | ck/ref no. | 9255732 | 50.00 |
| | HII TECHNICAL SO | EFT | V013929 | |
| | 005 00000000002204479953809700 | | | |
| Aug 29 | ACH DEPOSIT | ck/ref no. | 9331986 | 7,525.24 |
| | PROGRESSIVE CASU | PAYMENT | 220829AEVRI SAL | |
| | ISA*00*      *00*      *NA*NA | | | |
| | ISA*00*      *00*      *NA*NA      *NA*NA | | | |
| | *220825*190 | | | |
| | 0013AEVRI SALINA MEA | | | |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From August   01, 2022
To   August   31, 2022
Page    4 of   5

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                     See Back for Important Information

                                  Primary Account: 1504652609        0

Withdrawals and Other Debits
Aug 01  SWEEP WIRE                                              8,388.60
        REF#  20220801B6B7261F001757
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB             ACCT# 1001846692
Aug 02  SWEEP WIRE                                              1,700.50
        REF#  20220802B6B7261F000874
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB             ACCT# 1001846692
Aug 04  SWEEP WIRE                                              8,922.27
        REF#  20220804B6B7261F000811
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB             ACCT# 1001846692
Aug 19  SWEEP WIRE                                             57,284.88
        REF#  20220819B6B7261F000775
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB             ACCT# 1001846692
Aug 22  SWEEP WIRE                                              6,486.67
        REF#  20220822B6B7261F000766
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB             ACCT# 1001846692
Aug 23  SWEEP WIRE                                             14,406.77
        REF#  20220823B6B7261F000614
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB             ACCT# 1001846692
Aug 24  ANALYSIS - DIRECT FEE                                     275.00
Aug 25  SWEEP WIRE                                              9,130.63
        REF#  20220825B6B7261F000566
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB             ACCT# 1001846692
Aug 26  SWEEP WIRE                                             19,051.07
        REF#  20220826B6B7261F000831
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB             ACCT# 1001846692
Aug 29  SWEEP WIRE                                              7,525.24
        REF#  20220829B6B7261F000815
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB             ACCT# 1001846692



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From August  01, 2022
To   August   31, 2022
Page   5 of   5

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC            8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                       See Back for Important Information

                                    Primary Account: 1504652609         0

Daily Balances
 Jul 31          5,000.00      Aug 24          6,525.00
 Aug 18         19,395.67      Aug 25         24,001.07
 Aug 19          5,000.00      Aug 26          5,000.00

Rates for this statement period - Overdraft
Aug 01, 2022   15.250000 %



SIGNATURE BANK
565 Fifth Avenue, 12th Floor
New York, NY 10017

From July   01, 2022
To   July   31, 2022
Page   1 of   6

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                          See Back for Important Information

                                Primary Account: 1504652609          0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT! SIGNATURE BANK WILL NEVER
ASK YOU TO PROVIDE PERSONAL OR BUSINESS ACCOUNT INFORMATION THROUGH
E-MAIL. IF YOU RECEIVE ANY E-MAIL OR OTHER INQUIRY THAT APPEARS TO COME
FROM SIGNATURE, DO NOT RESPOND TO IT OR CLICK ON ANY LINKS INCLUDED IN
THE E-MAIL. INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE OR CONTACT
YOUR ACCOUNT OFFICER. FOR MORE INFORMATION ON IDENTITY THEFT, VISIT
OUR WEBSITE AT WWW.SIGNATURENY.COM. CLICK ON "ABOUT US", "PRIVACY
& SECURITY", "IDENTITY THEFT" FOR MORE INFORMATION ON SAFEGUARDING YOUR
IDENTITY AND PERSONAL INFORMATION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | 5,000.00 | 5,000.00 |
| RELATIONSHIP TOTAL | | 5,000.00 |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From July    01, 2022
To   July    31, 2022
Page    2 of   6

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                       See Back for Important Information

                                        Primary Account: 1504652609         0

MONOGRAM CHECKING          1504652609

Summary

Previous Balance as of July    01, 2022                                5,000.00
     23 Credits                                                      171,928.27
     13 Debits                                                       171,928.27
Ending Balance as of    July    31, 2022                               5,000.00

Deposits and Other Credits
Jul 01  ACH DEPOSIT           ck/ref no.   1566110                     1,911.53
        SENTRY INSURANCE    ACCT PAY     135085645
        JUL 2022 RENT PAYMENT\
        JUL 2022 RENT PAYMENT\
        AEVRI SALINA MEADOWS L
Jul 01  ACH DEPOSIT           ck/ref no.   1507128                     6,477.07
        WALGREENCO          PAYMENTS        2002005171
        ISA*00*        *00*         *01*008965063
        ISA*00*        *00*         *01*008965063JP3  *01*006981
        815    *220630*114
        0011AEVRI SALINA MEA
Jul 01  ACH DEPOSIT           ck/ref no.   1506073                     8,578.23
        HDR INC.      73860         20272287
        ISA 00        00            ZZ HDRGPXML
        ISA 00        00            ZZ HDRGPXML        ZZ BOFAEC
        SUSO    220630 115
        0013AEVRI SALINA MEA
Jul 05  ACH DEPOSIT           ck/ref no.   1724435                     1,700.50
        NU ERA LOGISTICS    RENT PMT      AEVRI SALINA
        002 0000000000170050198057S540
Jul 07  ACH DEPOSIT           ck/ref no.   2320863                     8,922.27
        SEFCU MORTGAGE S    VENDOR PAY    10320
        RMT*IV*07012022*8922.27\DTM*003*220701\
        RMT*IV*07012022*8922.27\DTM*003*220701\
        AEVRI SALINA MEADOWS L



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From  July    01, 2022
To    July    31, 2022
Page    3 of    6

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                     See Back for Important Information

                                   Primary Account: 1504652609          0

| Date | Description | ck/ref no. | Amount |
|---|---|---|---|
| Jul 11 | ACH DEPOSIT | 2750941 | 50.00 |
| | GEICO INSURANCE     EFT | | |
| | 1193\ | | |
| | 1193\ | | |
| | AEVRI SALINA MEADOWS L | | |
| Jul 14 | ACH DEPOSIT | 3549980 | 14,395.67 |
| | OSMOSE UTILITIES     ACH     343006 | | |
| | 002 0000000000143956713521 75310 | | |
| Jul 20 | ACH DEPOSIT | 4067799 | 7,281.28 |
| | BKLY INS CO-SLIA     ACH     AP0001744298 | | |
| | MONTHLY RENT SYRACUSE OFFICE | | |
| | MONTHLY RENT SYRACUSE OFFICE | | |
| | AEVRI SALINA MEADOWS L | | |
| Jul 21 | ACH DEPOSIT | 4419971 | 19,001.07 |
| | JLL CAS          549340     000000000037600 | | |
| | RMR*IK*549340\ | | |
| | RMR*IK*549340\ | | |
| | AEVRI SALINA MEADOWS L | | |
| Jul 22 | ACH DEPOSIT | 4207711 | 6,486.67 |
| | J AND S R - 8581   CASHCD     JAS RENT | | |
| | 002 0000000000064866722 63563988 | | |
| Jul 22 | ACH DEPOSIT | 4480585 | 11,380.88 |
| | NATIONAL SAFETY     AP BILLS     V0998992 | | |
| | 002 0000000000113808813 62167809 | | |
| Jul 25 | ACH DEPOSIT | 4691334 | 1,850.00 |
| | COLONIAL LIFE &    UNUM PMT     S-107800 | | |
| | S-107800_2022-07-20\ | | |
| | S-107800_2022-07-20\ | | |
| | AEVRI SALINA MEADOWS | | |
| Jul 25 | ACH DEPOSIT | 4421455 | 3,178.63 |
| | DUSCKAS ADVISORY     LEASE | | |
| | 002 0000000000031786314 61207955 | | |
| Jul 25 | ACH DEPOSIT | 4686285 | 7,125.49 |
| | BANKERS CONSECO     VENDOR EFT     1125693 | | |
| Jul 26 | ACH DEPOSIT | 4792481 | 1,418.63 |
| | GEICO INSURANCE     EFT | | |
| | 200 SALINA MEADOWS PARKWAY-6\ | | |
| | 200 SALINA MEADOWS PARKWAY-6\ | | |
| | AEVRI SALINA MEADOWS L | | |

SIGNATURE BANK
565 Fifth Avenue, 12th Floor
New York, NY 10017

From July    01, 2022
To   July    31, 2022
Page    4 of    6

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                    See Back for Important Information

Primary Account: 1504652609          0

| | | | |
|---|---|---|---:|
| Jul 26 | ACH DEPOSIT | ck/ref no.   4769002 | 31,508.33 |
| | PARSONS SERVICES    PAYMENT      LB129 | | |
| Jul 27 | ACH DEPOSIT | ck/ref no.   5026138 | 250.00 |
| | LEVEL 3 COMMUNIC   VENDOR PAY   K10020003322762 | | |
| | RMT*&IVQLR*&INVCE**250.00*250.00*0.00\ | | |
| | RMT*&IVQLR*&INVCE**250.00*250.00*0.00\ | | |
| | AEVRI SALINA MEADOWS L | | |
| Jul 27 | ACH DEPOSIT | ck/ref no.   5180048 | 1,441.00 |
| | FUTURE ELECTRONI    RENTS        2285757 | | |
| Jul 28 | ACH DEPOSIT | ck/ref no.   5244894 | 4,427.00 |
| | FDIC/FEDERAL DEP    EPOSPYMNTS   .CORP.700178500 | | |
| | ISA*00*       *00*       *ZZ*072000326 | | |
| | ISA*00*       *00*       *ZZ*072000326    *ZZ*026013 | | |
| | 576    *220727*180 | | |
| | 0007AEVRL SALINA MEA | | |
| Jul 28 | ACH DEPOSIT | ck/ref no.   5157364 | 14,876.13 |
| | TRAVELERS INDEMN    CCD+         RNT3007 | | |
| | 005 00000000015708357916889000 4 | | |
| Jul 29 | ACH DEPOSIT | ck/ref no.   5468854 | 3,564.42 |
| | JENSEN HUGHES, I   07282022_V   US810385784 | | |
| | RMR*IK*RENT-AUG 2022\ | | |
| | RMR*IK*RENT-AUG 2022\ | | |
| | AEVRI SALINA MEADOWS L | | |
| Jul 29 | ACH DEPOSIT | ck/ref no.   5279137 | 7,525.24 |
| | PROGRESSIVE CASU    PAYMENT      220729AEVRI SAL | | |
| | ISA*00*       *00*       *NA*NA | | |
| | ISA*00*       *00*       *NA*NA           *NA*NA | | |
| | *220727*190 | | |
| | 0013AEVRI SALINA MEA | | |
| Jul 29 | ACH DEPOSIT | ck/ref no.   5395827 | 8,578.23 |
| | HDR INC.          75339        20280856 | | |
| | ISA 00         00         ZZ HDRGPXML | | |
| | ISA 00         00         ZZ HDRGPXML       ZZ BOFAEC | | |
| | SUSO    220728 115 | | |
| | 0013AEVRI SALINA MEA | | |

Withdrawals and Other Debits
| | | | |
|---|---|---|---:|
| Jul 01 | SWEEP WIRE | | 16,966.83 |
| | REF#  20220701B6B7261F001693 | | |
| | TO:  AEVRI SALINA MEADOWS LLC          ABA:    221272031 | | |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From July   01, 2022
To   July   31, 2022
Page   5 of   6

