Exhibit A

1

2

                UNITED STATES DISTRICT COURT
3               SOUTHERN DISTRICT OF NEW YORK
    ------------------------------
4
    WILMINGTON TRUST, NATIONAL
5   ASSOCIATION, as Trustee for
    The benefit of the Registered
6   Holders of BBCMS Mortgage Trust
    2022-C15 Commercial Mortgage
7   Pass-Through Certificates,
    Series 2022-C15, acting by and
8   Through its special servicer,
    Rialto Capital Advisors, LLC,
9
                Plaintiff,
10
                vs.          No. 1:23-cv-08824-(JPC-JLC)
11
    AEVRI SALINA MEADOWS LLC;
12  HAWTHORNE PROPERTY SERVICES,
    LLC; and MOSHE ROTHMAN,
13
                Defendants.
14  ------------------------------

15

16

17          DEPOSITION OF MICHAEL STRICKLAND

18                 New York, New York

19              Thursday, July 31, 2025

20

21

22

23  Reported by:
    Yaffa Kaplan
24  JOB NO. J13269000

25



 1

 2                         July 31, 2025

 3                         9:09 a.m.

 4

 5          Deposition of MICHAEL STRICKLAND,

 6    held at the offices of Steptoe, 1114 Avenue

 7    of the Americas, New York, New York,

 8    pursuant to Notice, before Yaffa Kaplan, a

 9    Notary Public of the State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1

 2   A P P E A R A N C E S:

 3

 4        VENABLE LLP

 5        Attorneys for Plaintiff

 6             750 East Pratt Street, Suite 900

 7             Baltimore, Maryland 21202

 8        BY:   BRENT W. PROCIDA, ESQ.

 9

10        STEPTOE LLP

11        Attorneys for Defendants

12             1114 Avenue of the Americas

13             New York, New York 10036

14        BY:   NATHANIEL KRITZER, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```



1

2        IT IS HEREBY STIPULATED AND AGREED,

3   by and between counsel for the respective

4   parties hereto, that the filing, sealing and

5   certification of the within deposition shall

6   be and the same are hereby waived;

7        IT IS FURTHER STIPULATED AND AGREED

8   that all objections, except as to the form

9   of the question, shall be reserved to the

10  time of the trial;

11       IT IS FURTHER STIPULATED AND AGREED

12  that the within deposition may be signed

13  before any Notary Public with the same force

14  and effect as if signed and sworn to before

15  the Court.

16

17

18

19

20

21

22

23

24

25



1                        M. Strickland

2  M I C H A E L   S T R I C K L A N D , called as a

3  witness, having been duly sworn by a Notary Public,

4  was examined and testified as follows:

5  EXAMINATION BY

6  MR. KRITZER:

7       Q.    What is your name and address?

8       A.    Michael Strickland, 407 North Hampton

9  Lane, Canton, Georgia 30115.

10      Q.    Good morning, Mr. Strickland.  Please

11  state your name for the record.

12      A.    Michael Strickland.

13      Q.    Please state your business address for

14  the record.

15      A.    My business address is in Miami.  220

16  South Biscayne.

17      Q.    Where are you currently employed?

18      A.    Rialto Capital Advisors.

19      Q.    How long have you been employed there?

20      A.    Fifteen years.

21      Q.    What is your current role at Rialto?

22      A.    I am a senior vice president of asset

23  management.

24      Q.    What are your responsibilities in that

25  role?



1                    ROUGH

2      A.    I have a portfolio of nonperforming

3  loans that I am tasked with working out or

4  resolving.

5      Q.    How many nonperforming loans are in your

6  portfolio?

7      A.    Any given time, 20 to 70.

8      Q.    How many are there now?

9      A.    Nonperforming probably 35, 30.

10     Q.    Do you have any performing loans in your

11  portfolio?

12     A.    I have some.

13     Q.    How many?

14     A.    About 35.

15     Q.    So how many total loans do you have in

16  your portfolio right now?

17     A.    About 70.

18     Q.    How long have you been in your current

19  role at Rialto?

20     A.    Maybe five years.

21     Q.    What was your role before five years

22  ago?

23     A.    From 2010 to 2019, I worked on a joint

24  venture with FDIC and I was in charge of

25  post-judgement collection efforts and I handled



```
 1                       M. Strickland
 2    bankruptcy fraud and litigation.
 3         Q.    That was a joint venture between the
 4    FDIC and Rialto?
 5         A.    Yes.
 6         Q.    What was your role in that joint
 7    venture?
 8         A.    My role?
 9         Q.    Yes.
10         A.    I was an asset manager like I am now.  I
11    started in as a vice president and became a senior
12    vice president at some point.
13         Q.    What was your position before you were a
14    vice president and asset manager in that JV?
15         A.    I don't know that I had a different
16    position at JV.
17         Q.    What job, if any, did you have before
18    2010?
19         A.    I worked for Regions Bank.
20         Q.    How is that spelled?
21         A.    R-E-G-I-O-N-S.
22         Q.    I'm sorry, which years?
23         A.    Maybe '03 to 2010.
24         Q.    What was your role at Regions Bank?
25         A.    Did loan underwriting for a few years.
```



1                         M. Strickland

2    I was on the commercial and industrial team.  I was

3    in sales for a few years.

4         Q.    Did you do anything else other than loan

5    underwriting at Regions Bank?

6         A.    I was in sales for a few years.  In

7    commercial and industrial lending.

8         Q.    Anything else?

9         A.    No.

10        Q.    Okay.  So before 2003, when you were at

11   Regions Bank, what was your job, if any?

12        A.    I worked as an accounting controller for

13   a diamond jewelry manufacturer.  For four, five

14   years.

15        Q.    So that would be what, from 1999 to 2003

16   thereabouts?

17        A.    I would say '8.  1998.

18        Q.    Until you started at Regions Bank?

19        A.    2022, 2023.

20        Q.    I'm sorry.  You mean --

21        A.    2002 to 2003.

22        Q.    What was the name of that diamond

23   company?

24        A.    Kattan, K-A-T-T-A-N, Diamonds and

25   Jewelry.



```
 1                      M. Strickland

 2      Q.    Why did you leave that job?

 3      A.    We moved to Alabama.

 4      Q.    Where was the Kattan Diamonds located?

 5      A.    Los Angeles.

 6      Q.    Pause here just for a moment.  Have you

 7  had your deposition taken before?

 8      A.    I have.

 9      Q.    How many times?

10      A.    I don't know.

11      Q.    Dozens?

12      A.    Probably.

13      Q.    Have all those depositions been in

14  connection with your role as a special servicer for

15  nonperforming loans?

16      A.    I have always been in post-judgement

17  collection, so it's possible that I did a

18  deposition.  I don't recall.

19      Q.    Can you recall any depositions you sat

20  for that did not involve post-judgement collection?

21      A.    Yes.

22      Q.    Okay.  What are those depositions?  What

23  do they involve?

24      A.    Cases like this.  Ongoing litigation,

25  bankruptcy.
```



1                          M. Strickland

2          Q.    So you said "I have always been in

3     post-judgement collection", but at times your

4     depositions have related to collections of

5     nonperforming loans where there hasn't been a

6     judgment yet, right?

7          A.    That's really not what I intended to

8     answer.  I was answering the question about whether

9     the depositions were in relation to loan files and

10    workouts.

11         Q.    Have you ever given a deposition that

12    was in connection with something other than loan

13    files and workouts that you can recall?

14         A.    No.

15         Q.    So just a few quick rules of the road.

16    I know you probably know these already, but please

17    wait for me to finish my questions before you give

18    your answer.  Can you do that, please?

19         A.    I can.

20         Q.    And I need you to give verbal answers,

21    not head nods or head shakes.  You understand?

22         A.    I do.

23         Q.    And if you don't understand one of my

24    questions, please ask me to clarify.  Will you do

25    that?



```
1                      M. Strickland

2        A.     I will.

3        Q.     And if you don't ask me to clarify, I

4   will assume that you have heard and understood the

5   question.  Do you understand that?

6        A.     I do.

7        Q.     Is there any reason why you can't give

8   full and truthful testimony today?

9        A.     No.

10       Q.     Are you under the influence of any

11  medications or other substances that would impair

12  your ability to testify accurately?

13       A.     I am not.

14       Q.     And you understand that your testimony

15  today is given under oath just as if there were a

16  judge and jury present, correct?

17       A.     Correct.

18       Q.     So you said you were an account

19  controller at Kattan Diamonds and Jewelry in LA

20  from roughly 1998 to 2002 or '3.  What were your

21  responsibilities in that role?

22       A.     I was in charge of the collection of

23  debts and management of accounts receivable.

24  Accounts payable.

25       Q.     Anything else?
```



```
 1                        M. Strickland
 2        A.    That was mostly it.
 3        Q.    Before you worked at Kattan, where did
 4   you work, if anywhere?
 5        A.    I worked for a printing company for
 6   several years in Los Angeles.
 7        Q.    What's the name of that?
 8        A.    Doing a similar job.  It's called The
 9   Printing Palace.
10        Q.    Which years?
11        A.    Oh, probably '94 to '98.
12        Q.    And that was doing debt collection?
13        A.    Similar.  Accounts receivable.  Bank
14   reconciliations.
15        Q.    Was that also in LA?
16        A.    It was.
17        Q.    Where, if anywhere, did you work before
18   1994?
19        A.    I was in college.
20        Q.    Where did you go to college?
21        A.    Pepperdine University.
22        Q.    What years were you in college?
23        A.    '88 to '92.
24        Q.    Did you receive any degrees from
25   Pepperdine?
```



MICHAEL STRICKLAND                                    July 31, 2025
Wilmington Trust vs Aevri Salina Meadows                        13

```
 1                    M. Strickland
 2       A.    I did.
 3       Q.    What degree?
 4       A.    I received a bachelor of arts in
 5  communications.
 6       Q.    Did you have a minor?
 7       A.    No.
 8       Q.    Have you received any degrees other than
 9  your bachelor of arts in communications from
10  Pepperdine?
11       A.    Yes.
12       Q.    What degrees?
13       A.    I have a JD.
14       Q.    Where is it from?
15       A.    Thomas Goode Jones School of Law.  It's
16  now part of University of Alabama.
17       Q.    Was it independent when you attended it?
18       A.    I can't remember.  It's -- it was
19  affiliated with Faulkner University as well, but
20  it's all under some -- I couldn't explain the
21  connections.
22       Q.    Where was it located?
23       A.    In Montgomery, Alabama.
24       Q.    What years did you attend Thomas Goode
25  Jones School of Law?
```



1                        M. Strickland

2          A.    '07 to '10 or '11.  I don't remember

3    exactly.