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                       See Back for Important Information

                                        Primary Account: 1504652609        0

| Date | Description | | |
|---|---|---|---|
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jul 05 | SWEEP WIRE | | 1,700.50 |
| | REF# 20220705B6B7261F001752 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jul 07 | SWEEP WIRE | | 8,922.27 |
| | REF# 20220707B6B7261F000765 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jul 11 | SWEEP WIRE | | 50.00 |
| | REF# 20220711B6B7261F000693 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jul 15 | SWEEP WIRE | | 14,395.67 |
| | REF# 20220715B6B7261F001403 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jul 20 | SWEEP WIRE | | 7,281.28 |
| | REF# 20220720B6B7261F000788 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jul 22 | SWEEP WIRE | | 36,868.62 |
| | REF# 20220722B6B7261F000738 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jul 25 | SWEEP WIRE | | 12,154.12 |
| | REF# 20220725B6B7261F000834 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jul 25 | ANALYSIS - DIRECT FEE | | 275.00 |
| Jul 26 | SWEEP WIRE | | 32,651.96 |
| | REF# 20220726B6B7261F000588 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jul 27 | SWEEP WIRE | | 250.00 |
| | REF# 20220727B6B7261F000991 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jul 28 | SWEEP WIRE | | 20,744.13 |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From July  01, 2022
To  July  31, 2022
Page   6 of  6

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                 8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                              See Back for Important Information

Primary Account: 1504652609          0

|  Date | | Description | | | |
|---|---|---|---|---|---|
| | REF#  20220728B6B7261F001094 | | | | |
| | TO:  AEVRI SALINA MEADOWS LLC | | ABA:  221272031 | | |
| | BANK: INVESTORS SB | | ACCT# 1001846692 | | |
| Jul 29 | SWEEP WIRE | | | | 19,667.89 |
| | REF#  20220729B6B7261F002717 | | | | |
| | TO:  AEVRI SALINA MEADOWS LLC | | ABA:  221272031 | | |
| | BANK: INVESTORS SB | | ACCT# 1001846692 | | |

Daily Balances

| | | | | |
|---|---|---|---|---|
| Jun 30 | 5,000.00 | | Jul 25 | 4,725.00 |
| Jul 14 | 19,395.67 | | Jul 26 | 5,000.00 |
| Jul 15 | 5,000.00 | | Jul 27 | 6,441.00 |
| Jul 21 | 24,001.07 | | Jul 28 | 5,000.00 |
| Jul 22 | 5,000.00 | | | |

Rates for this statement period - Overdraft
Jul 28, 2022  15.250000 %
Jul 01, 2022  14.500000 %



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From June    01, 2022
To   June    30, 2022
Page    1 of    6

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                           See Back for Important Information

                                   Primary Account: 1504652609          0

THE BANK HAS UPDATED ITS FEES AND SERVICE CHARGES INTO A COMBINED SCHEDULE
OF FEES AND SERVICE CHARGES FOR BUSINESS ACCOUNTS ("SCHEDULE").

THE SCHEDULE WILL GOVERN YOUR USE OF YOUR BANK ACCOUNT(S), ALONG WITH
BANKING PRODUCTS AND SERVICES. THE SCHEDULE REPLACES ALL PRIOR FEE
ARRANGEMENTS AND SCHEDULES IN EFFECT PRIOR TO SEPTEMBER 1, 2022 WHEN THIS
SCHEDULE BECOMES EFFECTIVE.

TO REVIEW THE UPDATED SCHEDULE, PLEASE VISIT SIGNATURE'S INTERNET BANKING
SITE, CONTACT YOUR PRIVATE CLIENT GROUP OR VISIT A BANK FINANCIAL CENTER.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | 5,000.00 | 5,000.00 |
| RELATIONSHIP TOTAL | | 5,000.00 |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC               8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                      See Back for Important Information

Primary Account: 1504652609          0

MONOGRAM CHECKING        1504652609

Summary

Previous Balance as of June     01, 2022                          5,000.00
     23 Credits                                                 202,857.89
     11 Debits                                                  202,857.89
Ending Balance as of   June    30, 2022                           5,000.00

Deposits and Other Credits
  Jun 01  ACH DEPOSIT          ck/ref no.   7324616                1,911.53
          SENTRY INSURANCE   ACCT PAY    132966585
          JUN 2022 RENT PAYMENT\
          JUN 2022 RENT PAYMENT\
          AEVRI SALINA MEADOWS L
  Jun 01  ACH DEPOSIT          ck/ref no.   7299485                8,578.23
          HDR INC.          72116          20264751
          ISA 00        00            ZZ HDRGPXML
          ISA 00        00            ZZ HDRGPXML       ZZ BOFAEC
          SUSO     220531 130
          0013AEVRI SALINA MEA
  Jun 02  ACH DEPOSIT          ck/ref no.   7552594                   50.00
          GEICO INSURANCE      EFT
          1155\
          1155\
          AEVRI SALINA MEADOWS L
  Jun 02  ACH DEPOSIT          ck/ref no.   7499678                1,655.75
          NU ERA LOGISTICS     RENT PMT      AEVRI SALINA
          002 00000000000016557519805755540
  Jun 03  ACH DEPOSIT          ck/ref no.   7834390                8,922.27
          SEFCU MORTGAGE S    VENDOR PAY    10320
          RMT*IV*06012022*8922.27\DTM*003*220601\
          RMT*IV*06012022*8922.27\DTM*003*220601\
          AEVRI SALINA MEADOWS L



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From June  01, 2022
To  June  30, 2022
Page  3 of  6

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                    See Back for Important Information

Primary Account: 1504652609                    0

| | | | | |
|---|---|---|---|---|
| Jun 17 | ACH DEPOSIT | ck/ref no. | 9809112 | 14,395.67 |
| | OSMOSE UTILITIES    ACH | 342052 | | |
| | 002 0000000001439567135217 5310 | | | |
| Jun 22 | ACH DEPOSIT | ck/ref no. | 9919972 | 6,486.67 |
| | J AND S R - 8581    CASHCD | JAS RENT | | |
| | 002 0000000000648667226356 3988 | | | |
| Jun 22 | ACH DEPOSIT | ck/ref no. | 342317 | 19,001.07 |
| | JLL CAS    548871 | 000000000035712 | | |
| | RMR*IK*548871\ | | | |
| | RMR*IK*548871\ | | | |
| | AEVRI SALINA MEADOWS L | | | |
| Jun 23 | ACH DEPOSIT | ck/ref no. | 458956 | 1,800.00 |
| | COLONIAL LIFE &    UNUM PMT | S-107800 | | |
| | S-107800_2022-06-20\ | | | |
| | S-107800_2022-06-20\ | | | |
| | AEVRI SALINA MEADOWS | | | |
| Jun 23 | ACH DEPOSIT | ck/ref no. | 550086 | 2,376.00 |
| | JLL CAS    549063 | 000000000035799 | | |
| | RMR*IK*549063\ | | | |
| | RMR*IK*549063\ | | | |
| | AEVRI SALINA MEADOWS L | | | |
| Jun 23 | ACH DEPOSIT | ck/ref no. | 444095 | 7,125.49 |
| | BANKERS CONSECO    VENDOR EFT | 1111764 | | |
| Jun 23 | ACH DEPOSIT | ck/ref no. | 343239 | 31,508.33 |
| | PARSONS SERVICES    PAYMENT | LB129 | | |
| Jun 24 | ACH DEPOSIT | ck/ref no. | 606102 | 3,564.42 |
| | JENSEN HUGHES, I    06232022_V | US810384744 | | |
| | RMR*IK*RENT-JULY 2022\ | | | |
| | RMR*IK*RENT-JULY 2022\ | | | |
| | AEVRI SALINA MEADOWS L | | | |
| Jun 24 | ACH DEPOSIT | ck/ref no. | 605131 | 11,380.88 |
| | NATIONAL SAFETY    AP BILLS | V0998992 | | |
| | 002 0000000000113808813621 67809 | | | |
| Jun 24 | ACH DEPOSIT | ck/ref no. | 595974 | 43,703.67 |
| | ALION SCIENCE    AP | 0 | | |
| | AEVRI SALINA MEADOWS L | | | |
| Jun 27 | ACH DEPOSIT | ck/ref no. | 551365 | 3,178.63 |
| | DUSCKAS ADVISORY    LEASE | | | |
| | 002 0000000000317863146120 7955 | | | |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From June    01, 2022
To   June    30, 2022
Page    4 of    6

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                          See Back for Important Information

                                          Primary Account: 1504652609          0

| Date | Description | | Amount |
|------|-------------|---|-------:|
| Jun 27 | ACH DEPOSIT            ck/ref no.    781853 | | 4,427.00 |
|  | FDIC/FEDERAL DEP  EPOSPYMNTS   .CORP.700178053 | | |
|  | ISA*00*       *00*      *ZZ*072000326 | | |
|  | ISA*00*       *00*      *ZZ*072000326    *ZZ*026013 | | |
|  | 576     *220624*180 | | |
|  | 0007AEVRL SALINA MEA | | |
| Jun 28 | ACH DEPOSIT            ck/ref no.    916564 | | 250.00 |
|  | LEVEL 3 COMMUNIC    VENDOR PAY   K10020002852632 | | |
|  | RMT*&IVQLR*&INVCE**250.00*250.00*0.00\ | | |
|  | RMT*&IVQLR*&INVCE**250.00*250.00*0.00\ | | |
|  | AEVRI SALINA MEADOWS L | | |
| Jun 28 | ACH DEPOSIT            ck/ref no.    902769 | | 1,418.63 |
|  | GEICO INSURANCE      EFT | | |
|  | 200 SALINA MEADOWS PARKWAY-5\ | | |
|  | 200 SALINA MEADOWS PARKWAY-5\ | | |
|  | AEVRI SALINA MEADOWS L | | |
| Jun 29 | ACH DEPOSIT            ck/ref no.    1095773 | | 1,441.00 |
|  | FUTURE ELECTRONI    RENTS      2285757 | | |
| Jun 29 | ACH DEPOSIT            ck/ref no.    1126994 | | 7,281.28 |
|  | BKLY INS CO-SLIA    ACH        AP0001724987 | | |
|  | MONTHLY RENT SYRACUSE OFFICE | | |
|  | MONTHLY RENT SYRACUSE OFFICE | | |
|  | AEVRI SALINA MEADOWS L | | |
| Jun 29 | ACH DEPOSIT            ck/ref no.    971772 | | 7,525.24 |
|  | PROGRESSIVE CASU    PAYMENT    220629AEVRI SAL | | |
|  | ISA*00*       *00*      *NA*NA | | |
|  | ISA*00*       *00*      *NA*NA         *NA*NA | | |
|  | *220627*190 | | |
|  | 0013AEVRI SALINA MEA | | |
| Jun 29 | ACH DEPOSIT            ck/ref no.    1060600 | | 14,876.13 |
|  | TRAVELERS INDEMN    CCD+       RNT3007 | | |
|  | 005 00000000015708357916889000O4 | | |