4          Q.    That was during the time you were

5    working at Rialto?

6          A.    It was during the time I was working at

7    the bank, ending with when I came on at Rialto.

8          Q.    Was that a full-time program or a night

9    program?

10         A.    Night program.

11         Q.    Do you have a license to practice law?

12         A.    I do.

13         Q.    Where are you licensed?

14         A.    Alabama.

15         Q.    Anywhere else?

16         A.    No.

17         Q.    Do you have any other licenses other

18   than your law license in Alabama?

19         A.    I have a driver's license.

20         Q.    Other than your driver's license and law

21   license in Alabama, do you have any other licenses?

22         A.    I have a fishing license.

23         Q.    Do you have any professional licenses

24   other than your law license in Alabama?

25         A.    No.



1                    M. Strickland

2        Q.    Do you have any degrees other than your

3    BA from Pepperdine and your JD from Thomas Goode

4    Jones School of Law?

5        A.    No.

6        Q.    Do you have any certifications that we

7    haven't already discussed?

8        A.    I can't think of any that would be

9    relevant.  I had a certification from the

10   Gemological Institute of America when I worked in

11   the diamond industry.

12       Q.    Do you have any other professional

13   certifications?

14       A.    I don't think so.

15       Q.    Have you received any formal education

16   other than your time at Pepperdine and Thomas Goode

17   Jones School of Law?

18       A.    No.

19       Q.    At some point did you become aware of a

20   loan relating to a commercial property located at

21   the addresses 200, 220, 231 Salina Meadows Parkway?

22       A.    Yes.

23       Q.    When did you become aware of that loan?

24       A.    I believe April of 2024.

25       Q.    How did you become aware of that loan?



1                          M. Strickland

2          A.    A gentleman at Rialto took a job in

3    New York, and I was assigned one of the loans from

4    his book.

5          Q.    Who was the gentleman at Rialto?

6          A.    Joao.

7          Q.    Sorry.  Who?

8          A.    Joao Gerrara.

9          Q.    Joel?

10         A.    J-O-A-O.

11         Q.    J-O-A-L?

12         A.    J-O-A-O as in ostrich.

13         Q.    I'm sorry.  If you can just, from the

14   beginning, spell his name.

15         A.    J-O-A-O.

16         Q.    Got it.  And what is Joao's last name?

17         A.    I am challenged on the spelling, but it

18   begins with a G and it's Gerra or Gerrara or

19   something of that nature.  He was -- it's a

20   Portuguese name.

21         Q.    Did you discuss the loan with Joao when

22   you took it over from him?

23         A.    I did.

24         Q.    What did he tell you about it?

25         A.    I -- I don't remember as I sit here



```
 1                      M. Strickland
 2   today.
 3        Q.    Do you remember any details of any
 4   discussion you had with Joao regarding the loan?
 5        A.    No.
 6        Q.    Did you have any e-mails with Joao
 7   regarding that loan?
 8        A.    Possible.  I don't recall.
 9        Q.    And today I am probably going to make a
10   lot of references to the loan or that loan, and
11   unless I say otherwise, I am talking about the loan
12   relating to 200, 220, and 231 Salina Meadows
13   Parkway.  Do you understand?
14        A.    I understand.
15        Q.    So what, if anything, did you do in
16   April of 2024 to learn about the loan?
17        A.    When the loan transfers, generally the
18   asset manager will review the file, review the
19   communication that's taken place, and if there is
20   litigation as there was in this case, maybe look
21   over the case file, the docket, see what's going on
22   because you are stepping into a situation that has
23   been processing without you before.
24        Q.    What, if anything, did you specifically
25   review in April of 2024 to learn about the loan?
```



```
 1                    M. Strickland
 2       A.    I don't have any specific recollection
 3  April 2024 what I reviewed.
 4       Q.    Okay.  Did you speak with anyone other
 5  than Joao in April of 2024 when you took over the
 6  loan?
 7       A.    Yes.
 8       Q.    Who?
 9       A.    Mr. Procida.
10       Q.    And Mr. Procida is your counsel,
11  correct?
12       A.    Yes.
13       Q.    Other than Mr. Procida and Mr. Joao, did
14  you speak with anybody about the loan when you took
15  it over in April of 2024?
16       A.    I am sure I did.
17       Q.    Can you recall any names?
18       A.    Trying to think who my team leader might
19  have been at the time.  Maybe John Stanton.  You
20  have meetings once a month where you will go over
21  your loan assignments with someone who is tasked
22  with monitoring progress on cases and things of
23  that nature.  So it's very likely that I discussed
24  it with a couple of other people at Rialto.
25       Q.    Who were the other people you think it's
```



```
 1                        M. Strickland
 2    likely you discussed it with?
 3         A.    Well, Mr. Stanton.  Possibly Jonathan
 4    Horowitz.  Possibly Jonathan Schlact.
 5         Q.    So you said John Stanton is your team
 6    leader, correct?
 7         A.    He may have been at the time.  Mr.
 8    Schlact is my team leader now.
 9         Q.    How do you spell his last name?
10         A.    S-C-H-L-A-C-T.
11         Q.    And you also mentioned a Jon Horowitz,
12    right?  Who is that?
13         A.    He is the director of our loan workout
14    team.
15         Q.    Is he senior to Mr. Schlact?
16         A.    Yes.
17         Q.    Is there anyone else you can think of
18    who you discussed the loan with after you learned
19    about it in April of 2024?
20         A.    Maybe someone in REO who was handling
21    the building and likely Mr. Colucci who is the
22    receiver.
23         Q.    What do you mean by "REO"?  What does
24    that stand for?
25         A.    It stands for real estate owned, and
```



1                        M. Strickland

2    it's a department that we have that handles the

3    actual property itself as opposed to litigation or

4    loan documents and things of that nature.  They are

5    handling leases.  They are handling repairs of

6    HVAC, restriping of parking lots, things of that

7    nature.

8         Q.    How is that kind of work divided between

9    REO and a receiver like Mr. Colucci?

10        A.    Well, Mr. Colucci will identify problems

11   of issues that need to be addressed and will -- if

12   no money is available will request funding, someone

13   with REO will opine as to whether the amount for

14   something that I might not have knowledge of such

15   as how much it cost to stripe a parking lot, they

16   are going to have more institutional awareness of

17   the costs involved with the real estate side.

18        Q.    Is there anyone other than the folks we

19   have already discussed who you spoke with regarding

20   the loan when you learned about it in April of

21   2024?

22        A.    I can't think of anyone off the top of

23   my head.

24        Q.    Did you have any e-mails regarding the

25   loan after you learned about it?



1                         M. Strickland

2          A.     I am sure I did.

3          Q.     With whom?

4          A.     With Mr. Procida.

5          Q.     Anyone else?

6          A.     Likely with Mr. Colucci and Mr. -- I

7     believe Matt Diamond is the REO rep on this.  I am

8     guessing though.  I deal with a lot of people, and

9     sometimes the names overlap.

10         Q.     At some point did you review the loan

11    file for the loan?

12         A.     I did.

13         Q.     When did you first do that?

14         A.     It would have likely been in April of

15    2024.

16         Q.     But you have no specific recollection of

17    that?

18         A.     It's just part of my pattern and

19    practice of when I receive a new file, there are

20    certain documents and things that I will review

21    first.

22         Q.     How did you get those documents?

23         A.     They were shared with me on the

24    electronic database.

25         Q.     Other than the electronic database, did

MICHAEL STRICKLAND                                    July 31, 2025
Wilmington Trust vs Aevri Salina Meadows                        22

```
 1                          M. Strickland
 2    you get them any other way?
 3         A.    I have access to the master servicer
 4    website where I can maybe find the records in a
 5    different organizational fashion.  I can log on and
 6    look at things related to the loan that the master
 7    servicer was doing.
 8         Q.    Did anyone ever e-mail copies of the
 9    loan documents to you?
10         A.    It's possible but we already have them
11    so --
12         Q.    Did anyone ever provide any hard copies
13    of the loan documents to you?
14         A.    Hard copies of loan documents?  I am
15    going to say no.
16         Q.    Have you ever asked to see any part of
17    the loan file that was not provided to you?
18         A.    I don't remember.
19         Q.    What, if anything, did you do to ensure
20    that the copies of the loan file that you were
21    reviewing were complete and accurate?
22         A.    I don't understand the question.
23         Q.    So at some point you reviewed a copy of
24    the loan file, correct?
25         A.    Correct.
```



1                        M. Strickland

2      Q.    Did you do anything to ensure that the

3  copy of the loan file you were reviewing was

4  complete and accurate?

5      A.    Well, when you say "complete", what do

6  you mean?