Withdrawals and Other Debits
| Date | Description | Amount |
|------|-------------|-------:|
| Jun 01 | SWEEP WIRE | 10,489.76 |
|  | REF# 20220601B6B7261F001522 | |
|  | TO:  AEVRI SALINA MEADOWS LLC        ABA:  221272031 | |
|  | BANK: INVESTORS SB              ACCT# 1001846692 | |
| Jun 02 | SWEEP WIRE | 1,705.75 |
|  | REF# 20220602B6B7261F000710 | |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From June   01, 2022
To   June   30, 2022
Page    5 of   6

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                       See Back for Important Information

                                        Primary Account: 1504652609        0

| Date | Description | | |
|---|---|---|---|
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jun 03 | SWEEP WIRE | | 8,922.27 |
| | REF#  20220603B6B7261F000983 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jun 17 | SWEEP WIRE | | 14,395.67 |
| | REF#  20220617B6B7261F000725 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jun 22 | SWEEP WIRE | | 6,486.67 |
| | REF#  20220622B6B7261F000748 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jun 23 | SWEEP WIRE | | 57,634.89 |
| | REF#  20220623B6B7261F000746 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jun 24 | SWEEP WIRE | | 62,824.97 |
| | REF#  20220624B6B7261F000859 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jun 24 | ANALYSIS - DIRECT FEE | | 275.00 |
| Jun 27 | SWEEP WIRE | | 7,330.63 |
| | REF#  20220627B6B7261F000823 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jun 28 | SWEEP WIRE | | 1,668.63 |
| | REF#  20220628B6B7261F000862 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Jun 29 | SWEEP WIRE | | 31,123.65 |
| | REF#  20220629B6B7261F000898 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |



SIGNATURE BANK
565 Fifth Avenue, 12th Floor
New York, NY 10017

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                           See Back for Important Information

Primary Account: 1504652609          0

Daily Balances
 May 31              5,000.00      Jun 24              4,725.00
 Jun 22             24,001.07      Jun 27              5,000.00
 Jun 23              9,176.00

Rates for this statement period - Overdraft
Jun 16, 2022   14.500000 %
Jun 01, 2022   13.750000 %



SIGNATURE BANK
565 Fifth Avenue, 12th Floor
New York, NY 10017

From May    01, 2022
To   May    31, 2022
Page   1 of   6

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                          See Back for Important Information

                                   Primary Account: 1504652609          0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT! SIGNATURE BANK WILL NEVER
ASK YOU TO PROVIDE PERSONAL OR BUSINESS ACCOUNT INFORMATION THROUGH
E-MAIL. IF YOU RECEIVE ANY E-MAIL OR OTHER INQUIRY THAT APPEARS TO COME
FROM SIGNATURE, DO NOT RESPOND TO IT OR CLICK ON ANY LINKS INCLUDED IN
THE E-MAIL. INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE OR CONTACT
YOUR ACCOUNT OFFICER. FOR MORE INFORMATION ON IDENTITY THEFT, VISIT
OUR WEBSITE AT WWW.SIGNATURENY.COM. CLICK ON "ABOUT US", "PRIVACY
& SECURITY", "IDENTITY THEFT" FOR MORE INFORMATION ON SAFEGUARDING YOUR
IDENTITY AND PERSONAL INFORMATION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | 5,000.00 | 5,000.00 |
| RELATIONSHIP TOTAL | | 5,000.00 |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From May        01, 2022
To   May        31, 2022
Page   2 of   6

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                    See Back for Important Information

Primary Account: 1504652609            0

MONOGRAM CHECKING          1504652609

Summary

Previous Balance as of May        01, 2022                        5,000.00
      23 Credits                                               271,382.48
      10 Debits                                                271,382.48
Ending Balance as of   May        31, 2022                       5,000.00

Deposits and Other Credits

| Date | Description | | | Amount |
|---|---|---|---|---|
| May 02 | ACH DEPOSIT        ck/ref no.   3272267 | | | 1,911.53 |
| | SENTRY INSURANCE   ACCT PAY    130696519 | | | |
| | MAY 2022 RENT PAYMENT\ | | | |
| | MAY 2022 RENT PAYMENT\ | | | |
| | AEVRI SALINA MEADOWS L | | | |
| May 02 | ACH DEPOSIT        ck/ref no.   3438018 | | | 7,281.28 |
| | BKLY INS CO-SLIA   ACH        AP0001671325 | | | |
| | MONTHLY RENT SYRACUSE OFFICE | | | |
| | MONTHLY RENT SYRACUSE OFFICE | | | |
| | AEVRI SALINA MEADOWS L | | | |
| May 04 | ACH DEPOSIT        ck/ref no.   3725666 | | | 500.00 |
| | LEVEL 3 COMMUNIC   VENDOR PAY  K10020001966352 | | | |
| May 04 | ACH DEPOSIT        ck/ref no.   3673431 | | | 1,655.75 |
| | NU ERA LOGISTICS    RENT PMT    AEVRI SALINA | | | |
| | 002 00000000000016557519805755540 | | | |
| May 04 | ACH DEPOSIT        ck/ref no.   3724055 | | | 8,922.27 |
| | SEFCU MORTGAGE S   VENDOR PAY  10320 | | | |
| | RMT*IV*05012022*8922.27\DTM*003*220501\ | | | |
| | RMT*IV*05012022*8922.27\DTM*003*220501\ | | | |
| | AEVRI SALINA MEADOWS L | | | |
| May 13 | ACH DEPOSIT        ck/ref no.   5302587 | | | 1,323.61 |
| | JLL CAS          548382         000000000032746 | | | |
| | RMR*IK*548382\ | | | |
| | RMR*IK*548382\ | | | |
| | AEVRI SALINA MEADOWS L | | | |

**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From May        01, 2022
To   May        31, 2022
Page    3 of    6

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                           See Back for Important Information

Primary Account: 1504652609          0

| Date | Description | | | Amount |
|---|---|---|---|---|
| May 19 | ACH DEPOSIT | ck/ref no.   6018664 | | 14,395.67 |
| | OSMOSE UTILITIES    ACH        341269 | | | |
| | 002 0000000000143956713521753310 | | | |
| May 20 | ACH DEPOSIT | ck/ref no.   5796342 | | 6,486.67 |
| | J AND S R - 8581    CASHCD     JAS RENT | | | |
| | 002 00000000000064866722635363988 | | | |
| May 20 | ACH DEPOSIT | ck/ref no.   6081324 | | 7,281.28 |
| | BKLY INS CO-SLIA    ACH        AP0001691700 | | | |
| | MONTHLY RENT SYRACUSE OFFICE | | | |
| | MONTHLY RENT SYRACUSE OFFICE | | | |
| | AEVRI SALINA MEADOWS L | | | |
| May 20 | ACH DEPOSIT | ck/ref no.   5988808 | | 31,508.33 |
| | PARSONS SERVICES    PAYMENT    LB129 | | | |
| May 24 | ACH DEPOSIT | ck/ref no.   6372513 | | 7,125.49 |
| | BANKERS CONSECO     VENDOR EFT 1100604 | | | |
| May 25 | ACH DEPOSIT | ck/ref no.   6557103 | | 1,850.00 |
| | COLONIAL LIFE &     UNUM PMT   S-107800 | | | |
| | S-107800_2022-05-20\ | | | |
| | S-107800_2022-05-20\ | | | |
| | AEVRI SALINA MEADOWS | | | |
| May 25 | ACH DEPOSIT | ck/ref no.   6291434 | | 3,178.63 |
| | DUSCKAS ADVISORY    LEASE | | | |
| | 002 0000000000031786314612079555 | | | |
| May 26 | ACH DEPOSIT | ck/ref no.   6649274 | | 1,418.63 |
| | GEICO INSURANCE     EFT | | | |
| | 200 SALINA MEADOWS PARKWAY-4\ | | | |
| | 200 SALINA MEADOWS PARKWAY-4\ | | | |
| | AEVRI SALINA MEADOWS L | | | |
| May 26 | ACH DEPOSIT | ck/ref no.   6690491 | | 4,427.00 |
| | FDIC/FEDERAL DEP    EPOSPYMNTS  .CORP.700177585 | | | |
| | ISA*00*        *00*        *ZZ*072000326 | | | |
| | ISA*00*        *00*        *ZZ*072000326    *ZZ*026013 | | | |
| | 576    *220525*180 | | | |
| | 0007AEVRL SALINA MEA | | | |
| May 26 | ACH DEPOSIT | ck/ref no.   6838075 | | 19,001.07 |
| | JLL CAS          548420        000000000034014 | | | |
| | RMR*IK*548420\ | | | |
| | RMR*IK*548420\ | | | |
| | AEVRI SALINA MEADOWS L | | | |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From May       01, 2022
To   May       31, 2022
Page    4 of    6

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                                    See Back for Important Information

Primary Account: 1504652609               0

| | | | | |
|---|---|---|---|---|
| May 27 | ACH DEPOSIT | ck/ref no. | 6901485 | 250.00 |
| | LEVEL 3 COMMUNIC | VENDOR PAY | K10020002364592 | |
| | RMT*&IVQLR*&INVCE**250.00*250.00*0.00\ | | | |
| | RMT*&IVQLR*&INVCE**250.00*250.00*0.00\ | | | |
| | AEVRI SALINA MEADOWS L | | | |
| May 27 | ACH DEPOSIT | ck/ref no. | 6888680 | 1,441.00 |
| | FUTURE ELECTRONI | RENTS | 2285757 | |
| May 27 | ACH DEPOSIT | ck/ref no. | 6902175 | 3,518.63 |
| | JENSEN HUGHES, I | 05262022_V | US810383893 | |
| | RMR*IK*RENT-JUNE 2022\ | | | |
| | RMR*IK*RENT-JUNE 2022\ | | | |
| | AEVRI SALINA MEADOWS L | | | |
| May 27 | ACH DEPOSIT | ck/ref no. | 6715670 | 7,525.24 |
| | PROGRESSIVE CASU | PAYMENT | 220527AEVRI SAL | |
| | ISA*00*      *00*          *NA*NA | | | |
| | ISA*00*      *00*          *NA*NA        *NA*NA | | | |
| | *220525*190 | | | |
| | 0013AEVRI SALINA MEA | | | |
| May 27 | ACH DEPOSIT | ck/ref no. | 6836090 | 14,876.13 |
| | TRAVELERS INDEMN | CCD+ | RNT3007 | |
| May 27 | ACH DEPOSIT | ck/ref no. | 6890560 | 43,703.67 |
| | ALION SCIENCE | AP | 0 | |
| | AEVRI SALINA MEADOWS L | | | |
| May 27 | ACH DEPOSIT | ck/ref no. | 6838570 | 81,800.60 |
| | HDR INC. | 71901 | 20263811 | |
| | ISA 00         00          ZZ HDRGPXML | | | |
| | ISA 00         00          ZZ HDRGPXML        ZZ BOFAEC | | | |
| | SUSO    220526 115 | | | |
| | 0012AEVRI SALINA MEA | | | |

Withdrawals and Other Debits

| | | | | |
|---|---|---|---|---|
| May 02 | SWEEP WIRE | | | 1,911.53 |
| | REF#  20220502B6B7261F001110 | | | |
| | TO:   AEVRI SALINA MEADOWS LLC | | ABA:  221272031 | |
| | BANK: INVESTORS SB | | ACCT# 1001846692 | |
| May 03 | SWEEP WIRE | | | 7,281.28 |
| | REF#  20220503B6B7261F000765 | | | |
| | TO:   AEVRI SALINA MEADOWS LLC | | ABA:  221272031 | |
| | BANK: INVESTORS SB | | ACCT# 1001846692 | |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From May      01, 2022
To   May      31, 2022
Page   5 of    6