7      Q.    Whether it's missing any documents.

8      A.    I didn't notice it was missing any

9  documents.

10     Q.    Did you ask anyone at BMO about that?

11     A.    I am sure I didn't.

12     Q.    Do you know who was the outside law firm

13  for the lender in connection with the loan?

14     A.    Mr. Procida is the outside counsel for

15  the lender.

16     Q.    Okay.  In negotiating, where the loan

17  was negotiated and executed, do you know who was

18  acting as the outside counsel for the lender?

19     A.    I do.

20     Q.    Who?

21     A.    It was a gentleman named Peter -- I

22  forgot his last name -- with Katten.

23     Q.    Doyle?  Peter Doyle?

24     A.    Maybe.

25     Q.    Have you had any conversations with Mr.



```
1                      M. Strickland
2    Doyle to ensure that the loan file is complete and
3    accurate?
4         A.    Well, I don't -- I don't understand the
5    question why you would ask the question.  Because I
6    have not stated that the file was incomplete.
7         Q.    Maybe.  Did you have any conversations
8    with Mr. Doyle to ensure that the loan file was
9    accurate?
10        A.    No.
11        Q.    Did you have any conversations with
12   anybody to ensure that the loan file was accurate?
13        A.    I would have had discussions with Mr.
14   Procida.
15        Q.    What did you discuss with Mr. Procida to
16   ensure that the loan file was complete and
17   accurate?
18             MR. PROCIDA:  Objection.  That's
19        privileged.
20             MR. KRITZER:  Are you giving the witness
21        an instruction?
22   DI        MR. PROCIDA:  Yes.
23             Don't answer that.  That's a
24        conversation with me.  It's privileged.
25        Q.    Are you going to follow that
```



1                        M. Strickland

2    instruction?

3         A.    I am.

4         Q.    Other than Mr. Procida, did you have

5    conversations with anyone to ensure that the loan

6    file was accurate?

7         A.    I may have.  I don't recall.

8         Q.    Did you have any discussions with

9    anybody to ensure that the loan file was complete?

10        A.    I did not see anything that appeared

11   missing when I reviewed the loan file.

12        Q.    So did you have any discussions with

13   anyone about whether the loan file was complete?

14        A.    I don't remember.

15        Q.    It's fair to say you were not involved

16   in negotiations over the loan documents, correct?

17        A.    That's correct.

18        Q.    Let's go ahead and mark our first

19   exhibit.

20             Exhibit 1 has been marked for the

21   record.

22             (Exhibit 1, Declaration, marked for

23        identification, as of this date.)

24        Q.    Do you recognize Exhibit 1?

25        A.    It appears to be a declaration that I



```
 1                      M. Strickland
 2    made --
 3         Q.    Okay.
 4         A.    -- in relation to this case.
 5         Q.    Got it.  Who wrote this declaration?
 6         A.    I would say Mr. Procida and I wrote
 7    this.
 8         Q.    And you gave this declaration under
 9    oath, correct?
10         A.    I did.
11         Q.    So starting the first paragraph, you
12    state that you are one of the custodians of the
13    books, records, and files of the trust.  Do you see
14    that?
15         A.    I do.
16         Q.    What does "the trust" refer to here?
17         A.    It's referring to the BBCMS Mortgage
18    Trust 2022-C15, et cetera.
19         Q.    When was that trust created?
20         A.    Likely in 2022.
21         Q.    And how did you come to be a custodian
22    of the books, records, and files of the trust?
23         A.    When I was assigned the loan file,
24    Rialto was acting in its capacity as special
25    servicer for the loan.
```



1                          M. Strickland

2        Q.     You say that you have "personally worked

3    on" and reviewed the books, records, and files as

4    to the following facts, do you see that?

5        A.     Yes.

6        Q.     For which of the facts in your affidavit

7    had you personally worked on the books, records,

8    and files?

9        A.     I can't say as I sit here today.  I

10   would have to read through the declaration and find

11   things.

12       Q.     Go ahead.  That's fine.  Take your time.

13       A.     Can you repeat the question?

14       Q.     The question is for which of the books,

15   records, and files referenced in your declaration

16   did you personally work.

17       A.     I certainly working with the summary

18   judgment to -- I certainly would have personally

19   reviewed the loan agreement and the guarantee.  I

20   have read the Book opinion letter, allonge mortgage

21   assignment, A-L-L-O-N-G-E, mortgage, assignment of

22   mortgage.  The assignment of the ALR.  I reviewed

23   the payment history.  I reviewed the notice of

24   default.  I reviewed the notice of acceleration.  I

25   reviewed some of the bank records, the cash



1                    M. Strickland

2   management account, or the restricted account as

3   some documents call it.  I would have reviewed the

4   letter involving the demand to resume compliance

5   with cash management.  The communications involving

6   the existing property management at the time, 2023.

7   I would have reviewed the calculation of the

8   outstanding loan debt in coordination with the

9   declaration.  At a minimum.

10       Q.   So I appreciate your answer, but I am

11  trying to draw a distinction between documents you

12  personally worked on and documents you reviewed

13  since your declaration says that you personally

14  worked on and reviewed certain books and records.

15  So with respect to all the documents you just

16  mentioned that you had reviewed, which, if any of

17  those, did you work on while they were being

18  created?

19       A.   Okay.  The declaration.  The motion for

20  summary judgment.  The tabulation of deposits into

21  the restricted account.

22       Q.   Is there a paragraph you are referring

23  to there?

24       A.   22.  And the occupying loan balance

25  calculation at a minimum.



```
1                        M. Strickland
2         Q.    Is that paragraph 29 you are referring
3    to there, the last item?
4         A.    Yes.
5         Q.    Other than what you just identified, are
6    there any books and records referenced in your
7    declaration that you personally worked on while
8    they were being created?
9         A.    I am sure they were.
10        Q.    Can you please identify them?
11        A.    As I sit here today, I don't know.
12   There would have been e-mails, notes.
13        Q.    What types of e-mails?
14        A.    Communication.  E-mails about various
15   things with the loan.  Litigation.  Insurance.
16   Taxes.  Property.
17        Q.    Are those e-mails that you reviewed as
18   books and records that are referenced in paragraph
19   1 of your declaration?
20        A.    They would be included in that, yes.
21        Q.    So they form part of the basis of your
22   testimony?
23        A.    Well, specifically for this declaration,
24   no.
25        Q.    How do you mean?
```



```
 1                      M. Strickland
 2        A.    Well, if I am e-mailing about whether
 3   the taxes are paid, I don't recall making a
 4   statement in my declaration asserting that the
 5   taxes were or were not paid.
 6        Q.    So you say in paragraph 1, "I have
 7   personally worked on and reviewed the books,
 8   records, and files, and as to the following facts,
 9   I know them to be true of my own knowledge or I
10   have gained knowledge of them from the business
11   records."
12              Okay.  Do you see that?
13        A.    I do.
14        Q.    So I am focusing specifically on books,
15   records, and files that are referenced in your
16   declaration.  Other than what you have just
17   described with respect to the declaration, the
18   motion for summary judgment, and the calculations
19   in paragraphs 22 and 29, are there any books,
20   records, or files referenced in your declaration
21   that you personally worked on when they were being
22   created?
23        A.    There may be.
24        Q.    Can you please identify them?
25        A.    I can't as I sit here today.
```



1                      M. Strickland

2      Q.    What would you need in order to identify

3  them?

4      A.    The records.

5      Q.    Well, the records are all attached to

6  your declaration so if you need time to review

7  them, please take that time.

8      A.    Can you repeat your earlier question?

9  Maybe I misunderstood it.

10     Q.    Sure.  Other than what you described

11  with respect to the declaration, the motion for

12  summary judgment, and the calculations in

13  paragraphs 22 and 29, are there any books, records,

14  or files in your declaration that you personally

15  worked on?

16     A.    Wait a second.  Books, records, and

17  files in my declaration?

18     Q.    Yes.  Your declaration attaches and

19  references -- try again.  I don't want to speak

20  over each other.