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                           See Back for Important Information

                                   Primary Account: 1504652609          0

| Date | Description | | |
|------|-------------|---|---|
| May 04 | SWEEP WIRE | | 11,078.02 |
| | REF#  20220504B6B7261F001085 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| May 16 | SWEEP WIRE | | 1,323.61 |
| | REF#  20220516B6B7261F000778 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| May 20 | SWEEP WIRE | | 59,671.95 |
| | REF#  20220520B6B7261F000832 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| May 24 | SWEEP WIRE | | 7,125.49 |
| | REF#  20220524B6B7261F000623 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| May 24 | ANALYSIS - DIRECT FEE | | 275.00 |
| May 25 | SWEEP WIRE | | 2,903.63 |
| | REF#  20220525B6B7261F000926 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| May 26 | SWEEP WIRE | | 7,695.63 |
| | REF#  20220526B6B7261F000714 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| May 27 | SWEEP WIRE | | 172,116.34 |
| | REF#  20220527B6B7261F000906 | | |
| | TO:   AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |

Daily Balances

| | | | |
|------|------|------|------|
| Apr 30 | 5,000.00 | May 20 | 5,000.00 |
| May 02 | 12,281.28 | May 24 | 4,725.00 |
| May 03 | 5,000.00 | May 25 | 6,850.00 |
| May 13 | 6,323.61 | May 26 | 24,001.07 |
| May 16 | 5,000.00 | May 27 | 5,000.00 |
| May 19 | 19,395.67 | | |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From May      01, 2022
To   May      31, 2022
Page    6 of    6

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                        See Back for Important Information

Primary Account: 1504652609            0

Rates for this statement period - Overdraft
May 05, 2022   13.750000 %
May 01, 2022   13.250000 %



SIGNATURE BANK
565 Fifth Avenue, 12th Floor
New York, NY 10017

From April   01, 2022
To   April   30, 2022
Page    1 of    6

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC            8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                    See Back for Important Information

Primary Account: 1504652609          0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT! SIGNATURE BANK WILL NEVER
ASK YOU TO PROVIDE PERSONAL OR BUSINESS ACCOUNT INFORMATION THROUGH
E-MAIL. IF YOU RECEIVE ANY E-MAIL OR OTHER INQUIRY THAT APPEARS TO COME
FROM SIGNATURE, DO NOT RESPOND TO IT OR CLICK ON ANY LINKS INCLUDED IN
THE E-MAIL. INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE OR CONTACT
YOUR ACCOUNT OFFICER. FOR MORE INFORMATION ON IDENTITY THEFT, VISIT
OUR WEBSITE AT WWW.SIGNATURENY.COM. CLICK ON "ABOUT US", "PRIVACY
& SECURITY", "IDENTITY THEFT" FOR MORE INFORMATION ON SAFEGUARDING YOUR
IDENTITY AND PERSONAL INFORMATION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | 5,000.00 | 5,000.00 |
| RELATIONSHIP TOTAL | | 5,000.00 |

**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                       See Back for Important Information

                                        Primary Account: 1504652609          0

MONOGRAM CHECKING              1504652609


Summary

  Previous Balance as of April    01, 2022                              5,000.00
      25 Credits                                                      299,585.73
      12 Debits                                                       299,585.73
  Ending Balance as of    April    30, 2022                            5,000.00


Deposits and Other Credits
  Apr 01  ACH DEPOSIT          ck/ref no.   9112543                    1,911.53
          SENTRY INSURANCE    ACCT PAY      128648407
          APR 2022 RENT PAYMENT\
          APR 2022 RENT PAYMENT\
          AEVRI SALINA MEADOWS L
  Apr 01  ACH DEPOSIT          ck/ref no.   9127993                    3,518.63
          JENSEN HUGHES, I    03312022_V    US810382318
          RMR*IK*RENT-APR 2022\
          RMR*IK*RENT-APR 2022\
          AEVRI SALINA MEADOWS L
  Apr 01  ACH DEPOSIT          ck/ref no.   9059283                    8,578.23
          HDR INC.            66795         20249529
          ISA 00          00           ZZ HDRGPXML
          ISA 00          00           ZZ HDRGPXML       ZZ BOFAEC
          SUSO   220331 105
          0013AEVRI SALINA MEA
  Apr 01  ACH DEPOSIT          ck/ref no.   9113984                   35,780.52
          ALION SCIENCE       AP            0

          AEVRI SALINA MEADOWS L
  Apr 05  ACH DEPOSIT          ck/ref no.   9466047                    1,655.75
          NU ERA LOGISTICS    RENT PMT      AEVRI SALINA
          002 00000000000001655751980575540

**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                    See Back for Important Information

Primary Account: 1504652609          0

| Date | Description | | ck/ref no. | | Amount |
|---|---|---|---|---|---|
| Apr 05 | ACH DEPOSIT | | 9531668 | | 6,050.47 |
| | ALION SCIENCE | AP | 0 | | |
| | AEVRI SALINA MEADOWS L | | | | |
| Apr 06 | ACH DEPOSIT | | 9759850 | | 8,922.27 |
| | SEFCU MORTGAGE S | VENDOR PAY | 10320 | | |
| | RMT*IV*04012022*8922.27\DTM*003*220401\ | | | | |
| | RMT*IV*04012022*8922.27\DTM*003*220401\ | | | | |
| | AEVRI SALINA MEADOWS L | | | | |
| Apr 13 | ACH DEPOSIT | | 865396 | | 19,001.07 |
| | JLL CAS | 547926 | 000000000030694 | | |
| | RMR*IK*547926\ | | | | |
| | RMR*IK*547926\ | | | | |
| | AEVRI SALINA MEADOWS L | | | | |
| Apr 13 | ACH DEPOSIT | | 635148 | | 49,553.75 |
| | AMERICAN FAMILY | PAYMENT | 220412AEVRI SAL | | |
| | ISA*00* *00* *08*012345678 | | | | |
| | ISA*00* *00* *08*012345678910112*08*012345 | | | | |
| | 678910112*220412*003 | | | | |
| | 0014AEVRI SALINA MEA | | | | |
| Apr 15 | ACH DEPOSIT | | 1190937 | | 14,395.67 |
| | OSMOSE UTILITIES | ACH | 340007 | | |
| | 002 0000000000143956713521 75310 | | | | |
| Apr 22 | ACH DEPOSIT | | 1782644 | | 6,486.67 |
| | J AND S R - 8581 | CASHCD | JAS RENT | | |
| | 002 00000000000648667226 3563988 | | | | |
| Apr 22 | ACH DEPOSIT | | 1978335 | | 31,508.33 |
| | PARSONS SERVICES | PAYMENT | LB129 | | |
| Apr 25 | ACH DEPOSIT | | 2093220 | | .01 |
| | WALGREENCO | PAYMENTS | 2001601221 | | |
| | ISA*00* *00* *01*008965063 | | | | |
| | ISA*00* *00* *01*008965063JP3 *01*006981 | | | | |
| | 815 *220422*051 | | | | |
| | 0009AEVRI SALINA MEA | | | | |
| Apr 25 | ACH DEPOSIT | | 1982975 | | 3,178.63 |
| | DUSCKAS ADVISORY | LEASE | | | |
| | 002 00000000000317863146 1207955 | | | | |
| Apr 25 | ACH DEPOSIT | | 2208655 | | 7,125.49 |
| | BANKERS CONSECO | VENDOR EFT | 1084329 | | |

**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC              8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                          See Back for Important Information

                                    Primary Account: 1504652609          0

| | | | | | |
|---|---|---|---|---|---:|
| Apr 25 | ACH DEPOSIT | ck/ref no. | 2288928 | | 19,001.07 |
| | JLL CAS | 547974 | 000000000031766 | | |
| | RMR*IK*547974\ | | | | |
| | RMR*IK*547974\ | | | | |
| | AEVRI SALINA MEADOWS L | | | | |
| Apr 26 | ACH DEPOSIT | ck/ref no. | 2312792 | | 1,418.63 |
| | GEICO INSURANCE | EFT | | | |
| | 200 SALINA MEADOWS PARKWAY-3\ | | | | |
| | 200 SALINA MEADOWS PARKWAY-3\ | | | | |
| | AEVRI SALINA MEADOWS L | | | | |
| Apr 27 | ACH DEPOSIT | ck/ref no. | 2636054 | | 1,850.00 |
| | COLONIAL LIFE & | UNUM PMT | S-107800 | | |
| | S-107800_2022-04-18\ | | | | |
| | S-107800_2022-04-18\ | | | | |
| | AEVRI SALINA MEADOWS | | | | |
| Apr 28 | ACH DEPOSIT | ck/ref no. | 2998396 | | 1,441.00 |
| | FUTURE ELECTRONI | RENTS | 2285757 | | |
| Apr 28 | ACH DEPOSIT | ck/ref no. | 2792439 | | 4,427.00 |
| | FDIC/FEDERAL DEP | EPOSPYMNTS | .CORP.700177117 | | |
| | ISA*00* | *00* | *ZZ*072000326 | | |
| | ISA*00* | *00* | *ZZ*072000326 | *ZZ*026013 | |
| | 576 | *220427*180 | | | |
| | 0007AEVRL SALINA MEA | | | | |
| Apr 28 | ACH DEPOSIT | ck/ref no. | 2699769 | | 14,694.35 |
| | TRAVELERS INDEMN | CCD+ | RNT3007 | | |
| | 007 0000000019124179916 8890004 | | | | |
| Apr 29 | ACH DEPOSIT | ck/ref no. | 3022501 | | 3,568.63 |
| | JENSEN HUGHES, I | 04282022_V | US810383054 | | |
| | ISA 00 | 00 | ZZ JENSENXML | | |
| | ISA 00 | 00 | ZZ JENSENXML | ZZ BOFAEC | |
| | SUSO | 220428 155 | | | |
| | 0012AEVRI SALINA MEA | | | | |
| Apr 29 | ACH DEPOSIT | ck/ref no. | 2943839 | | 4,289.12 |
| | HDR INC. | 69742 | 20257009 | | |
| | ISA 00 | 00 | ZZ HDRGPXML | | |
| | ISA 00 | 00 | ZZ HDRGPXML | ZZ BOFAEC | |
| | SUSO | 220428 112 | | | |
| | 0013AEVRI SALINA MEA | | | | |