21          Other than what you described with

22  respect to the declaration, the motion for summary

23  judgment, and the calculations in paragraphs 22 and

24  29, are there any books, records, and files

25  referenced in your declaration that you personally



```
 1                        M. Strickland
 2    worked on when they were being created?
 3         A.    When you say that I "referenced",
 4    everything that is referenced in the declaration
 5    should be attached to the declaration.
 6         Q.    Okay.  So could the reporter please
 7    repeat the question?
 8               (Record read.)
 9         A.    I don't know how to answer that.  There
10    must be.
11         Q.    Okay.  Then I would ask you to identify
12    those.  They are all attached to your declaration,
13    so please identify them.
14         A.    Do you have the date of the second
15    amended complaint?  Appears to be lines typed over
16    at the top.
17         Q.    If you are looking for the date of it, I
18    believe if you turn to the end, it would be signed
19    and dated on looks like page 20.
20         A.    So this document, I was not involved
21    with the record when it was created.  Does that
22    answer your question?
23         Q.    As to that document, yes.  I think so.
24    This is a large exhibit.  It includes all your
25    exhibits to your declaration just for sake of ease
```



```
1                      M. Strickland
2     of review.  If you go ahead, you know, there are
3     the documents that have this kind of crossing out
4     at the top because they were filed and then refiled
5     and those go with your declaration.  All that stuff
6     is the second amended complaint and the exhibits
7     thereto.  So then if you turn to the first document
8     that doesn't have that, you will see what's marked
9     as Exhibit 2, and that is the second exhibit to
10    your declaration.  And that's document -- it's
11    marked at the top legibly 63-2.
12         A.    You said it did not have the double --
13         Q.    That's right.  I think you have it.
14    Exhibit 2, does that have -- is that 63-2 or is
15    that something different?  I think that's still
16    Exhibit 2 to the complaint so you have to go
17    forward.
18         A.    Might you have a list of the exhibits?
19         Q.    Sorry?
20         A.    Might you have a list of the exhibits?
21         Q.    They are listed in your affidavit or
22    your declaration, but your declaration attached as
23    an exhibit the complaint along with exhibits to the
24    complaint so that's why there is some confusion,
25    but if you keep looking for where there is a break
```



```
 1                      M. Strickland

 2    between the crossed-out endorsements from the court

 3    and the ones that are not, you will find 63-2.

 4    There.  I think you have it.

 5         A.    I have it.

 6         Q.    Okay.

 7         A.    So this is the promissory note, and I

 8    was not working on the file when this document was

 9    created.

10         Q.    And for clarity, that's a reference to

11    Exhibit 2 to your declaration, correct?

12         A.    This document 63-2.

13         Q.    Okay.

14         A.    63-3 is the mortgage and security

15    agreement.  Also, I was not personally involved in

16    the creation of this document.

17         Q.    Okay.  How about 63-4?

18         A.    I was not personally involved with the

19    creation of this document.

20         Q.    63-5?

21         A.    I was not personally involved in the

22    creation of 63-5.

23         Q.    63-6?

24         A.    I was not personally involved with the

25    creation of 63-6.  I was not personally involved
```

```
 1                       M. Strickland
 2   with the creation of 63-7.
 3        Q.    63-8?
 4        A.    I was not personally involved with the
 5   creation of 63-8.
 6        Q.    63-9?
 7        A.    I was not personally involved with the
 8   creation of 63-9.
 9        Q.    63-10?
10        A.    I was not personally involved with the
11   creation of 63.10.
12        Q.    63.11?
13        A.    I was not personally involved with the
14   creation of 63-11.
15        Q.    63-12?
16        A.    I was not personally involved with the
17   creation of 63-12.
18        Q.    63-13?
19        A.    I was not personally involved with the
20   creation of 63-13.
21        Q.    63-14?
22        A.    I was not personally involved with the
23   creation of 63.14.
24        Q.    Looking further, this is page 2 of your
25   declaration, still in paragraph 1.  First full
```



```
 1                     M. Strickland
 2   sentence on that page you say, "Upon information
 3   and belief, all such documents were prepared in the
 4   ordinary course of business by a person who had
 5   personal knowledge of the event being recorded and
 6   who had a business duty to accurately record such
 7   event".
 8            Do you see that?
 9       A.   Yes.
10       Q.   How do you know that?
11       A.    It's upon information and belief.
12       Q.   Do you know it to be true?
13       A.    I don't know that.  That's what I stated
14   in my declaration.
15       Q.   So you are not sure if it's true that
16   all documents were prepared in the ordinary course
17   of business by a person who had personal knowledge?
18       A.    No.  I stated upon my information I
19   believe that it's true.
20       Q.   What information do you base that on?
21       A.    A review of the documents.
22       Q.   Anything else?
23       A.    My review of the file in general.
24       Q.   Any specific documents in the file other
25   than what's referenced in your declaration?
```



1                          M. Strickland

2          A.    I can't think of any off the top of my

3    head.

4          Q.    Who prepared the promissory note that

5    you reviewed as Exhibit 2?

6          A.    I do not know.

7          Q.    Who prepared the mortgage that we

8    reviewed as Exhibit 3?

9          A.    I don't know.

10         Q.    Really I think it was 63-3.

11               Who prepared the assignment of leases

12   and returns that's been filed as 63-4?

13         A.    I don't know.

14         Q.    Who prepared the loan agreement that's

15   been filed as 63-5?

16         A.    I don't know.

17         Q.    Who prepared the guarantee that's been

18   filed as 63-6?

19         A.    I don't know.

20         Q.    Who prepared the Book opinion letter

21   that's attached as 63-14?

22         A.    I will assume Mr. Book.

23         Q.    What do you base that on?

24         A.    That he signed the document, and as I

25   understand, he had a solo practice.



1                    M. Strickland

2       Q.    So paragraph 3, you state, "On or about

3   February 16, 2022, the Bank of Montreal, the

4   original lender, made a loan to Aevri Salina

5   Meadows LLC, the borrower in the principal amount

6   of $25 million".

7             Do you see that?

8       A.    I do.

9       Q.    What is that statement based on?

10      A.    Review of the loan files and the records

11  that accompanied the documents.

12      Q.    Is it based on any documents outside of

13  your declaration?

14      A.    Maybe.

15      Q.    Can you identify those documents?

16      A.    Not as I sit here today.

17      Q.    And paragraph 4 says -- and so you say

18  that a true and complete copy of the note

19  associated with the loan is attached as Exhibit 2,

20  correct?

21      A.    Yes.

22      Q.    Can you turn to Exhibit 2, please?  This

23  runs six pages, document 63-2, page 106, page 6 of

24  6, correct?  I believe page 1 is a cover page?

25      A.    I'm sorry.  You are on Exhibit 1?



```
 1                      M. Strickland
 2        Q.    Exhibit 2.  So this is 63-2 in the
 3   documents you are looking at.  I think you are on
 4   Exhibit 2 to the complaint, so if you go again past
 5   the ones that have crossed-out markers on them to
 6   63-2 --
 7        A.    Okay.
 8        Q.    So pages 2 of 6 through 6 of 6 of
 9   document 63-2, is it your testimony that this is a
10   true and correct copy of the promissory note
11   associated with the loan?
12        A.    I believe that it is.
13        Q.    On what do you base that belief?
14        A.    Reviewing the files.  Reviewing the
15   recorded documents.  I had communications with my
16   counsel as well.
17        Q.    Is there anything your counsel told you
18   that formed the basis of your testimony that this
19   document, Exhibit 2, is a true and correct copy of
20   the promissory note?
21   DI          MR. PROCIDA:  Objection.  Don't answer
22        that.
23        Q.    Are you going to follow that direction?
24        A.    I am.
25        Q.    What other than communications with your
```



```
 1                      M. Strickland
 2   counsel -- well, strike that.
 3              MR. KRITZER:  I don't think that's
 4        actually a proper instruction.  I am simply
 5        asking him a foundational yes or no question
 6        whether counsel gave the witness any
 7        information that formed the basis of his
 8        testimony and he can answer that yes or no.
 9              MR. PROCIDA:  You can answer that.
10        A.    I don't believe so.
11        Q.    Okay.  Have you reviewed any copies of
12   the promissory note other than what's been filed as
13   document 63-2?
14        A.    I am sure I have.
15        Q.    When?
16        A.    At various times over the last year and
17   a half.
18        Q.    Which copies?
19        A.    Well, there was electronic copies.
20   There was many different copies I am sure.  I
21   probably printed one myself.
22        Q.    Do any of them vary from this document
23   that's 63-2?
24        A.    I don't recall any variance.
25        Q.    You can keep that one up.  I just have
```



1                    M. Strickland

2    another question for you about that document.  It's

3    paragraph 11 of your affidavit or your declaration.

4    You say, "Borrower physically delivered the note to

5    lender".  If you can -- you can either reference

6    your declaration if you choose to or not, but you

7    say in paragraph 11, "Borrower physically delivered

8    the note to lender".

9              Who is "lender" being described in that

10   paragraph?

11        A.    I believe it was the original lender.

12        Q.    So it's BMO?

13        A.    Yes.

14        Q.    How do you know that borrower physically

15   delivered a copy of the note to BMO?

16        A.    That's just upon information that I have

17   reviewed in the file.

18        Q.    What information?

19        A.    Just the normal filed documents.

20        Q.    Have you seen any evidence specifically

21   of the transmission of that note from the borrower

22   to the lender?

23        A.    Well, I guess I don't understand the

24   question because the lender obtained the original

25   document from the borrower, and how else would he



MICHAEL STRICKLAND                          July 31, 2025
Wilmington Trust vs Aevri Salina Meadows              42

```
1                    M. Strickland
2    have obtained the documents?  I just don't
3    understand.  I don't understand the question.
4         Q.    You say the "Borrower physically
5    delivered the note to lender".  How was it
6    physically delivered?
7         A.    That I don't know.
8         Q.    Was the note delivered by Federal
9    Express?
10        A.    Could be.
11        Q.    Do you know?
12        A.    I don't recall.
13        Q.    Was the note hand-delivered?
14        A.    Perhaps.
15        Q.    Do you know?
16        A.    No.
17        Q.    And you say it says, "Borrower
18   physically delivered the note to lender and
19   executed an allonge to the note in lender's favor
20   on or about April 13, 2022".
21             Let's look at that exhibit, that
22   document filed as 63-2 again.  So did the borrower,
23   in fact, execute an allonge?
24        A.    I am going to say no.
25        Q.    Who executed an allonge, if anyone?
```



1                          M. Strickland

2          A.    The original lender.

3          Q.    So the statement in your declaration

4    that "Borrower physically delivered a note to

5    lender and executed an allonge to the note in

6    lender's favor on or about April 13 2022"; is that

7    accurate?

8          A.    I say could have been worded better.

9          Q.    And you said that "A true and correct

10   copy of the allonge is affixed to the note".

11               Do you see that?

12         A.    Yes.

13         Q.    What do you mean by that?

14         A.    I mean that the allonge itself is

15   affixed to the note.

16         Q.    How so?

17         A.    Well, I imagine with a staple.  That's

18   usually how it's done.

19         Q.    You imagine that.  Have you reviewed the

20   original allonge in the promissory note?

21         A.    No.

22         Q.    Do you see any staple marks on this

23   document filed as 63-2?