**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

```
AEVRI SALINA MEADOWS LLC              8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                     See Back for Important Information


                                Primary Account: 1504652609        0

 Apr 29  ACH DEPOSIT         ck/ref no.   2800202                        7,525.24
         PROGRESSIVE CASU    PAYMENT      220429AEVRI SAL
         ISA*00*        *00*        *NA*NA
         ISA*00*        *00*        *NA*NA            *NA*NA
              *220427*190
         0013AEVRI SALINA MEA
 Apr 29  ACH DEPOSIT         ck/ref no.   3011003                       43,703.67
         ALION SCIENCE       AP           0

         AEVRI SALINA MEADOWS L

Withdrawals and Other Debits
 Apr 01  SWEEP WIRE                                                     49,788.91
         REF#  20220401B6B7261F001463
         TO:  AEVRI SALINA MEADOWS LLC       ABA:   221272031
         BANK: INVESTORS SB                  ACCT# 1001846692
 Apr 05  SWEEP WIRE                                                      7,706.22
         REF#  20220405B6B7261F000864
         TO:  AEVRI SALINA MEADOWS LLC       ABA:   221272031
         BANK: INVESTORS SB                  ACCT# 1001846692
 Apr 06  SWEEP WIRE                                                      8,922.27
         REF#  20220406B6B7261F000961
         TO:  AEVRI SALINA MEADOWS LLC       ABA:   221272031
         BANK: INVESTORS SB                  ACCT# 1001846692
 Apr 13  SWEEP WIRE                                                     49,553.75
         REF#  20220413B6B7261F000882
         TO:  AEVRI SALINA MEADOWS LLC       ABA:   221272031
         BANK: INVESTORS SB                  ACCT# 1001846692
 Apr 14  SWEEP WIRE                                                     19,001.07
         REF#  20220414B6B7261F000830
         TO:  AEVRI SALINA MEADOWS LLC       ABA:   221272031
         BANK: INVESTORS SB                  ACCT# 1001846692
 Apr 15  SWEEP WIRE                                                     14,395.67
         REF#  20220415B6B7261F001631
         TO:  AEVRI SALINA MEADOWS LLC       ABA:   221272031
         BANK: INVESTORS SB                  ACCT# 1001846692
 Apr 22  SWEEP WIRE                                                     37,995.00
         REF#  20220422B6B7261F000725
         TO:  AEVRI SALINA MEADOWS LLC       ABA:   221272031
         BANK: INVESTORS SB                  ACCT# 1001846692
```



PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                        See Back for Important Information

Primary Account: 1504652609            0

| Date | Description | | |
|------|-------------|---|---|
| Apr 25 | SWEEP WIRE | | 10,304.13 |
| | REF#  20220425B6B7261F000626 | | |
| | TO:  AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Apr 25 | ANALYSIS - DIRECT FEE | | 1,275.00 |
| Apr 26 | SWEEP WIRE | | 19,144.70 |
| | REF#  20220426B6B7261F000620 | | |
| | TO:  AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Apr 28 | SWEEP WIRE | | 20,971.35 |
| | REF#  20220428B6B7261F000911 | | |
| | TO:  AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Apr 29 | SWEEP WIRE | | 60,527.66 |
| | REF#  20220429B6B7261F001181 | | |
| | TO:  AEVRI SALINA MEADOWS LLC | ABA:   221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |

Daily Balances
| | | | | |
|---|---|---|---|---|
| Mar 31 | 5,000.00 | | Apr 26 | 5,000.00 |
| Apr 13 | 24,001.07 | | Apr 27 | 6,850.00 |
| Apr 14 | 5,000.00 | | Apr 28 | 6,441.00 |
| Apr 25 | 22,726.07 | | Apr 29 | 5,000.00 |

Rates for this statement period - Overdraft
Apr 01, 2022   13.250000 %



SIGNATURE BANK
565 Fifth Avenue, 12th Floor
New York, NY 10017

**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From March    01, 2022
To   March    31, 2022
Page    1 of    5

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                    See Back for Important Information

Primary Account: 1504652609          0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT! SIGNATURE BANK WILL NEVER
ASK YOU TO PROVIDE PERSONAL OR BUSINESS ACCOUNT INFORMATION THROUGH
E-MAIL. IF YOU RECEIVE ANY E-MAIL OR OTHER INQUIRY THAT APPEARS TO COME
FROM SIGNATURE, DO NOT RESPOND TO IT OR CLICK ON ANY LINKS INCLUDED IN
THE E-MAIL. INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE OR CONTACT
YOUR ACCOUNT OFFICER. FOR MORE INFORMATION ON IDENTITY THEFT, VISIT
OUR WEBSITE AT WWW.SIGNATURENY.COM. CLICK ON "ABOUT US", "PRIVACY
& SECURITY", "IDENTITY THEFT" FOR MORE INFORMATION ON SAFEGUARDING YOUR
IDENTITY AND PERSONAL INFORMATION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | 5,000.00 | 5,000.00 |
| RELATIONSHIP TOTAL | | 5,000.00 |

**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From March    01, 2022
To    March    31, 2022
Page       2 of       5

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                        See Back for Important Information

                                Primary Account: 1504652609          0

MONOGRAM CHECKING           1504652609

Summary

  Previous Balance as of March    01, 2022                              5,000.00
      15 Credits                                                      136,063.66
      11 Debits                                                       136,063.66
  Ending Balance as of    March    31, 2022                            5,000.00

Deposits and Other Credits
  Mar 01  ACH DEPOSIT          ck/ref no.    4832985                    1,911.53
          SENTRY INSURANCE    ACCT PAY    126449523
          MAR 2022 RENT PAYMENT\
          MAR 2022 RENT PAYMENT\
          AEVRI SALINA MEADOWS L
  Mar 03  ACH DEPOSIT          ck/ref no.    5260771                    8,922.27
          SEFCU MORTGAGE S     VENDOR PAY    10320
          RMT*IV*03012022*8922.27\DTM*003*220301\
          RMT*IV*03012022*8922.27\DTM*003*220301\
          AEVRI SALINA MEADOWS L
  Mar 07  ACH DEPOSIT          ck/ref no.    5853683                    1,441.00
          FUTURE ELECTRONI     RENTS    2285757
          002 00000000000144100204250746   8
  Mar 07  ACH DEPOSIT          ck/ref no.    5591420                   49,553.75
          AMERICAN FAMILY      PAYMENT    220304AEVRI SAL
          ISA*00*     *00*      *08*012345678
          ISA*00*     *00*      *08*012345678910112*08*012345
          678910112*220303*234
          0014AEVRI SALINA MEA
  Mar 08  ACH DEPOSIT          ck/ref no.    5871234                    1,655.75
          NU ERA LOGISTICS     RENT PMT    AEVRI SALINA
          002 00000000000165575198057554   0
  Mar 22  ACH DEPOSIT          ck/ref no.    7533912                    6,486.67
          J AND S R - 8581     CASHCD    JAS RENT
          002 00000000000648667226356398   8

*Signature*

**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From March    01, 2022
To   March    31, 2022
Page     3 of     5

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC            8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                        See Back for Important Information

Primary Account: 1504652609            0

| | | | |
|---|---|---|---|
| Mar 22 | ACH DEPOSIT          ck/ref no.   7729866 | | 7,281.28 |
| | BKLY INS CO-SLIA    ACH         AP0001634975 | | |
| | MONTHLY RENT SYRACUSE OFFICE | | |
| | MONTHLY RENT SYRACUSE OFFICE | | |
| | AEVRI SALINA MEADOWS L | | |
| Mar 22 | ACH DEPOSIT          ck/ref no.   7834825 | | 19,001.07 |
| | JLL CAS         547533         000000000029024 | | |
| | RMR*IK*547533\ | | |
| | RMR*IK*547533\ | | |
| | AEVRI SALINA MEADOWS L | | |
| Mar 23 | ACH DEPOSIT          ck/ref no.   7916186 | | 7,125.49 |
| | BANKERS CONSECO     VENDOR EFT  1069297 | | |
| Mar 25 | ACH DEPOSIT          ck/ref no.   7975211 | | 3,178.63 |
| | DUSCKAS ADVISORY    LEASE | | |
| | 002 00000000003178631461207955 | | |
| Mar 28 | ACH DEPOSIT          ck/ref no.   8337003 | | 1,418.63 |
| | GEICO INSURANCE     EFT | | |
| | 200 SALINA MEADOWS PARKWAY-2\ | | |
| | 200 SALINA MEADOWS PARKWAY-2\ | | |
| | AEVRI SALINA MEADOWS L | | |
| Mar 29 | ACH DEPOSIT          ck/ref no.   8516509 | | 4,427.00 |
| | FDIC/FEDERAL DEP    EPOSPYMNTS  .CORP.700176665 | | |
| | ISA*00*          *00*         *ZZ*072000326 | | |
| | ISA*00*          *00*         *ZZ*072000326    *ZZ*026013 | | |
| | 576    *220328*180 | | |
| | 0007AEVRL SALINA MEA | | |
| Mar 30 | ACH DEPOSIT          ck/ref no.   8544509 | | 7,525.24 |
| | PROGRESSIVE CASU    PAYMENT     220330AEVRI SAL | | |
| | ISA*00*          *00*         *NA*NA | | |
| | ISA*00*          *00*         *NA*NA          *NA*NA | | |
| | *220328*190 | | |
| | 0013AEVRI SALINA MEA | | |
| Mar 30 | ACH DEPOSIT          ck/ref no.   8625665 | | 14,694.35 |
| | TRAVELERS INDEMN    CCD+        RNT3007 | | |
| Mar 31 | ACH DEPOSIT          ck/ref no.   8845839 | | 1,441.00 |
| | FUTURE ELECTRONI    RENTS       2285757 | | |
| | 010 00000000014425122042507468 | | |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

```
AEVRI SALINA MEADOWS LLC              8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                     See Back for Important Information


                                Primary Account: 1504652609          0
```

Withdrawals and Other Debits

```
Mar 01  SWEEP WIRE                                                1,911.53
        REF#  20220301B6B7261F001212
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB                  ACCT# 1001846692
Mar 03  SWEEP WIRE                                                8,922.27
        REF#  20220303B6B7261F000709
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB                  ACCT# 1001846692
Mar 07  SWEEP WIRE                                               49,553.75
        REF#  20220307B6B7261F000917
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB                  ACCT# 1001846692
Mar 08  SWEEP WIRE                                                3,096.75
        REF#  20220308B6B7261F000726
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB                  ACCT# 1001846692
Mar 22  SWEEP WIRE                                               13,767.95
        REF#  20220322B6B7261F000590
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB                  ACCT# 1001846692
Mar 23  SWEEP WIRE                                               26,126.56
        REF#  20220323B6B7261F000892
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB                  ACCT# 1001846692
Mar 25  SWEEP WIRE                                                3,178.63
        REF#  20220325B6B7261F000948
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB                  ACCT# 1001846692
Mar 28  SWEEP WIRE                                                1,418.63
        REF#  20220328B6B7261F001430
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB                  ACCT# 1001846692
Mar 29  SWEEP WIRE                                                4,427.00
        REF#  20220329B6B7261F000697
        TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
        BANK: INVESTORS SB                  ACCT# 1001846692
Mar 30  SWEEP WIRE                                               22,219.59
        REF#  20220330B6B7261F000880
```



SIGNATURE BANK
565 Fifth Avenue, 12th Floor
New York, NY 10017

From March    01, 2022
To   March    31, 2022
Page    5 of    5

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                       See Back for Important Information

                                        Primary Account: 1504652609        0

| Date | Description | | |
|------|-------------|---|---|
| | TO:  AEVRI SALINA MEADOWS LLC | ABA:  221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |
| Mar 31 | SWEEP WIRE | | 1,441.00 |
| | REF#  20220331B6B7261F001226 | | |
| | TO:  AEVRI SALINA MEADOWS LLC | ABA:  221272031 | |
| | BANK: INVESTORS SB | ACCT# 1001846692 | |