24         A.    Doesn't mean that there isn't a staple.

25         Q.    That's not my question.  Do you see any



1                      M. Strickland

2    staple marks on this exhibit that's been filed as

3    63-2?

4         A.    No.

5         Q.    And you have never seen a stapled copy

6    of the promissory note with the allonge, correct?

7         A.    Correct.

8         Q.    Okay.  And in fact, if I look at Exhibit

9    63-2, wouldn't you agree with me that the allonge

10   looks like it's been scanned?

11        A.    Yes.

12        Q.    And wouldn't you agree with me that the

13   promissory note appears to have been digitally

14   printed?

15        A.    Perhaps.  I am certainly not looking at

16   an original.

17        Q.    In paragraph 15, you say "The borrower

18   initially paid the loan with comment" -- sorry.

19   You say, "The borrower initially paid the loan

20   without comment for over a year and never alleged

21   that its terms had been altered through the use of

22   detached signature pages".

23              Do you see that?

24        A.    I do.

25        Q.    Were you the servicer of the loan during



```
1                        M. Strickland
2    this time when the borrower -- you say the borrower
3    initially paid the loan?
4         A.    When you say "you", do you mean Rialto?
5         Q.    I mean you personally.
6         A.    Me personally, no.
7         Q.    And then you say, "The borrower failed
8    to make the regular monthly payment of interest and
9    escrow due under the loan documents on April 6th,
10   May 6th, and June 6, 2023".
11             Do you see that?
12        A.    I do.
13        Q.    Did you have any involvement at all with
14   this loan during the time period of 2023?
15        A.    No.
16        Q.    And then you say, "By letter dated
17   June 29, 2023, the notice of default, quote,
18   unquote, plaintiff notified borrower that an event
19   of default had occurred due to its failure to make
20   payments as and when due under the loan documents."
21             Do you see that?
22        A.    Yes.
23        Q.    Did you have any involvement with the
24   loan on or around June 29, 2023?
25        A.    I did not.
```



1                          M. Strickland

2        Q.     Paragraph 21 you make certain statements

3   regarding the restricted account, what you refer to

4   as "Restricted account under the loan agreement".

5               Do you see that?

6        A.     I'm sorry.  Which paragraph?

7        Q.     Paragraph 21.

8        A.     I see that.

9        Q.     And this refers to time periods in

10  February through October of 2022, correct?

11       A.     Correct.

12       Q.     Did you have any involvement with the

13  loan during that time period?

14       A.     No, I did not.

15       Q.     Paragraph 25 refers to a letter dated

16  August 8, 2023, correct?  Do you see that,

17  paragraph 25?

18       A.     I do.

19       Q.     Did you have any involvement with the

20  loan as of August 8, 2023?

21       A.     I did not.

22       Q.     Looking at paragraph 27, there is a

23  reference to demand made on September 16, 2023.  Do

24  you see that?

25       A.     I do.



1                      M. Strickland

2         Q.    Did you have any involvement with the

3    loan on September 16, 2023?

4         A.    I did not.

5         Q.    Paragraph 28 you make reference to

6    actions allegedly taken before November 22, 2023.

7    Do you see that?

8         A.    I'm sorry.  Which paragraph?

9         Q.    This is paragraph 28.

10        A.    I see that.

11        Q.    Did you have any involvement with the

12   loan on or before November 22, 2023?

13        A.    No, I did not.

14        Q.    In paragraph 29 you offer what you claim

15   are calculations of the unpaid balance.  Do you see

16   that?

17        A.    I do.

18        Q.    And in romanette ii you say, "Accrued

19   and unpaid interest at the non-default rate of 5.02

20   percent per annum was roughly 1.49 million".

21              Do you see that?

22        A.    I do.

23        Q.    How did you calculate that?

24        A.    The calculation was made by the master

25   servicer.  At the request of the special servicer.



```
 1                        M. Strickland
 2        Q.    So who was the master servicer?
 3        A.    This loan -- I believe it was Midlands.
 4   Midlands and P & C Bank owns I believe unless I am
 5   confusing it with another file.
 6        Q.    Who at Midlands P & C made that
 7   calculation?
 8        A.    Don't really know who would have made
 9   the calculation.
10        Q.    Did you check the calculation before you
11   put it in your declaration?
12        A.    I am sure I would have glanced over.
13        Q.    Other than glancing over, did you ensure
14   its accuracy?
15        A.    I -- I don't know of any other things I
16   would have done.
17        Q.    Romanette iii refers to late charges in
18   the amount of $62,734.92.  Do you see that?
19        A.    I do.
20        Q.    What's the basis of that calculation?
21        A.    Generally in the loan agreement there is
22   agreed upon some certain calculation if the monthly
23   payment is not made by the payment date that's
24   identified in the document, and every month that a
25   payment is not made by that date, a charge will be
```



```
 1                     M. Strickland
 2    assessed.
 3         Q.    Can you refer me to that language in the
 4    loan agreement here that's attached to your
 5    declaration?
 6         A.    Perhaps.  Where is it?
 7         Q.    Let's see.  It's probably two places.
 8    It's an exhibit to your declaration and exhibit
 9    attached to the complaint, which is also an exhibit
10    to your declaration.  If you look at Exhibit 7 to
11    the complaint, that's where it first appears.
12         A.    I will look there first.  Looking at
13    Section 2.6(d) entitled "Loan payments".  It says,
14    "If any principal interest or other sum due under
15    the loan documents other than the payment of
16    principal due on the maturity date is not paid by
17    the borrower on the date of which it is due,
18    borrower shall pay to lender upon demand an amount
19    equal to the lesser of 5 percent of such unpaid sum
20    or the maximum amount permitted by applicable law
21    in order to defray the expense incurred by the
22    lender in handling and processing such delinquent
23    payment and to compensate the lender for loss of
24    the use of such delinquent payment.  Any such
25    amount shall be secured by the security instrument
```

1                        M. Strickland

2    and other loan documents."

3         Q.    So Section 2.6(d) is the basis for the

4    late charges referenced in romanette iii of

5    paragraph 29; is that correct?

6         A.    That would be one of them I am sure.

7         Q.    What do you mean by "one of them"?

8         A.    There may be others.

9         Q.    Can you please direct me to those?  I

10   just want to know the basis of how you calculated

11   that and where it came from.

12        A.    Well, again, it was contemplated by the

13   master servicer, so they may have gone through

14   other provisions in the loan that they would

15   qualify as a late fee.

16        Q.    So can you tell me specifically how that

17   $62,000-figure in romanette iii was calculated?

18        A.    Not as I sit here today.

19        Q.    Romanette iv refers to a payoff

20   quote/verification fee in the amount of $4,500.  Do

21   you see that?

22        A.    Yes.

23        Q.    How is that calculated?

24        A.    I believe it's a fee built on behalf of

25   the master servicer to compensate it for making the



1                        M. Strickland

2     calculation involving the payoff.  Checking all the

3     numbers, et cetera.

4          Q.    Who calculated that fee?

5          A.    Master servicer.

6          Q.    Do you know how they calculated it?

7          A.    Based on the loan documents.

8          Q.    Can you please direct me to the section

9     of the loan documents it's based on?

10         A.    May be various documents.

11         Q.    Can you direct me to anything specific?

12         A.    Not as I sit here today.

13         Q.    Paragraph 5 refers to prepayment premium

14    in the amount of roughly $9.4 million.  Do you see

15    that?

16         A.    I do.

17         Q.    How was that calculated?

18         A.    Well, I believe there is a mathematical

19    formulation agreed upon in the loan documents at

20    the time that the loan is signed, knowing that it's

21    going to be securitized, that the people buying the

22    securities are expecting to receive all of the loan

23    interest payments.  So if the loan were to be paid

24    earlier, they would have to pay the majority of the

25    interest payments that would be denied them by an

1                      M. Strickland

2    early repayment of the loan.

3         Q.    Who calculated that amount in romanette

4    v in paragraph 29?

5         A.    It would have been the master servicer.

6         Q.    That's Midland?

7         A.    If they are the master servicer.  Again,

8    I have a lot of files.  Going from memory.

9         Q.    You did not personally calculate that

10   $9.4 million figure, correct?

11        A.    That's correct.

12        Q.    Did you understand how it was

13   calculated?

14        A.    Based on formulation from the loan

15   documents.

16        Q.    Can you please direct me to the

17   formulation of the loan documents?

18        A.    I can try.  I am looking at the loan

19   agreement, Section 2.7 "Prepayments".  There appear

20   to be a page based on the yield maintenance

21   referencing the REMIC default yield maintenance

22   premium, et cetera.

23        Q.    Are you able to walk me through those

24   provisions and tell me how that $9.4 million figure

25   was calculated?



1                      M. Strickland

2        A.    Probably not as I sit here today.

3        Q.    Who asked the master servicer to do

4   these calculations?

5        A.    Generally very likely myself I will say.

6        Q.    How did you ask them?

7        A.    I have a process whereby we have a

8   program where you request a payoff calculation and

9   we have an internal accounting team that

10  communicates directly with the master servicer.

11  Sort of a liaison and they would reach out to the

12  master servicer and say hey, we need a payoff for

13  this loan as of this date.  And a couple of days

14  later, they would get that back.

15       Q.    How do you receive the payoff

16  calculation?

17       A.    I receive it via e-mail.  May I get some

18  water?

19       Q.    Yes.  I should have said before at any

20  point if you want to take a break.  Why don't we

21  take a five-minute break?

22             (Recess taken.)