Daily Balances
Feb 28       5,000.00              Mar 22      24,001.07
Mar 07       6,441.00              Mar 23       5,000.00
Mar 08       5,000.00

Rates for this statement period - Overdraft
Mar 17, 2022   13.250000 %
Mar 01, 2022   13.000000 %



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

From February 22, 2022
To   February 28, 2022
Page    1 of    3

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC                    8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                     See Back for Important Information

                          Primary Account: 1504652609          0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT! SIGNATURE BANK WILL NEVER
ASK YOU TO PROVIDE PERSONAL OR BUSINESS ACCOUNT INFORMATION THROUGH
E-MAIL. IF YOU RECEIVE ANY E-MAIL OR OTHER INQUIRY THAT APPEARS TO COME
FROM SIGNATURE, DO NOT RESPOND TO IT OR CLICK ON ANY LINKS INCLUDED IN
THE E-MAIL. INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE OR CONTACT
YOUR ACCOUNT OFFICER. FOR MORE INFORMATION ON IDENTITY THEFT, VISIT
OUR WEBSITE AT WWW.SIGNATURENY.COM. CLICK ON "ABOUT US", "PRIVACY
& SECURITY", "IDENTITY THEFT" FOR MORE INFORMATION ON SAFEGUARDING YOUR
IDENTITY AND PERSONAL INFORMATION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1504652609    MONOGRAM CHECKING | .00 | 5,000.00 |
| RELATIONSHIP TOTAL | | 5,000.00 |



**SIGNATURE BANK**
565 Fifth Avenue, 12th Floor
New York, NY 10017

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC          8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                 See Back for Important Information

                                  Primary Account: 1504652609          0

MONOGRAM CHECKING          1504652609


Summary

 Previous Balance as of February  22, 2022                              .00
         6 Credits                                                56,065.62
         3 Debits                                                 51,065.62
 Ending Balance as of   February  28, 2022                        5,000.00


Deposits and Other Credits

| Date | Description | | ck/ref no. | Amount |
|---|---|---|---|---|
| Feb 22 | ACH DEPOSIT | | 3918082 | .01 |
| | FUTURE ELECTRONI | RENTS | 2285757 | |
| | 002 0000000000000001204250746B | | | |
| Feb 23 | ACH DEPOSIT | | 4111334 | 7,125.49 |
| | BANKERS CONSECO | VENDOR EFT | 1055145 | |
| | 002 00000000007125491128570327 | | | |
| Feb 25 | ACH DEPOSIT | | 4452023 | 3,381.42 |
| | JENSEN HUGHES, I | 02242022_V | US810381318 | |
| | RMR*IK*RENT-MAR 2022\ | | | |
| | RMR*IK*RENT-MAR 2022\ | | | |
| | AEVRI SALINA MEADOWS L | | | |
| Feb 25 | ACH DEPOSIT | | 4440600 | 37,653.40 |
| | ALION SCIENCE | AP | 0 | |
| | | | | |
| | AEVRI SALINA MEADOWS L | | | |
| Feb 28 | ACH DEPOSIT | | 4632320 | 1,418.63 |
| | GEICO INSURANCE | EFT | | |
| | 200 SALINA MEADOWS PARKWAY-1\ | | | |
| | 200 SALINA MEADOWS PARKWAY-1\ | | | |
| | AEVRI SALINA MEADOWS L | | | |
| Feb 28 | ACH DEPOSIT | | 4410899 | 6,486.67 |
| | J AND S R - 8581 | CASHCD | JAS RENT | |
| | 002 00000000006486672263563988 | | | |



SIGNATURE BANK
565 Fifth Avenue, 12th Floor
New York, NY 10017

From February  22, 2022
To    February  28, 2022
Page      3 of      3

PRIVATE CLIENT GROUP 837
201 MISSION STREET, 26TH FL
SAN FRANCISCO, CA 94105

AEVRI SALINA MEADOWS LLC            8-837
CONTROL ACCOUNT (DACA)
FBO BANK OF MONTREAL
5651 MAIN ST 8-124
BUFFALO NY  14221                        See Back for Important Information

                                   Primary Account: 1504652609          0

Withdrawals and Other Debits
  Feb 24  SWEEP WIRE                                                2,125.50
          REF#  20220224B6B7261F001307
          TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
          BANK: INVESTORS SB                  ACCT# 1001846692
  Feb 25  SWEEP WIRE                                               41,034.82
          REF#  20220225B6B7261F001111
          TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
          BANK: INVESTORS SB                  ACCT# 1001846692
  Feb 28  SWEEP WIRE                                                7,905.30
          REF#  20220228B6B7261F000920
          TO:   AEVRI SALINA MEADOWS LLC      ABA:   221272031
          BANK: INVESTORS SB                  ACCT# 1001846692

Daily Balances
  Feb 22              .00              Feb 23          7,125.50
  Feb 22              .01              Feb 24          5,000.00

Rates for this statement period - Overdraft
Feb 22, 2022   13.000000 %

# EXHIBIT 13


750 E. PRATT STREET   SUITE 900   BALTIMORE, MD 21202
**T** 410.244.7400   **F** 410.244.7742   www.Venable.com

August 8, 2023

**t** 410.244.7862
**f** 410.244.7742
BWProcida@Venable.com

**VIA UPS OVERNIGHT MAIL**

Aevri Salina Meadows, LLC
2604 Elmwood Avenue, Suite 210
Rochester, New York 14618
Attention: Moshe Rothman

Re:     That certain loan (the "**Loan**") in the original principal amount of $25,000,000 as evidenced by a Promissory Note dated February 16, 2022 ("**Note**") executed by Aevri Salina Meadows, LLC, a Delaware limited liability company ("**Borrower**") and made payable to the Bank of Montreal, ("**Original Lender**"), which Note is currently held by Wilmington Trust, National Association, as Trustee for BBCMS Mortgage Trust 2022-C15 ("**Lender**"). Additional terms and conditions of the Loan are set forth in a Loan Agreement ("**Loan Agreement**") and Cash Management Agreement ("**Cash Management Agreement**") of even date with the Note. The Note is secured by, among other things, a Mortgage and Security Agreement ("**Mortgage**") of even date executed by Borrower. The Loan is subject to a Limited Recourse Guaranty of even date ("**Guaranty**") made by Moshe Rothman ("**Guarantor**"). The Note, Loan Agreement, Cash Management Agreement, Mortgage, Guaranty and all other documents executed in connection with the Loan shall be collectively referred to as the "Loan Documents". Capitalized terms not otherwise defined shall have the meanings given to them in the Loan Documents.

Rialto Loan # 30508596

Dear Borrower:

The above-mentioned Loan is administered on behalf of the Lender by Rialto Capital Advisors LLC ("**Rialto**"), as Special Servicer. I write as counsel to Rialto acting solely in its capacity as Special Servicer to the Lender. Pursuant to Article 9 of the Loan Agreement, the Borrower is obligated to direct all tenants to pay rent directly to account no. 1504652609 at Signature Bank (the "**Restricted Account**".) The Borrower is further obligated to deposit any rent or other revenue from the Property into the Restricted Account within two Business Days of receipt, and to segregate and hold all such funds in trust for the Lender as collateral for the Loan.

The most recent rent roll provided by the Borrower shows monthly rental income of $261,504, however, no funds have been deposited in the Restricted Account since October 24, 2022. Further, statements for the Restricted Account suggest that the Borrower has been diverting rent from the account since at least June 2022. The Lender hereby **DEMANDS** an accounting of all rents withheld from the Restricted Account by the Borrower and Manager since the inception of Loan and the immediate turnover of all such rents to the Lender.



Aevri Salina Meadows, LLC
August 8, 2023
Page 2

       The Lender further **DEMANDS** that the Borrower immediately resume compliance with the cash management obligations set forth in Article 9 of the Loan Agreement, the Cash Management Agreement, and the Deposit Account Control Agreement.

       Note that, by reason of the above defaults, the Lender may be entitled, in its sole discretion, to exercise certain rights and remedies under the Loan Documents. Notwithstanding the exercise of the foregoing rights or the commencement or continuation of discussions or negotiations, the acceptance of payments, or the postponement or delay in taking action or exercising rights or remedies, the Lender has not and does not waive the existence of the defaults referred to above or waive the existence of any other defaults which may exist. The Lender shall not be limited or restricted from enforcing any rights or remedies available to it, including, without limitation, commencing judicial or non-judicial foreclosure proceedings and/or seeking the appointment of a receiver to collect rents and profits, or otherwise administer the collateral.

       No negotiations, making or acceptance of payments, delay in making demand or enforcing rights or remedies, or other action or inaction undertaken pursuant to this letter or under the Loan Documents shall constitute a waiver of the Lender's rights at law or under the Loan Documents unless specifically stated in a written agreement signed by the Lender.

                        Very truly yours,

                        Brent W. Procida

60891863

cc:    Book Law Group, LLC (via Overnight Delivery)
       2 Perlman Drive, Suite 201
       Spring Valley, New York 10977
       Attn: Mordechai Book, Esq.

       Nate Kritzer; nkritzer@Steptoe.com (via Electronic Mail)
       Jim Carolan; jcarolan@Steptoe.com (via Electronic Mail)

# EXHIBIT 14



750 E. PRATT STREET   SUITE 900   BALTIMORE, MD 21202
**T** 410.244.7400   **F** 410.244.7742   www.Venable.com

August 8, 2023

**t** 410.244.7862
**f** 410.244.7742
BWProcida@Venable.com

**VIA UPS OVERNIGHT MAIL**

Aevri Salina Meadows, LLC
2604 Elmwood Avenue, Suite 210
Rochester, New York 14618
Attention: Moshe Rothman

      Re:    That certain loan (the "**Loan**") in the original principal amount of $25,000,000 as evidenced by a Promissory Note dated February 16, 2022 ("**Note**") executed by Aevri Salina Meadows, LLC, a Delaware limited liability company ("**Borrower**") and made payable to the Bank of Montreal, ("**Original Lender**"), which Note is currently held by Wilmington Trust, National Association, as Trustee for BBCMS Mortgage Trust 2022-C15 ("**Lender**"). Additional terms and conditions of the Loan are set forth in a Loan Agreement ("**Loan Agreement**") and Cash Management Agreement ("**Cash Management Agreement**") of even date with the Note. The Note is secured by, among other things, a Mortgage and Security Agreement ("**Mortgage**") of even date executed by Borrower. The Loan is subject to a Limited Recourse Guaranty of even date ("**Guaranty**") made by Moshe Rothman ("**Guarantor**"). The Note, Loan Agreement, Cash Management Agreement, Mortgage, Guaranty and all other documents executed in connection with the Loan shall be collectively referred to as the "Loan Documents". Capitalized terms not otherwise defined shall have the meanings given to them in the Loan Documents.

      Rialto Loan # 30508596

Dear Borrower:

      The above-mentioned Loan is administered on behalf of the Lender by Rialto Capital Advisors LLC ("**Rialto**"), as Special Servicer. I write as counsel to Rialto acting solely in its capacity as Special Servicer to the Lender. Pursuant to the Section 4.12 of the Loan Agreement, the Borrower is obligated to furnish to Lender within 30 days of the close of each quarter (i) an updated rent roll for the Property; (ii) a year-to-date operating statement; and (iii) calculations of the Debt Service Coverage Ratio and Net Cash Flow. Annually, the Borrower is obligated to provide an end-of year balance sheet and operating statement. Within 10 days of a written request, the Borrower is also required to provide Lender with copies of its most recent state and federal tax returns. Separately, pursuant to section 26(c) of the Guaranty, the Guarantor is obligated to provide Lender a certified annual financial statement within 90 days of the end of each calendar year.