23       Q.    Mr. Strickland, before we took a break,

24  we were talking about the calculation of the

25  prepayment premium referenced in your declaration



```
1                      M. Strickland
2   at paragraph 29.  Do you recall that?
3        A.    Yes.
4        Q.    And you testified that you would request
5   payoff information from the master servicer and you
6   would receive the payoff calculation by e-mail.  Do
7   you recall that?
8        A.    Yes.
9        Q.    Who would send you that e-mail?
10       A.    Our internal accounting team.
11       Q.    Is there a name of a person who would
12   typically send it?
13       A.    Could be anyone on the team.  I don't
14   recall.
15       Q.    Romanette vi in paragraph 29 references
16   what you call "Separate and additional default
17   interest at the rate of 5 percent per annum in the
18   amount of roughly $2 million".
19             Do you see that?
20       A.    Yes.
21       Q.    Who calculated that?
22       A.    Probably someone on our internal team.
23       Q.    Who?
24       A.    I don't know.
25       Q.    Did you calculate that number?
```



                          M. Strickland

1

2        A.    No.

3        Q.    Do you recall who provided it to you?

4        A.    I don't.

5        Q.    How would you have received that number?

6        A.    By the same e-mail as I mentioned

7    earlier.

8        Q.    Romanette vii refers to interest on

9    advances in the amount of roughly $100,000.  Do you

10   see that?

11       A.    Yes.

12       Q.    Who calculated that?

13       A.    It would have been the master servicer.

14       Q.    How do they calculate it?

15       A.    They, first of all, would have

16   ascertained what advances were made by the trust

17   putting out money on what dates and those money

18   would be accruing at the interest rate per the loan

19   documents and they would have made the calculation

20   based from there.

21       Q.    Did you see any of the underlying

22   documents that they based that calculation on?

23       A.    I may have.  I don't know.  I don't

24   remember.

25       Q.    What, if anything, did you do to ensure



```
1                      M. Strickland
2     the accuracy of that calculation?
3          A.    I would have reviewed it.  To see what
4     advances were made on what dates.  Just generally.
5          Q.    Romanette viii refers to protective
6     advances for taxes, special servicer fees, and
7     legal fees.  Do you see that?
8          A.    Yes.
9          Q.    Who calculated that?
10         A.    Protective advances special servicer
11    fees and legal -- likely the master servicer would
12    calculate that.
13         Q.    How do they calculate that?
14         A.    They would go and see if the trust
15    advanced any, made any tax payments.  If the
16    borrower did not make them, they would ascertain
17    the special servicing fees that the trust paid and
18    they would calculate the legal bills that had
19    accrued up until that time.
20         Q.    How is Rialto paid for its services as
21    special servicer on the loan?
22         A.    They received a special servicing fee
23    per terms of the PSA.
24         Q.    How much was that fee?
25         A.    I believe it is 25 basis points per
```



```
 1                      M. Strickland
 2    annum charged monthly.
 3         Q.    So one quarter of 1 percent per year?
 4         A.    Based on UPB and possibly some other
 5    advances.  I am not sure exactly what the sort of
 6    numerator would be.
 7         Q.    I'm sorry.  What does "UPB" refer to?
 8         A.    Unpaid principal balance.
 9         Q.    Is there any other compensation that
10    Rialto receives with respect to its role as special
11    servicer?
12         A.    There can be.
13         Q.    What is it?
14         A.    If a workout was resolved, it would be a
15    workout fee.
16         Q.    How much is the workout fee?
17         A.    Depends on the agreement with the
18    parties.  Generally 1 percent or less of the UPB.
19    Sorry about the lingo.
20         Q.    Other than the workout fee and the
21    yearly/monthly servicing fees, does Rialto get paid
22    in any other way in connection with being the
23    special servicer for the loan?
24         A.    I believe that the default interest goes
25    to the special servicer.
```



1                        M. Strickland

2        Q.    So all the default interest is paid to

3   the special servicer?

4        A.    Or some split depending on transfer

5   dates.

6        Q.    And other than what you already

7   described, is there any other compensation that

8   Rialto gets as special servicer in connection with

9   the loan?

10       A.    I can't think of any.

11       Q.    Of that $1.389 million in romanette viii

12  of paragraph 29, do you know how much of that is

13  special servicer fees?

14       A.    No, not as I sit here today.

15       Q.    Do you know how much is protected

16  advances for taxes?

17       A.    No, not as I sit here today.

18       Q.    Do you know how much is legal fees?

19       A.    No, not as I sit here today.

20       Q.    Did anyone provide that information to

21  you at any time?

22       A.    Yes.

23       Q.    Sorry?

24       A.    Yes.

25       Q.    Who?



1                        M. Strickland

2        A.    Again, the team that acts as liaison for

3   master servicer would have presented that

4   information to me.

5        Q.    Would it have been provided by e-mail?

6        A.    Yes.

7        Q.    In the final clause of paragraph 29, you

8   refer to funds held in suspense, reserve, or escrow

9   accounts totalling roughly $1.7 million.  Do you

10  see that?

11       A.    I do see that reference.

12       Q.    How is that calculated?

13       A.    Well, the master servicer has certain

14  bank accounts held as reserve collateral or as

15  escrow accounts and they would get the statements

16  and add up the sums of those accounts.

17       Q.    So the master servicer calculated that

18  roughly $1.7 million figure?

19       A.    That's correct.

20       Q.    And that was provided to you by e-mail?

21       A.    Yes.

22       Q.    In connection with your affidavit, did

23  you review any e-mails to or from Peter Doyle at

24  Katten regarding the loan?

25       A.    I don't remember that I did.



```
 1                    M. Strickland
 2        Q.    Sorry.   You don't remember that you
 3   didn't or did you review?
 4        A.    I said I don't remember that I did.
 5        Q.    In connection with your declaration, did
 6   you review any e-mails to or from Mordy Book
 7   regarding the loan?
 8        A.    I don't believe so.
 9        Q.    In connection with your declaration, did
10   you review any e-mails to or from Moshe Rothman
11   regarding the loan?
12        A.    I don't recall.
13        Q.    I refer you to Exhibit 14 to your
14   declaration.   This is the last exhibit I believe to
15   it, so you can kind of flip to the back and find it
16   from there.   Document filed as 63-14, a letter from
17   Book Law Group dated February 16, 2022.   Looking in
18   the first paragraph, there is a defined term
19   "lender" that is then used throughout the document,
20   correct?
21        A.    When you say "the first paragraph", are
22   you mentioning the RE paragraph?
23        Q.    Looking at the one after "ladies and
24   gentlemen".
25        A.    So in that paragraph there is an
```



1                    M. Strickland

2    additional defined term of lender.

3         Q.    Okay and that -- that paragraph defines

4    lender as Citi Real Estate Funding Inc., correct?

5         A.    That's what it says.

6         Q.    And the trust in this case has not taken

7    assignment of the loan from Citi Real Estate

8    Funding Inc., correct?

9         A.    Because I believe that to be a

10   scrivener's error, no.

11        Q.    So just the trust in this case has not

12   taken assignment of the loan from Citi Real Estate

13   Funding Inc., correct?

14        A.    I am not under any knowledge that Citi

15   Real Estate Funding Inc. made this loan.

16        Q.    So your affidavit -- your declaration

17   rather is dated as of March 19, 2025, correct?

18        A.    Which one?

19        Q.    The declaration.

20        A.    The one we are looking at?

21        Q.    Correct.

22        A.    Okay.  March 19th.

23        Q.    And is that the date that you signed it?

24        A.    Yes.

25        Q.    Is that also the date that you reviewed



1                       M. Strickland

2     the documents that you referenced as exhibits to

3     your declaration?

4          A.    I would have reviewed them before this

5     -- this version I am sure.

6          Q.    What is the first date that you can

7     specifically recall reviewing the documents that

8     you reference as exhibits to your declaration?

9          A.    Many of them within the first month

10    after I got the loan file.

11         Q.    Do you remember which ones?  You said

12    "many of them".

13         A.    I would read documents as they -- as I

14    received them or as I had time to go through the

15    file.  I can't say with certainty what date I would

16    have reviewed any of these documents.

17         Q.    Let's mark Exhibit 2.

18              (Exhibit 2, Part of loan file

19         Bates-stamped Plaintiff-002287 through 2409,

20         marked for identification, as of this date.)

21         Q.    Have you seen this document before?  And

22    I will just note for the record Exhibit 2 has Bates

23    numbers Plaintiff-002287 through 2409.

24         A.    I may have seen this before.

25         Q.    Do you recall when?



                          M. Strickland

1

2        A.     No.

3        Q.     Is Exhibit 2 part of the loan file you

4    reviewed in connection with your declaration?

5        A.     It may have been.

6        Q.     Do you recall for certain either way?

7        A.     Not for certain.

8        Q.     Is there a reason you didn't reference

9    Exhibit 2 in your declaration?

10       A.     I don't know of any.

11       Q.     Let's look at the beginning.  It says,

12   "Loan purchase agreement" and you see it's dated

13   April 13, 2022?

14       A.     I see that.

15       Q.     It's between Bank of Montreal is the

16   seller and Barclays Commercial Mortgage Securities

17   LLC.  Do you see that?

18       A.     Okay.

19       Q.     Do you agree that's what this agreement

20   is?

21       A.     That's what it says.

22       Q.     And it says Barclays Mortgage Securities

23   is "The purchaser as defined in the agreement".  Do

24   you see that?

25       A.     I see that.



                          M. Strickland

1

2      Q.    Then in the first recital it says that

3  "The mortgage loan seller" -- which is BMO,

4  correct?