      The Borrower has failed to provide Lender with the rent roll, operating statement, Debt Service Coverage Ratio and Net Cash Flow for the second quarter of 2023 and the year-end balance sheet and operating statement for 2022. The Guarantor has failed to provide a certified financial statement within 90 days of the end of 2022. Lender hereby **DEMANDS** production of these documents and copies of the Borrower's most recent state and federal tax returns to the undersigned within 10 days. Failure to provided any of these documents (each a "**Required**



Aevri Salina Meadows, LLC
August 8, 2023
Page 2


**Financial Item**" under the Loan Agreement) will result in a **Reporting Failure** under section 4.12(e) of the Loan Agreement. Further, pursuant to section 4.12(c) of the Loan Agreement "Borrower shall furnish to Lender and its agents convenient facilities for the examination and audit of any such books and records." Lender hereby demands compliance with section 4.12(c) and will contact Borrower through counsel to arrange a suitable time for inspection.

Note that, by reason of the above defaults and/or reporting failures, the Lender may be entitled, in its sole discretion, to exercise certain rights and remedies under the Loan Documents. Notwithstanding the exercise of the foregoing rights or the commencement or continuation of discussions or negotiations, the acceptance of payments, or the postponement or delay in taking action or exercising rights or remedies, the Lender has not and does not waive the existence of the defaults and/or reporting failures referred to above or waive the existence of any other defaults or reporting failures which may exist. The Lender shall not be limited or restricted from enforcing any rights or remedies available to it, including, without limitation, commencing judicial or non-judicial foreclosure proceedings and/or seeking the appointment of a receiver to collect rents and profits, or otherwise administer the collateral.

No negotiations, making or acceptance of payments, delay in making demand or enforcing rights or remedies, or other action or inaction undertaken pursuant to this letter or under the Loan Documents shall constitute a waiver of the Lender's rights at law or under the Loan Documents unless specifically stated in a written agreement signed by the Lender.

Very truly yours,

Brent W. Procida

60842936

cc:     Book Law Group, LLC (via Overnight Delivery)
        2 Perlman Drive, Suite 201
        Spring Valley, New York 10977
        Attn: Mordechai Book, Esq.

        Nate Kritzer;  nkritzer@Steptoe.com (via Electronic Mail)
        Jim Carolan;  jcarolan@Steptoe.com (via Electronic Mail)

# EXHIBIT 15



750 E. PRATT STREET   SUITE 900   BALTIMORE, MD 21202
T 410.244.7400   F 410.244.7742   www.Venable.com

September 26, 2023

t 410.244.7862
f 410.244.7742
BWProcida@Venable.com

**VIA UPS OVERNIGHT MAIL**

Aevri Salina Meadows, LLC
2604 Elmwood Avenue, Suite 210
Rochester, New York 14618
Attention: Moshe Rothman

      Re:    That certain loan (the "**Loan**") in the original principal amount of $25,000,000 as evidenced by a Promissory Note dated February 16, 2022 ("**Note**") executed by Aevri Salina Meadows, LLC, a Delaware limited liability company ("**Borrower**") and made payable to the Bank of Montreal, ("**Original Lender**"), which Note is currently held by Wilmington Trust, National Association, as Trustee for BBCMS Mortgage Trust 2022-C15 ("**Lender**"). Additional terms and conditions of the Loan are set forth in a Loan Agreement ("**Loan Agreement**") and Cash Management Agreement ("**Cash Management Agreement**") of even date with the Note. The Note is secured by, among other things, a Mortgage and Security Agreement ("**Mortgage**") of even date executed by Borrower. The Loan is subject to a Limited Recourse Guaranty of even date ("**Guaranty**") made by Moshe Rothman ("**Guarantor**"). The Note, Loan Agreement, Cash Management Agreement, Mortgage, Guaranty and all other documents executed in connection with the Loan shall be collectively referred to as the "Loan Documents". Capitalized terms not otherwise defined shall have the meanings given to them in the Loan Documents.

      Rialto Loan # 30508596

Dear Borrower:

      The above-mentioned Loan is administered on behalf of the Lender by Rialto Capital Advisors LLC ("**Rialto**"), as Special Servicer. I write as counsel to Rialto acting solely in its capacity as Special Servicer to the Lender. At origination, Borrower provided Lender with (i) a Management Agreement providing for management of the Property by Smartcore Consulting LLC d/b/a Mike Barney Management ("**MBM**"); and (ii) a Conditional Assignment of Management Agreement ("**CAMA**"). Pursuant to the Section 5 of the CAMA, the Lender may terminate the Management Agreement during the occurrence and continuance of a "Trigger Event". Multiple Trigger Events exists due to, without limitation, the Borrower's failure to make required payments under the Loan Documents and the departure of Specified Tenants National Grange and Alion. Section 4.15(g) of the Loan Agreement provides that upon termination of the Management Agreement:

                Lender, at its option, may require Borrower to engage, in accordance with the terms and conditions set forth herein and in the Assignment of Management Agreement, a New Manager to manage the



Aevri Salina Meadows, LLC
September 26, 2023
Page 2

      Property, which such New Manager shall (i) to the extent a Trigger Period is continuing and if opted by Lender, be selected by Lender and (ii) be a Qualified Manager and shall be engaged pursuant to a Qualified Management Agreement.

      Pursuant to Section 5 of the CAMA the Lender hereby exercises its option to terminate the Management Agreement and directs Borrower to engage Qualified Manager William C. Colucci and Cushman & Wakefield/Pyramid Brokerage as successor manager. Please be advised that as owner of the Property the Borrower will remain responsible for all decisions related to the management of the Property, subject to the limitations in the Loan Documents and nothing herein shall be construed as imposing the obligations of a mortgagee in possession on the Lender. Please contact me as soon as possible to coordinate a transition of management duties and note that pursuant of Section 7 of the CAMA, MBM and Borrower are obligated to cooperate fully with the transition.

                    Very truly yours,

                    Brent W. Procida

cc:    Book Law Group, LLC (via Overnight Delivery)
       2 Perlman Drive, Suite 201
       Spring Valley, New York 10977
       Attn: Mordechai Book, Esq.

       Smartcore Consulting LLC d/b/a Mike Barney Management
       5015 Campuswood Drive, Suite 101
       East Syracuse, NY 13057

       Nate Kritzer; nkritzer@Steptoe.com (via Electronic Mail)
       Jim Carolan; jcarolan@Steptoe.com (via Electronic Mail)

# EXHIBIT 16

Lisa Dell, County Clerk
401 Montgomery Street
Room 200
Syracuse, NY 13202
(315) 435-2229

# Onondaga County Clerk Recording Cover Sheet

**Received From :**
LAWRENCE BROWN ESQ
PO BOX 669
363 ROUTE 31
BRIDGEPORT, NY 13030

**First PLAINTIFF**

| HAWTHORNE PROPERTY SERVICES LLC |
| --- |

**First DEFENDANT**

| AEVRI SALINA MEADOWS LLC |
| --- |

**Index Type :** Judgments
**File # :** 2022-00012505

**Type of Instrument :** Mechanics Lien
**Type of Transaction :** Mechanics Lien
**Recording Fee:** $15.00

**Recording Pages :** 7

---

### Recorded Information

State of New York

County of Onondaga

I hereby certify that the within and foregoing was
recorded in the Clerk's office for Onondaga
County, New York

On (Recorded Date) : 09/15/2022

At (Recorded Time) : 9:18:11 AM

Doc ID - 048639880007

Lisa Dell, County Clerk

---

This sheet constitutes the Clerks endorsement required by Section 319 of Real Property Law of the State of New York

Entered By: RSWEENIE  Printed On : 09/15/2022    At : 9:18:29AM

# NOTICE UNDER MECHANIC'S LIEN LAW

To the Clerk of the County of ~~Saratoga~~ *Onondaga (PL)* and all others whom it may concern:

**PLEASE TAKE NOTICE THAT THE LIENOR(S) NAME AND ADDRESS** is (are) Hawthorne Property Services LLC,

POB 564, Bridgeport, NY 13030

have claim a lien on the real property herein after described as follows:

1) Name and address of lienor's attorney is Lawrence Brown, Esq.  POB 669, Bridgeport, NY 13030

2) **NAME AND ADDRESS OF PROPERTY OWNER** Aevri Salina Meadows LLC 2604 Elmwood Ave.

Suite 210 Rochester , NY 14618 and the interest of the owner as far as known to be the lienor(s) is full owner.

3) Name of the person by whom the lienor(s) was (were) employed is: Eli Puretz representing Aevri.

Name of the person to whom the lienor(s) furnished or is (are) to furnish materials or for whom the lienor(s) performed

or is (are) to perform professional services is Aevri Salina Meadows LLC

Name of the person with whom the contract was made is Aevri Salina Meadows LLC

Name of the person for whom professional services were rendered is Aevri Salina Meadows LLC

4) Labor performed was Landscape maintenance and storm sewer repairs

Material furnished was various landscaping materials $6444. and painting products $2,484.

Materials actually manufactured for but not delivered to the real property are 0

Agreed price for labor performed $ 9410.04 monthly for two m

Agreed price for materials furnished $ 6,444.

Agreed price for material actually manufactured for but not delivered $ 0

5) Amount unpaid to the lienor(s) for said labor performed $ 1820.08

Amount unpaid to the lienor(s) for said material furnished is $ $8,928

Amount unpaid to lienor(s) for material actually manufactured but not delivered to $ 0

**TOTAL AMOUNT FOR WHICH LIEN IS BEING FILED FOR $** 27,748.08

6) Date of when the first item of work was performed 06/15/2022

Date when the first item of material was furnished 6/7/2022

Date when the last item of work was performed 8/15/2022

Date when the last item of material was furnished 8/15/2022

*Legal Description Attached*

*(Raymond R C)*

7) The property subject to the lien is situated in the County of ~~Saratoga~~ Town/City/Village of *Salina*

Lot Number(s) *050*   Block(s) *01*   Subdivision *1, 7 and*

Tax Map Number *050* *850*   *01* *01*   Deed-Reference Number *1, 6 and* *1, 3*

*Deed reference Book 2022/9354 and 2022/9535*

That said labor and materials were performed and furnished for and used, and the professional services rendered were used, in the improvement of the real property hereinbefore described. That 8 months (4 months if a single family dwelling) have not elapsed dating from the last item of work performed, or from the last items of materials furnished.

DATED: *8/19/22*

State of New York, County of          ss:                    Individual or Partner

_____ being duly sworn
states that deponent is _____ the owner or partner of
_____ the claimant(s) mentioned in the foregoing notice
of lien; that deponent has read the said notice and knows the contents thereof, and that the same is true to deponent's own knowledge, except as to the matters herein stated to be alleged on information and belief, and that as to those matters deponent believes it to be true.