5      A.    I see that.

6      Q.    -- "desires to sell certain mortgage

7  loans identified on the schedule annexed as Exhibit

8  A".

9            Do you see that?

10     A.    Yes.

11     Q.    Now, if you look at Exhibit A, which I

12  will give you the page reference.  It's going to be

13  Plaintiff-002326.

14     A.    I have found that page.

15     Q.    Actually, I apologize.  I am going to

16  start with a different page.  This will be 2318 on

17  that page.  You have sequence number 15, BMO Salina

18  Meadows Office Park.  Do you see that?

19     A.    Yes.

20     Q.    Refers to a loan in the original balance

21  of $25 million, correct?

22     A.    Correct.

23     Q.    Relates to 200, 220, 231, and 301

24  Plainfield Road.  Do you see that?

25     A.    I do.



M. Strickland

1

2      Q.    Would you agree with me that's the same

3  loan we have been discussing today involved with

4  this case?

5      A.    Certainly it appears to be.

6      Q.    And then if you look through the

7  following pages, there are a number of references

8  at sequence number 15 to that same loan, correct?

9      A.    I see that as well.

10     Q.    So you agree with me that the loan

11  involved in this case is one of the mortgage loans

12  identified on Schedule A -- sorry, Exhibit A to the

13  document that we marked as Exhibit 2, correct?

14     A.    Yes.

15     Q.    If you look at the last sentence on the

16  first page, it states, "It is anticipated that the

17  purchaser will transfer the mortgage loans to the

18  trustee on behalf of the trust contemporaneously

19  with its purchase of the mortgage loans hereunder".

20         Do you see that?

21     A.    I do see that.

22     Q.    And purchaser again is defined as

23  Barclays, right?

24     A.    Yes.

25     Q.    Do you know whether that happened?



1                          M. Strickland

2        A.    I believe that it did.

3        Q.    Barclays transferred loans to the

4   trustee?

5        A.    Yes.

6        Q.    Where are the documents indicating that

7   Barclays transferred loans to the trustee?

8        A.    Well, I would look at the -- okay, so --

9   it's possible that the loan went straight from BMO

10  to the trust.  And the trustee.

11       Q.    Do you know whether that's what

12  happened?

13       A.    I don't remember on this particular

14  security.

15       Q.    If you look at paragraph 1, it says

16  "Agreement to purchase".  Do you see that?

17       A.    Yes.

18       Q.    It says, "The mortgage loan seller

19  agrees to sell, assign, transfer, set over, and

20  otherwise convey to the purchaser without recourse,

21  representation, or warranty other than as set forth

22  herein, and the purchaser agrees to purchase from

23  the mortgage loan seller subject to the terms and

24  conditions set forth herein, the mortgage loans."

25             Do you see that?



                         M. Strickland

1
2        A.    I see that.
3        Q.    And those mortgage loans include the
4  loan in this case, correct?
5        A.    I believe so.
6        Q.    So that is BMO agreeing to sell these
7  loans to Barclays, right?
8        A.    Sure.
9        Q.    And Section 2 there is a paragraph
10  titled "Conveyance for the mortgage loans".
11        Do you see that?
12        A.    I do.
13        Q.    It says, "Effective as of the closing
14  date, subject only to receipt of the purchase price
15  referred to in Section 1 hereof and the
16  satisfaction of the other conditions to the
17  mortgage loan seller's obligations set forth
18  herein, the mortgage loan seller does hereby sell,
19  assign, transfer, set over, and otherwise convey to
20  the purchaser without recourse, representation, or
21  warranty, other than as set forth herein, all of
22  the right, title, and interest of the mortgage loan
23  seller in, to, and under the mortgage loans and all
24  documents included in the mortgage files and
25  servicing files with the understanding that a



                        M. Strickland

 1
 2   servicing rights purchase and sale agreement or
 3   comparable agreement may be executed by the
 4   mortgage loan seller and the master servicer."
 5             Do you see that?
 6        A.    I do.
 7        Q.    Was that term, to the best of your
 8   knowledge, ever rescinded?
 9        A.    I am not aware of that.
10        Q.    Was the purchase price referenced in
11   Section 1 paid?
12        A.    As I sit here today, I don't know.
13        Q.    And it says in paragraph B of Section 2,
14   "The conveyance of the mortgage loans and the
15   related rights and property accomplished hereby is
16   intended by the parties hereto to constitute a sale
17   by the mortgage loan seller of all the mortgage
18   loan seller's right, title, and interest in and to
19   such mortgage loans and such other related rights
20   and property by the mortgage loan seller to the
21   purchaser".
22             Do you see that?
23        A.    I do.
24        Q.    To the best of your knowledge, was that
25   Section 2(b) ever rescinded?



1                       M. Strickland

2         A.    I am not aware whether it was or wasn't.

3         Q.    If you look at Plaintiff-002315, this

4   document was signed by a gentleman named Michael

5   Birajiclian, B-I-R-A-J-I-E-L-I-A-N?

6         A.    I read that as J-I-C.

7         Q.    Oh, okay.  It's very difficult -- okay,

8   sure.  I will take your reading.  At Bank of

9   Montreal.  Do you see that?

10        A.    Yes.

11        Q.    And it says he was an authorized

12  signatory.  Do you see that?

13        A.    I do.

14        Q.    Was Mr. Birajiclian, in fact, an

15  authorized signatory for the Bank of Montreal?

16        A.    I must assume he was.

17        Q.    For Barclays Commercial Mortgage

18  Securities, was this document signed by Larry

19  Kravetz?

20        A.    It appears to be.

21        Q.    And this document states that on the

22  first page that it's dated and effective as of

23  April 13, 2022.  Do you see that?

24        A.    Okay.

25        Q.    Do you believe that to be accurate?



```
 1                        M. Strickland
 2        A.    I don't have any reason to doubt it.
 3        Q.    Do you have any reason to doubt that
 4   this Exhibit 2 is an authentic document?
 5        A.    I don't.
 6        Q.    If you recall, the allonge to the
 7   promissory note is also dated April 13, 2022,
 8   correct?
 9        A.    Okay.
10        Q.    So on the same date, BMO executed an
11   allonge to the trust and an assignment in this
12   mortgage loan purchase agreement to Barclays,
13   correct?
14        A.    Okay.  I -- looking at the documents,
15   that's what it appears.
16        Q.    Why did you not lay those facts out in
17   your declaration?
18        A.    I don't know as I sit here today.
19        Q.    Do you know why the parties entered into
20   these two transactions on the same day?
21        A.    No.  Other than to accomplish the
22   purchase and sale of this set of loans.
23        Q.    And are you aware of any other
24   communications between BMO and Barclays that relate
25   to Exhibit 2?
```



1                        M. Strickland

2          A.    There may be.  I can't recall as I sit

3     here today.

4          Q.    Before signing your declaration in this

5     case, did you do anything to investigate why

6     Exhibit 2 and the allonge to the note filed were

7     signed and executed on the same day?

8          A.    I don't recall.

9          Q.    Have you spoken to anybody at Barclays

10    about that fact?

11         A.    I have not.

12         Q.    Have you spoken to anyone at BMO about

13    that fact?

14         A.    I have not.

15         Q.    Exhibit 3.

16              (Exhibit 3, Documents Bates-stamped

17         Plaintiff-010360 through 381, marked for

18         identification, as of this date.)

19         Q.    Have you seen Exhibit 3 before?

20         A.    I believe that I have.

21         Q.    In what context?

22         A.    In the course of this litigation.

23         Q.    So this document, first of all, for the

24    record is Bates numbers Plaintiff-010360 through

25    381.  And the first page of the exhibit is a



MICHAEL STRICKLAND                                July 31, 2025
Wilmington Trust vs Aevri Salina Meadows                    72

1                      M. Strickland

2  Federal Express label, correct?

3       A.    I do see that.

4       Q.    And it's marked that it's been scanned.

5  Do you see that?

6       A.    I see that as well.

7       Q.    Do you know how Rialto came to be in

8  possession of this document?

9       A.    It's my understanding that it was in the

10  custodian file.

11      Q.    What do you mean custodian file?

12      A.    The custodian of records.

13      Q.    Who is the custodian of records?

14      A.    May I refer back to Exhibit 2?

15      Q.    Sure.

16      A.    Because in my head I want to say Wells

17  Fargo, but I also want to say Computershare.  They

18  had a merger, and I am not sure when they took over

19  that business.  Pretty sure it's spelled out in

20  here.  It's on Plaintiff-2402.  The custodian is

21  Computershare Trust Company, but you can see the

22  e-mail is CMBScustody@Wells Fargo, so again, I am

23  pretty sure they bought that unit as Wells Fargo

24  was divesting assets so probably the same people

25  but it's Computershare.



MICHAEL STRICKLAND                                    July 31, 2025
Wilmington Trust vs Aevri Salina Meadows                    73

```
 1                      M. Strickland
 2       Q.    How was Rialto able to access Exhibit 3?
 3       A.    Well, in the course of litigation, I or
 4  one of the -- could have been Joao before me.  One
 5  of us would have requested the custodian to send
 6  certain of the documents or all the documents to
 7  counsel, and we would review those documents.  And
 8  it's my understanding these were in the file.
 9       Q.    And you are aware from your experience
10  in litigation that that discovery is typically
11  exchanged during litigation?
12       A.    Okay.
13       Q.    Are you aware that document requests
14  have been served on Rialto in this matter?
15       A.    I believe so, yes.
16       Q.    Did you, at any point, search your
17  e-mail for documents that were responsive to those
18  requests?
19       A.    Me personally, no.
20       Q.    Did you provide access to anybody else
21  to search your e-mail for documents responsive to
22  those requests?
23       A.    We have an internal legal team that
24  assembles production.
25       Q.    Who is on that internal legal team?
```



```
1                        M. Strickland
2         A.    I don't know.  Our legal department.  I
3    don't know who handles it.
4         Q.    Does Rialto, to the best of your
5    knowledge, have any document retention policies?
6         A.    Yes.
7         Q.    What do those policies require in terms
8    of document retention?
9         A.    Well, they are very lengthy.  I am sure
10   I read them at some point, but generally there is
11   warehousing of documents.  I am told the trust is
12   wound down and any litigation pending is closed and
13   usually they ship it to Iron Mountain thereafter.
14        Q.    To your knowledge, does Rialto have
15   document retention policies that apply to e-mail?
16        A.    Yes.
17        Q.    What do you understand those policies to
18   be?
19        A.    Save your e-mails.  Put them in folders.
20   IT can catalog them.
21        Q.    Is there any roll-off period for e-mails
22   from Rialto's system?
23        A.    There may be but it's years.  Eight to
24   ten years if I recall.  It's been a long time since
25   I read that.  I apologize.
```



1                    M. Strickland

2        Q.    Turning back to Exhibit 3, what do you

3   understand this document to be?