Sworn to before me this _____
        day of _____ 2___

_____
        Notary Public

State of New York, County of *MADISON*   ss:                    Corporation

*Raymond Corney* _____ being duly sworn,
deposes and says that deponent is the *sole member* of *Hawthorne Property Services LLC* herein,
that deponent has read the foregoing notice of lien and knows the contents thereof, and that the same is true to deponent's, own knowledge, except as to the matters therein stated to be alleged upon information and belief, and that as to those matters deponent believes it to be true.

The reason why this verification is made by deponent is that deponent is an officer, to wit, the *sole member*
_____ of *Hawthorne Property Services LLC*
which is a *LLC* _____ corporation, and is familiar with the facts and circumstances herein.

And the sources of deponent's information and grounds of deponent's belief as to all matters not therein stated upon deponent's knowledge are as follows:

Sworn to before me this *19th*
        day of *August* *2022*

_____
        Notary Public

**Lawrence P. Brown , Notary**
Appointed Madison County, N.Y.
#02BR4831705
My Comm. Expires 12/31/25

# Schedule A

ALL that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Town of Salina, in the County of Onondaga, State of NY;

TRACT 1:

LOT 6

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, BELONGING, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK, AND BEING DESIGNATED AS LOT 6 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK, AMENDMENT NO. 3, PART OF MILITARY LOTS 2, 3, 17 AND 18, TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED ON THE CLERK'S OFFICE AS MAP 7196.

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY, THE NORTHEAST CORNER OF LOT 6 AND THE NORTHWEST CORNER OF LOT 10, SAID POINT BEING THE POINT OF BEGINNING.

RUNNING THENCE LEAVING SAID SOUTHERLY RIGHT-OF-WAY SOUTH 06° 54' 25" WEST ALONG THE EASTERLY BOUNDARY LINE OF LOT 6 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE 481.53 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 83° 05' 35" WEST ALONG THE SOUTHERLY BOUNDARY LINE OF LOT 6 AND THE NORTHERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 282.00 FEET TO A MAG NAIL;

THENCE NORTH 38° 05' 35" WEST ALONG THE WESTERLY BOUNDARY LINE OF LOT 6 AND THE EASTERLY BOUNDARY LINE OF LOT 7 A DISTANCE 281.48 FEET TO A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY;

THENCE NORTH 45° 24' 54" EAST ALONG SAID SOUTHERLY RIGHT-OF-WAY A DISTANCE 202.21 FEET TO A MAG NAIL AT A POINT OF CURVATURE.

THENCE ALONG A CURVE TO THE RIGHT SAID CURVE HAVING A RADIUS OF 352.96 FEET AND AN ARC LENGTH OF 396.82 FEET TO THE POINT OF BEGINNING.

LOT 10

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, BELONGING, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK AND BEING DESIGNATED AS LOT 10 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK, AMENDMENT NO. 3, PART OF MILITARY LOT 2, 3, 17 AND 18, TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196.

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A CAPPED IRON ROD SET ON THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS PARKWAY, THE NORTHEAST CORNER OF LOT 6 AND THE NORTHWEST CORNER OF LOT 10, SAID POINT BEING THE POINT OF BEGINNING.

RUNNING THENCE ALONG A CURVE TO THE RIGHT TO A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 352.96 FEET AND AN ARC LENGTH OF 36.63 FEET TO A CAPPED IRON ROD SET;

THENCE SOUTH 64° 13' 24" EAST CONTINUING ALONG THE SOUTHERLY RIGHT-OF-WAY OF SALINA MEADOWS A DISTANCE OF 170.00 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE LEFT TO A CAPPED IRON ROD SET AT A POINT OF REVERSE CURVE, SAID CURVE HAVING A RADIUS OF 600.00 FEET AND AN ARC LENGTH OF 151.63 FEET;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY ON THE WESTERLY RIGHT-OF-WAY LINE OF PLAINFIELD ROAD, SAID CURVE HAVING A RADIUS OF 25.00 FEET AND AN ARC LENGTH OF 37.07 FEET TO A CAPPED IRON ROD SET;

THENCE SOUTH 06° 14' 53" WEST ALONG SAID WESTERLY RIGHT-OF-WAY LINE A DISTANCE OF 211.20 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 540.37 FEET AND AN ARC LENGTH OF 415.87 FEET;

THENCE SOUTH 50° 20' 35" WEST A DISTANCE OF 173.84 FEET TO A CAPPED IRON ROD SET AT A POINT OF CURVATURE;

THENCE ALONG A CURVE TO THE RIGHT TO A CAPPED IRON ROD SET AT A POINT OF TANGENCY, SAID CURVE HAVING A RADIUS OF 320.00 FEET AND AN ARC LENGTH OF 260.06 FEET;

THENCE NORTH NORTH 83° 05' 35" WEST A DISTANCE OF 164.88 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 06° 54' 25" EAST ALONG THE EASTERLY BOUNDARY LINE OF LOT 7 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 453.76 FEET TO A DRILL HOLE SET;

THENCE SOUTH 83° 05' 35" EAST ALONG THE NORTHERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 295.00 FEET TO A CAPPED IRON ROD SET;

THENCE NORTH 06° 54' 25" EAST ALONG THE EASTERLY BOUNDARY LINE OF LOT 6 AND THE WESTERLY BOUNDARY LINE OF LOT 10 A DISTANCE OF 481.53 FEET TO A CAPPED IRON ROD SET AT THE POINT OF BEGINNING.

Being the same premises conveyed to Salina Park, LLC by deed made by SCCP SALINA I, LIMITED PARTNERSHIP, a Delaware limited partnership dated 06/06/2016, recorded 06/14/2016 in the Office of the County Clerk, Onondaga County in Book 5376 page 591.

TRACT 2:

LOT 3:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK CONTAINING 4.620 ACRES AND BEING DESIGNATED AS LOT 3 AS SHOWN ON THAT CERTAIN PLAT ENTITLED" FINAL PLAN SALINA MEADOWS OFFICE PARK AMENDMENT NO. 3 PART OF MILITARY LOTS 2,3, 17 AND 18 TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196 BOUNDED AND DESCRIBED AS FOLLOWS;

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY, WHICH POINT IS THE DIVIDING LINE BETWEEN LOTS 3 AND 13 AS SHOWN ON SAID MAP;

RUNNING THENCE ALONG SAID DIVIDING LINE, NORTH 42° 02' 10" WEST, 338.15 FEET TO LOT 8 AS SHOWN ON SAID MAP;

THENCE ALONG SAID LAST MENTIONED LOT, NORTH 45° 24' 54" EAST, 407.00 FEET TO LAND NOW OR FORMERLY OF DONALD W. KNIGHT;

THENCE ALONG SAID LAST MENTIONED LAND, SOUTH 82° 25' 16" EAST, 285.00 FEET TO LOT 1 ON SAID MAP;

THENCE ALONG SAID LAST MENTIONED LOT, SOUTH 7° 34' 44" WEST, 439.29 FEET TO THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF SALINA MEADOWS PARKWAY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 412.96 FEET, A DISTANCE OF 301.66 FEET TO THE POINT OR PLACE OF BEGINNING.

BEING THE SAME PREMISES CONVEYED TO ROWE PROPERTIES-SALINA MEADOWS IV LIMITED PARTNERSHIP BY DEED FROM ROWE DEVELOPMENT COMPANY, A VIRGINIA CORPORATION, TO ROWE PROPERTIES-SALINA MEADOWS IV LIMITED PARTNERSHIP, A VIRGINIA LIMITED PARTNERSHIP, DATED JULY 2, 1987 AND RECORDED IN ONONDAGA COUNTY CLERK'S OFFICE JULY 27, 1987 ON BOOK 3371 OF DEEDS AT PAGE 165.

LOT 7:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, LYING AND BEING IN THE TOWN OF SALINA, COUNTY OF ONONDAGA AND STATE OF NEW YORK CONTAINING 4.161 ACRES AND BEING DESIGNATED AS LOT 7 AS SHOWN ON THAT CERTAIN PLAT ENTITLED "FINAL PLAN SALINA MEADOWS OFFICE PARK AMENDMENT NO. 3 PART OF MILITARY LOTS 2, 3, 17 AND 18 TOWN OF SALINA, ONONDAGA COUNTY, NEW YORK" PREPARED BY ALFRED N. IANUZI, JR. DATED SEPTEMBER 22, 1989, A COPY OF WHICH PLAT IS FILED IN THE CLERK'S OFFICE AS MAP 7196, BOUNDED AND DESCRIBED AS FOLLOWS;

BEGINNING AT A POINT ON THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, WHICH POINT IS THE DIVIDING LINE BETWEEN LOTS 7 AND 6 AS SHOWN ON SAID MAP;

RUNNING THENCE ALONG SAID DIVIDING LINE SOUTH 38° 05' 35" EAST, 281.48 FEET TO LOT 10 AS SHOWN ON SAID FILED MAP;

THENCE ALONG THE DIVIDING LINE BETWEEN LOTS 7 AND 10, NORTH 83° 05' 35" WEST, 13.00 FEET TO A POINT;

THENCE STILL ALONG THE DIVIDING LINE BETWEEN LOTS 7 AND 10, SOUTH 6° 54' 25" WEST, 453.76 FEET TO THE NORTHERLY SIDE OF PLAINFIELD ROAD;

THENCE ALONG THE NORTHERLY AND NORTHEASTERLY SIDES OF PLAINFIELD ROAD THE FOLLOWING 4 COURSES AND DISTANCES:

1. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 203.77 FEET, A DISTANCE OF 153.83 FEET;

2. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 801.50 FEET, A DISTANCE OF 208.36 FEET;

3. NORTHWESTERLY, ALONG THE ARC OF A CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 271.60 FEET, A DISTANCE OF 221.81 FEET;

4. NORTH 5° 58' 33" WEST, 79.40 FEET TO THE EXTREME SOUTHERLY END OF THE ARC OF A CURVE CONNECTING THE EASTERLY SIDE OF PLAINFIELD ROAD WITH THE SOUTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE NORTHEASTERLY, ALONG THE ARC OF SAID CURVE, BEARING TO THE RIGHT, HAVING A RADIUS OF 25.00 FEET, A DISTANCE OF 36.60 FEET TO THE SOUTHERLY SIDE OF SALINA MEADOWS PARKWAY;

THENCE NORTHEASTERLY ALONG THE SOUTHEASTERLY SIDE OF SALINA MEADOWS PARKWAY, ALONG THE ARC OF A CURVE, BEARING TO THE LEFT, HAVING A RADIUS OF 489.54 FEET, A DISTANCE OF 227.45 TO THE POINT OR PLACE OF BEGINNING.

Address Reference: 220 Salina Meadows Parkway and 301 Plainfield Road (as to Tract 1) and 231 Salina Meadows Parkway and 200 Salina (as to Tract 2), Syracuse, NY 13212 (For Information Only)

Being the same premises conveyed to Salina Park, LLC by deed made by SCCP SALINA II, LIMITED PARTNERSHIP, a Delaware limited partnership dated 06/06/2016 recorded 06/14/2016 in the Office of the County Clerk, Onondaga County in Book 5376 page 604.

FOR CONVEYANCING ONLY, IF INTENDED TO BE CONVEYED: TOGETHER WITH ALL RIGHT, TITLE AND INTEREST OF, IN AND TO ANY STREETS, ROADS, OR AVENUES ABUTTING THE ABOVE DESCRIBED PREMISES, TO THE CENTER LINE THEREOF.