4        A.    My understanding was that Mr. Book is

5   required to send his opinion letter to the closing

6   attorney and aside from his earlier noted

7   scrivener's error also included another document

8   probably by accident.

9        Q.    And the document that you referred to as

10  another document on -- refers to Citi Real Estate

11  Funding Inc., correct?

12       A.    They refer to Plaintiff 10362 up until

13  10370.

14       Q.    And that document was signed by Mr.

15  Book, correct?

16       A.    It appears to be yes.

17       Q.    That document is dated February 17,

18  2022, correct?

19       A.    That is correct.

20       Q.    And the document that you refer to as

21  containing scrivener's error is dated February 16,

22  2022, correct?

23       A.    Correct.

24       Q.    And these documents were received by Mr.

25  Doyle on February 18, 2022, correct?



1                           M. Strickland

2          A.     That's what is implied by the mark here,

3    yes.

4          Q.     Are you aware of any other transmission

5    whereby Mr. Book provided an opinion letter to Mr.

6    Doyle other than what's in Exhibit 3?

7          A.     I can't recall any as I sit here today.

8          Q.     Are you aware of any correspondence

9    between Mr. Doyle and Mr. Book addressing the

10   inconsistency between the February 17th and

11   February 16th letters in the February 18th FedEx?

12         A.     I don't recall as I sit here today.

13         Q.     Do you know whether any additional

14   documents were included in the FedEx sent as

15   Exhibit 3?

16         A.     I am not sure.

17         Q.     Do you know whether Mr. Book sent a

18   physical copy of a promissory note to Katten?

19         A.     I don't know.  I don't know.  I am

20   assuming we didn't.

21         Q.     But you don't know, correct?

22         A.     Correct.

23         Q.     Do you have a Federal Express label or

24   any other similar evidence of chain of custody for

25   a physical copy of the promissory note evidencing



```
 1                    M. Strickland
 2    the loan?
 3         A.    Can you repeat the question, please?
 4         Q.    Do you have a Federal Express label or
 5    any other similar evidence of chain of custody for
 6    a physical copy of the promissory note evidencing
 7    the loan?
 8         A.    Maybe.  I don't know.
 9         Q.    Is Rialto in physical possession of an
10    original copy of the promissory note?
11         A.    When you say "Rialto", do you mean the
12    plaintiff?  The lender?  Just Rialto?
13         Q.    Rialto.
14         A.    No.
15         Q.    Is Wilmington Trust in possession of a
16    physical copy of the promissory note?
17         A.    No.
18         Q.    Do you know where the original physical
19    copy of the promissory note resides?
20         A.    It's with Mr. Procida.  It was sent to
21    his law firm.
22         Q.    By who?
23         A.    By custodian.
24         Q.    By Computershare?
25         A.    Yes.
```



```
 1                     M. Strickland
 2       Q.    But you have never examined a physical
 3  copy of the promissory note, correct?
 4       A.    That's correct.
 5       Q.    We can take another break.  I think I
 6  probably have one session left, and we can try to
 7  wrap up before lunch.  I just want to get
 8  organized.
 9             (Recess taken.)
10       Q.    Mr. Strickland, to the best of your
11  memory, how much time did you spend on the
12  declaration that we marked as Exhibit 1?
13       A.    Probably a couple of hours.
14       Q.    And what did you do to prepare for this
15  deposition?
16       A.    Looked over the loan file, the
17  pleadings.  Some of the files for the documents.
18       Q.    Anything else?
19       A.    I -- maybe.  I can't think of anything
20  else.
21       Q.    Did you meet with your counsel to
22  prepare for this deposition?
23       A.    I did.
24       Q.    I am not asking for the contents of any
25  discussions, but how many times did you meet with
```



```
 1                      M. Strickland
 2    your counsel to prepare for this deposition?
 3         A.    We had a telephonic session recently,
 4    and we spent yesterday going over the -- the
 5    deposition prep.  I would call it depo prep.
 6         Q.    So you had two meetings with your
 7    counsel to prepare for this deposition?
 8         A.    Yes.
 9         Q.    About how long was the phone call you
10    referenced?
11         A.    I don't know.
12         Q.    Was it more than an hour?
13         A.    I don't recall.
14         Q.    And you said you spent yesterday meeting
15    with your counsel.  Was that an all-day meeting?
16              (Continued onto next page to include
17          jurat.)
18
19
20
21
22
23
24
25
```



```
 1                    M. Strickland

 2        A.    Yes.

 3        Q.    So I am going to end the deposition

 4   here.  I will just say there are a number of

 5   references to e-mail communications that would be

 6   relevant and responsive, and we have received next

 7   to no e-mail communications with Mr. Strickland in

 8   the production, so we are going to reserve the

 9   right to spend some additional time deposing you

10   that may or may not be necessary.  We can speak to

11   counsel about it off the record in the coming days,

12   but subject to that reservation, I have no further

13   questions at this time.

14            MR. PROCIDA:  We have no questions.

15            (Time noted: 11:46 a.m.)

16        _____.

17        MICHAEL STRICKLAND

18

19   Subscribed and sworn to before me

20   this ____ day of _____, 2025.

21

22   _____

23

24

25
```



```
 1                    M. Strickland
 2              C E R T I F I C A T E
 3   STATE OF NEW YORK      )
 4                         : ss.
 5   COUNTY OF QUEENS       )
 6
 7          I, YAFFA KAPLAN, a Notary Public
 8       within and for the State of New York, do
 9       hereby certify:
10          That MICHAEL STRICKLAND, the witness
11       whose deposition is hereinbefore set forth,
12       was duly sworn by me and that such
13       deposition is a true record of the
14       testimony given by the witness.
15          I further certify that I am not
16       related to any of the parties to this
17       action by blood or marriage, and that I am
18       in no way interested in the outcome of this
19       matter.
20          IN WITNESS WHEREOF, I have hereunto
21       set my hand this 6th day of August, 2025.
22
23       _____
24              YAFFA KAPLAN
25
```



```
 1

 2       ----------------- I N D E X ---------------

 3     WITNESS                EXAMINATION BY         PAGE

 4     Michael Strickland    Mr. Kritzer               5

 5

 6       ----------- INFORMATION REQUESTS -----------

 7     DIRECTIONS: 24, 39

 8     RULINGS:

 9     TO BE FURNISHED:

10     REQUESTS:

11     MOTIONS:

12

13       ----------------- EXHIBITS -----------------

14     EXHIBIT                              FOR ID.

15     Exhibit 1  Declaration                   25

16     Exhibit 2  Part of loan file Bates-stamped

17               Plaintiff-002287 through 2409     62

18     Exhibit 3  Documents Bates-stamped

19               Plaintiff-010360 through 381     71

20

21

22

23

24

25
```



MICHAEL STRICKLAND                              July 31, 2025
Wilmington Trust vs Aevri Salina Meadows              83

```
 1
 2               DEPOSITION ERRATA SHEET
 3    Our Assignment No. 13269000
 4    CASE NAME: Wilmington vs. Aevri
 5
 6      DECLARATION UNDER PENALTY OF PERJURY
 7         I declare under penalty of perjury
 8    that I have read the entire transcript of
 9    my Deposition taken in the captioned matter
10    or the same has been read to me, and
11    the same is true and accurate, same and
12    except for changes and/or corrections, if
13    any, as indicated by me on the DEPOSITION
14    ERRATA SHEET hereof, with the understanding
15    that I offer these changes as if still under
16    oath.
17    _____
18           MICHAEL STRICKLAND
19    Subscribed and sworn to on the _____ day of
20    _____, 2025 before me,
21    _____
22    Notary Public,
23    in and for the State of _____
24
25
```



1

2                    DEPOSITION ERRATA SHEET

3    Page No._____Line No.____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No.____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No.____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No.____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No.____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No.____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No.____Change to:_____

22   _____

23   Reason for change:_____

24   SIGNATURE:_____DATE:_____

25                    MICHAEL STRICKLAND



```
1
2                    DEPOSITION ERRATA SHEET
3     Page No._____Line No.____Change to:_____
4     _____
5     Reason for change:_____
6     Page No._____Line No.____Change to:_____
7     _____
8     Reason for change:_____
9     Page No._____Line No.____Change to:_____
10    _____
11    Reason for change:_____
12    Page No._____Line No.____Change to:_____
13    _____
14    Reason for change:_____
15    Page No._____Line No.____Change to:_____
16    _____
17    Reason for change:_____
18    Page No._____Line No.____Change to:_____
19    _____
20    Reason for change:_____
21    Page No._____Line No.____Change to:_____
22    _____
23    Reason for change:_____
24    SIGNATURE:_____DATE:_____
25                    MICHAEL STRICKLAND
```

